# EXHIBIT 27

1                          L. Ori

2              UNITED STATES DISTRICT COURT

3              EASTERN DISTRICT OF MISSOURI

4                     EASTERN DIVISION

5   AWARE PRODUCTS LLC D/B/A    )
    VOYANT BEAUTY,              )
6                               )
                    Plaintiff,  )
7                               )
              vs.               )     No. 4:21-cv-249-JCH
8                               )
    EPICURE MEDICAL, LLC,       )
9   FOXHOLE MEDICAL, LLC, and   )
    LEE ORI,                    )
10                              )
                    Defendants. )

11

12     REMOTE VIDEOTAPED DEPOSITION OF LEE ORI

13                  March 24, 2022

14

15

16

17

18

19

20   Reported by:

21   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

22

23

24

25   JOB NO. 208140

Page 2

```
1                    L. Ori
2              March 24, 2022
3
4        REMOTE videotaped deposition of
5   LEE ORI, before Kathy S. Klepfer, a
6   Registered Professional Reporter,
7   Registered Merit Reporter, Certified
8   Realtime Reporter, Certified Livenote
9   Reporter, and Notary Public of the State
10  of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                    L. Ori
2              A P P E A R A N C E S:
3              (All Appearing Remotely)
4
5   SHER TREMONTE
6   Attorneys for Plaintiff
7        90 Broad Street
8   New York, NY 10004
9   BY:  JUSTIN GUNNELL, ESQ.
10       ROBERT PENN, JR., ESQ.
11
12  KORANTENG LAW FIRM
13  Attorneys for Defendants
14       5050 Quorum Drive
15       Dallas, TX 75254
16  BY:  FIBBENS KORANTENG, ESQ.
17
18
19  ALSO PRESENT:
20       TRISHA VON LANKEN, Videographer
21
22
23
24
25
```

Page 4

```
1                    L. Ori
2                    INDEX
3   TESTIMONY OF LEE ORI                    PAGE
4   MR. GUNNELL ...............................   9
5   MR. KORANTENG .............................
6
7   ORI EXHIBITS:                           PAGE
8   Exhibit 1, LinkedIn profile of Lee Ori   26
9   Exhibit 2, Picture from website RCTherapy.com  33
10  Exhibit 3, Document titled "Missouri Board of  40
    Pharmacy Newsletter," dated August 2016
11
    Exhibit 4, Document of three pages titled,   44
12  "Michigan Board of Pharmacy Disciplinary
    Subcommittee"
13
    Exhibit 5, Collection of Foxhole formation   56
14  documents, Bates-stamped DEF3744 to DEF3793
15  Exhibit 6, Document titled, "Account         62
    Agreement," Bates-stamped DEF0031
16
    Exhibit 7, Document titled, "Epicure Medical, 77
17  LLC, Organization Chart," Bates-stamped DEF3683
18  Exhibit 8, Document titled "Epicure Medical,  87
    LLC, Limited Liability Company Operating
19  Agreement," Bates-stamped DEF3505 to DEF3545
20  Exhibit 9, Document titled "Account          91
    Agreement," Bates-stamped DEF0030
21
    Exhibit 10, Sales brochure from Epicure's    111
22  website
23  Exhibit 11, E-mail chain, Bates-stamped DEF1139  121
    to DEF1146
24
    Exhibit 12, Letter on Foxhole Medical        134
25  letterhead, Bates-stamped DEF3835
```

Page 5

```
1                    L. Ori
2              INDEX (Cont'd.)
3   ORI EXHIBITS:                           PAGE
4   Exhibit 13, E-mail chain with attachment,    142
    Bates-stamped DEF4592 to DEF4595
5
    Exhibit 14, Epicure Medical, LLC Purchase    149
6   Orders, consisting of eight pages,
    Bates-stamped DEF4741 to DEF4748
7
    Exhibit 15, E-mail chain dated April 22, 2020,  162
8   Bates-stamped DEF4659 to DEF4660
9   Exhibit 16, Document entitled, "Promissory   167
    Note," Bates-stamped Bates-stamped DEF4737 to
10  DEF4740
11  Exhibit 17, E-mail chain, Bates-stamped      177
    Bates-stamped DEF0736 to DEF0737
12
    Exhibit 18, E-mails starting with e-mail from  181
13  Mark Murray at Triad Bank, Bates-stamped
    DEF0702 to DEF0703
14
    Exhibit 19, e-mail from                      183
15  LeeOri@EpicureMedical.com, Bates-stamped
    DEF0572
16
    Exhibit 20, Letter from Epicure Medical to   194
17  Michael Partridge at Voyant dated June 4, 2020,
    Bates-stamped DEF3680
18
    Exhibit 21, E-mail chain with attachment,    199
19  Bates-stamped DEF1646
20  Exhibit 22, E-mail chain with top e-mail from  207
    Lee Ori at Epicure Medical to Epicure Medical
21  accounting, Bates-stamped DEF3872 to DEF3875
22  Exhibit 23, E-mail from Lee Ori to Dan Reilly,  215
    Bates-stamped DEF0774 to DEF0775
23
    Exhibit 24, E-mail chain with top e-mail from  217
24  Lee Ori to Michael Partridge and Paul Heslin,
    with CC to Dan Reilly, Bates-stamped DEF0635 to
25  DEF0637
```

Page 6

L. Ori

INDEX (Cont'd.)

ORI EXHIBITS:                                                    PAGE
Exhibit 25, E-mail chain Bates-stamped DEF0421        221
to DEF0422

Exhibit 26, E-mails Bates-stamped DEF0610 to          225
DEF0611

Exhibit 27, E-mails with top e-mail from Lee          237
Ori to Linda Ragsdale, Bates-stamped DEF0426 to
DEF0427

Exhibit 28, Notice from Voyant to Epicure             239
Medical, Bates-stamped AWAREVOYANT003784 to
AWAREVOYANT003786

Exhibit 29, Document titled, "Foxhole                 242
Corporation Balance Sheet as of December 31,
2020," Bates-stamped DEF3741 to DEF3743

Exhibit 30, Document titled, "Foxhole Medical,        247
LLC Balance Sheet as of December 31, 2021,"
Bates-stamped DEF004807 to DEF004810

Exhibit 31, Document titled, "Epicure Medical         252
Balance Sheet as of December 31, 2020,"
Bates-stamped DEF3495 to DEF3497

Exhibit 32, Document titled, "Epicure Medical         256
Balance Sheet As of December 31, 2021,"
Bates-stamped DEF004803 to DEF004806

REQUESTS FOR PRODUCTION:
Page 13:2

Page 7

L. Ori

THE VIDEOGRAPHER:  Good morning, counselors.  My name is Trisha Von Lanken, and I'm a certified legal videographer in association with TSG Reporting.

Due to the severity of COVID-19 and following the practice of social distancing, I will not be in the same room with the witness.  Instead, I will record this videotaped deposition remotely.

The court reporter, Kathy Klepfer, also will not be in the same room and will swear the witness remotely.

Do all parties stipulate to the validity of this video recording and remote swearing, and that it will be admissible in the courtroom as if it had been taken following Rule 30 of the Federal Rules of Civil Procedures and the state's rules where this case is pending?

Do all agree?

MR. KORANTENG:  Yes.

MR. GUNNELL:  Yes.

THE VIDEOGRAPHER:  Thank you.

This is the start of media labeled

Page 8

L. Ori

number 1 of the video-recorded deposition of Lee Ori in the matter of Aware Products LLC, doing business as Voyant Beauty versus Epicure Medical, LLC, et al., in the United States District Court, Eastern District of Missouri, Eastern Division, Case No. 4:21-cv-249-JCH.

This deposition is being held remotely on Thursday, March 24, 2022 at approximately 9:32 a.m.

Counsel, will you introduce yourselves and the parties you represent, after which the court reporter will swear in the witness.

MR. GUNNELL:  Good morning.  My name is Justin Gunnell from Sher Tremonte, and I represent the plaintiff Aware Products LLC, doing business as Voyant Beauty.

I am also here with my colleague Robert Penn.

MR. KORANTENG:  Good morning.  This is Fibbens Koranteng, and I represent Lee Ori, Foxhole Medical, LLC and Epicure Medical, LLC, all defendants in this case.

Page 9

L. Ori

* * *

LEE ORI,  called as a
    witness, having been duly sworn by a Notary
    Public, was examined and testified as
    follows:

EXAMINATION BY
MR. GUNNELL:

Q.    Good morning, Mr. Ori.

A.    Good morning.

Q.    My name is Justin Gunnell.  As I mentioned, this is my colleague Robert Penn.  We represent the plaintiff in this action, Aware Products LLC, doing business as Voyant Beauty, who I will refer to today as "Voyant."

I want to just go over a few ground rules.  Today I'm going to ask you a series of questions.  Everything is recorded, both on video and by a stenographer.

The court reporter can only take down verbal answers and cannot take down more than one person at a time.  So let's try not speak over one another.  I'll do my best not to speak over you when you're giving an answer, and please do your best not to speak over me when

L. Ori

1  I'm asking a question.
2
3         And this is particularly true in a
4  remote environment like we have today:  If you
5  don't understand a question that I am phrasing
6  to you, please ask me to rephrase it.
7         If you need a break, I will do my best
8  to accommodate you, but I ask that you answer
9  the question pending at the time before we
10 break.
11        Your counsel may make objections
12 today.  They are for the record only, and unless
13 you are specifically instructed not to answer,
14 you must still answer the question.
15        Do you understand?
16    A.   Yes.
17    Q.   Did you do anything to prepare for
18 your deposition today?
19    A.   Read through all of the e-mails, all
20 the documents provided by both parties.
21    Q.   Did you meet with your counsel?
22    A.   Over the phone.
23    Q.   When?
24    A.   Yesterday.
25    Q.   For how long?

L. Ori

1
2    A.   Hour-and-a-half.
3    Q.   And did you review specific documents
4  together?
5    A.   No, it was more him -- there was a few
6  items that we needed to get for you, and the
7  documents that were discussed were the
8  documents -- the e-mails or documents that were
9  discussed were things that we needed to get to
10 you.  So I spent some time making sure to
11 facilitate that.
12    Q.   Are there any documents in particular
13 that you're -- that you recall that you
14 reviewed?
15    A.   All of them.
16    Q.   When you say "all of them," you mean
17 all of the documents that were produced in this
18 case or...
19    A.   I reviewed all documents that were
20 presented by Voyant as well as myself.
21    Q.   And those would be documents that your
22 counsel provided to us?
23    A.   Correct.
24    Q.   And you understand that you're under
25 oath today?

L. Ori

1
2    A.   Yes, sir.
3    Q.   And you understand if you don't
4  provide truthful answers to the questions that I
5  pose, that would be considered perjury?
6    A.   Sure.
7    Q.   And is there any reason you cannot
8  testify truthfully today?
9    A.   No.
10    Q.   Today we're taking this deposition in
11 a remote setting, so I have a couple of ground
12 rules related to this unique forum and some
13 questions.
14        Is anyone else in the room with you
15 where you are today?
16    A.   No.  I am by myself.
17    Q.   I would ask if anyone enters the room
18 at any time that you please let me know.
19        Are you looking at anything other than
20 the screen upon which the deposition is being
21 taken?
22    A.   I have a notepad of which I'm taking
23 notes on.  Other than that, I have no documents
24 in front of me.  I have no documents on my
25 computer nor in front of me.

L. Ori

1
2    Q.   Okay.  I would call for the production
3  of any notes that you take during the
4  deposition.
5         Unless I instruct you otherwise,
6  please do not look at anything else while we're
7  on the record.  I ask that you answer all the
8  questions by yourself.  Don't look to anyone for
9  help in answering the questions, and if you
10 cannot answer a question by yourself, just let
11 me know.
12        I would ask that we agree not -- that
13 you agree not to communicate with anyone else
14 besides me while we're on the record.
15        Do you agree to that?
16    A.   Yes.
17    Q.   That includes checking e-mails, text
18 messages, and things of that nature.
19        Do you understand?
20    A.   Yes.
21    Q.   Okay.  And you -- you are here today
22 as Lee Ori, the individual, correct?
23    A.   Correct.
24    Q.   And as a representative of Foxhole
25 Medical, LLC?

Page 14

L. Ori

1
2     A.    Correct.
3     Q.    And as a representative of Epicure
4  Medical, LLC?
5     A.    Correct.
6     Q.    And you yourself, can you talk a
7  little bit about your schooling after high
8  school?
9     A.    Sure.
10          Attended Wallace State Community
11  College for two years, transferred to Auburn
12  University my junior year.
13          Started my tenure at Auburn in
14  chemical engineering.  Realized it wasn't for
15  me.  Ultimately, applied to pharmacy school, was
16  accepted, and I completed my bachelor's and
17  doctorate of pharmacy.
18     Q.    And where did you do your bachelor's?
19     A.    All -- all degrees are from Auburn.
20     Q.    And where is Auburn?
21     A.    Auburn University in Alabama.
22     Q.    And how long were you there?  Did you
23  go straight through?
24     A.    Yes.  Yes.  Ultimately, I was at
25  Auburn for six years due to the changing of

Page 15

L. Ori

1
2  majors.
3     Q.    And you received a BA degree or BS
4  degree and a pharm -- pharmacy degree?
5     A.    A Pharm.D., yes, both a bachelor's and
6  a doctorate of pharmacy.
7     Q.    And is it -- it's a BA, a bachelor of
8  art, or bachelor of science?
9     A.    Bachelor's of science.
10     Q.    Uh-huh.  Okay.  And then after you
11  received your pharmacy license, can you take me
12  through your work history?
13     A.    I started out with Eli Lilly in
14  pharmaceutical sales.  And from there, I decided
15  I was going to open my own pharmacy, and I left
16  Eli Lilly and I worked for both Schnucks
17  Supermarket Pharmacy in St. Louis, Missouri as
18  well as Express Scripts for I'm going to say a
19  year.  I mean, ultimately, I stayed there about
20  a year-and-a-half with Schnucks anyway.
21          Opened -- so I left Lilly in January
22  of 2002, and I opened my pharmacy January of
23  '03.  So about a year later.
24          So I worked -- worked there -- worked
25  for Schnucks and Express Scripts during that

Page 16

L. Ori

1
2  year, and then I stayed with Schnucks through
3  around June/July of 2003.  Since then, I've --
4  I've owned and operated my -- my own pharmacies.
5     Q.    And after you left Schnuck, you
6  started your own pharmacy?
7     A.    Well, I started the pharmacy in
8  January of '03.  I stayed on Schnucks part-time
9  through the summer.
10     Q.    I see.
11     A.    Of '03.  Through June or July of '03.
12     Q.    And what was the name of the pharmacy
13  you opened?
14     A.    Specialty Pharmacy of St. Louis.
15     Q.    And how many locations did it have?
16     A.    Specialty Pharmacy was only the one.
17     Q.    And did you open other pharmacies?
18     A.    Yes, sir.
19     Q.    What were their names?
20     A.    The -- I had -- shoot, I'm blanking on
21  the name.
22          I wound up opening two -- two
23  pharmacies in St. Louis, and I had pharmacies in
24  Scottsdale, Arizona and Las Vegas, Nevada at one
25  point, all part of the same -- same structure.

Page 17

L. Ori

1
2  I am honestly blanking on the name of the
3  pharmacy without looking at my notes.  They --
4  they were closed-door pharmacies, and I'm
5  blanking on the name.
6     Q.    And how many -- I guess after you
7  started Specialty, how many locations --
8  pharmacy locations, did you own?
9     A.    At one point, I owned three in
10  St. Louis plus Arizona, plus Nevada, so five at
11  one point.
12     Q.    So three in St. Louis, one in Arizona,
13  one in Nevada.  Five total?
14     A.    Yes, sir.
15     Q.    And were they all operating at the
16  same time?
17     A.    Yes, sir.
18     Q.    And what happened to them?
19     A.    The client that we were servicing
20  abruptly went bankrupt and went out of business,
21  and they were the -- it was the only client for
22  the -- for the four pharmacies that weren't
23  specialty, and so when the pharmacy went --
24  excuse me, the client went away, the need for
25  the pharmacies did also.

L. Ori

1                 L. Ori
2   tremendous resource for sterile, and so she
3   did -- so injectables.  So I would lean on her
4   for help as it -- as I might need it for
5   sterile, if I had questions.  And that's how we
6   developed our relationship.
7        Q.    And when was Foxhole formed?
8        A.    Early 2018.  I believe it was March.
9        Q.    And I -- and I believe you said -- let
10  me just ask you:  Who formed it?
11       A.    It was formed in Missouri.  I believe
12  Fibbens did.
13       Q.    And by that you mean he filed the
14  necessary paperwork to set up the LLC?
15       A.    Correct.
16       Q.    And who were its members?
17       A.    Oh, so Sarah and myself.  Sorry.  I
18  misunderstood the question.
19       Q.    That's okay.  That's a relevant point
20  too.  So we got that out there.
21             And are you involved -- I think the
22  answer to this is yes, but let me just ask you
23  to go through it.  What other business ventures
24  were you involved in with Ms. Simmers?
25       A.    Other than Epicure, that's nothing

L. Ori

1   that hasn't been named.  We -- we have PFL,
2   which was going to be a holding company.  It's
3   of no -- it does no business, and -- and so we
4   have that together.
5             Obviously, she -- other than what I've
6   talked about, the other entities that we
7   discussed previously.  Off the top of my head, I
8   don't believe we have anything else.
9        Q.    And in terms of the PFL entity, is
10  that an LLC?
11       A.    Yes, sir.
12       Q.    And who are its members?
13       A.    Just the two of us.
14       Q.    And --
15       A.    Sarah and --
16       Q.    Sorry.  Go ahead.
17       A.    Sarah and Lee.
18       Q.    And who are its managers?
19       A.    Both of us.
20       Q.    And what is the ownership percentage
21  of the membership?
22       A.    50/50.
23       Q.    Okay.  And who are the managers of
24  Foxhole Medical, LLC?

L. Ori

1        A.    Sarah and myself.
2        Q.    And how did Foxhole generate its
3   revenue?
4        A.    Consulting.  Well -- well, originally
5   we started as consulting.  We -- we moved into
6   CBD.  We -- we started -- got an opportunity
7   to -- to do -- you know, again, as part of what
8   we do, being pharmacists, we got the opportunity
9   to -- we tried to do some warehouse and
10  distribution of CBD products, and we did some,
11  what I refer to as white label manufacturing.
12  We're not the manufacturer, but we had
13  manufacturer relationships.
14             So if we had clients that were looking
15  for products, specifically white label
16  manufactured, we would facilitate those products
17  to the client and obviously make money in the
18  process.
19             So that -- that -- so the -- the --
20  the entity generated revenue through one of
21  those ways, either consulting through warehouse
22  and distribution or through white label
23  manufacturing.
24       Q.    In other words, just to be clear, you

L. Ori

1   either earned money consulting or selling
2   products that were white labeled?
3        A.    Correct, or the warehouse and
4   distribution of -- of those products.
5        Q.    I see.
6             Charging some other entity or person a
7   fee to hold those products or facilitate
8   their -- their selling of the products?
9        A.    Correct.  An entity that owns a --
10  that has a website, typically.
11       Q.    Uh-huh.  And was that a particular
12  entity or could -- could be any number of
13  entities?
14       A.    Any number.
15       Q.    And in terms of dollars, what was
16  the -- what was the biggest revenue-driver?
17       A.    The -- the white label.  Well, the
18  consulting, you know, consulting for -- for a
19  little bit did well, and, you know, consulting
20  is -- is cyclical.  You know, it just -- it
21  comes and goes.  Depends on, you know,
22  customers' needs and -- needs and the amount of
23  money that they have to pay for them.
24             And then the white label manufacturing

L. Ori

1
2          Athena Accounting is only a
3     bookkeeper. So it is possible that they
4     overlapped -- that she overlapped with E3. E --
5     E3 did not replace her, as they provide
6     different services.
7          Q.   Okay. Did you have a service that was
8     providing bookkeeping services to Foxhole prior
9     to Athena Accounting?
10         A.   Not that I am aware of. Not that I
11    recall. So -- so that's why I want to say she's
12    been with us since roughly inception, but I -- I
13    can't -- I can't comment.
14              As I indicated, the -- the entity
15    started as a consulting company and a contract
16    company, to hold contracts. As such, the need
17    for bookkeeping would have been minimal to -- to
18    zilch. So I -- that's the best I can tell you
19    without having it in front of me.
20         Q.   And when you say -- just to clarify, I
21    believe you said you believed she was providing
22    services since "inception," that -- and you were
23    referring -- are you referring to Athena
24    Accounting when you said that?
25         A.   Correct. Yeah, I believe, but I -- I

L. Ori

1     only can go on record as it's 2020 on. I don't
2     know that she provided services in '18 or '19.
3          Q.   I see.
4               She may have, but you're only
5     specifically aware of her providing services
6     from 2020 on, as you sit here today?
7          A.   Yes, sir.
8          Q.   Okay. I'll going to ask you some
9     questions about Epicure now.
10         A.   Okay.
11         Q.   What is Epicure Medical, LLC, which
12    I'll refer to as "Epicure"?
13         A.   I would define it as -- are you asking
14    how I would define the company as far as its
15    services?
16         Q.   I'm just asking you in your own words,
17    what is it?
18         A.   Well, a -- a -- it provided hand
19    sanitizer and personal protection -- protective
20    equipment, PPE, products.
21         Q.   And when was it formed?
22         A.   March of 2020.
23         Q.   And why was it formed?
24         A.   For that specific purpose that I just

L. Ori

1     defined.
2          Q.   Uh-huh. And that purpose being to
3     sell hand sanitizer and PPE equipment?
4          A.   PPE -- yeah, Products and Equipment.
5               I don't know that you would define a
6     hairnet as equipment or a face mask, but PPE
7     products, yes.
8          Q.   Understood.
9               To sell hand sanitizer and PPE,
10    products and equipment, or just products?
11         A.   I would say just products.
12         Q.   Okay.
13         A.   Yeah, we -- we really didn't do any
14    equipment.
15         Q.   Got it.
16         A.   And you know, the sale of hand
17    sanitizer would -- would be, you know,
18    ultimately the -- the contract -- contract
19    manufacturing, you know, of it and -- and sale
20    of it.
21              We -- you know, so, I mean, we
22    didn't -- didn't just sell it, obviously, or we
23    wouldn't be here. But, yes.
24         Q.   And who formed Epicure?

L. Ori

1          A.   The three -- three of us.
2          Q.   And who are its members?
3          A.   Myself, Dan Reilly and Sarah Simmers.
4          Q.   And who are its managers?
5          A.   The -- the same -- well, I -- I don't
6     have the operating agreement in front of me, but
7     as I understand or recall, it's the three of us.
8          Q.   Okay. How did Epicure generate
9     revenue?
10         A.   Through the sale of those products.
11         Q.   Hand sanitizer and PPE products?
12         A.   Correct.
13         Q.   And how -- and how was the company
14    first capitalized?
15         A.   Through sales. Through sales and --
16    and marketing, sales and marketing.
17         Q.   And did you or any of the other two
18    founding members contribute any of your own
19    capital to form the entity?
20         A.   Can you please be more specific?
21         Q.   Sure.
22              In March 2020, when the entity was
23    formed, did any of the three members contribute
24    their own personal capital to start the

Page 74

L. Ori

1  business?
2      A.    And I'm not trying to be a pain, but
3  "start the business."  Are you referring to
4  business operations in general, or are you
5  referring to the structuring?
6      Q.    Business operations in general.
7      A.    All three of us put -- contributed our
8  own time and money and effort in various ways.
9  You know, anything from meetings to lunches to
10  buying office supplies or what-have-you, to
11  start the company, yes.
12      So, yeah, I mean for trips, travel,
13  did we pay for those things ourselves?  Yes.
14      Q.    And do you have a recollection of
15  making any type of capital contribution at the
16  time the company was formed, personally?
17      A.    I do not.
18      Q.    Did Epicure have any employees?
19      A.    No.
20      Q.    Did Epicure have any independent
21  contractors?
22      A.    Yes.
23      Q.    And roughly speaking, as you sit here
24  today, what independent contractor relationships
25

Page 75

L. Ori

1  do you recall?
2      A.    At formation, from -- from formation
3  forward, you know, I'll start by saying, you
4  know, we, from an independent contractor
5  perspective, we had somebody that was brought
6  in-house at some points.  Her name was Sarah
7  Fedorko.  Sarah was our -- I would call her
8  administrative assistant.  She entered --
9  entered orders.  She attempted to do
10  bookkeeping.  Sarah was -- I would call her -- I
11  would term her as an admin, kind of as-needed.
12      You know, the nature -- nature of the
13  business at that time was -- was the world
14  was -- especially the medical world was just
15  so -- so ebb and flow.  It was so up and down.
16  It was so fast.  You know, so -- so we only
17  needed her, you know, temporarily, very
18  part-time.  So Sarah was a -- a 1099.  Her
19  husband, Don Fedorko, did some design work for
20  us at different points.  He's an architect and
21  designer.  Both of those are relationships of
22  Dan Reilly.
23      We worked with Trish Hanke of ISH,
24  I-S-H, Marketing.  Trish developed our website,
25

Page 76

L. Ori

1  our branding, marketing materials.  She -- she
2  also was a relationship of Dan that he had
3  worked with in the past.
4      We ultimately transitioned that role
5  that Sarah Fedorko was filling in bookkeeping to
6  Athena Accounting Solutions.  It's -- it -- a
7  month in or so, that -- that role was
8  transitioned.
9      We had sales -- sales reps, all of
10  which were contract.  There was ultimately six
11  or eight of them, probably sales reps.
12      Obviously we had legal and accounting
13  services.  You know, ultimately we contracted
14  with an accountant for the filling of the --
15  filing, excuse me, of the returns.
16      Those are all the 1099's that I can
17  think of off the top of my head.  There -- there
18  may be a few others that I'm missing, but those
19  are -- are the main ones.
20      Q.    And the accountants who prepared the
21  tax returns, who were they for Epicure?
22      A.    That was also Louanne.
23      Q.    Louanne and I know you made an attempt
24  to say her last name before.  Would you mind
25

Page 77

L. Ori

1  doing that again?
2      A.    C-A-G-N-O-N, Cagnon.
3      Q.    Okay.  I'm going to introduce an
4  exhibit.  This will be -- I think I'm up to 7.
5      (Ori Exhibit 7, Document titled,
6      "Epicure Medical, LLC, Organization Chart,"
7      Bates-stamped DEF3683, marked for
8      identification, as of this date.)
9  BY MR. GUNNELL:
10      Q.    Share the screen.  Here we go.
11      Do you see what I have put up on the
12  screen?  It's marked "Epicure Medical, LLC,
13  Organization Chart," and it's Bates-stamped
14  DEF3683.
15      A.    Yes.
16      Q.    Does this document look familiar to
17  you?
18      A.    It does.
19      Q.    And what is it?
20      A.    It was an organizational chart that
21  Dan Reilly put together for -- for either a
22  vendor or client at -- at some point, later --
23  later in -- I would say late in 2020, late 2020,
24  early '21 maybe, so yes.
25

Page 86

L. Ori

1
2    Q.    Okay.
3    A.    Yeah, they -- they approved all
4  labeling and had -- had guidance and/or
5  approved, you know, told us what we could and
6  couldn't do.
7          As far as the back of the label,
8  the -- the ingredients and all that, that was
9  all them.
10         We were just really the logo, the --
11 you know, the logo and branding and the, you
12 know, the back -- back of the label was really
13 all Voyant.
14   Q.    Got it.
15         Does Epicure have any -- have any
16 assets?  I know you -- you just indicated they
17 have no inventory, but do they have any assets?
18   A.    No.
19   Q.    Do they have any liabilities?
20         MR. KORANTENG:  Objection.  Hold on
21 one second.  So I'm just -- I'm going to
22 object to the form.  It's vague as to -- I
23 mean, I don't know what time you're talking
24 about.
25

Page 87

L. Ori

1
2  BY MR. GUNNELL:
3    Q.    Today, other than to Voyant, does
4  Epicure have any outstanding liabilities?
5    A.    Does -- does legal defense count?
6          (Laughter.)
7    Q.    Other than --
8    A.    I mean, yes.
9          No, no outstanding liabilities that
10 come to mind outside of -- outside of Voyant.
11   Q.    Okay.  I'm going to show you an
12 exhibit.  Let's see, this is -- this will be,
13 what?  8?
14         (Ori Exhibit 8, Document titled
15         "Epicure Medical, LLC, Limited Liability
16         Company Operating Agreement," Bates-stamped
17         DEF3505 to DEF3545, marked for
18         identification, as of this date.)
19 BY MR. GUNNELL:
20   Q.    This is a document produced by your
21 counsel Bates-stamped DEF3505 to DEF3545:  It's
22 titled "Epicure Medical, LLC, Limited Liability
23 Company Operating Agreement."
24         Do you see that?
25   A.    Yes, sir.

Page 88

L. Ori

1
2    Q.    Do you -- are you familiar with this
3  document?
4    A.    Yes, sir.
5    Q.    And what is it?
6    A.    The Epicure Medical, LLC Operating
7  Agreement.
8    Q.    And it says it's effective as of March
9  26, 2020?
10   A.    Yes.
11   Q.    Is that when the company was formed?
12   A.    Yes.
13   Q.    And I'm going to direct your attention
14 to page 38, I believe -- 37.  And it shows here
15 managers are listed as Lee Ori, Sarah Simmons --
16 Simmers, and Dan Reilly, right?
17   A.    Correct.
18   Q.    And is that your signature that
19 appears next to your name under "Manager"?
20   A.    Yes.
21   Q.    And then for members, the members are
22 listed as PFL Investments, LLC.  And is that
23 your signature that appears next to that entity?
24   A.    Yes.
25   Q.    And then Clover Leaf Strategies, LLC.

Page 89

L. Ori

1
2  Whose signature is next to that?
3    A.    That's Dan Reilly.
4    Q.    And do you have an understanding of
5  who owns Clover Leaf Strategies?
6    A.    I do not.
7    Q.    Do you have -- do you know why Lisa
8  Reilly is listed under Clover Leaf Strategies
9  here?
10   A.    I do not.
11   Q.    And it appears that it's Dan Reilly's
12 signature in the -- in the signature line,
13 correct?
14   A.    Correct.
15   Q.    Do you -- and if you don't know, you
16 know, just tell me you don't know, but do you
17 think that might be a typo that Lisa's listed
18 here, or -- or -- and Dan signed?
19   A.    I don't know.  I don't know the -- the
20 operating agreement or -- or structure of Clover
21 Leaf.
22   Q.    Okay.  Do you have any knowledge
23 sitting here today that Lisa Reilly has an
24 ownership stake in Clover Leaf?
25   A.    I do not.  As his spouse, she --

Page 90

L. Ori

1           L. Ori
2   she -- that is -- Lisa Reilly is his wife.
3   She -- she certainly could.
4       Q.   Okay.  And PFL Investments, LLC up
5   here, this is the entity we talked about
6   previously that you explained was owned 50
7   percent by you and 50 percent by Ms. Simmers; is
8   that correct?
9       A.   Yes, sir.
10      Q.   And it says under here in Schedule A
11  that PFL Investments membership interest is
12  66.66 percent?
13      A.   Yes, sir.
14      Q.   And Clover Leaf is 33.34 percent?
15      A.   Yes, sir.
16      Q.   How were those proportions arrived at?
17      A.   Three -- three-way split, third, a
18  third, a third.
19      Q.   I see.
20      A.   Since Sarah and I own 50/50 of PFL,
21  it's essentially a three-way split of the
22  company.
23      Q.   Uh-huh.  And it lists here a capital
24  contribution of $666.66 next to PFL Investments,
25  LLC?

Page 91

L. Ori

1           L. Ori
2       A.   Yes.
3       Q.   You see that?  Do you know if a
4   deposit of that amount was made by PFL
5   Investments around the time of this agreement
6   into an account held by Epicure?
7       A.   I do not know if that exact dollar
8   figure was, as you said, written -- a check
9   written, so to speak, or deposited into an
10  Epicure account.
11      Q.   How about for -- how about a
12  checking -- or a deposit in the amounts of
13  $333.34 by Clover Leaf Strategies?
14      A.   I do not recall.
15      Q.   I'm going -- I'll show you another
16  document.  This one is going to be 9.
17           (Ori Exhibit 9, Document titled,
18           "Account Agreement," Bates-stamped DEF0030,
19           marked for identification, as of this date.)
20  BY MR. GUNNELL:
21      Q.   This document is Bates-stamped
22  DEF0030, and it states at the top "Account
23  Agreement," and then under "Account Owner," it
24  states "Epicure Medical, LLC."
25           Do you see that?

Page 92

L. Ori

1           L. Ori
2       A.   Yes, sir.
3       Q.   Do you know what this document is?
4       A.   Formation of Epicure Medical, LLC
5   business checking account.
6       Q.   And it lists here as the initial
7   deposit $72,500.
8           Do you see that?
9       A.   Yes, sir.
10      Q.   Where was that from?
11      A.   It was from sales.  It was from a
12  customer.
13      Q.   And what was the customer -- what did
14  the customer purchase?
15      A.   I -- I am not a hundred percent, but I
16  do believe it was sanitizer, without looking
17  back at the QuickBooks of the transactions, I
18  couldn't tell you unequivocally.
19      Q.   And did you discuss with either
20  Ms. Simmers or Mr. Reilly the amount of capital
21  that would be required to operate Epicure at or
22  around the time it was formed?
23      A.   We -- we talked every day, so yes, I'm
24  quite certain we talked about finances.
25      Q.   A little more specific:  Do you

Page 93

L. Ori

1           L. Ori
2   have -- do you have a specific recollection of
3   discussing the capitalization of the company at
4   or around the time that it was formed with
5   either Ms. Simmers or Mr. Reilly?
6       A.   In capitalizing the company is a very
7   broad -- broad or -- broad word.  You know, it
8   depends on -- because the capital certainly
9   depends on what's being done and how it's being
10  done.  So, again, we discussed financing,
11  funding needs, strategies, all of the above.
12      Q.   And do you recall anything more
13  specific about those conversations, about --
14  around the time that the entity was formed?
15      A.   Your -- your question is very vague,
16  so I'm going to say no.
17      Q.   Okay.  I -- I think capital -- when I
18  use the term "capitalize," I mean the amount of
19  money necessary to run the business.
20           Does that make sense?
21      A.   It -- it -- again, the amount of money
22  needed to run -- run that business is -- is
23  the -- the -- no, we did not have -- we -- the
24  goal of the -- business was, as you can see
25  from a $72,000 deposit, was to -- to -- we

Page 102

L. Ori

1
2  that you're aware of?
3      A.    No.
4      Q.    Do you -- did you establish capital
5  accounts for the members?
6      A.    That would be an accounting question.
7  I believe so.
8      Q.    Who should we direct accounting
9  questions to?
10     A.    That would either be Linda -- Linda
11 Ragsdale at Athena Accounting, or Louanne
12 Cagnon, the CPA.
13     Q.    Okay.  Do you have any personal
14 knowledge of a capital account being formed for
15 yourself with Epicure as you sit here today?
16     A.    I do believe there was one, yes.  But
17 I will tell you it's also been -- it's -- it's
18 established that we -- that Louanne has realized
19 that she made a mistake and that she miscoded --
20 miscoded those dollars that she had in that
21 capital account and that should not have been
22 there.
23     Q.    Can you be more specific about what
24 you're referring to?
25     A.    The $25,125 that was a due to, that's

Page 103

L. Ori

1
2  what I was referring to, that was a due to Lee
3  Ori that was on the Epicure financials.  That is
4  a mistake.  That is -- that is an error and she
5  is in the process of correcting it.
6      Q.    And do you know how that error came
7  about?
8      A.    She miscoded something, and she is --
9  she will correct it.  There's -- there's no
10 money owed to me.
11     Q.    And is -- is that 125 owed to someone
12 or some other entity or person?
13     A.    It was $25,125.  It wasn't $125.
14     Q.    Oh, okay.
15     A.    And that was the -- it -- it is not
16 owed to anybody else.  It was a miscoding on
17 their part.  The value was miscoded in the wrong
18 account.
19     Q.    Okay.  Understood.
20           Has any company that you personally
21 have an interest in done business with Epicure?
22     A.    No, but I will say that Foxhole
23 Medical did receive, prior to the Epicure bank
24 account being set up, did receive a deposit on
25 Epicure's behalf and immediately paid out that

Page 104

L. Ori

1
2  dollar value the very next day.
3           So, other than the receipt of -- of
4  some revenue, of which was adjudicated,
5  rectified, balanced out, there -- there has been
6  no business with -- with another entity.
7      Q.    And how much was that transaction for,
8  if you recall?
9      A.    It was for $125,000.  And that also
10 was miscoded on the Epicure financials, as well
11 as the Foxhole financials.
12     Q.    How is it miscoded?
13     A.    Linda failed to recognize that the
14 money was paid back out, and so thus it was
15 due -- it was put in as a due to Epicure and a
16 due from Foxhole.  The money was paid back out
17 the next day, and Linda missed it.
18     Q.    And those payments would be reflected
19 in wire transfers or bank account records?
20     A.    They would be in -- reflected in the
21 Foxhole -- Foxhole bank account records of which
22 you should have from March of 2020.
23     Q.    So in March of 2020, Foxhole received
24 $125,000 prior to Epicure having a bank account,
25 which Foxhole held and then remitted to Epicure,

Page 105

L. Ori

1
2  is that your testimony?
3      A.    The -- the payment was made to -- from
4  Foxhole to the vendor, directly to the vendor on
5  Epicure's behalf.  So it was not remitted
6  directly to Epicure, but it was remitted to
7  Epicure's vendor.
8      Q.    What was the vendor?
9      A.    I -- I would -- I can't tell -- it's a
10 Spanish company.  It's got a Spanish name.  If I
11 even attempted, I would -- I would butcher the
12 heck out of it.  It's -- it's listed on the --
13 it's actually in the -- in the Foxhole bank
14 statement.
15     Q.    From March -- from March 2020?
16     A.    Yes, sir.
17     Q.    Okay.
18     A.    It was wired directly to the vendor.
19 You'll see $125,000 in on -- I believe it was
20 the 30th, and then it went right back out, the
21 same dollar went -- went to the vendor, which
22 was a Spanish name, on the next day.
23     Q.    And -- okay.  And has, to your
24 knowledge, Epicure ever done business with any
25 entity that Sarah Simmers has a direct or

Page 146

L. Ori

1
2        Greg See has multiple companies.
3  Global Medical Source was a company that he had
4  that was specifically for PPE and sanitizer.
5        Q.    And did you have an understanding of
6  why you were supplying this agreement?
7        A.    Per Michelle's direction of new credit
8  application for new customers.
9        Q.    Uh-huh.  Okay.  And is that your
10 signature on the bottom here?
11       A.    Yes, sir.
12       Q.    And did you understand by signing this
13 you were agreeing to its terms?
14       A.    Yes, sir.
15       Q.    And if you look here, it says -- let's
16 see.  "The undersigned by this credit
17 application agreement does continually
18 personally guarantee payment for all goods and
19 merchandise purchased by the applicant."
20       Do you see that?
21       A.    I do.
22       Q.    And you understood when you signed
23 this that you were personally guaranteeing
24 payment for all goods and merchandise purchased
25 by Epicure?

Page 147

L. Ori

1        A.    I did not.
2        Q.    But that is your signature on the
3  bottom?
4        A.    It is.
5        Q.    And what became of this?  You sent to
6  it Ms. Jimenez?
7        A.    Yes, sir.
8        Q.    And -- and did you receive a reply
9  from her?
10       A.    Don't recall.
11       Q.    Okay.  And this is dated April 12,
12 2020, this e-mail, correct?
13       A.    Yes.
14       Q.    Who's Courtney Reihs, R-E-I-H-S?
15       A.    I do not know Courtney.
16       Q.    Okay.  Never had any dealings with
17 her?
18       A.    Other than a -- I'm going to say no.
19 I don't even recognize the name.
20       Q.    Got it.
21       And now just a question:  You -- by
22 this time, Epicure has been formed, correct,
23 April 12, 2020?
24       A.    That is correct.

Page 148

L. Ori

1        Q.    And did you have an Epicure e-mail
2  address?
3        A.    I don't know if we had it at that
4  point.
5        Q.    Looks like you did just looking at the
6  top.  It says Lee@epicuremed.com?
7        A.    You are correct.
8        Q.    But then it looks like your signature
9  block and -- and the icon that goes with it is
10 associated with Foxhole Med?
11       A.    That was obviously not my -- my
12 Epicure medical signature block that -- that was
13 traditional.  So I -- you know, without having
14 an idea of -- you know, this was forwarded --
15 well, I -- I don't even know.  So I don't know
16 how that's on there.  It's obviously not my
17 Epicure one.
18       Q.    Right.
19       A.    So --
20       Q.    Were you still using your Foxhole Med
21 signature block and -- and contact information
22 in connection with hand sanitizer sales at this
23 point?
24       A.    I was not.

Page 149

L. Ori

1        Q.    Okay.  I'm going to introduce now
2  Exhibit --
3        MR. GUNNELL:  What am I up to?  13?
4  Or was that 13?  Give me one second.
5        COURT REPORTER:  That was 13.
6        MR. GUNNELL:  Okay, thank you.
7        I will now introduce Exhibit 14.
8        (Ori Exhibit 14, Epicure Medical, LLC
9  Purchase Orders, consisting of eight pages,
10 Bates-stamped DEF4741 to DEF4748, marked for
11 identification, as of this date.)
12 BY MR. GUNNELL:
13       Q.    And that will be a collection of
14 purchase orders.  Just let me get those.
15       That's not what I want.  Apologies.
16       Just bear with me for one moment while
17 I get the exhibit that I want.
18       There we go.  Okay.  I have introduced
19 as Exhibit 14 a collection of documents provided
20 by your counsel.  It's eight pages.  It starts
21 at DEF4741 and goes to -- I can't read the Bates
22 on the last one.  DEF --
23       MR. GUNNELL:  Am I still here?  I just
24 got an error that Zoom quit unexpectedly.

Page 150

L. Ori

1
2      MR. KORANTENG:  You're still here.
3      MR. GUNNELL:  Okay.  Very strange.
4  Maybe it's just the screen sharing that's
5  buggy.
6      Okay, well, I don't see -- oh, there
7  it is.  Sorry.  It goes to DEF4748.  Okay.
8      And these are Epicure Medical, LLC
9  purchase orders.
10 BY MR. GUNNELL:
11     Q.   Mr. Ori, can you take a minute to look
12 at these?
13     I can scroll through them just so you
14 can look at the screen.
15     Okay.  Do you have an understanding of
16 what these are?
17     A.   Yes, sir.
18     Q.   What are they?
19     A.   Purchase orders.
20     Q.   Purchase orders for what?
21     A.   For hand sanitizer of various
22 quantities and sizes.
23     Q.   Issued by?
24     A.   Epicure.
25     Q.   Okay.  It looks like there were --

Page 151

L. Ori

1  let's see -- this one's dated April 13 for 600
2  2-ounce hand sanitizers, right?
3      This one is dated April 13, another
4  600 2-ounce.
5      This one's April 13, 120,000 12-ounce.
6      April 16, a couple days later, 600 at
7  2 ounces.
8      And then on April 16, a final 600 at 2
9  ounces, and then the next one goes into June.
10     Is that right?
11     A.   The next one goes into June?
12     Q.   The next purchase order is dated June.
13     I just want to talk about the April
14 ones for a minute.
15     A.   Okay.
16     Q.   It looks like there were five purchase
17 orders issued in April by Epicure to Voyant, is
18 that consistent with your recollection?
19     A.   I don't recall the -- the second round
20 of 2-ounce sanitizers at the dollar-2, but -- in
21 April anyway, so -- but...
22     Q.   You don't recall that ordering a total
23 of 2.4 million units in April of the 2-ounce
24 bottles?
25

Page 152

L. Ori

1
2      A.   I -- yeah, I mean, I know we ordered
3  them.  I didn't -- I didn't know it was in
4  April, so I didn't --
5      Q.   Okay.
6      A.   I didn't know it was that close to the
7  other -- the other order.
8      Q.   Got it.
9      But you don't dispute that you ordered
10 2.4 million units in April?
11     MR. KORANTENG:  Objection.
12     When you say "you," again, the witness
13     is testifying in three different capacities,
14     so I just want to make sure we're talking
15     about --
16     MR. GUNNELL:  Sure.
17 BY MR. GUNNELL
18     Q.   At the Epicure, you don't dispute that
19 Epicure purchased 2.4 million units of hand
20 sanitizer in April?
21     A.   I don't dispute that Epicure submitted
22 purchase orders for 2.4 million units.
23     Q.   Uh-huh.  And do you -- is there a
24 distinction in your mind between submitting a
25 purchase order and -- and purchasing?

Page 153

L. Ori

1
2      A.   Well, in my mind, purchasing would
3  have been taken full possession of -- of it is
4  how I would interpret it.
5      Q.   As opposed to what?
6      A.   Ordering its production, I guess, I
7  would say.
8      Q.   I am sorry.  Go ahead.  Ordering its
9  production and?
10     A.   I would say.  That is what I was, you
11 know --
12     Q.   But -- but -- but the hand sanitizer
13 that was produced by Voyant was warehoused,
14 right?
15     A.   It was.
16     Q.   And you ultimately had custody of
17 those once they were delivered to the warehouse?
18     A.   That's -- that's what I've been told,
19 yeah, yeah.
20     Q.   And you sold hand sanitizer from the
21 warehouse, right?
22     A.   As I recall, yes.  But everything was
23 through Voyant.  I mean, as far as I was
24 concerned, the warehouse was a generic extension
25 of them.

Page 154

L. Ori

1
2       Q.      And when you made a sale to a
3   customer, how would you go about getting the
4   customer their hand sanitizer?
5           MR. KORANTENG:  Again, let me briefly
6   interject here.
7           Unless specifically stated by you,
8   Justin, I'm going to assume that this line
9   of questioning is relating to Epicure so I
10  don't keep interrupting you.
11          MR. GUNNELL:  Correct.
12          MR. KORANTENG:  Okay.
13          THE WITNESS:  Can you repeat that,
14  please, sir?
15          MR. GUNNELL:  Can you -- can the court
16  reporter read it back, please?
17          (Record read.)
18          THE WITNESS:  When Epicure made a
19  sale, we worked with Voyant directly to
20  facilitate the -- the delivery of the
21  product.
22  BY MR. GUNNELL:
23      Q.      How did you do that?
24      A.      Typically, we worked with them through
25  e-mail.

Page 155

L. Ori

1
2       Q.      And how did you set up the shipping
3   of -- of hand sanitizer that had been produced
4   for Epicure and was warehoused?
5       A.      Dan -- Dan was in charge of
6   shipping -- shipping it, but we had contract --
7   contracts with trucking companies.
8       Q.      So you would pay the trucking company
9   to retrieve the product from the warehouse and
10  then ultimately get it to a customer?
11      A.      Yes, sir.
12      Q.      And what was -- do you recall offhand
13  what the name of that company was?
14      A.      Not off the top of my head.
15      Q.      Okay.  The 2.4 million units that
16  Epicure ordered, what did you base that quantity
17  on when you were placing the orders?
18      A.      Well, the -- the -- the first one, as
19  you'll recall from the e-mail, was -- was what
20  was available.  You know, the 1.2 million
21  bottles was all that Michael could get.  So,
22  same with the 12-ounce, that's the reason why
23  there was only 120,000, my recollection from
24  seeing the PO a minute ago, 120,000 12 ounces
25  because that's all the bottles they could

Page 156

L. Ori

1
2   possibly get.
3       Q.      Uh-huh.  And it seems like three days
4   later those -- those orders were on the 13th for
5   the first 1.2 million and the 120 of the
6   12-ounce and then three days later, there are
7   two purchase orders for another 1.2 million.
8           Do you recall how that came about?
9       A.      I don't off the top of my head.  I --
10  I believe that -- that Voyant had opportunity to
11  acquire more bottles.
12      Q.      And Epicure was interested in that?
13      A.      Yes, sir.
14      Q.      And do you get -- so sitting here
15  today you don't have a specific recollection of
16  how the second 1.2 million bottles ordered on
17  the 16th occurred other than the purchase orders
18  we're looking at?
19      A.      What do you mean by "how" they
20  occurred?
21      Q.      Conversations with Voyant,
22  correspondence with Voyant about those -- about
23  that second batch of orders?
24      A.      No.
25      Q.      Okay.  And just going back to my

Page 157

L. Ori

1
2   original question, so the -- so the 2.4 million
3   bottles that were ordered in April, it was just
4   a product of what Voyant was representing to you
5   they could produce, is that your testimony?
6       A.      It was a product of the bottles and
7   caps that Voyant could source.
8       Q.      So if -- if Voyant was able to produce
9   more, Epicure would have purchased more?
10      A.      I -- I can't speak to that at this
11  point.  I don't recall what orders or customers
12  we had then, but that was all that they could
13  get.
14      Q.      And so you were taking what they could
15  get?
16      A.      At that point, yes, sir.
17      Q.      And did you ever discuss with Sarah or
18  Dan, you know, the 2-point million bottles?  You
19  know, that seems like a large amount.
20          Did you talk about how you would
21  ultimately sell that quantity of hand sanitizer
22  that was being ordered?
23      A.      Absolutely, yes.
24      Q.      And what did you discuss in April?
25      A.      We -- we met every day.  You know,

Page 194

L. Ori

2  Thank you.

3       I'm going to introduce Exhibit 20.

4       (Ori Exhibit 20, Letter from Epicure

5   Medical to Michael Partridge at Voyant dated

6   June 4, 2020, Bates-stamped DEF3680, marked

7   for identification, as of this date.)

8  BY MR. GUNNELL:

9       Q.   This is marked as DEF3680.  It is a

10  letter on Epicure Medical letterhead dated June

11  4, 2020.

12      Mr. Ori, do you see the document on

13  the screen?

14      A.   I do.

15      Q.   And what is it?

16      A.   A purchase order from Epicure Medical

17  signed by me to Michael Partridge at Voyant for

18  the purchase of 5 million units of sanitizer --

19  of 2-ounce hand sanitizer.

20      Q.   Is it a purchase order?

21      A.   Oh, excuse me.  Letter of intent.

22  Thank you.

23      Q.   Okay.  And that's your signature on

24  the bottom?

25      A.   Yes, sir.

Page 195

L. Ori

2       Q.   And it says, "We're committed to

3   purchasing 5 million units of 2-ounce hand

4   sanitizer, monthly, for the next 90 days"?

5       A.   Yes, sir.

6       Q.   And then it says, "This letter of

7   intent is intended for you to immediately

8   procure the alcohol and the bottles and caps

9   prior to a formal purchase order"; is that

10  right?

11      A.   Yes, sir.

12      Q.   So you understood that this was

13  committing Epicure to purchase 5 million units

14  of 2-ounce hand sanitizer?

15      A.   Yes, sir.

16      Q.   And you understood you were directing

17  Voyant to procure the alcohol and the bottles

18  and caps in preparation?

19      A.   Yes, sir.

20      Q.   And you understood Voyant would incur

21  costs of its own in making such preparations?

22      A.   Yes, sir.

23      Q.   And at this time, Epicure didn't have

24  the funds available to pay for 5 million units

25  of 2-ounce hand sanitizer, correct?

Page 196

L. Ori

2       MR. KORANTENG:  Objection.  Objection

3   to form.

4       MR. GUNNELL:  Okay.  Noted.

5  BY MR. GUNNELL:

6       Q.   You can answer.

7       A.   What was the objection?

8       Q.   To form.

9       A.   What does that mean?

10      Q.   It means you still have to answer the

11  question, but he's preserving the objection for

12  the record.

13      A.   Okay.  Thank you.

14      I can't comment to the exact amount of

15  money that was in Epicure's bank account on June

16  4 of 2020, but I would say that we did not have

17  the money to -- to terminally purchase 5 million

18  units of sanitizer.

19      Q.   And are you aware of how much

20  inventory remained at this point on the initial

21  2.4 million hand sanitizer bottles that you

22  purchased in April?

23      A.   I -- I was I'm sure at the time.  I

24  don't know how many was left in that moment --

25  in this moment, I should say.

Page 197

L. Ori

2       Q.   And why -- why were you ordering

3   another 5 million units?

4       A.   Because as I indicated earlier, we had

5   several large clients, all of which that had

6   committed to 400,000-plus units a month of -- of

7   product.

8       Then, you know, we also had an

9   opportunity with Albertsons, which was -- was in

10  itself bigger than probably all the others put

11  together, or as big, that we -- we were

12  preparing for.

13      Q.   And are those commitments and purchase

14  orders documents that you collected and provided

15  with your attorney to produce in this action?

16      MR. KORANTENG:  Will you repeat the

17  question?  I'm sorry, Justin.

18  BY MR. GUNNELL:

19      Q.   Yeah.

20      The purchase orders and commitments

21  you referenced, are those documents you put

22  together and shared with your attorney to

23  produce in this action?

24      A.   I know that we did provide some

25  documents that were provided by Dan Courtney

L. Ori

1    off the record?

2        MR. GUNNELL:  No.

3        THE VIDEOGRAPHER:  Okay.  I'm sorry,

4    there was this just long pause and I'm

5    thinking, did I miss something.  I'm sorry.

6        MR. GUNNELL:  That was just me looking

7    for the next exhibit.

8        THE VIDEOGRAPHER:  No problem.

9        MR. KORANTENG:  Just out of curiosity,

10   how much longer do you guys plan to go?

11       MR. GUNNELL:  What's the run time?

12       THE VIDEOGRAPHER:  Let me give you

13   that.  Just one second.

14       You are at 4 hours and 49 minutes.

15       MR. GUNNELL:  Okay.  I'm very hopeful

16   that I'll do it within the seven hours I

17   have.  I'll do my best to -- to do it sooner

18   than that.  I guess -- hold on.  Let me try

19   to give you a better estimate than that.

20       You know, I'm -- I would say I have

21   probably another two hours, but hopefully

22   less.

23       MR. KORANTENG:  Okay.

24       MR. GUNNELL:  Is there a request for a

L. Ori

1    break, or should I just go forward?

2        MR. KORANTENG:  I think we should --

3    we should go ahead.  I mean, unless Lee,

4    unless you need a break, but --

5        THE WITNESS:  No, I'm fine.

6        MR. GUNNELL:  Okay.

7        MR. KORANTENG:  I have -- I have

8    several commitments that -- so let's move

9    forward.

10       MR. GUNNELL:  Okay.  This is -- I

11   mean, you know, we tried to accommodate the

12   witness's time zone, so we started at noon,

13   which I understand pushes things later than

14   usual, but, you know, we understand the

15   witness is in Arizona, so...

16       All right.  So I guess I'm up to 23

17   now.  This is a document Bates-stamped

18   DEF0774 to DEF0775.  It is an e-mail from

19   Lee Ori to Dan Reilly.

20       (Ori Exhibit 23, E-mail from Lee Ori

21   to Dan Reilly, Bates-stamped DEF0774 to

22   DEF0775, marked for identification, as of

23   this date.)

24   BY MR. GUNNELL:

L. Ori

1        Q.   Do you see that?

2        A.   Yes, sir.

3        Q.   Why don't you take a minute to look at

4    it, and then let me know when you're done.

5        A.   You can go ahead.

6        Q.   Okay.  So there is an e-mail from

7    Michael Partridge and then it says, "Attached is

8    the summarized receivables to finished goods

9    that we have completed, 472,000 is past due and

10   needs to be paid.  And then a little over one

11   million is due at the end of this month."

12       Do you see that?

13       A.   Yes, sir.

14       Q.   And then you write up top to Dan, you

15   say, "Here's the bad news.  Let's discuss in the

16   morning."  And this is dated July 15.

17       What do you -- what is this about?

18       A.   I would say the bad news of the -- the

19   amount of money that's owed -- owed to Voyant.

20       Q.   And did you have a conversation with

21   Mr. Reilly about that at this time after this

22   e-mail?

23       A.   I'm sure I did, yeah.

24       Q.   Do you recall this conversation you're

L. Ori

1    referencing here, "Let's discuss in the

2    morning"?

3        A.   I do not.

4        Q.   And, you know, I guess I have to ask:

5    Did -- didn't you see this coming?  You know,

6    why was it just bad news now?

7        A.   I'm quite confident I saw it coming

8    before then.  You know, I'm letting Dan -- you

9    know, Dan is also running sales.  You know,

10   it's -- it's -- I'm communicating the,

11   quote/unquote, bad news to him that -- that, you

12   know, hey, you've got -- we've got product that

13   needs, you know, that's -- that's due and we've

14   got to move it.

15       So that -- that was the -- in my mind,

16   that was the intention of my communication.

17       Q.   Okay.  Let's move on to Exhibit 24.

18       (Ori Exhibit 24, E-mail chain with top

19   e-mail from Lee Ori to Michael Partridge and

20   Paul Heslin, with CC to Dan Reilly,

21   Bates-stamped DEF0635 to DEF0637, marked for

22   identification, as of this date.)

23   BY MR. GUNNELL:

24       Q.   Exhibit 24 is an e-mail chain marked

Page 218

L. Ori

1      DEF0635 to DEF0637.  It's an e-mail chain, and
2      at the top it starts from Lee Ori to Michael
3      Partridge and Paul Heslin, with a CC to Dan
4      Reilly.
5              You see that, Mr. Ori?
6      A.    Yes, sir.
7      Q.    And then I'd like you to take a look
8      at this e-mail here, the one dated September
9      3RD.
10     A.    I see it.  I'm familiar with it.
11     Q.    Okay.  And what do you remember about
12     it?
13     A.    I'm -- I'm openly communicating with
14     Michael the status of payments, status of deals,
15     business, revenue into Epicure from how --
16     however source it may come in and -- and letting
17     him know that the -- you know, any money that
18     comes in either from the sale of sanitizer or
19     PPE would -- would be directed toward -- would
20     be directed toward Voyant.
21     Q.    And you said -- you say you wanted to
22     know how we can work together to get this
23     product sold.
24             What did you mean by that?
25

Page 219

L. Ori

1      A.    Michael had told me that he had
2      several inquiries, I don't want to put a number
3      on it, but he had inquiries into Voyant for
4      sanitizer.  You know, I -- I had asked him about
5      the possibility of the Voyant, you know,
6      quote/unquote, selling the sanitizer.  You know,
7      we've got this liability sitting here.  If
8      you've got people that are reaching out to you
9      looking for product, can we move product?
10             You know, Dan and I had other
11     potential opportunities to move product, of
12     which, you know, it's referenced in another
13     e-mail of probably which you'll get to, that
14     we -- that the bottom completely dropped out of
15     the market.  You know, one of the things that
16     we -- that the problems that we had is, you
17     know, we're buying product at the dollar-2,
18     dollar-5, and the bottom drops out and, you
19     know, you're able to now get it at 65 cents --
20     60 cents.  And -- and, you know, we couldn't
21     compete.
22             So, you know, we had went to Voyant
23     and asked them if they would negotiate a -- a
24     different rate in order for us to move the
25

Page 220

L. Ori

1      product, and they -- they had -- they declined.
2              So, you know, I was trying to get
3      Voyant to work with us in a multitude of ways in
4      order to allow us to move the sanitizer or for
5      them to help us move the sanitizer.
6      Q.    Okay.
7      A.    If I -- if I could break into my Jerry
8      Maguire, you know, "Help me help you" kind of
9      thing.
10     Q.    But you understood that you were the
11     party who made the purchases?
12     A.    I do, I do, but at the end of the day,
13     you know, if I'm -- if I'm a vendor and I'm
14     looking at getting -- getting stuck with
15     sanitizer and I've got people that are calling
16     me looking to buy it, I'm probably going to pick
17     up the phone and call the client and say, hey,
18     I've got people that are looking.  You know,
19     you -- you want to talk to these guys, you want
20     to unload this.  I think I would help myself.
21     So -- but I respect what you're saying.
22     Q.    I'm going to introduce another
23     exhibit.  This is -- this will be Exhibit 25.
24             (Ori Exhibit 25, E-mail chain

Page 221

L. Ori

1      Bates-stamped DEF0421 to DEF0422, marked for
2      identification, as of this date.)
3      BY MR. GUNNELL:
4      Q.    And this is marked DEF0421 to DEF0422.
5              And why don't you take a minute.  I'll
6      try to zoom in a little bit here so you can...
7              Why don't you take a minute to look
8      that over.  I'm interested in this part.  I'm
9      interested in this e-mail here, the Sunday,
10     September 6 one, from you to Dan, CC-ing Epicure
11     Medical.  Although you address it to Dan and
12     CC'd Accounting, you address it to Linda.  So I
13     guess this was an e-mail intended for Linda?
14     A.    If -- if you -- yes.  I mean, if you
15     scroll down, I'm going to assume it was a "reply
16     all."  I don't know if it was --
17     Q.    Looks like Dan is the immediate --
18     maybe it was a "reply all" to Dan?
19     A.    But you can see Linda was addressed.
20     Linda was addressed in the earlier e-mail by
21     Dan.
22             No, go back up, sir.  It specifically
23     says "Linda, I made payment by accident."
24     Q.    Got it.
25

Page 222

L. Ori

1
2    A.    So I only assume I replied all.
3    Q.    Got it.  Okay.
4          So you say here, "We also need to
5    distribute funds to the partners this week."
6          What did you mean by that?
7    A.    Do a distribution to -- to the three
8    members.
9    Q.    What was the process for that?
10   A.    If you scroll down at the bottom,
11   it -- you know, Dan -- basically, you know,
12   we -- this was our -- substantially our
13   full-time job.  You know, Dan -- Dan had
14   expressed, you know, concern to me that, you
15   know, he needed -- he needed money to live.  We,
16   you know, by the nature of our partnership, we
17   couldn't take salaries and we could only take
18   distributions.
19         We took very bare minimum
20   distributions to essentially support our life,
21   to live off of.
22         You can see where I asked Dan, "What
23   do you need...?  You indicated $3,000.  Is that
24   enough?  Please advise Linda so she can
25   schedule."  You know, we have-- we have met, we

Page 223

L. Ori

1    are in agreement, please let Linda know the very
2    bare minimum that you need to survive.  Is
3    $3,000 enough?  And that's -- that's what we
4    distributed to the partners as a result.
5    Q.    In other words, as a result of this,
6    $3,000 went to yourself, $3,000 went to Dan, and
7    $3,000 went to Ms. Simmers?
8    A.    Correct.
9    Q.    And did you have any schedule upon
10   which distributions were made?
11   A.    We did not.
12   Q.    No?
13   A.    Go ahead.
14   Q.    I didn't hear your answer.  I'm sorry.
15   A.    We -- we did not have a schedule.
16   The -- the schedule was -- there wasn't one, no.
17   Q.    And how did distributions come about?
18         MR. KORANTENG:  Objection.  The
19         question is vague.  Can you -- can you
20         rephrase that?
21   Q.    What prompted you to make
22   distributions when you made them?
23   A.    We -- we met as a group and, you know,
24   as you probably know, there were only five or

Page 224

L. Ori

1    six total distributions made.  It was a
2    combination of availability of -- of funds
3    and -- and, you know, the perceived liabilities
4    at that time and, you know, quite honestly,
5    necessity.  You know, in this case, necessity.
6    Q.    And do you recall how many
7    distributions were made in 2020?
8    A.    Five or six.
9    Q.    And do you recall how many --
10   A.    I don't recall the exact number.
11         Sorry.  Go right ahead, sir.
12   Q.    Do you recall roughly the total?
13   A.    $43,000 per member.
14   Q.    And would that -- that amount was --
15   just happened to be the sum of what the
16   distributions were?  It wasn't a predetermined
17   amount that you would get X amount over the
18   year?
19   A.    It was not a predetermined value, no,
20   sir.
21   Q.    And were the five or six
22   distributions, were they equal amount or varying
23   amounts?
24   A.    I believe there were four, four

Page 225

L. Ori

1    $10,000 distributions and one $3,000.
2    Q.    And you didn't receive a salary from
3    Epicure?
4    A.    We did not.
5    Q.    Do you know if -- if Dan or Sarah
6    had -- were employed elsewhere in addition to
7    their work with Epicure?
8    A.    Dan -- Dan was not.  Dan -- Dan and I
9    have solely -- 100 percent of our attention was
10   devoted to Epicure.
11         Sar- -- Sarah was also not on salary
12   anywhere else.
13   Q.    Do you know if Sarah had other sources
14   of income other than Epicure during this time?
15   A.    I can't speak for Sarah.
16   Q.    Okay.  Let me introduce Exhibit 26.
17         (Ori Exhibit 26, E-mails Bates-stamped
18         DEF0610 to DEF0611, marked for
19         identification, as of this date.)
20   BY MR. GUNNELL:
21   Q.    This is an e-mail Bates-stamped
22   DEF0610 to DEF0611.  Starts with an e-mail from
23   Michael Partridge to Dan Reilly, and I want to
24   draw your attention to the e-mail by Dan finally

Page 234

L. Ori

1    MR. KORANTENG:  Mr. Gunnell, I'm
2    having a hard time hearing you.  I don't
3    know if everybody else is having the same
4    problem.
5        MR. GUNNELL:  Can you hear me?  Hello?
6    Can you hear me?
7        MR. KORANTENG:  It's -- it's a little
8    better now.  It's still a little faded than
9    earlier.
10       Am I only the one having this problem?
11       THE WITNESS:  He's going in and out.
12       MR. GUNNELL:  Maybe I can move my
13   laptop closer to me.  It's a built-in
14   microphone.
15       Can you hear me now?
16       MR. KORANTENG:  It's better.
17   BY MR. GUNNELL:
18       Q.    So my question was, you knew what the
19   shelf life was when you put the purchase orders
20   in, right?
21       A.    Actually, when the first purchase
22   orders were placed, no, I didn't.  Did I know
23   subsequently?  Yes.
24       Did I ask Voyant to extend the -- the

Page 235

L. Ori

1    expiration?  Absolutely.  Did we -- did I ask?
2    Did I -- was I hopeful and did I expect that
3    they would?  Yes.
4        Did -- did I expect full transparency?
5    Did I expect that even the June ones would have
6    been longer dated?  No, not -- not at -- not at
7    manufacture.  But, you know, in -- in
8    manufacturing world, they're always trailing and
9    establishing an expiration date of which they
10   can send a communication or they can give me
11   data that says, hey, we have now established the
12   three-year expiration, you can extend your
13   expiration by two more years.
14       Did I expect that they were
15   establishing longer expiration?  Absolutely.
16       Q.    Did anyone from Voyant represent to
17   you that they would change the expiration?
18       A.    They indicated that they were looking
19   at it, that they were looking to -- to establish
20   that, yeah.  I mean, they -- in their world,
21   they -- they can only assign -- they don't know.
22   All they can do is give it a year.  That's all
23   they're allowed to do, and I respect that.
24   They're an FDA GAMP facility, but they can

Page 236

L. Ori

1    establish an expiration date past a year,
2    absolutely.
3        Q.    And do you know what they would have
4    had to go through to establish extra dates?
5        A.    I -- I am going to be vague because I
6    honestly don't know, Justin.  It's -- it's
7    stability studies.  What the stability study
8    would look like for an alcohol-based hand
9    sanitizer, I don't know.
10       Q.    Or how long it would take or what the
11   cost would be for Voyant, you don't know that
12   sitting here today, do you?
13       A.    I don't.  You can do accelerated
14   studies that probably take 90 days.  90 days out
15   you could have -- you could extend dating in as
16   little as 90 days.  What that takes, I don't
17   know.  I really don't.  It's not overly
18   expensive, but it's -- it's -- you know, I can't
19   comment.  It's not my world.  So...
20       Q.    Okay.  Let's move on to Exhibit 27.
21       (Ori Exhibit 27, E-mails with top
22   e-mail from Lee Ori to Linda Ragsdale,
23   Bates-stamped DEF0426 to DEF0427, marked for
24   identification, as of this date.)

Page 237

L. Ori

1    BY MR. GUNNELL:
2        Q.    This is a document produced by your
3    counsel.  It's Bates-stamped DEF0426 to DEF0427.
4    And at the top it's an e-mail from Lee Ori to
5    Linda Ragsdale.
6        Do you see that?
7        A.    Yes, sir.
8        Q.    And then I'm going to draw your
9    attention to the middle.  It's dated October 23.
10   It's an e-mail from Lee Ori to Epicure Medical,
11   which is Accounting@EpicureMedical.com, and you
12   write, "I moved my 10,000 into NEO.  Please
13   apply $8,000 of the money to the credit card.
14   Thank you."
15       What were you referring to there?
16       A.    My -- my $10,000 distribution that was
17   paid, I contributed it to NEO Health, my
18   consulting company, and -- and instructed Linda,
19   who was also my bookkeeper for NEO, to pay my
20   credit card.
21       Q.    Was NEO doing business during this
22   time?
23       A.    I -- I had $8,000 of credit card bill,
24   so it -- it certainly had expenses.

Page 238

L. Ori

1  
2     Q.    What were the nature of the expenses?
3     A.    I -- I can't tell you.
4     Q.    Was it general -- was NEO generating
5  any revenue at this time?
6     A.    I was sufficiently working for
7  Epicure. My guess is I was using my NEO card
8  for personal -- personal expenses and/or travel
9  related -- probably related to Epicure, and --
10  and I was personally contributing my money to --
11  to -- to cover those expenses.
12     Q.    And then you write here, "I'd like to
13  distribute $10,000 per person on top of the
14  Voyant payment. Whatcha think?"
15          Do you see that?
16     A.    Yes, sir.
17     Q.    And this is one of the distributions
18  we talked about earlier?
19     A.    Yes, sir. I think that was the last
20  distribution.
21     Q.    And you describe it as money to the
22  ownership?
23     A.    Correct.
24     Q.    Okay. This will be Exhibit 28.
25          (Ori Exhibit 28, Notice from Voyant to

Page 239

L. Ori

1  
2     Epicure Medical, Bates-stamped
3     AWAREVOYANT003784 to AWAREVOYANT003786,
4     marked for identification, as of this date.)
5  BY MR. GUNNELL:
6     Q.    It is marked AWAREVOYANT003784 to
7  AWAREVOYANT003786. It's also in the chat.
8          Mr. Ori, why don't you take a minute
9  to look it over.
10     A.    Yeah, I'm familiar with the document.
11     Q.    Okay. What is it?
12     A.    It's notice from Voyant to Epicure
13  Medical for -- for, as it says, the proper
14  cancellation of the purchase agreements.
15     Q.    And do you recall receiving this on or
16  about November 24th?
17     A.    Yes, sir.
18     Q.    Did you take any action as a result of
19  this communication?
20     A.    I don't recall other -- I mean, yes,
21  but, you know, I'm sure that there was -- that
22  we met as members.
23          You know, we -- we continued, you
24  know, as you just said from the -- the document
25  that you -- the e-mail that you just presented,

Page 240

L. Ori

1  
2  you know, even though orders from Epicure
3  ceased -- start over.
4          As sanitizer orders were canceled,
5  commitments were canceled from our customers,
6  you know, we continued to pay Voyant as much
7  as -- all the revenue -- substantially all
8  revenue that came into Epicure was -- was
9  allocated to Voyant. You know, there was
10  reference in the last e-mail of -- of us paying
11  whatever it was in October. You know, we -- we
12  continued to even pay Voyant past that.
13          So, you know, we -- we committed, as a
14  group, as a -- as a membership of Epicure to
15  continue to pay Voyant substantially all money
16  that was collected in order to remove -- remove
17  or relieve our debt.
18          We -- we committed in other e-mails to
19  pay -- paying them -- paying Voyant from other
20  revenue sources such as PPE or any other thing
21  that Epicure would do to generate revenue.
22          So, yeah, we certainly met on this and
23  we certainly had a commitment to pay -- pay our
24  debt. So -- so, yeah, it was not taken lightly.
25     Q.    And you were unable to ultimately pay

Page 241

L. Ori

1  
2  the debt, right?
3     A.    We -- we have paid Voyant
4  substantially all monies that -- that Epicure's
5  collected.
6     Q.    That wasn't my question.
7     A.    We have paid everything that we could,
8  yes. Have we not paid it in full, then yes.
9     Q.    Okay. Do you know if you took
10  partnership distributions again in 2020 --
11  sorry, 2021?
12     A.    We did not. Our last distribution was
13  October 23 that you referenced earlier of 2020.
14     Q.    Okay.
15          MR. GUNNELL: Why don't we take a
16  short break now. I'm going to try to finish
17  up after my next segment.
18          MR. KORANTENG: Okay.
19          MR. GUNNELL: Let's do -- let's do
20  five minutes.
21          THE VIDEOGRAPHER: The time is 4:13
22  p.m. and we are now off the record.
23          (Recess.)
24          THE VIDEOGRAPHER: The time is 4:20
25  p.m. and we are now on the record.

Page 282

L. Ori

1  distribution, and then I contributed that
2  distribution to NEO.  So, first and foremost.
3     Q.  And then the credit card bill was
4  related to expenses that were incurred by NEO.
5  It was a complete misspoken.  No -- I want to
6  make sure I say this correctly.  I did not
7  personally pay, nor did NEO or any entity
8  thereof, pay for anything related to Epicure.
9     Furthermore, when I flippantly said
10  that it was travel for -- for -- for Epicure, in
11  2020, there was no travel.  We didn't travel, we
12  didn't go anywhere, and there was no travel.  So
13  there -- there wasn't -- there wasn't any
14  need -- there wasn't an opportunity to -- to
15  travel in 2020.
16     Q.  All right.
17     I just want to make sure that -- so
18  when you mentioned that it may have been
19  expenses for Epicure, that -- I mean, that's not
20  what you meant, correct?
21     MR. GUNNELL:  Objection to form.
22     A.  That -- that is not what I meant.
23     Q.  Okay.  Did you use your personal funds
24  to pay for Epicure expenses?

Page 283

L. Ori

1     A.  I did not.
2     Q.  And vice-versa, were there points
3  where you used funds from Epicure to pay for
4  your own personal expenses?
5     A.  No.
6     Q.  Okay.  This will probably be my last
7  listing line of questioning.  I think, Lee, and
8  it's been, what, close to seven hours so far
9  we've been talking, so there's been a lot of
10  mention of you, you, you, and I want to -- I
11  want to clarify a couple things when it comes to
12  that.
13     As far as any dealings that you, Lee
14  Ori, had with Voyant, in what capacity were you
15  dealing with Voyant?
16     MR. GUNNELL:  Objection.
17     A.  As -- as a manager of Epicure.
18     Q.  Okay.  And I know there's been a lot
19  of discussion in e-mails and a variety of things
20  that mention or discuss meetings that you had
21  with Dan and Sarah about Epicure operations.
22     Do you recall some of those
23  testimonies?
24     MR. GUNNELL:  Objection.

Page 284

L. Ori

1     A.  Yes.
2     Q.  Okay.  Was there anything that you did
3  in terms of the transactions with Voyant that
4  was not authorized by Dan and Sarah in your
5  discussions?
6     MR. KORANTENG:  Objection.
7     A.  Everything was authorized by all three
8  parties.
9     Q.  Okay.  And I know that there was
10  discussion about -- there's been discussions
11  about e-mails back and forth between Voyant and
12  Epicure on which Sarah and Dan were all copied.
13     Do you -- do you recall some of those
14  e-mails?
15     A.  Yes.
16     MR. GUNNELL:  Objection.
17     Q.  Let me -- let me ask you:  At any
18  given point was there anything that you were
19  doing in terms of deals that Epicure was doing
20  with Voyant that Dan and Sarah were not aware
21  of?
22     MR. GUNNELL:  Objection.  Objection to
23  form.  Objection, calls for speculation.
24     A.  There's --

Page 285

L. Ori

1     THE WITNESS:  Can you -- Kathy, could
2  you repeat that for me?
3     MR. KORANTENG:  Actually, Kathy, don't
4  worry.  I'm going to strike that question.
5  I'm going to rephrase it.
6  BY MR. KORANTENG:
7     Q.  Was Dan and Sarah aware of what
8  transactions that you were spearheading on
9  behalf of Epicure as far as Voyant is concerned?
10     MR. GUNNELL:  Objection.  It asks what
11  other parties are aware of.
12     A.  Well, there's two things to say there,
13  both of which were said to Justin at some point
14  today.
15     Number one was, is Dan and I worked
16  side-by-side, literally ten feet apart from each
17  other, all day, every day, 14-hour days.
18     There was -- there was nothing that
19  either one of us did that wasn't in earshot of
20  the other.  We were in very close quarters all
21  day.
22     We met many, many times a day.  You
23  know, throughout every day.  Sarah was involved
24  in multiple conversations a day, as appropriate.

Page 290

```
 1                    L. Ori
 2               CERTIFICATE
 3    STATE OF NEW YORK )
                        :  ss
 4    COUNTY OF NEW YORK)
 5         I, Kathy S. Klepfer, a Registered
 6    Merit Reporter and Notary Public within and
 7    for the State of New York, do hereby
 8    certify:
 9         That LEE ORI, the witness whose
10    deposition is herein before set forth, was
11    duly sworn by me and that such deposition is
12    a true record of the testimony given by such
13    witness.
14         I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage and that I am in no way
17    interested in the outcome of this matter.
18         In witness whereof, I have hereunto
19    set my hand this 5th day of April, 2022.
20
21
          KATHY S. KLEPFER, RPR, RMR, CRR, CLR
22
23
24
25
```

Page 291

```
 1    NAME OF CASE:
 2    DATE OF DEPOSITION:
 3    NAME OF WITNESS:
 4    Reason Codes:
 5         1.  To clarify the record.
 6         2.  To conform to the facts.
 7         3.  To correct transcription errors.
 8    Page _____ Line _____ Reason _____
 9    From _____ to _____
10    Page _____ Line _____ Reason _____
11    From _____ to _____
12    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
17    From _____ to _____
18    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
23    From _____ to _____
24
25                   _____
```