# EXHIBIT 28

1          SARAH SIMMERS

2      IN THE UNITED STATES DISTRICT COURT

3         EASTERN DISTRICT OF MISSOURI

4             EASTERN DIVISION

5

6   AWARE PRODUCTS LLC,

7   D/B/A VOYANT BEAUTY,

8             Plaintiff,

9      vs.                    No. 4:21-cv-249-JCH

10  EPICURE MEDICAL, LLC,

11  FOXHOLE MEDICAL, LLC,

12  and LEE ORI,

13            Defendants.

14  _____/

15

16

17   REMOTE VIDEOTAPED DEPOSITION SARAH SIMMERS

18             ST. LOUIS, MISSOURI

19          TUESDAY, MARCH 29TH, 2022

20

21

22

23  REPORTED BY:

24  DEBORAH HABIAN, RMR, CRR, CLR

25  JOB NO. 208448

Page 2

```
1            SARAH SIMMERS
2
3
4
5
6            March 29, 2022
7            11:05 A.M. CST
8
9
10
11           Remote videotaped deposition of
12   SARAH SIMMERS, appearing at St. Louis, Missouri,
13   USA, pursuant to notice, appearing remotely via
14   Zoom conference before Deborah Habian, an
15   Illinois Certified Shorthand Reporter, Missouri
16   Certified Court Reporter, Registered Merit
17   Reporter, Certified Realtime Reporter, Certified
18   Livenote Reporter.
19
20
21
22
23
24
25
```

Page 3

```
1            SARAH SIMMERS
2        APPEARING REMOTELY VIA ZOOM
3
4    ON BEHALF OF THE PLAINTIFF
5        SHER TREMONTE
6        BY:  ROBERT PENN, JR., ESQ.
7        90 Broad Street
8        New York, New York 10004
9
10
11   ON BEHALF OF THE DEFENDANTS
12       KORANTENG LAW FIRM
13       BY:  FIBBENS KORANTENG, ESQ.
14       5050 Quorum Drive
15       Dallas, Texas 75254
16
17
18   ALSO PRESENT:
19       Rudolfo Durand, TSG videographer
20
21
22
23
24
25
```

Page 4

```
1            SARAH SIMMERS
2            I N D E X
3    WITNESS:                         PAGE
4    SARAH SIMMERS
5    Examination by Mr. Penn .................... 10
6    Examination by Mr. Koranteng .............. 127
7
8
9    INSTRUCTIONS AND REQUESTS OF COUNSEL
10       By Mr. Koranteng....................... 77
11       By Mr. Penn ........................... 85
12
13           INDEX OF EXHIBITS
14       EXHIBITS TO SARAH SIMMERS DEPOSITION
15   NUMBER          DESCRIPTION          PAGE
16   Exhibit 1   Unanimous Written Consent in   33
17               Lieu of Organizational Meeting
18               of Managers and Members of
19               Foxhole Medical, LLC, 3/22/18
20               Bates DEF3744 through DEF3793
21
22   Exhibit 2   Carrollton Account Agreement   37
23               12/10/18, Bates DEF0031
24
25
```

Page 5

```
1            SARAH SIMMERS
2    (CONTINUING)
3           INDEX OF EXHIBITS
4       EXHIBITS TO SARAH SIMMERS DEPOSITION
5    NUMBER          DESCRIPTION          PAGE
6    Exhibit 3   3/26/20 Operating Agreement   51
7               of Epicure Medical, LLC
8               Bates DEF3505 through DEF3545
9
10   Exhibit 4   Carrollton Account Agreement   55
11               3/27/20, Bates DEF0030
12
13   Exhibit 5   2/21/22 Sarah Simmers e-mail   72
14               to Lee Ori including 3/26/20
15               letter to Michael Partridge
16               Bates DEF004811 through DEF004812
17
18   Exhibit 6   4/13/2020 Purchase Order from   79
19               Voyant Beauty to Epicure
20               Bates DEF004741 through DEF004748
21
22   Exhibit 7   4/22/20 Lee Ori e-mail thread   84
23               Pro Forma Sanitizer.xlsx
24               Bates DEF004659 through DEF004660
25
```

```
                                            Page 6
1                 SARAH SIMMERS
2  (CONTINUING)

3            INDEX OF EXHIBITS

4      EXHIBITS TO SARAH SIMMERS DEPOSITION

5  NUMBER        DESCRIPTION            PAGE

6  Exhibit 8  5/8/20 Promissory Note      91

7            Bates DEF004737 through DEF4740

8

9  Exhibit 9  5/24/20 Lee Ori e-mail to    97

10           Michelle Jimenez and others

11           Bates DEF004572

12

13 Exhibit 10 6/1/20 Epicure Medical e-mail 100

14           attaching cash report

15           Bates DEF0176 through DEF0178

16

17 Exhibit 11 Epicure Medical Excel cash   103

18           report June 2nd, 2020, no Bates

19

20 Exhibit 12 6/4/20 Lee Ori letter to     107

21           Michael Partridge, Bates DEF3680

22

23 Exhibit 13 8/4/20 e-mail thread between  109

24           Lee Ori and Michael Partridge

25           Bates DEF0714 through DEF0715
```
```
                                            Page 7
1                 SARAH SIMMERS
2  (CONTINUING)

3            INDEX OF EXHIBITS

4      EXHIBITS TO SARAH SIMMERS DEPOSITION

5  NUMBER        DESCRIPTION            PAGE

6  Exhibit 14 8/14/20 e-mail thread between 114

7            Lee Ori and Bill King

8            Bates DEF0082 through DEF0083

9

10 Exhibit 15 9/7/20 e-mail thread between  116

11           Lee Ori and Dan Reilly

12           Bates DEF0421 through DEF0422

13

14 Exhibit 16 10/26/20 e-mail thread between 120

15           Lee Ori and Linda Ragsdale

16           Bates DEF0426 through DEF0427

17

18 Exhibit 17 Epicure Medical Balance Sheet 121

19           As of December 31, 2020

20           Bates DEF3495 through DEF3497

21

22 Exhibit 18 Foxhole Medical Balance Sheet 124

23           As of December 31, 2021

24           Bates DEF004807 through DEF004810

25
```

```
                                            Page 8
1                 SARAH SIMMERS
2       THE VIDEOGRAPHER:  Good morning,
3  Counselors.  My name is Rudolfo Durand.  I am
4  the legal videographer in association with TSG
5  Reporting, Inc.  Due to the severity of the
6  COVID-19 and following the practices of social
7  distancing, I will not be in the same room with
8  the witness.  Instead, I will record this
9  remotely.  The court reporter, Debbie Habian,
10 also will not be in the same room and will swear
11 in the witness remotely.
12      Do all parties stipulate to the
13 validity of this video recording, the swearing
14 in of the witness, that it will be admissible in
15 the courtroom as if it had been taken following
16 Rule 30 of the Federal Rules of Civil Procedure
17 and the state's rules where this case is
18 pending.
19      MR. KORANTENG:  We do.
20      MR. PENN:  Yes, plaintiffs do.
21      THE VIDEOGRAPHER:  Thank you.  This is
22 the start of media labeled number 1 of the
23 remote video recorded deposition of Sarah
24 Simmers in the matter of Aware Products LLC,
25 doing business as Voyant Beauty vs. Epicure
```
```
                                            Page 9
1                 SARAH SIMMERS
2  Medical LLC, et al.  Today is March 29, 2022.
3  The time is 11:05 a.m. Central Daylight Time,
4  and we're on the record.
5       Will counsel please introduce
6  yourselves.
7       MR. PENN:  Robert Penn for the
8  plaintiff Aware Products LLC, doing business as
9  Voyant Beauty, and my colleague Justin Sher may
10 be joining us from his firm Sher Tremonte.
11      MR. KORANTENG:  This is Fibbens
12 Koranteng, and I'm appearing for the defendants,
13 Foxhole Medical LLC, Epicure Medical LLC, and
14 Lee Ori.
15      THE VIDEOGRAPHER:  Will the court
16 reporter please swear in or affirm the witness.
17      THE REPORTER:  Raise your right hand
18 please.
19      THE WITNESS:  (Complying.)
20      (Oath administered remotely.)
21      THE WITNESS:  I do.
22      THE REPORTER:  Thank you so much.
23
24
25
```

1            SARAH SIMMERS
2            SARAH SIMMERS,
3    called as a witness herein by the plaintiff,
4    having been first duly sworn remotely, was
5    examined and testified as follows:
6                EXAMINATION
7    BY MR. PENN:
8    Q.  Good morning, Ms. Simmers.  My name is
9    Robert Penn.  I represent the plaintiff Aware
10   Products LLC, doing business as Voyant Beauty,
11   who I will refer to today as "Voyant."
12         I'd like to go through some -- a few
13   ground rules.  Have you been deposed before?
14   A.  I have not.
15   Q.  Okay.  So today I will ask you a series
16   of questions, and of course everything is
17   recorded.  The court reporter can only take down
18   the verbal answers, so nods or shaking your head
19   will not be a sufficient answer, so try to make
20   a verbal answer, please.
21         The reporter can only take down the --
22   one person at a time, so we'll try not to speak
23   over each other, although I know on Zoom it can
24   be -- sometimes there's a little delay, so we'll
25   try not to speak over each other.

1    I'll do my best to look to let you
2    finish your answers, and if you could let me
3    finish my questions, that would be excellent.
4    A.  Okay.
5    Q.  If you don't understand a question, you
6    can ask me to -- you can tell me, you can ask me
7    to rephrase.
8         If you -- if I ask a question your
9    counsel, Mr. Koranteng, may object today.  Those
10   objections are for the record, and you must
11   still answer the question.  So I'm going to ask
12   the question, maybe just give a beat in case
13   there's an objection, and then you can answer
14   the question.
15         If you need a break at any time, please
16   let me know.  We will try to accommodate those
17   requests, of course, but I'll ask that you
18   answer whatever question is pending at the time
19   before we take a break.
20   A.  Okay.
21   Q.  Okay.  Did you prepare for your
22   deposition today?
23   A.  Yes.
24   Q.  How did you prepare?

1            SARAH SIMMERS
2    A.  I reviewed e-mails.  That's the only
3    preparation I did.
4    Q.  And were these e-mails e-mails produced
5    by -- by your counsel?
6    A.  Yes.
7    Q.  When did you do your preparation?
8    A.  Yesterday.
9    Q.  And about how long was the preparation?
10   A.  An hour.
11   Q.  And you said you looked at e-mails.
12   Did you look at any other documents?
13   A.  Just my Epicure Operating Agreement.
14   Q.  Today you understand that you're under
15   oath today, correct?
16   A.  I do.
17   Q.  And that if you don't provide truthful
18   answers, that would be considered perjury?
19   A.  I do.
20   Q.  Is there any reason that you cannot
21   testify truthfully today?
22   A.  There's no reason.
23   Q.  So today we're obviously taking this
24   deposition remotely because of -- partly because
25   of the COVID situation, so I have a few

1            SARAH SIMMERS
2    questions related to that situation.
3         Is anyone in the room with you?
4    A.  No.
5    Q.  I would ask that if anyone enters the
6    room at any time that you please let me know.
7    A.  Absolutely.
8    Q.  And are you looking at anything other
9    than the screen upon which the deposition is
10   being taken?
11   A.  Just the screen.
12   Q.  So I'd ask that you please don't look
13   at anything else while we're on the record.
14   A.  Okay.
15   Q.  I'd like to please -- I'd like you to
16   please answer all questions by yourself and that
17   you don't look to anyone or anyone else to help
18   in answering the questions.
19   A.  Okay.
20   Q.  If you cannot answer a question by
21   yourself, let me know.
22         I'd also ask that you agree not to
23   communicate with anyone else besides me in any
24   way while we're on the record.
25         Do you agree to do that?

Page 14

SARAH SIMMERS

1    A. I agree.
2    Q. And this includes not checking e-mail,
3    text messages or other forms of communication.
4    Do you understand that?
5    A. I do.
6    Q. Okay.
7    A. I'm having a little trouble hearing
8    you, so if you see me doing this, I'm trying to
9    turn you up.
10   Q. Okay.
11   A. So if there's any way you can maybe
12   lean in, I would appreciate that.
13   Q. That's exactly what I was going to try
14   to do. How is this? A little better?
15   A. That is a little better.
16   Q. Perfect. And if it's hard to hear me
17   at any time, you can just let me know.
18       Okay. I'd like to start a little bit
19   talking about your work background and your
20   education. Did you attend a school after high
21   school?
22   A. Yes.
23   Q. Where did you go?
24   A. I went to North Dakota State University

Page 15

SARAH SIMMERS

1    in Fargo.
2    Q. Did you get a degree from there?
3    A. Yes.
4    Q. What degree?
5    A. I have a doctorate in pharmacy.
6    Q. And how many years did you attend North
7    Dakota State University?
8    A. Six.
9    Q. Did you attend any other schools?
10   A. I did not.
11   Q. Can you tell me a little bit about your
12   work history after leaving or getting your
13   degree at North Dakota State?
14   A. Work history? I've worked in various
15   hospitals, clinics, corporate pharmacy
16   predominantly.
17   Q. What was your first position after you
18   left North Dakota State?
19   A. I was a hospital pharmacist at North
20   Memorial in Robbinsdale, Minnesota.
21   Q. And what did that entail, generally
22   speaking?
23   A. Hospital pharmacy, order entry. You
24   were a reference for physicians in the hospital

Page 16

SARAH SIMMERS

1    system, checking prescriptions.
2    Q. And what was your next position after
3    that?
4    A. Home infusion pharmacy.
5    Q. I'm sorry, did you say "home infusion"?
6    A. Home infusion, yes.
7    Q. What was home infusion pharmacy?
8    A. You took -- patients were given their
9    medications in the home. Most of them were
10   intravenous.
11   Q. And was that the name of the company
12   you worked for?
13   A. No. No, that was the setting. The
14   company was Allina Home Infusion.
15   Q. And how long did you do that position?
16   A. I want to say six years.
17   Q. And you eventually left that position?
18   A. Can you repeat that?
19   Q. Did you eventually leave the home
20   infusion job?
21   A. I did.
22   Q. What was your next position after that?
23   A. I was an authorized nuclear pharmacist
24   for Cardinal Health.

Page 17

SARAH SIMMERS

1    Q. What did that job entail?
2    A. Preparing radio nucleotides for the
3    hospital.
4    Q. Can you explain what that means at a
5    very high level?
6    A. Radio nucleotides are used in
7    diagnostics, and we basically follow the body.
8    We don't make any changes to the body. It's for
9    imaging for physicians to see how well the organ
10   systems are operating and working.
11   Q. Is this a line -- is that -- excuse me.
12   Strike that.
13       Was this a -- did you study at North
14   Dakota State University for this line of work
15   that you were doing?
16   A. No. Cardinal Health partners with a
17   training program through the University of New
18   Mexico to provide on the job to do the training
19   that's required to be an ANP.
20   Q. And what was your next position after
21   that?
22   A. When I left Cardinal? Actually -- I
23   actually worked still per diem for Cardinal and
24   went to work for a clinical -- excuse me -- a

SARAH SIMMERS

1
2   clinic pharmacy for Innovis, Innovis Health.
3       Q.  Would you spell Innovis, please?
4       A.  I-N-N-O-V-I-S.
5       Q.  And what was your -- what did your job
6   entail at Innovis Health?
7       A.  I was the clinic pharmacist retail --
8   more of a retail model dispensing prescriptions
9   within the clinic for the primary care doctors.
10      Q.  And did you eventually leave that
11  position at Innovis?
12      A.  I did.
13      Q.  What was your next position after that?
14      A.  I moved to Arizona and opened a
15  compounding pharmacy.
16      Q.  Tell me what is a compounding pharmacy.
17      A.  A compounding pharmacy is where we make
18  patients' prescriptions pursuant to a doctor's
19  formulation that we work together on for a
20  patient.  It's customized to the patients.
21      Q.  What was the -- what is the name or
22  what was the name of the pharmacy in Arizona?
23      A.  Customceutical Compounding.
24      Q.  And do you recall what year you
25  established this pharmacy?

SARAH SIMMERS

2       A.  2010, I believe.  I believe my
3   operating agreement is 2010, yes, I believe.
4       Q.  And are you -- well, it is
5   Customceutical; is that correct?
6       A.  Customceutical.
7       Q.  Customceutical.  Are you an owner of
8   Customceutical?
9       A.  I am.
10      Q.  And are there any other owners?
11      A.  Yes.
12      Q.  Who are the other owners?
13      A.  James Birch.
14      Q.  And has he been an owner since 2010?
15      A.  Yes.
16      Q.  For Customceutical, do you -- does --
17  do you operate in a retail space or how does --
18  how do you dispense the products that you make?
19      A.  Customceutical is a retail pharmacy,
20  yes.  We dispense the prescriptions to the
21  patient.  We also did do some injectables to
22  providers, but they were all patient-specific.
23      Q.  And can you just briefly explain the
24  process for how you might produce a specific
25  product?  For example, does the doctor make a

SARAH SIMMERS

1
2   request and then you fill the request?
3       A.  The doctor writes a prescription, yes,
4   and we fulfill the prescription.
5       Q.  And is -- and you may have said this,
6   and forgive me if I'm asking you again.  Is
7   Customceutical still operating?
8       A.  It is not.
9       Q.  Okay.  When did it stop operating?
10      A.  November 4th of 2020.
11      Q.  Is there any reason that it stopped
12  operating?
13      A.  Yes.  It was -- we weren't making it
14  because of the pandemic.
15      Q.  Besides Custom -- Customceutical, did
16  you have any other work -- did you work at any
17  other pharmacies or entities?
18      A.  Yes.
19      Q.  Can you tell me about those, please?
20      A.  I also am an owner in Scottsdale
21  Professional Pharmacy.
22      Q.  Okay.  What is Scottsdale Professional
23  Pharmacy?
24      A.  Scottsdale Professional Pharmacy is a
25  nonsterile compounding pharmacy.

SARAH SIMMERS

1
2       Q.  And what does a nonsterile -- what is a
3   nonsterile compounding pharmacy?
4       A.  We make customized prescriptions
5   pursuant to a prescription from a doctor
6   specific for certain patients.  This is
7   noncommercial products.  We make them, in
8   essence.
9       Q.  How is -- how is the non -- how is the
10  product that you produce at Scottsdale
11  Professional different from what you produce
12  with Customceutical?
13      A.  Customceutical was largely sterile
14  products.  Scottsdale Professional Pharmacy --
15  and we do business as Customedico -- was
16  nonsterile.
17      Q.  For a nonpharmacist, what's the
18  difference between sterile and nonsterile?
19      A.  Sterile you inject; nonsterile, you
20  don't.
21      Q.  Great.  Thank you.  Now, I know that.
22          Okay.  So you are an owner of
23  Scottsdale Professional Pharmacy, and are there
24  any other owners?
25      A.  There is not.

Page 22

SARAH SIMMERS

1
2    Q.  Do you recall about the time that you
3  established Scottsdale?
4    A.  January 10th, 2017.
5    Q.  And I believe you said that Scottsdale
6  Professional Pharmacy is doing business as
7  Customedico; is that correct?
8    A.  That is correct.
9    Q.  And is it still in business?
10   A.  It is still in business, yes, sir.
11   Q.  Do you have any other -- are you an
12 owner of any other businesses in the pharmacy
13 industry?
14   A.  I am not.
15   Q.  Do you know what First Choice Pharmacy
16 is?
17   A.  Yes.  I -- so yes, I -- I'm sorry.  In
18 December, we opened First Choice Pharmacy next
19 door to Customedico.
20   Q.  Okay.  And you said -- when you said
21 when "we opened," who were you referring to?
22   A.  Myself, Lee Ori and an entity called
23 Pharm Barn.
24   Q.  The entity was Pharm Barn?
25   A.  Um-hum.

Page 23

SARAH SIMMERS

1
2    Q.  And what -- are you -- strike that.
3      What percentage of First Choice
4  Pharmacy do you own?
5    A.  20 percent.
6    Q.  And is that in -- ownership in your
7  name or is it an LLC?
8    A.  It's in my name.
9    Q.  And what percentage does Pharm Barn
10 own?
11   A.  60.
12   Q.  And Mr. Ori, Lee Ori owns the other
13 20 percent; is that correct?
14   A.  Yes, sir.  But that was my mistake.
15 I'm sorry.  I do have ownership in First Choice.
16 I'm just not thinking.  I'm sorry.
17   Q.  No problem.  No problem.  That's why we
18 ask the questions.  It's okay.
19      Does -- so -- strike that.
20      Does Customedico own -- strike that.
21      Is there any relationship between
22 Customedico and First Choice besides your
23 ownership stake?
24   A.  Customedico has no stake in First
25 Choice Pharmacy or vice versa.

Page 24

SARAH SIMMERS

1
2    Q.  Does First Choice do business with
3  Customedico?
4    A.  It does not.  They're separate
5  entities.
6    Q.  And is First Choice just a retail
7  pharmacy?
8    A.  Yes, sir.
9    Q.  Does it specialize in any sense for --
10   A.  Injured workers.  It's work comp,
11 Workman's Comp.
12      MR. KORANTENG:  Sarah, would you wait
13 until he's asked his question?  Until he has
14 fully asked his question, I think you kind of --
15      THE WITNESS:  Oh, I apologize.
16      MR. KORANTENG:  That's okay.
17 BY MR. PENN:
18   Q.  Okay.  Are you an owner -- strike that.
19      Can you tell me what is Foxhole
20 Medical, LLC?
21   A.  Foxhole Medical, LLC is an LLC that I
22 work with with Lee Ori.
23   Q.  And when was it formed?
24   A.  We formed Foxhole in 2018.
25   Q.  And why did you form Foxhole?

Page 25

SARAH SIMMERS

1
2    A.  We started doing some pharmacy
3  consulting as Foxhole.
4    Q.  And when you say "pharmacy consulting,"
5  what does that mean?
6    A.  We were approached to help another
7  pharmacy entity with programs, so we formed an
8  LLC to help them with pharmacy programs.
9    Q.  Just stepping back a moment, are you
10 currently -- you're currently a licensed
11 pharmacist, correct?
12   A.  Yes.
13   Q.  And what states are you licensed in?
14   A.  I'm licensed in Arizona, I'm licensed
15 in Minnesota, and I have a PIC license in Iowa,
16 and I had been licensed in Oklahoma.
17   Q.  Okay.  So you said that Foxhole was
18 formed to do pharmacy consulting.  Who formed
19 Foxhole?
20   A.  Can you repeat that?  I heard -- the
21 air just kicked on.
22   Q.  Yes.  Who formed Foxhole?
23   A.  I and Lee did.
24   Q.  And are you and Mr. Ori its only
25 members?

Page 26

SARAH SIMMERS

1
2  A.  Lee Ori and I are the only members of
3  Foxhole, yes, sir.
4  Q.  Okay.  And who is Lee Ori?
5  A.  Lee Ori is my business partner in
6  Foxhole, he is my business partner in Epicure
7  Medical, and he does some management --
8  management agreement with Scottsdale
9  Professional.
10  Q.  What -- how did you -- how do you know
11  Mr. Ori?  When did you meet?
12  A.  I met Lee at a pharmacy conference.
13  Q.  Do you know around when?
14  A.  2013, 2014, around then.
15  Q.  Okay.  You said that Mr. Ori is
16  involved -- has a management position at
17  Customedico; is that correct?
18  A.  He does business -- some business
19  investment, correct.
20  Q.  Is he an employee?
21  A.  He is not an employee.
22  Q.  Going back to Foxhole, can you tell me
23  its members?  Who are the managers of Foxhole?
24  A.  Both Lee and myself.
25  Q.  Does Foxhole generate any revenue?

Page 27

SARAH SIMMERS

1
2  A.  While we were doing consulting, it did.
3  Since the pandemic, I -- we haven't done as much
4  of it.
5  Q.  Did Foxhole engage in any other -- any
6  other business besides consulting?
7  A.  Yes.
8  Q.  What was that?
9  A.  In 2019, we started doing contract CBD
10  out of Foxhole.
11  Q.  When you say "contract CBD," what does
12  that mean?
13  A.  We engaged with a manufacturer,
14  developed formulas and were doing some white
15  labeling contract distribution of CBD.
16  Q.  And is Foxhole still contracting in
17  CBDs?
18  A.  Not -- no, because of the pandemic.
19  Q.  When -- when, if you recall, when did
20  Foxhole stop taking in revenue?
21  A.  I don't -- I'm not sure.  I'm really
22  not.
23  Q.  Have you done -- do you recall the last
24  time you did any consulting under Foxhole's
25  name?

Page 28

SARAH SIMMERS

1
2  A.  2020.  To my best recollection, it'd be
3  2020.
4  Q.  Okay.  Thank you.
5  Does Foxhole have any employees?
6  A.  It does not.
7  Q.  Does Foxhole have independent
8  contractors?
9  A.  Yes.
10  Q.  Do you recall who those contractors
11  are?
12  A.  We had Dan Reilly as an independent
13  contractor when we started doing the CBD.
14  Q.  And who was Mr. -- who is Dan Reilly?
15  A.  Dan Reilly is an associate or a
16  business relationship of Lee's from the Saint --
17  in St. Louis.
18  Q.  Did you meet Mr. Reilly through his
19  Foxhole engagement?
20  A.  Yes, sir.
21  Q.  And what did Dan Reilly do for Foxhole?
22  A.  Dan had a background in promotional
23  products.  We were trying to engage his
24  relationships to sell CBD.
25  Q.  About how long did you end up working

Page 29

SARAH SIMMERS

1
2  with Dan Reilly in the Foxhole entity?
3  A.  Can you say that again?
4  Q.  Sure.  How long did Foxhole work with
5  Dan Reilly?
6  A.  In the CBD space, most of 2019, from my
7  best recollection.
8  Q.  When you were developing the CBD
9  products, I guess, with Foxhole, would you say
10  Dan Reilly was mostly involved on finding
11  customers?  Is that -- is that a fair
12  characterization?
13  A.  Dan did some infrastructure stuff for
14  us, but it was mostly sales.
15  Q.  And in -- and what was your role
16  primarily with respect to the CBD sales?
17  A.  Branding and formulating.
18  Q.  And what was Mr. Ori's role primarily?
19  A.  Business development, contracting.  He
20  worked directly usually with the contract
21  manufacturers.
22  Q.  When -- just getting back to the
23  Foxhole itself, when you established it, how was
24  the company capitalized?
25  MR. KORANTENG:  Objection.  Objection

SARAH SIMMERS

2 to the form of the question.  It's vague as it
3 asks specifically what capitalization means.
4     MR. PENN:  Actually, let me withdraw
5 the question.
6 BY MR. PENN:
7     Q.  Was -- when you established Foxhole,
8 was it capitalized?
9     MR. KORANTENG:  Objection again as to
10 what "capitalization" means.  I think it's
11 vague.
12 BY MR. PENN:
13     Q.  You can answer the question if you
14 know.
15     A.  When we formed Foxhole, we -- as far as
16 capitalizing it, we had a lot of meetings around
17 putting the programs together, so I know I had
18 expenses and dinners and meetings meeting Lee.
19 As far as money in to the business, it was a
20 fee-for-service business.  I didn't need -- we
21 didn't need a lot of capital to engage with the
22 customer and what we knew in the programs.  So I
23 had investment in it as far as when we would
24 meet, but physically putting in money was mostly
25 that or -- and our time.

SARAH SIMMERS

2     Q.  When you say "not physically putting in
3 money was mostly that," what --
4     A.  Well, I mean, it was our expenses that
5 we incurred putting the programs together that
6 we were contracted to do.  I didn't go out --
7 what I'm saying is I didn't go out and get a
8 loan to do what I needed to capitalize Foxhole
9 is what I'm saying.
10     Q.  Okay.
11     A.  It had minimal expenses to start the
12 company, to put programs together for the
13 customer.
14     Q.  Okay.  And what is Foxhole's current
15 status?
16     A.  Well, we have the CBD on pause because
17 of the pandemic.  I would love to start that
18 again.  Just trying to gauge marketplace.  So we
19 currently are just waiting to see if we can do
20 any further CBD sales out of it or not.  I don't
21 know.  It's on pause.
22     Q.  And have you sold any part of the
23 company?
24     A.  Have I sold any part of Foxhole?
25     Q.  Correct.

SARAH SIMMERS

2     A.  No.
3     Q.  You said that the CBD venture was on
4 pause.  Can you venture a guess about how you
5 will determine when to try to restart that
6 venture?
7     A.  I can't.  I'm too committed to other
8 places.
9     Q.  By "committed to other places," how --
10 what do you mean?
11     A.  I'm busy in the pharmacy space, too
12 busy in the pharmacy space.
13     Q.  Okay.  I'm going to try to show you a
14 document here.  I will be trying to share my
15 screen.  We'll see how that goes first time
16 round.  I'm also going to be putting the
17 document into the chat.  So you'll have sort of
18 two options to view it.
19     Most -- most of these exhibits, I think
20 it will be easy enough for you to view the
21 portion I'm sharing on the screen, but you also
22 have the option to look into the chat and
23 download the document to your computer and to
24 review it there.
25     Most of these documents are going to be

SARAH SIMMERS

2 relatively short, but if at any time you feel
3 like you need to read the complete document or
4 you want to do more or you need more time to
5 finish reading it, just please let me know.
6     A.  Okay.
7     Q.  Okay.
8     MR. KORANTENG:  Are you planning to use
9 the exhibits that have already been marked?
10     MR. PENN:  You know, I'm not.  There
11 will be some repeats, but I'm just doing a whole
12 new set.
13     (Simmers Exhibit 1 was marked
14     for ID.)
15 BY MR. PENN:
16     Q.  Okay.  Can you see the document on the
17 share screen?
18     A.  I can.
19     Q.  Do you recognize this document?
20     A.  I do.
21     Q.  What is it?
22     A.  It is our Operating Agreement for
23 Foxhole, Foxhole Medical.
24     Q.  Okay.  Let me show you -- sorry.  Let
25 me back up and say I'd like to introduce this as

SARAH SIMMERS

1
2  Defendant's Exhibit 1.  The document's
3  identified as DEF3744 through DEF393793, and
4  this was a document produced by your counsel.
5       And on this page you can see -- can you
6  see the signatures at the bottom?
7     A.  Can you slide it up?  I can't see the
8  whole page.
9     Q.  Yes.  (Complying.)
10    A.  (Reviewing document.)
11    Q.  Okay.  How's that?
12    A.  Perfect.
13    Q.  Okay.  And do you see your signature
14 listed as a member?
15    A.  Yes, sir.
16    Q.  And do you see your signature listed
17 under manager?
18    A.  Yes, sir.
19    Q.  And who was the other member from
20 Foxhole that's there?
21    A.  Lee Ori.
22    Q.  Okay.  And do you see his signature on
23 this document?
24    A.  I do.
25    Q.  And is Lee Ori also listed as a manager

SARAH SIMMERS

1
2  on this document?
3     A.  Yes, sir.
4     Q.  Moving to the next page, this is
5  Schedule A, and it lists capital contributions.
6  Do you see that?
7     A.  Yes.
8     Q.  It indicates that -- it says Sarah
9  Simmers made -- it said "Sarah Simmers," and
10 next to that it says "capital contribution,
11 $500."  Do you see that?
12    A.  I do.
13    Q.  The next column says "membership
14 interest, 50 percent."  Do you see that?
15    A.  I do.
16    Q.  It also says Mr. Ori -- strike that.
17       Mr. Ori is also listed as a member, and
18 next to his name it says that the $500
19 contribution.  Do you see that?
20    A.  I do.
21    Q.  Do you recall, did you actually deposit
22 $500 into Foxhole?
23    A.  I did not.
24    Q.  Do you know if Lee Ori deposited $500
25 into Foxhole?

SARAH SIMMERS

1
2     MR. KORANTENG:  Objection.
3     THE WITNESS:  He did not.
4     MR. KORANTENG:  Objection.  The
5  question is vague.
6     THE WITNESS:  What I do know is we both
7  incurred expenses setting up the programs in
8  between meetings, office supplies, et cetera.  I
9  don't know -- I don't know beyond that if he
10 deposited $500 into the checking.
11 BY MR. PENN:
12    Q.  Okay.  And did you establish a checking
13 account for -- or a bank account for Foxhole?
14    A.  Yes.
15    Q.  All right.  I'm going to show you
16 another page.  This is -- directing your
17 attention to Article VII of the agreement.  It's
18 the "Management."
19       Subsection a, the first sentence -- the
20 first two sentences say "Management of company.
21 All of the business and affairs of the company
22 shall be managed by a board of managers.  The
23 board of managers shall consist of two managers
24 who may not be members of the company.  The
25 initial manager shall be, 1, Lee Ori, and, 2,

SARAH SIMMERS

1
2  Sarah Simmers."
3       Do you see that in the agreement?
4     A.  I do.
5     Q.  It says Lee Ori and Sarah Simmers are
6  the initial managers.  Is that accurate?
7     A.  Yes.
8     Q.  Were there any other managers?
9     A.  No.
10    Q.  And you were the only -- I think you
11 already testified that you and Mr. Ori were the
12 only members; is that correct?
13    A.  Correct.
14       MR. PENN:  I have a next exhibit that
15 I'd like to mark as Exhibit 2.
16       (Simmers Exhibit 2 was marked
17       for ID.)
18 BY MR. PENN:
19    Q.  This is Bates stamped DEF0031.  Can you
20 see the document on your screen, Miss Simmers?
21    A.  I can.
22    Q.  You cannot?
23    A.  I can, yes, sir.
24    Q.  Oh, okay.  Do you recognize this
25 document?

Page 38

SARAH SIMMERS

1
2   A.  Yeah.  It's the Carrollton.  It's our
3   bank account document.
4   Q.  And is it the bank account document for
5   Foxhole?
6   A.  The writing is so small.  Yes, it's for
7   Foxhole.  There we go.  Yes.
8   Q.  Just to remind you, if at any time you
9   can't see it or it's too small, just let me know
10  because, you know, I can't quite tell what it
11  always looks like on your end, so just feel free
12  to let me know.
13  A.  Okay.
14  Q.  Just drawing your attention to the
15  highlighted section, it shows that there's a --
16  there was an initial deposit of zero dollars.
17  Do you see that?
18  A.  I do.
19  Q.  Scrolling down, do you see your
20  signature on this document?
21  A.  I do.
22  Q.  You indicated -- strike that.
23      Did you ever invest capital into
24  Foxhole?
25      MR. KORANTENG:  Objection.  It's been

Page 39

SARAH SIMMERS

1
2   asked and answered.
3   BY MR. PENN:
4   Q.  You can answer the question, if you
5   can.
6   A.  You are asking me if I have invested
7   any money in Foxhole?  Personally, just in
8   meetings, what it cost us when we met, office
9   supplies, things we were doing to put the
10  programs together, yes, I have made those
11  investments.  It's not -- I did not write a
12  check into the checking account and make a
13  capital contribution that way, no.
14  Q.  Okay.  Thank you.
15      MR. PENN:  How long have we been going?
16  How are you on time?  Do you need a break at
17  all, Miss Simmers?
18      THE WITNESS:  Nope.
19      MR. PENN:  Okay.
20  BY MR. PENN:
21  Q.  Let's talk a little bit about Epicure.
22  What is Epicure Medical?
23  A.  Epicure Medical is a company that I
24  formed with Dan and Lee.
25  Q.  And when was it formed?

Page 40

SARAH SIMMERS

1
2   A.  Epicure was in March, March of 20 --
3   oh, gee.  The pandemic years all run together
4   for me.  It's one big year.
5       Lee formed it in March of 2020, I
6   believe.
7   Q.  And why was Epicure formed?
8   A.  Epicure was formed to do contract --
9   contract manufacturing of products.  Initially,
10  it was for sanitizer.  We had other products
11  that Dan was working on with some masks and some
12  other pandemic products through Epicure.
13  Q.  Who are Epicure's members?
14  A.  Epicure's members are -- the members
15  are two companies.  It's PFL Investments and
16  then Dan's company.  I don't recall the name of
17  his company, but he has a company in there
18  that's the member.
19  Q.  Okay.  Do you know what percentage each
20  company holds in Epicure?
21  A.  I -- I believe it's -- I think it's
22  60/40.
23  Q.  Okay.
24  A.  I actually don't recall.  I believe
25  it's 60/40.  I -- but I'm not recalling.

Page 41

SARAH SIMMERS

1
2   Q.  Okay.  You said one of the companies is
3   PFL Investments.
4   A.  Um-hum.
5   Q.  Is that an LLC?
6   A.  Yes, sir.
7   Q.  Who are PFL's members?
8   A.  Lee Ori and myself.
9   Q.  And who are PFL's managers?
10  A.  Lee Ori and myself.
11  Q.  When -- when did you establish PFL
12  Investments?
13  A.  2020, I believe.
14  Q.  And what is PFL's purpose?
15  A.  We established PFL, Lee and I did, to
16  work with -- I guess I would say ServeRx as a
17  company.  Trying to decide.  I couldn't recall
18  who -- which company we signed the agreement
19  with.
20  Q.  Could you say the name of the company
21  again, please?
22  A.  Yeah, I believe -- I need to look at
23  who we signed the agreement with, but we were
24  doing some work, pharmacy work.  It was a
25  pharmacy related initially, yes.

Page 42

SARAH SIMMERS

2  Q.  And what type of -- generally, what
3  type of work were you doing with the entity?
4  Was it consulting also?
5  A.  (Nodding.)  Yes, sir.  I'm sorry.  I
6  forgot.  I'm sorry.  That was a nodded yes.
7  Q.  Did PFL generate any income?
8  A.  Yes, I believe so.
9  Q.  Do you recall what source the income
10 was from?
11 A.  The consulting that we were doing.
12 Q.  Were you doing the consulting in --
13 strike that.
14      You said that you established PFL in
15 2000, and do you recall when in 2000 you were
16 doing this consulting?
17 MR. KORANTENG:  Objection, misstates
18 her testimony.
19 BY MR. PENN:
20 Q.  You can answer if you know.
21 A.  I want to say latter half of the year,
22 and that's as far as engaging the client, like,
23 talking to the client was the latter half of
24 2020.
25 Q.  And did you do -- did PFL do any -- or

Page 43

SARAH SIMMERS

1  strike that.
2
3      Did you continue to engage in
4  consulting through PFL after 2020?
5  A.  Yes.
6  Q.  And did PFL continue to generate income
7  after 2020?
8  A.  Yes.
9  Q.  And do you still operate PFL today?
10 A.  Yes, sir.
11 Q.  Do you know if Lee Ori was involved in
12 any of the consulting work for PFL?
13 A.  He absolutely was.
14 Q.  What was his role?
15 A.  We were consulting -- I did more of the
16 operations, and he did more of the business,
17 contracting and operated the business side of
18 it.  I did more the operations side.
19 Q.  And can you describe the type of
20 consulting you were doing with PFL?
21 A.  Absolutely.  It was in preparation for
22 opening First Choice Pharmacy.
23 Q.  So did PFL contract with First Choice
24 to provide services?
25 A.  No.

Page 44

SARAH SIMMERS

2  Q.  What type of preparation were you doing
3  for opening First Choice?
4  A.  A buildout of a space.  Lee did a lot
5  of the work with the contractor for the
6  buildout.  So that was city planning and things
7  like that.
8      I was doing more of the SOPs, SOP work
9  for pharmacy, standard operating procedures.
10 The licensure was my responsibility.  That's
11 predominantly what we were doing in there.  Some
12 program work, setting up the program stuff too.
13 Q.  Did PFL receive payment for these
14 services?
15 A.  Yes, sir.
16 Q.  Who was the client making payments?
17 A.  I can't remember the name of the entity
18 that we -- that they were using.
19 Q.  When --
20 A.  I'd have to look.  I'd have to look at
21 who we signed the contract with.  I don't
22 remember.
23 Q.  Just so I understand, the relationship
24 between PFL and First Choice, so PFL was
25 providing these services --

Page 45

SARAH SIMMERS

2  A.  Yeah, it's pharmacy -- it's kind of
3  some pharmacy management service that would
4  probably make the most sense to you.  Having
5  been pharmacists and in the industry, it's
6  pharm -- it's running a pharmacy.
7  Q.  Okay.  Turning back to Epicure, do you
8  recall if Epicure was capitalized when you
9  formed the company?
10 A.  Yes.  I believe we had a large deposit
11 from a sanitizer sale.  It was a customer
12 deposit I believe is the -- I believe is how we
13 capitalized Epicure.
14 Q.  Did you -- were there any other capital
15 contributions to Epicure when you established
16 the company?
17 A.  Just what we put in individually in
18 re- -- you know, with receipts in our meeting
19 and getting prepared.  We had -- we had personal
20 expenses that we -- it would be a capital
21 contribution to Epicure, yes.  Each of us
22 individually did.  I don't -- I don't know how
23 much each -- everyone's receipts were, but yes,
24 that -- that would be from my side for me, I had
25 receipts and expenses.

Page 46

SARAH SIMMERS

1
2    Q.  Did you have any discussions with
3    Mr. Ori or Mr. Reilly about how the
4    capitalization should be determined?
5    A.  Initially?
6    Q.  Yes, initially.
7    A.  Yes.
8    Q.  And what were those discussions?
9    A.  From my recollection, we talked about
10   that they were already out selling, and we would
11   have a -- we would have a contri- -- we would
12   have a capital in the account from a few sales
13   that they had already lined up, essentially.
14   That's what my understanding was.  And then we
15   did have a pretty large deposit when they opened
16   the account, that I understood that they were
17   already out there selling, trying to line up
18   contracts and relationships.
19   Q.  When you say they were out there
20   selling, they were selling hand sanitizer?
21   A.  Yeah, and I think -- I think we also
22   had some masks in place too.  There were other
23   things besides sanitizer.  Sanitizer was the
24   fake focus, but I know there was -- I'm pretty
25   sure we did a mask deal in there too in the

Page 47

SARAH SIMMERS

1
2    beginning.
3    Q.  So it sounds like Mr. Ori and -- well,
4    strike that.
5    It sounds like Epicure was -- strike
6    that.
7    You said Mr. Ori and Mr. Reilly were
8    already out selling; is that correct?
9    A.  Yes.
10   Q.  And can you -- do you recall the time
11   frame when they began making these sales?
12   A.  I can't.
13   Q.  Is it fair to say that they began these
14   efforts prior to Epicure's formation?
15   A.  Yes, it's fair to say that.  We -- we
16   were -- Epicure was Dan's -- kind of Dan's baby.
17   He -- he was starting to work with us, and we
18   were setting up channels for CBD as Epicure.  So
19   that's kind of how we started the Epicure
20   conversation originally.  Ahead of the pandemic,
21   we were talking about CBD, Dan, and reforming
22   Epicure to do CBD out of it because Dan was not
23   a partner in Foxhole.
24   Q.  So Epicure -- the early discussions
25   about Epicure were for Epicure to go into the

Page 48

SARAH SIMMERS

1
2    CBD business; is that correct?
3    A.  Correct.
4    Q.  And those early discussions took place
5    in the -- strike that.
6    You indicated that those early
7    discussions took place before the pandemic; is
8    that right?
9    A.  Yes.
10   Q.  And can you give an estimate about --
11   on the date when you first started having these
12   conversations with Dan Reilly?
13   A.  Yes.  Dan started working with us in
14   Foxhole in 2019.  He was -- we got involved with
15   him because we needed his help for sales.  Once
16   things were doing pretty well towards the end of
17   '19, Dan talked to us about Epicure and asking
18   if we could possibly look at a new company with
19   him as a partner because he has a lot of sales
20   relationships.  Dan's lane is sales.  He's very
21   good at it.  So we were talking Epicure as early
22   as end of 2019 about CBD and putting that
23   together.  So he had a lot of ideas there.
24   Q.  Did there come a point in 2000 when the
25   focus of Epicure shifted from CBD to hand

Page 49

SARAH SIMMERS

1
2    sanitizer?
3    A.  Yes, because Dan was -- Dan was
4    engaging customer bases, and his promotional
5    customer space is CBD, and they all wanted
6    sanitizer instead of CBD.  So rather than
7    Epicure getting fully formed and going in the
8    CBD space, it pivoted because of the
9    marketplace.
10   Q.  You -- I think you indicated that there
11   were sales prior to Epicure's formation.  Do you
12   know on whose behalf those sales were made?
13   A.  The sales were made on behalf of
14   Epicure.
15   Q.  And that's even though Epicure wasn't
16   formed yet; is that correct?
17   A.  Yeah, they were just scrambling as fast
18   as they could to get the documents in place,
19   yes, but they went -- Dan was -- that's when he
20   was engaging us and pushing to be a partner
21   because he has the sales relationships.  So we
22   had to respect that.  So we were just -- Lee was
23   working as fast as he could to get the documents
24   in place for Epicure.
25   Q.  You indicated that -- or rather you

Page 50

SARAH SIMMERS

1    testified that Epicure -- or strike that.
2    You indicated that Epicure was
3    initially conceived as a CBD venture but you
4    pivoted to hand sanitizer, correct?
5        A.  Yeah, no CBD was produced as Epicure.
6        Q.  Okay.  You -- you had -- did you have
7    any background in producing or selling hand
8    sanitizer?
9        A.  Do I?
10       Q.  Did you?
11       A.  Or did we collectively?  Are you saying
12   we, Epicure, or I, Sarah Simmers?
13       Q.  We'll start -- let's start with you,
14   Sarah Simmers.
15       A.  I do not have hand sanitizer sales
16   experience, no, sir.
17       Q.  And do you know if Mr. Ori or
18   Mr. Reilly had experience selling that -- those
19   products, hand sanitizer products?
20       A.  Not to my knowledge.
21       Q.  And do you know if Mr. Ori or
22   Mr. Reilly had any background in manufacturing
23   hand sanitizer products?
24       A.  Hand sanitizer specifically?  Not to my
25

Page 51

SARAH SIMMERS

1    knowledge.
2        MR. PENN:  I'm going to introduce
3    Exhibit 3.
4        (Simmers Exhibit 3 was marked
5         for ID.)
6    BY MR. PENN:
7        Q.  Okay.  Do you recognize this document?
8        A.  I do.
9        Q.  And what do you recognize it as?
10       A.  This is our Epicure Operating
11   Agreement.
12       Q.  Do you see the effective date on this
13   document?
14       A.  I do.
15       Q.  And what is the effective date?
16       A.  March 26th, 2020.
17       Q.  This document was provided by your
18   counsel.  It's identified as DEF3505 through
19   DEF3545.  On the screen, can you see what is the
20   signature page for this Epicure agreement?
21       A.  I can.
22       Q.  Can you dell tell me the entities
23   listed under the "members" signature?
24       A.  PFL Investment LLC and its manager, Lee
25

Page 52

SARAH SIMMERS

1    Ori, and Clover Leaf Strategies LLC, by it's
2    manager, Lisa Reilly.
3        Q.  And you testified about PFL
4    Investments.  This is the PFL Investments that
5    you're a member of, correct?
6        A.  Correct and manager of, yes.
7        Q.  And --
8        A.  I'm a manager of, yes.
9        Q.  You're a member and a manager, correct?
10       A.  Correct.
11       Q.  Correct.  And Mr. Ori is a member of
12   PFL Investments, correct?
13       A.  Yes.
14       Q.  And do you recognize his signature next
15   to the member on this section?
16       A.  Yes, I do.
17       Q.  The other member listed on this
18   document is Clover Leaf Strategies LLC.  Do
19   you -- do you know what that is?
20       A.  That is Dan -- Dan's company.  That's
21   all I know.  That's all I know of it.
22       Q.  Okay.  Do you have any -- do you know
23   why Lisa Reilly is listed as its manager?
24       A.  I don't.
25

Page 53

SARAH SIMMERS

1        Q.  Okay.
2        A.  That's Dan's.  You'd have to ask Dan.
3        Q.  Okay.  And do you see the signature
4    next to the Clover Leaf Strategies?
5        A.  That's Dan's signature.
6        Q.  That's Dan's.  Okay.  Just below that,
7    it lists the managers of Epicure.  Do you see
8    that?
9        A.  I do.
10       Q.  And who are the managers listed?
11       A.  Lee Ori, myself, and Dan Reilly.
12       Q.  And you see your signature next to your
13   name there?
14       A.  I do.
15       Q.  Okay.  You spoke a little bit about
16   your background with Mr. Reilly, this background
17   with Mr. Reilly.  Are you involved with any
18   other ventures with Mr. Reilly?
19       A.  I am not.
20       Q.  Moving to the next page, does this
21   chart accurately reflect the ownership structure
22   of Epicure?
23       A.  Yes, sir.
24       Q.  And it looks like it lists PFL
25

SARAH SIMMERS

1  SARAH SIMMERS
2  Investments as having a 66.6 percent membership
3  interest.  Is that accurate?
4       A.  Yeah, that's what I recalled,
5  two-thirds/one-third.
6       Q.  And it says that PFL Investments
7  made -- it indicates a capital contribution of
8  $666.66 by PFL Investments.  Do you see that?
9       A.  I do.
10      Q.  Do you know if PFL actually deposited
11 $600.66 --
12      A.  No, I do not.
13      Q.  -- into an account with Epicure?
14      A.  I do not know.  I'm not sure if we did
15 or not.
16      Q.  Do you recall how you made -- how you
17 determined these the capital contribution
18 amounts listed on Schedule A for this document?
19      A.  All we've ever discussed for capital
20 contribution of coming up with that is a nominal
21 amount because of expenditures we do personally
22 or from the business, not that we wrote a check
23 from one to the other.
24          Lee and I as PFL had had expenses in
25 setting these things up, but not to my knowledge

1  SARAH SIMMERS
2  that a specific check of that amount was put
3  into the account.
4          MR. PENN:  Okay, I'd like to introduce
5  Exhibit 4.
6              (Simmers Exhibit 4 was marked
7               for ID.)
8  BY MR. PENN:
9       Q.  This is a document produced by your
10 counsel.  It's identified at DEF0030.  Can you
11 see this document okay?
12      A.  I can, yes.
13      Q.  Do you recognize it?
14      A.  Yep.  It's the bank setup.  It's
15 accounting via bank account setup with
16 Carrollton.
17      Q.  And it's the bank account for Epicure
18 Medical, correct?
19      A.  Yes, sir.
20      Q.  This agreement is dated March 27th,
21 2020; is that correct?
22      A.  Yes, it is.
23      Q.  It indicates an initial deposit of
24 $72,500.  Do you see that?
25      A.  I do.

1  SARAH SIMMERS
2       Q.  Where did that deposit come from?
3       A.  I didn't recall this amount, but I knew
4  we had a sanitizer deposit from a customer when
5  they were out -- when Dan and Lee were working
6  to establish sales for Epicure.  I remember that
7  they had had an initial deposit from a customer
8  wanting to procure sanitizer, that that was for
9  sanitizer, to my knowledge.
10      Q.  What was your role -- or strike that.
11          Did you have any role in procuring the
12 initial sanitizer sales?
13      A.  I did not.  Not directly, no.
14      Q.  And so you became aware of them by
15 Mr. Ori or Mr. Reilly told you about them?
16      A.  Yeah, we talked daily.  We would talk
17 on the phone.  I was aware of what they were
18 doing, yes.
19      Q.  Did you have any discussions with
20 Mr. Ori or Mr. Reilly about making this initial
21 deposit?
22      A.  Just that it was happening.  That's
23 what I know of it, but they did secure a
24 customer, they did -- and the customer was going
25 to make a deposit for sanitizer to secure a

1  SARAH SIMMERS
2  certain amount.  I don't know how many units
3  this was for, but I just knew of it.
4       Q.  Did you have any Mr. Ori or Mr. Reilly
5  about what the initial capital contributions
6  should be?
7          MR. KORANTENG:  Objection, asked and
8  answered.
9  BY MR. PENN:
10      Q.  You can answer, if you know.
11      A.  You're asking me if I had any
12 discussions on what I think it should be?
13      Q.  I'm asking if you had any conversations
14 with Mr. Ori or Mr. Reilly about what the
15 initial capital contribution to Epicure should
16 have been.
17      A.  I don't recall, no.
18      Q.  Did -- was there any further capital
19 contributed to Epicure?
20      A.  I believe a mask -- I believe there was
21 a mask sale going on at the same time.  I
22 believe that there was a mask sale going on,
23 yes.  I don't know -- it was around the same
24 time.  I couldn't give you an exact date, but I
25 know they were -- and that was with Dallas, I

Page 58

SARAH SIMMERS

1  think.  So I think there was a mask deal, yes.
2      Q.  At this time when you were setting up
3  Epicure, do you recall that any budgets for
4  Epicure's business was created?
5      A.  I know Dan and Lee worked on some
6  pro formas, but that's -- I know they were
7  working on pro formas based on the customers
8  that Dan was speaking with.  That's as much as I
9  know of it, but if there were budgets
10  specifically as award a budget, no.
11      Q.  Are you aware of any projections about
12  Epicure's business?
13      A.  Can you repeat that?
14      Q.  Sure.  Let me try to rephrase it.
15          When Epicure was thinking of going into
16  the hand sanitizer business, did you have any
17  projections for -- any sales projections?
18      A.  Well, that's the pro forma that Dan and
19  Lee were working on.  I know that they were
20  actively doing that, trying to -- trying to
21  establish, because there was more business than
22  they knew what to do with, and they were trying
23  to put -- wrap their heads around it.  That was
24  the quick pivot out of CBD.
25

Page 59

SARAH SIMMERS

1      Q.  Did you have discussions about them,
2  about these pro formas with them?
3      A.  Yes.  We talked on the phone about it.
4  I was aware that they were busy doing it and
5  doing a lot of conversations with different
6  customers and engaging salespeople that Dan had
7  relationships with, yes.
8      Q.  Okay.  You -- you had just said -- you
9  said -- strike that.
10          Did Epicure's board of managers have
11  regular meetings?
12      A.  Yeah, we -- because of the pandemic and
13  you -- we had a lot of stay-at-home orders.  We
14  did a lot of stuff on the phone, almost a
15  hundred percent on the phone.
16          I did go to St. Louis once, but --
17  where we met face-to-face and did kind of a
18  top-to-down meeting.  So we met regularly either
19  via phone most often.  We didn't Zoom very
20  often.  It was mostly phone.
21      Q.  And -- and -- strike that.
22          I'm not -- it wasn't clear from your
23  answer to me.  Did you have regular -- did the
24  board of managers have formal meetings?
25

Page 60

SARAH SIMMERS

1      A.  Yes.
2      Q.  On these daily phone calls, did you
3  only speak about Epicure business with Mr. Ori
4  and Mr. Reilly?
5      A.  Yes.
6      Q.  So there were no conversations with
7  Mr. Ori about PFL Investments; is that correct?
8      A.  Well, when Dan was on the phone,
9  because you're talking about Epicure, yeah, we
10  didn't talk about anything but Epicure.  It was
11  very consuming for them at the time.
12      Q.  In these regular board of manager
13  meetings, what items did you discuss?
14      A.  Initially, sales, procurements, what Lee
15  was trying to do to supply the customer.  They
16  asked me to -- I worked a lot initially on the
17  website.  So that would be copy branding.  I
18  worked with ish Marketing to help get our
19  marketing pieces together.  I did a lot of that.
20          Initially, when I started, it was
21  mostly -- mostly -- mostly website and branding
22  probably.  So I was trying to get marketing
23  materials together so as they would meet with
24  these customers, they had something to present.
25

Page 61

SARAH SIMMERS

1  And Lee was working on procurement and pricing.
2  Those were a lot of the content of the calls.
3  If I had the marketing stuff done, they wanted
4  to proof it, look at it, because they had to
5  present what I was working on with Trish.
6      Q.  Okay.  I just want to go back quickly.
7  You mentioned Mr. Ori and Dan Reilly were
8  working on pro formas.  Did you see those
9  pro formas?
10      A.  I don't recall.  Like -- we talked a
11  lot about them, but because so much of them were
12  on the phone because of the pandemic, I just
13  don't remember -- I don't remember.  I know we
14  talked about them on the phone, but I don't
15  remember if I eyeballed any of them because,
16  like I said, most of it was from home.
17      MR. PENN:  This is a question for
18  Fibbens.  Fibbens, do you know if these
19  pro formas were produced?
20      MR. KORANTENG:  So I produced
21  everything that we received.  I don't recall
22  specifically.  As long as they -- if they
23  existed and haven't been provided, I will gather
24  them and send them to you.
25

Page 62

SARAH SIMMERS

1
2     MR. PENN: Okay, yeah. Will you check
3 that? I'll check on my end too, but I don't
4 recall seeing them.
5     Okay. I think now is a good time for a
6 break.
7     THE WITNESS: Okay.
8     MR. PENN: Can we go off the record?
9     THE VIDEOGRAPHER: The time is
10 12:31 p.m., and we're going off the record.
11                 (Recess taken from 12:31 p.m.
12                  to 12:47 p.m.)
13     THE VIDEOGRAPHER: The time is
14 12:47 p.m., and we're back on the record.
15 BY MR. PENN:
16     Q. Miss Simmers, we were discussing
17 Epicure and its visit for selling hand
18 sanitizer. You indicated that there were
19 discussions about Epicure selling hand sanitizer
20 prior to 2020 but it was certainly happening in
21 March 2020; is that correct?
22     A. Yes.
23     Q. Was Epicure engaging manufacturers of
24 hand sanitizer?
25     A. Yes.

Page 63

SARAH SIMMERS

1
2     Q. And did there come a time when Epicure
3 engaged Voyant to produce hand sanitizer?
4     A. Yes, sir.
5     Q. What was -- did you have any role in
6 engaging Voyant?
7     A. I did not. Not directly.
8     Q. Did you say "not directly"?
9     A. Not directly.
10     Q. Okay.
11     A. It wasn't my lane, basically.
12     Q. Did you have any -- so did you have any
13 interactions with anyone at Voyant in March 2020
14 that you can recall?
15     A. Directly to me, I only -- my only
16 involvement with Voyant was approving, like, I
17 approved I think the label because I was working
18 on the branding, and I believe I received an
19 e-mail, and I approved a label and also approved
20 product. I think they sent me a sample that I
21 approved for the -- what the label content was.
22 But I was copied -- I was looped on -- I was
23 aware of some of the e-mails going back and
24 forth that Lee and Dan were engaging with Voyant
25 for procurement of sanitizer.

Page 64

SARAH SIMMERS

1
2     Q. Just to back up a little bit, were you
3 involved in the process of identifying
4 manufacturers of hand sanitizer at this time?
5     A. Directly, no. That was Lee and Dan's
6 lane, Lee's mostly.
7     Q. So did you have any input or
8 recollection about how manufacturers were
9 chosen?
10     A. Yeah, I did have involvement in that.
11 We had engaged in a contractual relationship
12 with Paul because Paul has a lot -- extensive
13 relationships in the contract manufacturing. So
14 we hired a consultant basically to help us
15 there, Bath Manufacturers. So Paul was involved
16 with us with.
17     So I know Voyant was a very reputable
18 company. We were very impressed with them. I
19 believe the customers were asking for more of a
20 gel finish. A lot of the finishes were really
21 tacky. So when we were vetting manufacturers,
22 we were looking at quality. There was a lot of
23 bad -- I'll say bad actors maybe is a good word
24 to use in the marketplace. So we spent some
25 time with Paul vetting who we wanted to work

Page 65

SARAH SIMMERS

1
2 with and who had a product that the customers
3 were looking for because they were working --
4 they wanted less liquid liquidy, and they wanted
5 more gel of which Voyant had a gel-based
6 product, which was desirable, and it was a nice
7 product they produced when we looked at their
8 samples.
9     So I was involved in that part of it on
10 the periphery of just looking at the sample and
11 looking at some of their SDSs they're called,
12 you know, the safety data sheets and stuff that
13 they produced, I looked at the safety data
14 sheets. We were trying to determine some of
15 those quality, you know, basically quality
16 measures you'd be looking for in a manufacturer.
17 So that's about what I had to do with it on the
18 very early side.
19     Q. Okay. You mentioned that customers or
20 potential -- I guess they were -- were they
21 customers or were they potential customers that
22 were wanting the gel?
23     A. Well, they were -- at what point are
24 you a customer?
25     Q. Well --

Page 66

SARAH SIMMERS

1
2    A.  What are you asking?  If you could
3  rephrase that.  I'm just not quite understanding
4  what you're asking me.
5    Q.  You testified that customers were
6  looking for the gel product, so I'm just asking,
7  you know --
8    A.  And that was information from Dan.
9  Yeah, that's what -- that's what the ask was.
10  So when you're trying to procure a product, you
11  want to procure what the customer wants.  So if
12  they're asking for gel and not a liquid and
13  we're trying to find a manufacturer, you've got
14  to match that up.  If I have a liquid, I'm not
15  going to sell it if that's not what the customer
16  wants.
17    Q.  At the time in March 2020, do you know
18  if Epicure had any commitments for the sale of
19  sanitizer except for the one you mentioned
20  earlier?
21    A.  Define "commitments."
22    Q.  I think I would just see if you can
23  answer the question.
24    A.  It's hard for me to answer that
25  question not truly understanding what you mean

Page 67

SARAH SIMMERS

1
2  by "commitment."  There were people looking for
3  the product, yes, and this was the
4  specifications they were looking for a gel.
5  They were discussing sizes.  It was so difficult
6  to find bottles, like, getting all of those
7  parts to line up to have a true customer you
8  needed to be able to bring them to what they're
9  asking for.
10    So you had -- you see it's the chicken
11  and the egg here in the sense that you had to
12  have what they want for that, yes, and if we
13  could get the commitments from procurement,
14  then, yes, you could have a commitment.  Does
15  that make sense?
16    Q.  Okay.
17    A.  It's trying to get all that to line up,
18  and they did a lot -- they spent a lot of hours
19  at it.
20    Q.  Okay.  Shifting back to choosing
21  manufacturers of hand sanitizer, you said you
22  engaged a consultant, Paul, to assist Epicure
23  with that.  And who is Paul?
24    A.  Paul Hexsom is a relationship of Lee's.
25  I know they've known each other a long time.  I

Page 68

SARAH SIMMERS

1
2  don't know much more beyond that, just that Paul
3  has a lot of experience in manufacturing.
4  That's his background.  So we engaged a
5  consultant to help us make a decision there, and
6  Paul -- so that's why we engaged Paul.
7    Q.  And I'm not sure if you said this.  Did
8  you have a role in choosing -- strike that.
9    Did you have a role in choosing Voyant
10  to manufacture hand sanitizer for Epicure?
11    A.  I didn't.  That was not my lane.
12    Q.  And who, if you know, chose Voyant?
13    A.  Ultimately, I don't know if it was Dan
14  or Lee, and I'm sure they did it together.  I
15  don't know.
16    Q.  You also talked about some of the
17  quality control that you did.  Did you do the
18  quality control on products for a variety of
19  manufacturers?
20    A.  No, but I do it in my day job.  So my
21  role as it relates to that is my industry --
22  there was pharmacists in my industry that were
23  compounding sanitizer under the FDA guides.
24  Okay?  We did not choose to do that because I
25  had this opportunity in Epicure.  So I have --

Page 69

SARAH SIMMERS

1
2  because of my day job and because there was the
3  guidance document put out by the FDA, I was
4  aware of what their requirements were for
5  quality.  So my role, when it came to
6  manufacturers, I just said, "Guys, as long as
7  they're meeting the guidance documents, please
8  let me see the SDS."
9    I don't -- I won't put -- we won't put
10  our name on somebody or work with somebody that
11  we can't be sure, especially as professionals,
12  like, I just can't do that, that I can give
13  something to somebody that's not safe.
14    Q.  You said that -- you made reference to
15  your day job.  Are you referring to --
16    A.  Yeah, I'm -- because I'm a pharmacist.
17  That's what I mean.  I'm referencing the fact
18  that I'm a pharmacist.
19    MR. KORANTENG:  You wait until he
20  finishes his question, then you answer.
21    THE WITNESS:  Okay.
22    MR. KORANTENG:  I think we're speaking
23  over each other.
24    THE WITNESS:  Sorry.
25    MR. KORANTENG:  Sorry.

Page 70

SARAH SIMMERS

1
2      THE WITNESS:  Sorry.
3  BY MR. PENN:
4      Q.  We'll start over a little bit.  So you
5  made reference to your day job as a pharmacist.
6  Is that with Customedico?
7      A.  Yes.
8      Q.  Okay.  So you testified, I believe,
9  that you -- you reviewed or inspected Voyant's
10  hand sanitizer product, a sample; is that
11  correct?
12      A.  Yes.
13      Q.  And you reviewed their safety data
14  sheet; is that correct?
15      A.  Yes, sir.
16      Q.  In terms of reviewing the product
17  sample, can you tell me how you -- what you used
18  to assess the sample?
19      A.  I looked at the quality of the
20  container, I looked at how the product felt, I
21  looked at the contents in regards to
22  the contents.
23      Q.  You also said you approved a label.
24  Was it -- this is labels for the bottles, you
25  mean?

Page 71

SARAH SIMMERS

1
2      A.  Yes, sir.
3      Q.  What was the process for approving the
4  labels?
5      A.  What process did I go through?  Can you
6  ask the question differently?  Like, what do you
7  mean?
8      Q.  Just, I guess, maybe start with a
9  general step-by-step in terms of how the labels
10  were approved.  So did Voyant provide a sample
11  label to Epicure for its approval?
12      A.  Yes, please.  Yes, they sure did.
13      Q.  Did Epicure have any input into what
14  was supposed to go onto that initial label
15  sample?
16      A.  The only -- only from the design aspect
17  for the -- for Epicure's brand.  The -- I would
18  say the monograph labeling came from Voyant.
19      Q.  And once you received the label sample,
20  what did you need or what did you do to approve
21  it?
22      A.  It -- I reviewed -- I reviewed the --
23  for correctness, basically.  Did it match what
24  we provided them for the branding, yes, and it
25  did.  I approved it.  You had -- you had a label

Page 72

SARAH SIMMERS

1
2  spec, and I approved it.
3      Q.  Okay.  Just one more question on the
4  sample.  Did the makeup of the sample, did
5  Voyant provide that or was there any input from
6  Epicure?
7      MR. KORANTENG:  Objection, vague.
8      MR. PENN:  Yeah, let me see if I can
9  ask it differently.
10  BY MR. PENN:
11      Q.  Did Epicure request a sample of hand
12  sanitizer from Voyant?
13      A.  I believe so, yes.  I believe we
14  requested that.  I didn't make the request, but
15  Epicure did.  I don't know if it was Lee, I
16  don't know if it was Dan.
17      MR. PENN:  Okay.  Let me go to what's
18  going to be Exhibit 5.
19      (Simmers Exhibit 5 was marked
20      for ID.)
21  BY MR. PENN:
22      Q.  Okay.  Do you recognize this document?
23      A.  (Reviewing document.)
24      It's an e-mail.
25      Q.  Okay, and what is it?

Page 73

SARAH SIMMERS

1
2      A.  I can see the top of it is an e-mail.
3      Q.  Sure.  Let me start over, back up a
4  little bit.  This was produced by your counsel.
5  It's Exhibit 5.  It's identified as DEF4811
6  through 4812.  Let me show you first.  It's two
7  pages in this document.
8      A.  Okay.
9      Q.  I can show you the first page, and let
10  me know if you can see all of it.
11      I'll go to the second page.
12      This exhibit is also in the chat if you
13  want to see it.
14      Okay.  Do you -- do you recognize what
15  this is?
16      A.  That's the LOI.  It looks to be the LOI
17  we sent.
18      Q.  Okay.  And how did this LOI come about?
19      A.  I understood from our calls that
20  Michael needed a placeholder until Epicure's was
21  formed.  He needed a placeholder so we could
22  have our basically place in line, to hold our
23  place in line.  So that's the LOI that Lee sent.
24      Q.  And so you said Michael needed a
25  placeholder?

Page 74

SARAH SIMMERS

2   A.  Yes.
3   Q.  Who is Michael?
4   A.  Michael Partridge from Voyant.  His
5   name is right on the document.  I believe that's
6   who Lee was working with representing Voyant, to
7   my understanding.
8   Q.  And do you have any knowledge of what
9   conversations led to this LOI aside from what
10  you've already testified to?
11  A.  Just that we had to get -- we had
12  customers that wanted to purchase sanitizer, and
13  we had to get in line with Voyant if we were
14  going to work with them.  That's all I know
15  about it.  And Lee had put this in place so that
16  we could basically get in the manufacturing --
17  get an opportunity with Voyant.  They had other
18  people interested, I understood, in the prod --
19  in their product.
20  Q.  Do you know -- well, strike that.
21       This LOI indicates or, rather, it
22  states, "We are committed to purchasing one
23  million units of 2-ounce sanitizers at a turnkey
24  price of 93 cents per unit."
25       Do you know if formal purchase orders

Page 75

SARAH SIMMERS

2   were issued after this LOI was sent to Voyant?
3       MR. KORANTENG:  Objection to form,
4   vague.
5       THE WITNESS:  I know we did a purchase
6   order out of Epicure once everything was in
7   place.  I do know that, yes.
8   BY MR. PENN:
9   Q.  And just to further clarify, the e-mail
10  is dated March 26th, 2020, and the LOI, which is
11  also dated the same day, also says, "This letter
12  of intent is intended for you to immediately
13  procure the bottles and caps prior to a formal
14  purchase order."
15       Do you see that on the LOI?
16  A.  I do see it, yes.
17  Q.  Do you know why Foxhole didn't issue
18  purchase orders?
19  A.  Because we had no intent of -- of
20  Foxhole --
21       MR. KORANTENG:  One second, Sarah.  One
22  second.  Let me interject my objection.  Okay?
23       THE WITNESS:  Oh, sure, okay.
24       MR. KORANTENG:  I object to the
25  question as being asked and answered several

Page 76

SARAH SIMMERS

2   times already.
3       If you want, you can go ahead and
4   answer.
5       THE WITNESS:  Ask me the question
6   again, please.
7   BY MR. PENN:
8   Q.  Do you know why Foxhole didn't issue
9   purchase orders?
10  A.  Because we were going to work with
11  Voyant as Epicure, not Foxhole.  We were always
12  engaging with Voyant as Epicure.
13  Q.  Okay.  And this LOI is submitted on it
14  looks like Foxhole letterhead; is that correct?
15  A.  It is.
16  Q.  And if you look at the e-mail header,
17  it looks like Lee Ori sent it from
18  lee@foxholemed.com; is that correct?
19  A.  He did, yes.  We did not have Epicure
20  fully set up yet.
21  Q.  If you look at the top of the e-mail,
22  at the very top, it indicates -- it looks like
23  it indicates this was forwarded on
24  February 21st, 2020.  Do you see that?
25  A.  I do.

Page 77

SARAH SIMMERS

2   Q.  It was from lee@epicure.med?
3   A.  Um-hum.
4   Q.  Epicuremed.com.  Excuse me.
5       And you sent -- or -- and it's from
6   sarah@foxhole.med; is that correct?
7   A.  Um-hum, because I didn't have an
8   Epicure e-mail at the time.  We just didn't have
9   it set up yet.  So you will see that as Foxhole.
10  Q.  Did you in fact forward this e-mail on
11  February 21st, 2022?
12  A.  Yes.
13  Q.  And do you recall why you forwarded it?
14  A.  Do I recall why I did?
15  Q.  I'll withdraw that question.
16       Have you received instruction from your
17  counsel to search for documents for this matter?
18       MR. KORANTENG:  I will instruct the
19  witness not to answer that if the -- if the
20  instruction -- what her and I discussed or not
21  discussed she can't really testify about.
22       MR. PENN:  Let me clarify.  I'm not --
23  I'm not asking in this question for any
24  attorney-client privileged communication.  I
25  just want to know if Miss Simmers received an

Page 78

SARAH SIMMERS

1  instruction to search for documents for -- to be
2  produced in this matter.
3          THE WITNESS:  No, Robert, I'm having
4  trouble hearing you.  I keep leaning in because
5  I can't -- you lean back, and I can't hear what
6  you're saying.
7          MR. PENN:  Sure.  Well, I'll say it
8  again.
9  BY MR. PENN:
10     Q.  Have you received any instructions to
11  search for documents for this matter?
12     A.  Define "this matter."
13     Q.  This lawsuit.
14     A.  To search for documents?  I know we had
15  to submit e-mails that we had, if I had any
16  e-mails I could contribute, that I was to
17  provide, but I -- these were already provided by
18  Lee, so I -- I was asked that.
19     Q.  Okay.
20     A.  For discovery.
21     Q.  And -- sure.  That's what I'm referring
22  to.
23          And so you sent this particular e-mail
24  on February 21st, 2022?

Page 79

SARAH SIMMERS

1     A.  Yep.
2     Q.  When did you first receive the
3  instruction about searching for e-mails or
4  producing e-mails in discovery, do you recall?
5     A.  We first talked about it last year.
6     Q.  Is there a reason why you produced
7  it -- you didn't produce this document or you
8  didn't forward this document from Lee Ori last
9  year?
10     A.  No.  Well, he'd already submitted this.
11  It's the same content.
12     Q.  What caused you to send it on
13  February 21st of this year, if you recall?
14     A.  I don't.  I don't recall specifically
15  why I forwarded it back to him.  I don't recall.
16  It's just a forward of an existing e-mail.
17          MR. PENN:  Okay.  I'm going to
18  introduce Exhibit 6.
19          (Deposition Exhibit 6 was
20          marked for ID.)
21  BY MR. PENN:
22     Q.  These are documents produced by your
23  counsel.  They're identified as DEF4741 through
24  DEF4748.  I'll represent that these are purchase

Page 80

SARAH SIMMERS

1  orders submitted to Voyant Beauty for hand
2  sanitizer.  I'm going to -- I'll scroll
3  through -- this is eight pages.  I'll just
4  scroll through these so you can see the full
5  document is also in the chat if you'd like to
6  download it.  Can you see the document in the
7  share screen?
8     A.  I can.
9     Q.  Okay.
10     A.  I can.  I'm, like, leaning back so I
11  can -- it's very small.
12     Q.  How's that?
13     A.  That's a little bit better.  Thank you.
14     Q.  All right.  Do you recognize these
15  documents?
16     A.  Yes.
17     Q.  Do you recall seeing -- well, strike
18  that.
19          Can you -- strike that.
20          What are they?
21     A.  They're purchase orders from Epicure.
22     Q.  And they're purchase orders for hand
23  sanitizer; is that correct?
24     A.  Correct.

Page 81

SARAH SIMMERS

1     Q.  Can you walk me through the process of
2  creating a purchase order in this case?
3     A.  I can't because it wasn't -- that
4  wasn't my role.  Creating it wasn't my role.
5     Q.  Were you aware that these orders were
6  being placed at that time?
7     A.  I was, yes.
8     Q.  So and you are aware that Epicure
9  issued five purchase orders in April 2020?
10     A.  I couldn't recall the exact number and
11  dates.  I would have to look at them, but yes, I
12  see April 13th.
13     Q.  And this first purchase order is
14  purchase order 1011 for 600,000 -- 600,000 units
15  of 2-ounce hand sanitizers.  Do you see that?
16     A.  600,000, yes.
17     Q.  And then the second purchase order for
18  another 600,000.  This is purchase order 1012.
19  Do you see that?
20     A.  Can you scroll back up to the first one
21  ahead?
22     Q.  Yes.  (Complying.)
23     A.  Okay.  I see that.
24     Q.  There's a third purchase order number

Page 82

SARAH SIMMERS

1 1013 dated April 13th, 2020, for 120,000 units
2
3 of hand sanitizer.
4     A.  Yeah, they're different sizes I see.
5     Q.  Yes, yes, correct, yes.  This one is
6 for a 12-ounce bottle.  So that's about a total
7 amount purchased of 2.4 million units, 2-ounce,
8 correct?
9     A.  Well, that's not -- they're not all
10 2 ounce.  Oh, okay, now you're down to another
11 one.
12     Q.  You're right.
13     A.  There are different sizes.  I know
14 different customers wanted different sizes.
15     Q.  Correct.  Let me continue.  This is
16 purchase order 1018 for 600,000 units of 2-ounce
17 hand sanitizer; is that right?
18     A.  That is, yes.
19     Q.  And this is a purchase order number
20 1019 dated April 16th, 2020, for 600,000 units
21 of 2-ounce hand sanitizer, right?
22         So now what we've seen, we're seeing
23 2.4 million 2-ounce units that Epicure ordered
24 in April; is that correct?
25     A.  I believe that's correct, yes.

Page 83

SARAH SIMMERS

1
2     Q.  And when these orders were placed in
3 April 2020, did you have an understanding that
4 the cost of these goods was over 2.6 million?
5         MR. KORANTENG:  Objection, misstates
6 her testimony earlier.  Also been asked and
7 answered.
8 BY MR. PENN:
9     Q.  You can answer, Miss Simmers.
10     A.  I was aware of the purchase orders.  I
11 didn't recall exactly the amounts and the dates.
12 I didn't.  (Shaking head.)
13     Q.  Do you know, in April 2020, did Epicure
14 have $2.6 million?
15     A.  Did we have -- have $2.6 million?  We
16 did not, but we had, I believe, orders from
17 customers that reflected the order, quantities
18 ordered from Voyant.  That's what I know.
19     Q.  How do you know that?
20     A.  From my calls with Dan and Lee when we
21 would -- when we would talk about what they were
22 putting together, that's what I know from them.
23     Q.  Okay.  So Dan or Lee told you --
24     A.  They were running the sales side of
25 things, yes.  I was on the periphery of this.

Page 84

SARAH SIMMERS

1 It wasn't my lane.  I was doing other things for
2
3 the business.
4         MR. PENN:  I'll move on to what's going
5 to be Exhibit 7.
6             (Simmers Exhibit 7 was marked
7                 for ID.)
8 BY MR. PENN:
9     Q.  This is a document provided by your
10 counsel.  It's identified as DEF4659 through
11 DEF4660.  There's two pages here.  So look at
12 the first page.  I'll let you review it, and let
13 me know when I can bring up the second page.
14     A.  Are you wanting me to review the
15 April 22nd e-mail?
16     Q.  I'll direct your attention to part of
17 it.  I just wanted you to see it.  Just let me
18 know when you're ready.
19     A.  (Reviewing document.)
20         Okay.
21     Q.  Moving up now, we're on the second
22 page.
23     A.  Yeah, can you make that bigger, please?
24     Q.  Yeah, I will, and I think the chart is
25 little bit --

Page 85

SARAH SIMMERS

1
2     A.  Really hard to read.
3     Q.  It's very hard to read.  I'll try to
4 make it bigger, but I think it's going to make
5 it blurrier, frankly.
6     A.  Yeah, I see it's a chart.
7     Q.  It's okay if you can't read it.  I'm
8 not going to --
9     A.  Yeah, I can't -- I can't, but I can see
10 it's a chart.
11     Q.  I'm not going to ask you to -- I'll
12 just note that at the bottom it says that it
13 looks like there's an attachment to this e-mail
14 that says pro forma sanitizer.  Do you see that?
15     A.  Yeah, I do.  So that's I guess -- I
16 know we were talking about pro formas on the
17 calls.  I just didn't recall if I ever saw one
18 or not, but I see what you're referencing there.
19         MR. PENN:  I'll submit to you that you
20 produced the pro forma hand sanitizer that was
21 attached to this e-mail.  It looks like this is
22 the chart that's imbedded here, but I -- it's
23 not legible, so can we have the native version?
24         MR. KORANTENG:  Yeah, if it's not
25 attached yet, I'll be more than happy to find

SARAH SIMMERS

1
2  that sales pro forma and provide them, produce
3  it.
4        MR. PENN:  Great.  Thank you.
5        MR. KORANTENG:  You're welcome.
6  BY MR. PENN:
7    Q.  If you look at the earliest e-mail on
8  this page, it's dated April 22nd, 2020, from Lee
9  Ori to Dan Reilly --
10   A.  Dan.
11   Q.  -- and Dan Courtney yourself and a
12 Jason --
13   A.  Yeah.
14   Q.  Lee Ori writes, "I want each of you to
15 spend a few minutes on Wednesday and write down
16 every single contact that you think you can
17 either sell sanitizer to or that you can get to
18 sell it for you."
19       Do you see that?
20   A.  I do.
21   Q.  Did you have any understanding of what
22 Lee Ori was trying to convey with this e-mail or
23 with that sentence?
24   A.  I don't.  That would be a question for
25 Lee.

SARAH SIMMERS

1
2    Q.  Did you do anything in response to
3  reading this e-mail?
4    A.  Say that again.
5    Q.  Did you do anything in response to
6  reading this e-mail?
7    A.  I was copied on it for reference.  I
8  was not -- sales was not my lane.  I wouldn't
9  have done anything with it.
10   Q.  Do you know if Epicure had orders for
11 the sale of sanitizer at this time on
12 April 22nd?
13   A.  Yes.  To my knowledge, yes.  Which
14 ones, how much, I don't know because that just
15 wasn't my lane.  I was working on other things.
16 I would be looped on our calls, and we would
17 talk about it, but I don't recall particular
18 customers, particular details for April 2020.
19       I know we were going -- what I can say
20 to that is I know he was meeting with banks and
21 lenders.  I know he was.  So I don't know
22 anything beyond that.
23   Q.  Okay.  It does say further in this
24 e-mail, it says -- Lee Ori writes, "I want to
25 blow away a potential lender at our capacity to

SARAH SIMMERS

1
2  make this happen.  I know they are going to look
3  at this and think it isn't real."
4        So do you think he's referring to
5  potential lenders in that sentence?
6        MR. KORANTENG:  Objection.  It
7  requires, you know, to speculate as to what
8  somebody was thinking at the time somebody else
9  wrote an e-mail.
10       THE WITNESS:  Yeah, I don't know.  I
11 know he was meeting with lenders.  That's all I
12 know of it.
13 BY MR. PENN:
14   Q.  What discussions did you have about
15 Ori -- excuse me.  Withdrawn.
16       Did you have any discussions with
17 Mr. Ori about potential lenders?
18   A.  Yes.  I know he and Dan met with a
19 couple of banks, and then they had met with a
20 gentleman -- it's something I don't really
21 understand so well, but it was something to do
22 with purchase orders, with a different type of
23 lending.  I don't know.  It was purchase -- it
24 was something to do with purchase orders.  I --
25 like I said, I'd be on the call.  The sales part

SARAH SIMMERS

1
2  of it, I just listened.  I didn't actively -- I
3  just listened on -- on what they were talking
4  about and what they were doing, and then I would
5  do my part and talk about what I was doing.
6        So what I just recall is they had met
7  with some banks, gone in and sat down, and then
8  there was a gentleman, something to do with POs,
9  that if you had a purchase order, they would --
10 I don't know -- somehow finance new purchase
11 orders.  That's as much as I know or know or
12 remember of it.
13   Q.  You just said -- I think you made
14 reference to this earlier.  You were doing --
15 you were doing your own part or -- let me strike
16 that.
17       You just testified that on these calls
18 with Dan and Mr. -- and Lee Ori that you would
19 do your part and talk about what you were doing?
20   A.  Yes.
21   Q.  What are you referring to?  What were
22 you doing?
23   A.  Well, early on, like I said, it was the
24 marketing pieces, the website content.  Once
25 that was done, pivoted into infrastructure

Page 90

SARAH SIMMERS

1            SARAH SIMMERS
2  things, I vetted a couple of companies to
3  support the sales.  Dan was building the sales
4  team.
5            I was -- I met a company called RepZio
6  where I was putting together an app where the
7  sales team could know what our inventory was in
8  front of the customer.  So I signed a contract
9  with them to implement that, and it integrated
10 with QuickBooks so we could know exactly in
11 realtime if they were out in, let's say, a --
12 one of the convenient stores with their
13 customer, they'd know exactly what we had in
14 stock to basically restock the store, which was
15 the intention.
16           The difficulty was, when we were on the
17 calls, was infrastructure-wise.  It was, like,
18 how do we know exactly what we have to provide
19 to the customer in the moment and do it timely?
20           So they tasked me with trying to figure
21 out a way to do that to generate POs and to know
22 supply chain, and I engaged in a contract with
23 the RepZio to do that so they'd have that on
24 hand for the sales team.
25           I was working on a kind of unified kind

Page 91

1            SARAH SIMMERS
2  of sales contract for the sales team.  I was
3  just trying to do infrastructure things that
4  made daily tasks, trying to build this behind
5  them so that the sales team had what they needed
6  to sell effectively.  So I was kind of
7  operations stuff, I'd say, probably,
8  infrastructure.
9            I also did merchanting.  Lee helped me
10 with that.  We did that one together, getting
11 merchant services so we could take a credit card
12 if we needed to.  If it wasn't on a PO, then
13 they had both options, to do credit card or
14 purchase order and then with payment terms.
15           MR. PENN:  I'm going to move on to
16 Exhibit 8.
17           (Simmers Exhibit 8 was marked
18                for ID.)
19 BY MR. PENN:
20      Q.  This is a document provided by your
21 counsel.  It is identified at DEF4737 through
22 DEF4740.  Do you recognize this document?
23      A.  I do.
24      Q.  And what is it?
25      A.  It was a loan.  Can you scroll down?

Page 92

1            SARAH SIMMERS
2      Q.  Yes.
3      A.  I believe that's what this is.
4           (Reviewing document.)
5           Keep scrolling.
6      Q.  Oh?
7      A.  Yeah, I believe this was money Lee
8  loaned Epicure.  Can you scroll back?  Yeah,
9  this was money Lee loaned Epicure, I believe.
10     Q.  Let me go back to the first page.
11     A.  Yeah, go back up to the top.
12     Q.  (Complying.)
13     A.  Promissory note to Epicure, yeah, to
14 Lee, yeah.  This is money that he lended
15 Epicure.
16     Q.  Do you know why there's a -- he's
17 executing a promissory note to Epicure?
18     A.  I think it was kind of -- I'd call it a
19 bridge loan maybe is a good term.  He was trying
20 to bridge until we had either some -- I believe
21 some receivables coming in or there was
22 something to do with the lending, but it was
23 a -- it was a capital into business for a loan
24 to kind of bridge, I believe, the payments due
25 to us from customers.

Page 93

1            SARAH SIMMERS
2      Q.  Okay.  I'm going to go to the last page
3  here, and this is a signature page.  It says,
4  "Execution date, May 8, 2020," and your name and
5  signature are under the -- signing for Epicure;
6  is that correct?
7      A.  Yes.
8      Q.  I'm just going to scroll back to the
9  top.  Did Lee Ori actually transfer the $135,000
10 to Epicure as indicated in the promissory note?
11     A.  To my knowledge, absolutely.
12     Q.  Did you have discussions with Mr. Ori
13 about him making this move?
14     A.  Yes.  Yes.
15     Q.  And what were those discussions?
16     A.  Just that he was willing to do it
17 because he believed in it.  He believed in what
18 we were doing.
19     Q.  The promissory note says the maturity
20 date is August 2020.  Do you know if Epicure
21 paid back the loan?
22     A.  Yes.
23     Q.  Do you know when Epicure paid back the
24 loan?
25     A.  I don't off the top of my head, I

SARAH SIMMERS

1 don't. I know we did. I just don't know when.
2    Q. It also says on bullet number 2 under
3 principal and interest payments: "Borrower
4 shall promptly pay lender $25,125 on a date not
5 beyond the maturity date stated above."
6    Do you see that?
7    A. I do.
8    Q. Do you know if Epicure paid Lee Ori the
9 $25,125?
10    A. From the top -- off the top of my head,
11 I don't. I know we paid the loan back. I don't
12 know if -- I'm not sure on the interest.
13    Q. So I think you testified earlier that
14 Lee Ori was having -- was looking for financing
15 for Epicure. Is that accurate?
16    A. Epicure was looking for financing, yes.
17 It was he and Dan that went together to the
18 banks.
19    Q. And do you know why that they were
20 looking for financing? I'm not sure you
21 answered that earlier.
22    A. What -- what I understand of it from
23 our meetings, we were getting bigger customers
24 like when Dan Courtney was out, he was getting

SARAH SIMMERS

1 Albertson, some of the larger grocery chains,
2 grocery store chains, and to get their business
3 they wanted terms. They weren't willing -- you
4 know, first in the beginning, the first
5 customers were willing to pay more up front
6 because they knew they had to because it was so
7 hard to get. They had to be -- give a little
8 bit.
9    But as time progressed, then we got to
10 larger -- I'd say larger groups. I think it
11 was -- it was more the grocery stores than the
12 gas stations, but the larger groups were more
13 aggressive in their terms, and they needed --
14 they wanted terms from us. So I believe that
15 was the necessity for lending was because we had
16 to -- we had to pay, you know, to meet our terms
17 with the manufacturers such as Voyant. We
18 needed more capital to do it. So that was why
19 they were seeking lending or different ways to
20 finance that gap. And I think while we were
21 working on it, this was -- well, this is why Lee
22 put in -- put in the capital while they were
23 trying to secure, secure that. That was my
24 understanding of it. Those bigger -- bigger

SARAH SIMMERS

1 stores and gas stations weren't willing to put
2 as much down. They didn't want to pay until
3 they got the product.
4    Q. Do you know if Mr. Ori, Lee Ori was
5 successful in seeking -- getting funding for
6 Epicure?
7    A. I know he wasn't with the banks.
8    MR. KORANTENG: Sarah, Sarah. Wait.
9 Let me object first.
10    Objection. The question is vague.
11    THE WITNESS: Sorry, Fibbens.
12    MR. KORANTENG: Okay. Just give me a
13 second.
14    THE WITNESS: No, I'm sorry.
15    MR. KORANTENG: That's okay. You're
16 doing fine.
17    THE WITNESS: I'm just trying to
18 answer.
19    MR. KORANTENG: You're doing fine. You
20 can go ahead and answer pursuant to my
21 objection.
22    THE WITNESS: He wasn't successful with
23 the -- with the large banks or the banks that he
24 went to. I know that he had some trouble with a

SARAH SIMMERS

1 gentleman that was doing the PO. He spent a lot
2 of time working with this gentleman, and I know
3 we had ended up in a lawsuit over it, but that's
4 about what I know of it. That was stuff that
5 Lee and Dan were working on in their lane. I
6 just knew of it. I knew we weren't successful
7 with the banks.
8    MR. PENN: Okay. I'm going to -- oops.
9 Hold on.
10    (Brief pause in proceedings.)
11    MR. PENN: Okay. I'm going to
12 introduce Exhibit 9.
13    (Simmers Exhibit 9 was marked
14    for ID.)
15 BY MR. PENN:
16    Q. This is a document produced by your
17 counsel. It's identified at DEF0572. It's a
18 May 24th, 2020, e-mail from Lee Ori to Voyant,
19 and you are cc'd on this e-mail?
20    A. Yes.
21    Q. Once you've had a chance to review,
22 just let me know.
23    A. (Reviewing document.)
24    Could you scroll down for me?

Page 98

SARAH SIMMERS

1
2    Q.  (Complying.)
3    A.  (Reviewing document.)
4         I've had a chance to review.
5    Q.  Okay.  Do you recognize this e-mail?
6    A.  I don't remember the details of it, but
7    I was on it, yes.  I don't specifically -- I'm
8    answering your question.  I don't remember this
9    e-mail.  I don't.
10   Q.  Okay.  Okay.  If you look at the --
11   this is -- as I said, this an e-mail from Lee
12   Ori to the Voyant team.
13   A.  Okay.
14   Q.  The first sentence, he says, "As I
15   expressed on our conference call last week, I'd
16   like to very much like to work with you to ramp
17   up production with your company."
18        Do you see that?
19   A.  (Nodding.)
20   Q.  Do you recall being on a conference
21   call with Lee Ori and Voyant people?
22   A.  I wasn't on the call.
23   Q.  Okay.  In the first bullet of this
24   e-mail, the first two sentences, it says,
25   "Michael indicated that you could do 2 billion

Page 99

SARAH SIMMERS

1    units corporately.  Being realistic, how quickly
2    do you think you could ramp up across your
3    facility to say 50 million units a month?"
4         Do you see that?
5    A.  I do.
6    Q.  Do you recall having any understanding
7    of why Lee Ori was seeking information about
8    50 million units of hand sanitizer?
9    A.  I think that was from the sales team.
10   That's what -- I think that's what the customers
11   were asking for.  He was trying to get a
12   semblance on the purchase orders that we were --
13   he was just trying to see what they could do
14   based on our demand -- based on the demand in
15   the marketplace.
16   Q.  And do you know as -- in -- on
17   May 24th, 2020, do you know if Epicure had sold
18   the 2.4 million units that it'd previously
19   ordered in April?
20   A.  I know we'd sold 1.2 by May, but I'm
21   not positive.  I know we'd sold 1.2 by May.  I
22   recall that.  But outside of the 1.2, I don't
23   recall.
24        MR. PENN:  I'd like to introduce

Page 100

SARAH SIMMERS

1    Exhibit 10.
2         (Simmers Exhibit 10 was marked
3         for ID.)
4    BY MR. PENN:
5    Q.  This is an e-mail chain of several
6    e-mails produced by your counsel.  They're
7    identified at DEF0176 through DEF0178.
8         I will -- let me know when you want me
9    to scroll down to the next page.
10   A.  It's a cash report from Linda.
11        (Reviewing document.)
12        This -- okay.
13   Q.  Okay.
14   A.  I got it.
15   Q.  Okay.  Do you recognize these e-mails?
16   A.  I do.
17   Q.  Okay.  And what are they?
18   A.  This was -- Linda was having difficulty
19   is kind of what I was speaking to, with tracking
20   purchase orders.  It was -- and keeping track of
21   all of it.  That's why I was working on the
22   RepZio part.  There was a lot of in and out with
23   different sales reps.  So this is what she's
24   speaking to.  After our call on processes

Page 101

SARAH SIMMERS

1    yesterday is -- I was trying to get things a
2    little more organized so that it was smoother,
3    basically.
4    Q.  On the --
5    A.  I was trying to help put structure in
6    it.
7    Q.  In the May 29th, 2020, e-mail -- well,
8    let me back up.
9         The e-mail header says it's from
10   Epicure Medical, and it has an e-mail address,
11   accounting@epicuremed.com?
12   A.  Yep.
13   Q.  Do you know who was the holder of that
14   account?
15   A.  The accounting@epicure.com was Dan, and
16   it was assigned to Linda for PO management.  So
17   it would land in Linda's inbox.
18   Q.  Okay.  And so this e-mail -- I guess
19   Linda is writing, "Good morning.  I'm going to
20   start sending cash reports each morning for
21   Epicure."
22        Do you see that?
23   A.  Um-hum.
24   Q.  Do you know if she -- if Linda sent

Page 102

SARAH SIMMERS

1
2  cash reports each morning?
3      A.  I don't recall if it was every morning.
4      Q.  Do you recall the -- sorry.  Go ahead.
5      A.  Um...  I don't recall if it was every
6  morning because we were tying to move that into
7  that app, you know, and she was doing this in
8  the interim until we could get this stuff in
9  place, basically, where it was on a dashboard I
10 think is -- there was a dashboard component to
11 it so that she could see it all in realtime in
12 and out.
13     Q.  Do you know when that app or dashboard
14 was implemented approximately at the time?
15     A.  No.  We were -- I don't remember.  I
16 don't.  I don't remember the details of the
17 dates, no, but is was trying to solve some of
18 the manual that this is.
19     Q.  Okay.  On the June 2nd -- on the --
20 excuse me.  There's an e-mail dated June 2nd
21 where it looks like Linda is sending other cash
22 reports.  Do you see this?
23     A.  Yeah, it's Epicure Medical, yep.
24     Q.  It looks like they're attachments,
25 Excel spreadsheet attachments indicated on the

Page 103

SARAH SIMMERS

1
2  e-mail.  Do you see that?
3      A.  I do.
4      Q.  And it indicates -- that e-mail header
5  for this June 2nd e-mail indicates that you
6  received.  It says Sarah Simmers,
7  sarah@custommedico.com; is that correct?
8      A.  That's correct.
9      Q.  Is there a reason you were using -- it
10 was sent to your Customedico account, e-mail
11 account?
12     A.  I think it was just an oversight on
13 Linda's part.  I work with Linda.  She's a --
14 she does controlling for other businesses, and I
15 think she saw Sarah, and I must have picked
16 that.  I don't know.  I can't see why Linda
17 would send that to Customedico because at that
18 point I had an Epicure e-mail.  I don't know.
19 That was Linda's choice and...
20     MR. PENN:  Okay, I'm going to introduce
21 Exhibit 11.
22              (Simmers Exhibit 11 was marked
23               for ID.)
24 BY MR. PENN:
25     Q.  This is a document produced by your

Page 104

SARAH SIMMERS

1
2  counsel.  It doesn't have a Bates stamp, but it
3  is the Excel cash report from the June 2nd,
4  2020, e-mail that we just saw in Exhibit 10.
5      A.  Okay.
6      Q.  The file name is "Epicure Medical
7  Financial Quip Report."
8          I'm going to scroll through these pages
9  here, and then I'll ask you questions.
10     MR. KORANTENG:  Will you be kind enough
11 to give us the Bates number?
12     MR. PENN:  It was produced without a
13 Bates number.  It was a native Excel file.
14     MR. KORANTENG:  Okay.
15 BY MR. PENN:
16     Q.  So this -- I'm going to direct your
17 attention to specific pages, so, you know, you
18 don't need to study it.  If you need closer
19 inspection to answer a question, I'll
20 certainly -- you'll have time to read it.
21     A.  Okay.
22     Q.  Okay.  So do you recognize this
23 document?
24     A.  I don't remember it, no.  It's a --
25 it's part of our -- I don't recognize it.

Page 105

SARAH SIMMERS

1
2      Q.  Do you recall -- do you recall
3  receiving it in June 2020?
4      A.  I don't -- I mean, I honestly don't
5  remember these details of these cash reports
6  from last year or two years ago.  I don't
7  remember them.
8      Q.  Did you ever review any of the cash
9  reports that were sent to you?
10     A.  Yes, we did review them in the moment
11 at the time.
12     Q.  Okay.  This page, can you see what the
13 title of this page is?
14     A.  The aging, A/P aging.
15     Q.  Okay.  It says Epicure Medical A/P
16 aging as of May 28th, May 28, 2020; is that
17 correct?
18     A.  Yes.
19     Q.  Okay.  And do you see you Voyant Beauty
20 on this chart?
21     A.  I do.
22     Q.  And does it indicate an amount of
23 accounts payable for Voyant?
24     A.  It does.
25     Q.  And what is that amount?

Page 106

SARAH SIMMERS

1
2    A.  (Reviewing document.)
3        It's $1,848,252.32.
4    Q.  Okay.  This is the second page I think
5  of the same cash report.  You can see in the
6  center of -- in the middle, there's a column.
7  It says "Outstanding checks (and withdrawals)."
8        Do you see that?
9    A.  Yep.
10   Q.  Listed under that column, there's a
11 notation that says "6/1/2020, Sarah Simmers
12 Dist."
13       Do you see that?
14   A.  I do.
15   Q.  Do you have an understanding of what
16 that refers to?
17   A.  That is a 10,000, $10,000 distribution
18 to me.
19   Q.  And did you receive that distribution
20 on -- on or about June 1st, 2020?
21   A.  I believe so, yes.
22   Q.  And was the payment to you personally?
23   A.  The payment was to me personally, yes.
24   Q.  Do you know if Lee Ori received a
25 distribution on or around June 1st, 2020?

Page 107

SARAH SIMMERS

1
2    A.  Whenever we did a distribution, it was
3  done equally.  So I -- I know that it was done
4  equally, but to say that he got one around then,
5  I'm going to say I assume so because that's how
6  we distributed.
7    Q.  Okay.  Let's --
8    A.  Do you mind -- do you mind if I go to
9  the bathroom?  Is it okay?  Can we take a break?
10       MR. PENN:  Yeah, I was going to say
11 let's go off the record.
12       THE WITNESS:  Oh, does that mean that?
13 Okay.
14       THE VIDEOGRAPHER:  It's 2:01 p.m., and
15 we're going off the record.
16              (Recess taken from 2:01 p.m.
17              to 2:20 p.m.)
18       THE VIDEOGRAPHER:  The time is
19 2:20 p.m., and we're back on the record.
20       MR. PENN:  Okay.  Welcome back, Miss
21 Simmers.  I want to introduce an Exhibit 12.
22              (Simmers Exhibit 12 was marked
23              for ID.)
24 BY MR. PENN:
25   Q.  This is a document produced by your

Page 108

SARAH SIMMERS

1
2  counsel.  The Bates number is DEF3680.  I'll
3  represent that this is a letter of intent sent
4  from Epicure to Voyant Beauty dated June 4th,
5  2020.
6        Miss Simmers, do you recognize this
7  document?
8    A.  I don't particularly remember it, but I
9  see it's an LOI.  I don't remember it.  But,
10 yes, I see it's an LOI.
11   Q.  And do you recall seeing it at the
12 time, around June 2020?
13   A.  I don't remember.  I just don't
14 remember.
15   Q.  Okay.  This letter of intent is signed
16 by Lee Ori.  It's -- can you -- would you read
17 the first sentence of the letter, please?
18   A.  "Michael, we are committed to
19 purchasing 5mm units of 2-ounce hand sanitizer
20 monthly for the next 90 days."
21   Q.  Were you aware in June 2020 that
22 Epicure was committing to purchase 5 million
23 units of 2-ounce hand sanitizer?
24   A.  I was aware of it as far as the -- I
25 believe -- I thought it was the gas stations

Page 109

SARAH SIMMERS

1
2  that were looking for this size.  Exactly the
3  number, I don't remember the numbers, but I
4  remember that they were looking for that size
5  and quite a few of them.  That's what I
6  remember.
7    Q.  And when you say "that size," are you
8  referring to the 2-ounce?
9    A.  2 ounce.  Yeah, the 2-ounce size.
10   Q.  Do you recall having any discussions
11 with Lee Ori or Dan Reilly about purchasing
12 millions of units of hand sanitizer from Voyant
13 in June 2020?
14   A.  I remember conversations of having
15 millions of units purchased, but specifically
16 being June, I don't remember it being June
17 specifically.
18       MR. PENN:  I'm going to move on to
19 Exhibit 13.
20              (Simmers Exhibit 13 was marked
21              for ID.)
22 BY MR. PENN:
23   Q.  This is a document produced by your
24 counsel.  It's DEF0714.  Once you've had a
25 chance to review it, just let me know.

Page 110

SARAH SIMMERS

1
2    A.  "Michael, all three partners are in
3    St. Louis meeting this week.  I will be in touch
4    with a plan.  Thank you."
5            And then can you scroll down to see
6    what --
7        Q.  (Complying.)
8        A.  (Reviewing document.)
9            So that's from Michael, August 3rd.
10           Can you go back up?  Because we --
11       Q.  (Complying.)
12       A.  Okay.  Got it.
13       Q.  Okay.  Do you recall receiving this
14   e-mail?
15       A.  I don't recall receiving the e-mail.
16       Q.  Do you -- let's take a look at the
17   August 4th, 2020, e-mail, the top.  It says,
18   "All three partners are in St. Louis meeting
19   this week to put together a plan."
20           And that e-mail is from Lee Ori to
21   Michael Partridge, and you are copied on the
22   e-mail.  Do you see that?
23       A.  Yes.
24       Q.  Was -- do you know if Mr. Ori was
25   referring to the three partners of Epicure?

Page 111

SARAH SIMMERS

1
2        A.  Yes.
3        Q.  And by "three partners," did -- is it
4    your understanding Mr. Ori meant you, Lee Ori
5    and Dan Reilly?
6        A.  Yes.  I'm assuming that because I went
7    to St. Louis.
8            MR. KORANTENG:  Sarah, give me one
9    second.
10           THE WITNESS:  Sorry, Fibbens.
11           MR. KORANTENG:  I want to object.  I'll
12   object to the question.  It calls for somebody
13   else's state of mind.
14           Subject to that objection, you can go
15   ahead and answer.
16           THE WITNESS:  As Fibbens said, I'm
17   assuming it is because we all met in St. Louis,
18   Lee, Dan and myself.
19   BY MR. PENN:
20       Q.  What -- do you recall what you
21   discussed during the meeting in St. Louis?
22       A.  Generally, yes, I do recall.
23       Q.  Do you recall when the meeting
24   occurred?
25       A.  The exact date?  We did two days.  We

Page 112

SARAH SIMMERS

1
2    met two different days.
3        Q.  Were those days around August 4th,
4    2020?
5        A.  Yeah.  I don't know the exact date, but
6    yes.
7        Q.  Lee Ori writes in the August 4th e-mail
8    that the -- that the partners will be putting
9    together a plan.
10           Did you discuss a plan during your
11   meeting with Ori and Reilly?
12       A.  What I remember was we met, and there
13   was discussions about trying to move product
14   through the grocery stores and the convenience
15   stores specifically, and Dan showed us the --
16   they're called dump boxes.  They were boxes that
17   were going to go in the end of the displays to
18   try to move more product because it hadn't been
19   really moving for reorders, and we were trying
20   to move reorders through the different
21   customers.  And he was trying strategies to make
22   the product more visible to the customer.  So he
23   had prototypes of the dump boxes for the end of
24   the displays he showed us, trying to move things
25   because he was trying to move product off the

Page 113

SARAH SIMMERS

1
2    shelf.  He had initial POs and commitments, and
3    we were pushing -- he was working with the
4    customers to try to get those next POs in.  I
5    remember those details.
6            We went through financials.  They
7    talked about sales with customers.  He talked
8    about customers.  We looked at purchase orders,
9    what -- strategizing to try to put more --
10   because we just weren't getting reorders as they
11   had expected or that had been committed to us.
12   That's what I recall of it from our
13   conversations, generally.
14       Q.  If you look at the August 3rd e-mail
15   from Michael Partridge, it says, "Lee, didn't
16   hear from you last week, and now all payables
17   are due."
18           Do you have an understanding of what he
19   was referring to with payables being due?
20           MR. KORANTENG:  Objection, calls for
21   what somebody else's state of mind again.
22           THE WITNESS:  The all payables he's
23   referring to, I don't know exactly what he's
24   referring to.
25   BY MR. PENN:

Page 114

SARAH SIMMERS

1
2    Q.  During your meeting with Lee Ori and
3 Dan Reilly, did you discuss any outstanding
4 payables or outstanding balance due to Voyant?
5    A.  I don't remember specifically.  I don't
6 remember.  I know we went through the
7 financials, but exactly the details of the
8 payables, I don't remember.
9    MR. PENN:  I'm going to introduce
10 Exhibit 14.
11             (Simmers Exhibit 14 was marked
12                  for ID.)
13 BY MR. PENN:
14    Q.  This is a document produced by your
15 counsel.  It's DEF0082.  Just let me know when
16 you want me to scroll down.
17    A.  Okay.  Got some orders -- a million...
18 oh.  (Reviewing document.)
19        Yep.
20    Q.  Okay.  Do you recognize this document?
21    A.  I do.
22    Q.  Okay.  What is it?
23    A.  It's an e-mail I did.  There was a
24 distribution partner that I was talking to about
25 our -- about some CBD, that he possibly would be

Page 115

SARAH SIMMERS

1
2 interested in sanitizer.  So I forwarded
3 information on our sanitizer that we were trying
4 to sell, that we had units for.  So I sent that
5 to him also.
6        And he never -- he said he would see if
7 there was any of his group that would be
8 interested and he would be -- like, I didn't do
9 sales, so this would be the extent of me having
10 anything to do with that.  And I sent him what
11 we had in inventory for -- currently for
12 sanitizer.
13    Q.  And in your August 13, 2020, e-mail,
14 you indicate that there are 2-ounce -- there are
15 15 -- excuse me -- strike that.
16    A.  1.5 million?
17    Q.  In your August 13th e-mail, you
18 indicate there are 1.5 million units of 2-ounce
19 hand sanitizer available for immediate delivery;
20 is that right?
21    A.  Um-hum.
22    THE REPORTER:  Sorry, was that yes?
23    THE WITNESS:  Yes that's what the
24 e-mail says.
25    THE REPORTER:  Okay.  Thanks.

Page 116

SARAH SIMMERS

1
2 BY MR. PENN:
3    Q.  In the August 13th response from -- I
4 guess it's William King to you --
5    A.  Um-hum.
6    Q.  -- he asks about the price of the
7 sanitizer.  Do you see that?  And on
8 August 14th, it looks like he forwarded the
9 e-mail to Lee; is that right?
10    A.  Yes.  I asked Lee to follow up with
11 him.
12    Q.  Did -- did you get any response from
13 Lee Ori on the price of the sanitizer?
14    A.  Lee took it from there, to my
15 knowledge.  I think Lee followed up with Bill.
16 I don't believe I did.
17    MR. PENN:  Okay.  I'd like to introduce
18 Exhibit 15.
19             (Simmers Exhibit 15 was marked
20                  for ID.)
21 BY MR. PENN:
22    Q.  This is a document produced by your
23 counsel.  It's DEF0421 through
24 DEF0422.  It's an e-mail dated September 7th,
25 2020.  Let me know when you want me to scroll

Page 117

SARAH SIMMERS

1
2 down.
3    A.  (Reviewing document.)
4        Okay.
5    Q.  (Complying.)
6    A.  (Reviewing document.)
7        Do you mind starting at the bottom so
8 it's -- it's really confusing to start at the
9 end of an e-mail.
10    Q.  I was just going to ask you that very
11 question.
12    A.  Because I don't remember it.  I don't
13 remember this.
14    Q.  I'm going to start here, and when
15 you're ready for me to move up, just let me
16 know.
17    A.  "Dan, wanted to touch base with you.
18 Here's what I'd like to do."
19        (Reviewing document.)
20        "That way you'll have all money
21 deposited..."
22        Okay, so I read that.  Scroll up,
23 kindly.
24    Q.  (Complying.)
25    A.  "Lee here is the payment that I made."

Page 118

SARAH SIMMERS

1        SARAH SIMMERS
2        Yeah, I remember Dan needing some
3   reimbursements for some stuff he screwed up on.
4   I remember that.  Okay.  Scroll up.
5        Q.  (Complying.)
6        A.  Yeah, okay.  There we go, Clover Leaf
7   card by mistake, he needs reimbursement.
8        Okay.  (Reviewing document.)
9        I've finished reading it.
10        Q.  Okay.  Do you recall receiving this
11   e-mail?  Strike that.
12        A.  I don't.  I don't.
13        Q.  Strike that.  I'll withdraw that
14   question.
15        It indicates -- if you look at the
16   September 6th and September 7th e-mail, it
17   appears -- strike that.
18        If you take a look at the
19   September 7th, 2020, e-mail from Lee Ori to the
20   Epicure Medical accounting, do you see that?
21        A.  Um-hum.
22        Q.  It says, "Please also pay Sarah and I.
23   I want my money sent to Foxhole, please."
24        Do you see that?
25        A.  (Nodding.)

Page 119

1        I see it.
2        Q.  If you -- I just scrolled down to the
3   September 6th, 2020, e-mail from Lee Ori to Dan
4   Reilly, and it says Epicure Medical accounting
5   address, and Lee Ori writes, "We also need to
6   distribute funds to the partners this week.
7   Dan, what do you need to be distributed?  You
8   had indicated $3,000."
9        Do you see that written there?
10        A.  I do.
11        Q.  Okay.  Do you recall receiving
12   distributions of $3,000 in the year 2020?
13        A.  I mean, I don't remember specifically a
14   distribution on September -- what is it? --
15   September 6th or on or around -- I don't
16   remember it, but we -- I know that we equally
17   distributed.  Whenever a distribution was done,
18   it was done equally.
19        Q.  Do you know how often the funds were
20   distributed to the members?
21        A.  Are you -- can you ask the question
22   differently?
23        Q.  Did you receive distributions from
24   Epicure?

Page 120

1        SARAH SIMMERS
2        A.  I did.
3        Q.  How often did you receive distributions
4   from Epicure?
5        A.  Initially, we were doing around 10,000
6   a month, and then when we were having difficulty
7   selling when the market kind of fell out, we
8   stopped doing that.  We stopped distributing
9   money to the partners.  At least that's what I
10   remember it being.
11        Q.  Was there any process to determine what
12   the distribution amounts were?
13        A.  There wasn't a formal process, no.
14        MR. PENN:  I'd like to introduce
15   Exhibit 16.  This is a document produced by your
16   counsel.  It's DEF0426 through DEF0427.
17        (Simmers Exhibit 16 was marked
18            for ID.)
19        THE WITNESS:  "Linda, I'd like to pay
20   Voyant some more money."
21        So can you shrink it because the e-mail
22   falls behind the Zoom.  Yeah, there we go.
23        (Reviewing document.)
24        Okay.  Scroll up, please.
25   BY MR. PENN:

Page 121

1        SARAH SIMMERS
2        Q.  (Complying.)
3        A.  Yeah.  (Reviewing document.)
4        Okay.  So that's referring to Linda's
5   invoice.  Okay.  Okay.  Okay.  Got it.
6        Q.  Okay.  Do you recall receiving a
7   distribution of $10,000 on or around
8   October 22nd?
9        A.  Again, I don't remember the dates, but
10   I remember whenever there was a distribution, we
11   equally got one.  So I'm going to say yes.
12        MR. PENN:  Okay.  I'd like to introduce
13   Exhibit 17.
14        (Simmers Exhibit 17 was marked
15            for ID.)
16   BY MR. PENN:
17        Q.  This is a document produced by your
18   counsel.  It's DEF3495 through DEF3497.  I'll
19   just ask if you recognize the document.
20        A.  Yes.  It's the Epicure -- Epicure
21   balance sheet.
22        Q.  And this is the balance sheet for
23   Epicure for -- as of December 31st, 2020; is
24   that correct?
25        A.  That is correct, yes.

Page 122

SARAH SIMMERS

1
2    Q.  Okay.  I'd just direct your attention
3  to the section on distributions.  It lists Lee
4  Ori, Sarah Simmers and Dan Reilly.
5       Do you see that?
6    A.  Um-hum.
7    Q.  And do you see what -- what -- it
8  indicates a distribution $43,000 for Sarah
9  Simmers.  Do you see that?
10   A.  I do.
11   Q.  Is that accurate?
12   A.  That is accurate.
13   Q.  That's as of -- these are distributions
14  through December 31st, 2020.  Did you receive
15  any distributions from Epicure in the year 2021?
16   A.  I did not.
17   MR. KORANTENG:  Robert, I don't see
18  Exhibit 16 in the chat to the extent that it's
19  been compiled by the court reporter maybe,
20  unless I'm missing it.
21   THE REPORTER:  Is he still with us?
22   THE WITNESS:  I don't see him.
23   MR. KORANTENG:  Robert said he's having
24  some technical difficulties.  I guess he's not
25  on here.  He's trying to fix it and rejoin us.

Page 123

SARAH SIMMERS

1
2    THE VIDEOGRAPHER:  Do you want to go
3  off the record?
4    MR. KORANTENG:  Yes.  Let's do that
5  while we wait for him.
6    THE VIDEOGRAPHER:  The time is
7  2:53 p.m., and we're going off the record.
8       (Recess taken from 2:53 p.m.
9        to 3:02 p.m.)
10   THE VIDEOGRAPHER:  The time is
11  3:02 p.m., and we're back on the record.
12  BY MR. PENN:
13   Q.  Miss Simmers I just want to go back to
14  the prior exhibit, actually.  We were discussing
15  distribution on around September -- wait.
16  Strike that.
17       We were discussing a distribution
18  around October 26th, 2020, for $10,000.  Do you
19  recall that?
20   A.  (Nodding.)
21   I do.  I recall the discussion, yes.
22   Q.  Okay.  Let me just put it up.  Yes.
23  Okay.  So this was the document that we were
24  discussing.
25       When you received this -- if you

Page 124

SARAH SIMMERS

1
2  recall, when you received this $10,000
3  distribution, did you ask to be informed about
4  points?  Excuse me.  Did you ask to be informed
5  about Epicure's obligations, financial
6  obligation?
7    MR. KORANTENG:  Objection to form of
8  the question.  It's vague.
9    MR. PENN:  I'll withdraw the question
10  and try to re- -- restate it.
11  BY MR. PENN:
12   Q.  When you had meetings with Dan Reilly
13  and Lee Ori, did you collectively discuss the
14  finance -- Epicure's financial obligation?
15   A.  Yes.  I knew -- I knew of our financial
16  obligations, absolutely.
17   Q.  And that includes -- does that include
18  outstanding balances to your different vendors?
19   A.  Absolutely.
20   MR. PENN:  Okay.  I'd like to introduce
21  Exhibit 18.
22       (Simmers Exhibit 18 was marked
23        for ID.)
24  BY MR. PENN:
25   Q.  This document was also produced by your

Page 125

SARAH SIMMERS

1
2  counsel.  It's identified at DEF004807.
3       Do you recognize this document?
4    A.  Yes.
5    Q.  And what is it?
6    A.  It's Foxhole's balance sheet.
7    Q.  And this is a balance sheet as of
8  December 31st, 2021, correct?
9    A.  Correct.
10   Q.  So I'm on the first page.  I'm looking
11  at the other assets category.
12   A.  Okay.
13   Q.  There's a notation here that says "Due
14  from SPP."
15   A.  Yes.
16   Q.  What is SPP?
17   A.  Scottsdale Professional Pharmacy.
18   Q.  It says the amount of $131,789.85 is
19  due to Foxhole.  Do you know what that reflects?
20   A.  Yes.  Foxhole when we had revenue from
21  consulting loans, moneys, discussion with
22  Scottsdale Professional.
23   Q.  Has that loan been paid back to
24  Foxhole?
25   A.  It has not.

Page 126

SARAH SIMMERS

1
2     Q.  Do you happen to recall when the
3  maturity date is?
4     A.  I don't.
5     Q.  Moving down under the "Long-term
6  liabilities" section, there's a notation that
7  says "Due to Epicure."  Do you see that?
8     A.  (Nodding.)
9     Q.  Do you see it or no?
10    A.  No, I see it.
11    Q.  Okay, okay.  It says in the amount of
12 $126,076.74 due to Epicure.  Do you happen to
13 know what that relates to?
14    A.  I don't recall any money being due to
15 Epicure from Foxhole.  I don't.  That doesn't
16 seem right.  I don't -- I don't have any
17 recollection of any money being due from Foxhole
18 to Epicure.
19    Q.  Okay.
20       MR. PENN:  One moment, please.
21       (Brief pause in proceedings.)
22       MR. PENN:  That's all the questions I
23 have.
24       MR. KORANTENG:  Okay.  Can we go off
25 the record for maybe 10, 15 minutes, 15 minutes

Page 127

SARAH SIMMERS

1  tops, while I look at what questions I may have,
2  and we can get back on?
3
4       THE VIDEOGRAPHER:  The time's
5  3:10 p.m., and we're going off the record.
6       (Recess taken from 3:10 p.m.
7        to 3:24 p.m.)
8       THE VIDEOGRAPHER:  The time is
9  3:24 p.m., and we're back on the record.
10      MR. KORANTENG:  So, Miss Simmers, I
11 think you know me.  I don't need any
12 introductions.
13      THE WITNESS:  I know you.
14      MR. KORANTENG:  I'll go straight to my
15 questions.  Okay.  You're doing well.  We have a
16 few minutes to go, and then this should be over.
17
18       EXAMINATION
19 BY MR. KORANTENG:
20    Q.  There's been a lot of testimony about
21 Foxhole Medical.  I think you and Robert have
22 discussed that extensively, but I have a few
23 questions about that.  And, specifically, other
24 than the LOI that Foxhole submitted on
25 March 26th of 2020, was Foxhole involved in any

Page 128

SARAH SIMMERS

1  other way with the transactions between Epicure
2  and Voyant?
3     A.  No.
4     Q.  Okay.  Was there any purchase orders
5  that were submitted by Foxhole to Voyant?
6     A.  No.
7     Q.  Were there any orders of any kind, you
8  know, for hand sanitizer from Foxhole to Voyant?
9     A.  No.
10    Q.  Okay.  Did Foxhole pay Voyant any
11 moneys for any hand sanitizer ordered by
12 Epicure?
13    A.  No.
14    Q.  And did Foxhole receive any hand
15 sanitizer from Epicure?
16    A.  No.
17    Q.  No -- strike that question.
18       Did Foxhole receive any hand sanitizer
19 from Voyant?
20    A.  No.
21    Q.  Okay.  And did Voyant issue any
22 invoices to Foxhole Medical at all?
23    A.  No.
24    Q.  Did Foxhole receive any compensation

Page 129

SARAH SIMMERS

1  from Epicure for any services relating to its
2  hand sanitizer business?
3     A.  No.
4     Q.  All right.  And did Foxhole receive any
5  compensation from Epicure as a result of the
6  transaction between Epicure and Voyant?
7     A.  No.
8     Q.  Okay.  Do you know of any other
9  involvement whatsoever between Foxhole and
10 Voyant other than that LOI that was sent on
11 March 26th of 2020?
12    A.  No.
13    Q.  Okay.  Let's talk about Epicure.
14 What -- I think you've testified, you know,
15 significantly about your role in Epicure, but I
16 want to ask you briefly to recap each of your
17 roles, yours, Lee Ori's and Dan Reilly's role in
18 Epicure.
19      MR. PENN:  Objection.
20 BY MR. KORANTENG:
21    Q.  You can go ahead and answer.
22    A.  Oh, okay.
23    Q.  Same rule.  When I ask a question,
24 Robert can object, but subject to that

SARAH SIMMERS

1        SARAH SIMMERS
2    objection, you can go ahead and answer if you
3    understand my question.
4        A.  My role, as I have testified, is
5    infrastructure.  I worked on the website, I
6    worked on branding, I worked on the RepZio
7    project, contracts for the sales team.  I'm
8    trying to think what else.  Oh, I did the micro
9    merchant systems for credit cards.
10        Lee's role was business development and
11   the manufacturer relationships.  Procurement I
12   think would be a good word.  And Dan was largely
13   sales.
14        Q.  Okay.  And Foxhole, you guys weren't
15   employees of Foxhole, were you -- not Foxhole --
16   but Epicure, were you?
17        A.  We were not employees, no.
18        Q.  Okay.  And so I think earlier you also
19   testified that you, Dan, Reilly, and Lee Ori
20   were all managers of Epicure; is that correct?
21        A.  That is correct.
22        Q.  So in performing any of these roles on
23   behalf of Epicure, in what capacity were you
24   guys performing these roles?  In performing
25   these roles that you just discussed --

SARAH SIMMERS

1        SARAH SIMMERS
2        A.  Yes.
3        Q.  -- for Epicure, in what capacity were
4    you guys performing those roles?
5        MR. PENN:  Objection.
6        THE WITNESS:  Define "capacity."
7    BY MR. KORANTENG:
8        Q.  Were you performing those roles as
9    employees, independent contractors, managers?
10        A.  As managers.
11        MR. PENN:  Objection.
12        THE WITNESS:  Sorry, Robert.
13   BY MR. KORANTENG:
14        Q.  So you were performing these roles as
15   managers of Epicure?
16        A.  Yes.
17        Q.  You testified about -- I think Robert
18   had asked you earlier about meetings that you
19   had to make decisions, and you said that you
20   guys had many telephone conversations about it.
21   So was that typically how you guys made
22   decisions relating to Epicure?
23        A.  Yes.
24        Q.  Right.  And let me ask, I think there's
25   been some testimony of e-mails and testimony

SARAH SIMMERS

1        SARAH SIMMERS
2    relating to those e-mails about Lee Ori's
3    transactions or interactions with Voyant.  I
4    think you recall some of that testimony -- do
5    you?
6        A.  Yes.
7        Q.  Now, let me ask, as far as Lee Ori's
8    interaction was Voyant, was he authorized by
9    Epicure, you and Dan Reilly to act on behalf of
10   Epicure in relation to these transactions?
11        MR. PENN:  Objection.
12        THE WITNESS:  Yes.
13   BY MR. KORANTENG:
14        Q.  Okay.  So Lee was -- in what capacity
15   was he authorized?  I mean what was -- what was
16   he authorized to do, if you can speak to that.
17   Was he --
18        A.  Well, just as I test- -- as my
19   testimony has said, his job was to procure
20   product on behalf of Epicure.
21        Q.  Okay.  So he had your authority and
22   Dan's authority as managers to interact with
23   Voyant?
24        A.  Yes.
25        Q.  On these transactions that are the

SARAH SIMMERS

1        SARAH SIMMERS
2    basis of this lawsuit; is that correct?
3        MR. PENN:  Objection.
4        THE WITNESS:  Yes.
5    BY MR. KORANTENG:
6        Q.  Okay.  Let me rephrase that question.
7    Did he -- did Lee Ori have authority to interact
8    with Voyant on these transactions that formed
9    the basis of the lawsuit that -- in which you
10   know -- for which you testified?
11        A.  Yes.
12        MR. PENN:  Objection.
13   BY MR. KORANTENG:
14        Q.  All right.  When Lee Ori submitted the
15   LOI -- I think earlier you had testified -- and
16   I think your quote -- you said "Lee had put in
17   the LOI," and this was in relation to the
18   Foxhole LOI.
19        A.  (Nodding.)
20        Q.  What did you mean by that?
21        MR. PENN:  Objection.
22        THE WITNESS:  I meant that Lee -- Lee
23   in his role sent the LOI is what I meant by
24   that.
25   BY MR. KORANTENG:

Page 134

SARAH SIMMERS

2  Q. All right. So you weren't implying
3 that somehow Lee Ori as a person sent the LOI,
4 were you?
5  A. No.
6  MR. PENN: Objection. Misstates
7 testimony.
8 BY MR. KORANTENG:
9  Q. Okay. Okay. So when Lee had submitted
10 the LOI on behalf of -- on behalf of Foxhole, in
11 what capacity was he submitting that LOI?
12  MR. PENN: Objection.
13  THE WITNESS: From what I understood,
14 it's -- it was a placeholder until Epicure was
15 formed.
16 BY MR. KORANTENG:
17  Q. And when Lee submitted the LOI for
18 Epicure, that was dated June -- I think
19 June 4th, that you had -- you and counsel had
20 discussed, do you understand -- what's your
21 understanding of the capacity in which he was
22 submitting that LOI?
23  MR. PENN: Objection.
24  THE WITNESS: As a manager of Epicure.
25  MR. KORANTENG: Okay. I don't think I

Page 135

SARAH SIMMERS

2 have any further questions, Robert.
3  MR. PENN: Okay. Give me -- let's just
4 go off the record for a couple minutes, please.
5  MR. KORANTENG: Okay.
6  THE VIDEOGRAPHER: The time is
7 3:33 p.m., and we're going off the record.
8  (Recess taken from 3:33 p.m.
9  to 3:36 p.m.)
10  THE VIDEOGRAPHER: The time is
11 3:36 p.m., and we're back on the record.
12  MR. PENN: I have no further questions.
13  THE VIDEOGRAPHER: The time is
14 3:36 p.m., and we're going off the record.
15  (Deposition concluded at 3:36 p.m. CST.)

Page 136

SARAH SIMMERS
2  IN THE UNITED STATES DISTRICT COURT
  EASTERN DISTRICT OF MISSOURI
3  EASTERN DIVISION
4
AWARE PRODUCTS LLC,
5 D/B/A VOYANT BEAUTY,
6  Plaintiff,
7  vs.  No. 4:21-cv-249-JCH
8 EPICURE MEDICAL, LLC,
FOXHOLE MEDICAL, LLC,
9 and LEE ORI,
10  Defendants.
  _____/
11
12  I hereby certify that I have read the
13 foregoing transcript of my deposition given at
14 the time and place aforesaid, consisting of
15 pages 1 to 135, inclusive, and I do again
16 subscribe and make oath that the same is a true,
17 correct, and complete transcript of my
18 deposition so given as aforesaid and includes
19 changes, if any, so made by me.
20
  _____
21  SARAH SIMMERS
22
  SUBSCRIBED AND SWORN TO
23 before me this _____ day
  of _____, A.D. _____.
24
  _____
25  Notary Public

Page 137

SARAH SIMMERS
2  REPORTER CERTIFICATE
3  I, Deborah Habian, a Certified
  Shorthand Reporter within and for the State of
4 Illinois, do hereby certify:
5  That previous to the commencement of
  the examination of the witness, the witness was
6 remotely duly sworn to testify the whole truth
  concerning the matters herein;
7
  That the foregoing deposition was
8 reported stenographically by me, was thereafter
  reduced to printed transcript by me, and
9 constitutes a true record of the testimony given
  and the proceedings had;
10
  That the said deposition was taken
11 remotely before me at the time and place
  specified;
12
  That the reading and signing by the
13 witness of the deposition transcript was not
  discussed within the body of this transcript;
14
  That I am not a relative or employee of
15 attorney or counsel, nor a relative or employee
  of such attorney or counsel for any of the
16 parties hereto, nor interested directly or
  indirectly in the outcome of this action.
17
  IN WITNESS WHEREOF, I do hereunto set
18 my hand this 8th day of April, 2022.
19
20
21  _____
22  DEBORAH HABIAN, CSR, RMR, CRR, CLR
  IL CSR NO. 084-02432
23  MO CCR NO. 1409
24
25

Page 138

```
 1   NAME OF CASE:
 2   DATE OF DEPOSITION:
 3   NAME OF WITNESS:
 4   Reason Codes:
 5         1.  To clarify the record.
 6         2.  To conform to the facts.
 7         3.  To correct transcription errors.
 8   Page _____ Line _____ Reason _____
 9   From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25                    _____
```

Index: $1,848,252.32..ahead

**$**

**$1,848,252.32** 106:3

**$10,000** 106:17 121:7 123:18 124:2

**$126,076.74** 126:12

**$131,789.85** 125:18

**$135,000** 93:9

**$2.6** 83:14,15

**$25,125** 94:5,10

**$3,000** 119:9,13

**$43,000** 122:8

**$500** 35:11,18,22,24 36:10

**$600.66** 54:11

**$666.66** 54:8

**$72,500** 55:24

**1**

**1** 8:22 33:13 34:2 36:25

**1.2** 99:21,22,23

**1.5** 115:16,18

**10** 100:2,3 104:4 126:25

**10,000** 106:17 120:5

**1011** 81:15

**1012** 81:19

**1013** 82:2

**1018** 82:16

**1019** 82:20

**10th** 22:4

**11** 103:21,22

**11:05** 9:3

**12** 107:21,22

**12-ounce** 82:6

**120,000** 82:2

**12:31** 62:10,11

**12:47** 62:12,14

**13** 109:19,20 115:13

**13th** 81:13 82:2 115:17 116:3

**14** 114:10,11

**14th** 116:8

**15** 115:15 116:18,19 126:25

**16** 120:15,17 122:18

**16th** 82:20

**17** 121:13,14

**18** 124:21,22

**19** 48:17

**1st** 106:20,25

**2**

**2** 36:25 37:15,16 82:10 94:3 98:25 109:9

**2-ounce** 74:23 81:16 82:7,16,21,23 108:19,23 109:8,9 115:14,18

**2.4** 82:7,23 99:19

**2.6** 83:4

**20** 23:5,13 40:2

**2000** 42:15 48:24

**2010** 19:2,3,14

**2013** 26:14

**2014** 26:14

**2017** 22:4

**2018** 24:24

**2019** 27:9 29:6 48:14, 22

**2020** 20:10 28:2,3 40:5 41:13 42:24 43:4,7 51:17 55:21 62:20,21 63:13 66:17 75:10 76:24 81:10 82:2,20 83:3,13 86:8 87:18 93:4,20 97:19 99:18 101:8 104:4

**12:47** 62:12,14

105:3,16 106:20,25 108:5,12,21 109:13 110:17 112:4 115:13 116:25 118:19 119:4, 13 121:23 122:14 123:18 127:25 129:12

**2021** 122:15 125:8

**2022** 9:2 77:11 78:25

**21st** 76:24 77:11 78:25 79:14

**22nd** 84:15 86:8 87:12 121:8

**24th** 97:19 99:18

**26th** 51:17 75:10 123:18 127:25 129:12

**27th** 55:20

**28** 105:16

**28th** 105:16

**29** 9:2

**29th** 101:8

**2:01** 107:14,16

**2:20** 107:17,19

**2:53** 123:7,8

**2nd** 102:19,20 103:5 104:3

**3**

**3** 51:4,5

**30** 8:16

**31st** 121:23 122:14 125:8

**3:02** 123:9,11

**3:10** 127:5,6

**3:24** 127:7,9

**3:33** 135:7,8

**3:36** 135:9,11,14,15

**3rd** 110:9 113:14

**4**

**4** 55:5,6

**4812** 73:6

**4th** 20:10 108:4 110:17 112:3,7 134:19

**5**

**5** 72:18,19 73:5 108:22

**50** 35:14 99:4,9

**5mm** 108:19

**6**

**6** 79:19,20

**6/1/2020** 106:11

**60** 23:11

**60/40** 40:22,25

**600,000** 81:15,17,19 82:16,20

**66.6** 54:2

**6th** 118:16 119:4,16

**7**

**7** 84:5,6

**7th** 116:24 118:16,19

**8**

**8** 91:16,17 93:4

**9**

**9** 97:13,14

**90** 108:20

**93** 74:24

**A**

**a.m.** 9:3

**A/p** 105:14,15

**absolutely** 13:7 43:13,21 93:11 124:16,19

**accommodate** 11:17

**account** 36:13 38:3, 4 39:12 46:12,16 54:13 55:3,15,17 101:15 103:10,11

**accounting** 55:15 118:20 119:5

**accounting@ epicure.com** 101:16

**accounting@ epicuremed.com** 101:12

**accounts** 105:23

**accurate** 37:6 54:3 94:16 122:11,12

**accurately** 53:22

**act** 132:9

**actively** 58:21 89:2

**actors** 64:23

**address** 101:11 119:6

**administered** 9:20

**admissible** 8:14

**affairs** 36:21

**affirm** 9:16

**aggressive** 95:14

**aging** 105:14,16

**agree** 13:22,25 14:2

**agreement** 12:13 19:3 26:8 33:22 36:17 37:3 41:18,23 51:12,21 55:20

**ahead** 47:20 76:3 81:22 96:21 102:4 111:15 129:22 130:2

**air** 25:21

**Albertson** 95:2

**Allina** 16:15

**amount** 54:21 55:2 56:3 57:2 82:7 105:22,25 125:18 126:11

**amounts** 54:18 83:11 120:12

**ANP** 17:20

**answering** 13:18 98:8

**answers** 10:18 11:3 12:18

**apologize** 24:15

**app** 90:6 102:7,13

**appearing** 9:12

**appears** 118:17

**approached** 25:6

**approval** 71:11

**approve** 71:20

**approved** 63:17,19, 21 70:23 71:10,25 72:2

**approving** 63:16 71:3

**approximately** 102:14

**April** 81:10,13 82:2, 20,24 83:3,13 84:15 86:8 87:12,18 99:20

**Arizona** 18:14,22 25:14

**Article** 36:17

**asks** 30:3 116:6

**aspect** 71:16

**assess** 70:18

**assets** 125:11

**assigned** 101:17

**assist** 67:22

**associate** 28:15

**association** 8:4

**assume** 107:5

**assuming** 111:6,17

**attached** 85:21,25

**attachment** 85:13

**attachments** 102:24,25

**attend** 14:21 15:7,10

**attention** 36:17 38:14 84:16 104:17 122:2

**attorney-client** 77:24

**August** 93:20 110:9, 17 112:3,7 113:14 115:13,17 116:3,8

**authority** 132:21,22 133:7

**authorized** 16:24 132:8,15,16

**award** 58:11

**aware** 8:24 9:8 10:9 56:14,17 58:12 59:5 63:23 69:4 81:6,9 83:10 108:21,24

---

**B**

**baby** 47:16

**back** 25:9 26:22 29:22 33:25 45:7 61:7 62:14 63:23 64:2 67:20 73:3 78:6 79:16 80:11 81:21 92:8,10,11 93:8,21, 23 94:12 101:9 107:19,20 110:10 123:11,13 125:23 127:3,9 135:11

**background** 14:20 28:22 50:8,23 53:17 68:4

**bad** 64:23

**balance** 114:4 121:21,22 125:6,7

**balances** 124:18

**bank** 36:13 38:3,4 55:14,15,17

**banks** 87:20 88:19 89:7 94:19 96:8,24 97:8

**Barn** 22:23,24 23:9

**base** 117:17

**based** 58:8 99:15

**bases** 49:4

**basically** 17:8 63:11 64:14 65:15 71:23 73:22 74:16 90:14 101:4 102:9

**basis** 133:2,9

**Bates** 37:19 104:2, 11,13 108:2

**Bath** 64:15

**bathroom** 107:9

**beat** 11:13

**Beauty** 8:25 9:9 10:10 80:2 105:19 108:4

**began** 47:11,13

**beginning** 47:2 95:5

**behalf** 49:12,13 130:23 132:9,20 134:10

**believed** 93:17

**big** 40:4

**bigger** 84:23 85:4 94:24 95:25

**Bill** 116:15

**billion** 98:25

**Birch** 19:13

**bit** 14:19 15:12 39:21 53:16 64:2 70:4 73:4 80:14 84:25 95:9

**blow** 87:25

**blurrier** 85:5

**board** 36:22,23 59:11,25 60:13

**body** 17:8,9

**Borrower** 94:4

**bottle** 82:6

**bottles** 67:6 70:24 75:13

**bottom** 34:6 85:12 117:7

**boxes** 112:16,23

**brand** 71:17

**branding** 29:17 60:18,22 63:18 71:24 130:6

**break** 11:16,20 39:16 62:6 107:9

**bridge** 92:19,20,24

**briefly** 19:23 129:17

**bring** 67:8 84:13

**budget** 58:11

**budgets** 58:4,10

**build** 91:4

**building** 90:3

**buildout** 44:4,6

**bullet** 94:3 98:23

**business** 8:25 9:8 10:10 21:15 22:6,9, 10 24:2 26:5,6,18 27:6 28:16 29:19 30:19,20 36:21 43:16,17 48:2 54:22 58:5,13,17,22 60:4 84:3 92:23 95:3 129:3 130:10

**businesses** 22:12 103:14

**busy** 32:11,12 59:5

---

**C**

**call** 88:25 92:18 98:15,21,22 100:25

**called** 10:3 22:22 65:11 90:5 112:16

**calls** 60:3 61:3 73:19 83:20 85:17 87:16

89:17 90:17 111:12 113:20

**capacity** 87:25 130:23 131:3,6 132:14 134:11,21

**capital** 30:21 35:5,10 38:23 39:13 45:14,20 46:12 54:7,17,19 57:5,15,18 92:23 95:19,23

**capitalization** 30:3, 10 46:4

**capitalize** 31:8

**capitalized** 29:24 30:8 45:8,13

**capitalizing** 30:16

**caps** 75:13

**card** 91:11,13 118:7

**Cardinal** 16:25 17:17,23,24

**cards** 130:9

**care** 18:9

**Carrollton** 38:2 55:16

**case** 8:17 11:13 81:3

**cash** 100:11 101:21 102:2,21 104:3 105:5,8 106:5

**category** 125:11

**caused** 79:13

**CBD** 27:9,11,15 28:13,24 29:6,8,16 31:16,20 32:3 47:18, 21,22 48:2,22,25 49:5,6,8 50:4,6 58:25 114:25

**CBDS** 27:17

**cc'd** 97:20

**center** 106:6

**Central** 9:3

**cents** 74:24

**cetera** 36:8

**chain** 90:22 100:6

**chains** 95:2,3

**chance** 97:22 98:4 109:25

**channels** 47:18

**characterization** 29:12

**chart** 53:22 84:24 85:6,10,22 105:20

**chat** 32:17,22 73:12 80:6 122:18

**check** 39:12 54:22 55:2 62:2,3

**checking** 14:3 16:2 36:10,12 39:12

**checks** 106:7

**chicken** 67:10

**choice** 22:15,18 23:3,15,22,25 24:2,6 43:22,23 44:3,24 103:19

**choose** 68:24

**choosing** 67:20 68:8,9

**chose** 68:12

**chosen** 64:9

**city** 44:6

**Civil** 8:16

**clarify** 75:9 77:22

**clear** 59:23

**client** 42:22,23 44:16

**clinic** 18:2,7,9

**clinical** 17:25

**clinics** 15:16

**closer** 104:18

**Clover** 52:2,19 53:5 118:6

**colleague** 9:9

**collectively** 50:12 124:13

**column** 35:13 106:6, 10

**commitment** 67:2, 14

**commitments** 66:18,21 67:13 113:2

**committed** 32:7,9 74:22 108:18 113:11

**committing** 108:22

**communicate** 13:23

**communication** 14:4 77:24

**comp** 24:10,11

**companies** 40:15 41:2 90:2

**company** 16:12,15 29:24 31:12,23 36:20,21,24 39:23 40:16,17,20 41:17, 18,20 45:9,16 48:18 52:21 64:18 90:5 98:17

**compensation** 128:25 129:6

**compiled** 122:19

**complete** 33:3

**Complying** 9:19 34:9 81:23 92:12 98:2 110:7,11 117:5, 24 118:5 121:2

**component** 102:10

**compounding** 18:15,16,17,23 20:25 21:3 68:23

**computer** 32:23

**conceived** 50:4

**concluded** 135:15

**conference** 26:12 98:15,20

**confusing** 117:8

**considered** 12:18

**consist** 36:23

**consultant** 64:14 67:22 68:5

**consulting** 25:3,4,18 27:2,6,24 42:4,11,12,

16 43:4,12,15,20 125:21

**consuming** 60:12

**contact** 86:16

**container** 70:20

**content** 61:3 63:21 79:12 89:24

**contents** 70:22

**continue** 43:3,6 82:15

**contract** 27:9,11,15 29:20 40:8,9 43:23 44:21 64:13 90:8,22 91:2

**contracted** 31:6

**contracting** 27:16 29:19 43:17

**contractor** 28:13 44:5

**contractors** 28:8,10 131:9

**contracts** 46:18 130:7

**contractual** 64:11

**contri-** 46:11

**contribute** 78:17

**contributed** 57:19

**contribution** 35:10, 19 39:13 45:21 54:7, 17,20 57:15

**contributions** 35:5 45:15 57:5

**control** 68:17,18

**controlling** 103:14

**convenience** 112:14

**convenient** 90:12

**conversation** 47:20

**conversations** 48:12 57:13 59:6 60:7 74:9 109:14 113:13 131:20

**convey** 86:22

**copied** 63:22 87:7 110:21

**copy** 60:18

**corporate** 15:16

**corporately** 99:2

**correct** 12:15 19:5 22:7,8 23:13 25:11 26:17,19 31:25 37:12,13 47:8 48:2,3 49:16 50:5 52:6,7,10, 11,12,13 55:18,21 60:8 62:21 70:11,14 76:14,18 77:6 80:24, 25 82:5,8,15,24,25 93:6 103:7,8 105:17 121:24,25 125:8,9 130:20,21 133:2

**correctness** 71:23

**cost** 39:8 83:4

**counsel** 9:5 11:10 12:5 34:4 51:19 55:10 73:4 77:17 79:24 84:10 91:21 97:18 100:7 104:2 108:2 109:24 114:15 116:23 120:16 121:18 125:2 134:19

**Counselors** 8:3

**couple** 88:19 90:2 135:4

**court** 8:9 9:15 10:17 122:19

**Courtney** 86:11 94:25

**courtroom** 8:15

**COVID** 12:25

**COVID-19** 8:6

**created** 58:5

**creating** 81:3,5

**credit** 91:11,13 130:9

**CST** 135:15

**current** 31:14

**Custom** 20:15

**Customceutical** 18:23 19:5,6,7,8,16,

19 20:7,15 21:12,13

**Customedico** 21:15 22:7,19 23:20,22,24 24:3 26:17 70:6 103:10,17

**customer** 30:22 31:13 45:11 49:4,5 56:4,7,24 60:16 65:24 66:11,15 67:7 90:8,13,19 112:22

**customers** 29:11 58:8 59:7 60:25 64:19 65:2,19,21 66:5 74:12 82:14 83:17 87:18 92:25 94:24 95:6 99:11 112:21 113:4,7,8

**customized** 18:20 21:4

---

**D**

**daily** 56:16 60:3 91:4

**Dakota** 14:25 15:8, 14,19 17:15

**Dallas** 57:25

**Dan** 28:12,14,15,21, 22 29:2,5,10,13 39:24 40:11 47:21,22 48:12,13,17 49:3,19 52:21 53:3,12 56:5 58:6,9,19 59:7 60:9 61:8 63:24 66:8 68:13 72:16 83:20,23 86:9,10,11 88:18 89:18 90:3 94:18,25 97:6 101:16 109:11 111:5,18 112:15 114:3 117:17 118:2 119:4,8 122:4 124:12 129:18 130:12,19 132:9

**Dan's** 40:16 47:16 48:20 52:21 53:3,6,7 64:5 132:22

**dashboard** 102:9, 10,13

**data** 65:12,13 70:13, 21

**date** 48:11 51:13,16 57:24 93:4,20 94:5,6 111:25 112:5 126:3

**dated** 55:20 75:10,11 82:2,20 86:8 102:20 108:4 116:24 134:18

**dates** 81:12 83:11 102:17 121:9

**day** 68:20 69:2,15 70:5 75:11

**Daylight** 9:3

**days** 108:20 111:25 112:2,3

**deal** 46:25 58:2

**Debbie** 8:9

**December** 22:18 121:23 122:14 125:8

**decide** 41:17

**decision** 68:5

**decisions** 131:19,22

**DEF0030** 55:10

**DEF0031** 37:19

**DEF004807** 125:2

**DEF0082** 114:15

**DEF0176** 100:8

**DEF0178** 100:8

**DEF0421** 116:23

**DEF0422** 116:24

**DEF0426** 120:16

**DEF0427** 120:16

**DEF0572** 97:18

**DEF0714** 109:24

**DEF3495** 121:18

**DEF3497** 121:18

**DEF3505** 51:19

**DEF3545** 51:20

**DEF3680** 108:2

**DEF3744** 34:3

**DEF393793** 34:3

**DEF4659** 84:10

**DEF4660** 84:11

**DEF4737** 91:21

**DEF4740** 91:22

**DEF4741** 79:24

**DEF4748** 79:25

**DEF4811** 73:5

**defendant's** 34:2 116:23

**defendants** 9:12

**Define** 66:21 78:13 131:6

**degree** 15:3,5,14

**delay** 10:24

**delivery** 115:19

**dell** 51:23

**demand** 99:15

**deposed** 10:13

**deposit** 35:21 38:16 45:10,12 46:15 55:23 56:2,4,7,21,25

**deposited** 35:24 36:10 54:10 117:21

**deposition** 8:23 11:23 12:24 13:9 79:20 135:15

**describe** 43:19

**design** 71:16

**desirable** 65:6

**details** 87:18 98:6 102:16 105:5 113:5 114:7

**determine** 32:5 65:14 120:11

**determined** 46:4 54:17

**developed** 27:14

**developing** 29:8

**development** 29:19 130:10

**diagnostics** 17:8

**diem** 17:24

**difference** 21:18

**differently** 71:6 72:9 119:23

**difficult** 67:5

**difficulties** 122:24

**difficulty** 90:16 100:19 120:6

**dinners** 30:18

**direct** 84:16 104:16 122:2

**directing** 36:16

**directly** 29:20 56:13 63:7,8,9,15 64:5

**discovery** 78:21 79:5

**discuss** 60:14 112:10 114:3 124:13

**discussed** 54:19 77:20,21 111:21 127:22 130:25 134:20

**discussing** 62:16 67:5 123:14,17,24

**discussion** 123:21 125:21

**discussions** 46:2,8 47:24 48:4,7 56:19 57:12 59:2 62:19 88:14,16 93:12,15 109:10 112:13

**dispense** 19:18,20

**dispensing** 18:8

**displays** 112:17,24

**Dist** 106:12

**distancing** 8:7

**distribute** 119:7

**distributed** 107:6 119:8,18,21

**distributing** 120:8

**distribution** 27:15 106:17,19,25 107:2 114:24 119:15,18

120:12 121:7,10 122:8 123:15,17 124:3

**distributions** 119:13,24 120:3 122:3,13,15

**doctor** 19:25 20:3 21:5

**doctor's** 18:18

**doctorate** 15:6

**doctors** 18:9

**document** 32:14,17, 23 33:3,16,19 34:4, 10,23 35:2 37:20,25 38:3,4,20 51:8,14,18 52:19 54:18 55:9,11 69:3 72:22,23 73:7 74:5 79:8,9 80:6,7 84:9,19 91:20,22 92:4 97:17,24 98:3 100:12 103:25 104:23 106:2 107:25 108:7 109:23 110:8 114:14,18,20 116:22 117:3,6,19 118:8 120:15,23 121:3,17, 19 123:23 124:25 125:3

**document's** 34:2

**documents** 12:12 32:25 49:18,23 69:7 77:17 78:2,12,15 79:23 80:16

**dollars** 38:16

**door** 22:19

**download** 32:23 80:7

**drawing** 38:14

**due** 8:5 92:24 113:17, 19 114:4 125:13,19 126:7,12,14,17

**duly** 10:4

**dump** 112:16,23

**Durand** 8:3

**E**

**e-mail** 14:3 63:19 72:24 73:2 75:9 76:16,21 77:8,10 78:24 79:17 84:15 85:13,21 86:7,22 87:3,6,24 88:9 97:19, 20 98:5,9,11,24 100:6 101:8,10,11,19 102:20 103:2,4,5,10, 18 104:4 110:14,15, 17,20,22 112:7 113:14 114:23 115:13,17,24 116:9, 24 117:9 118:11,16, 19 119:4 120:21

**e-mails** 12:2,4,11 63:23 78:16,17 79:4, 5 100:7,16 131:25 132:2

**earlier** 66:20 83:6 89:14 94:14,22 130:18 131:18 133:15

**earliest** 86:7

**early** 47:24 48:4,6,21 65:18 89:23

**easy** 32:20

**education** 14:21

**effective** 51:13,16

**effectively** 91:6

**efforts** 47:14

**egg** 67:11

**else's** 111:13 113:21

**employee** 26:20,21

**employees** 28:5 130:15,17 131:9

**end** 28:25 38:11 48:16,22 62:3 112:17,23 117:9

**ended** 97:4

**engage** 27:5 28:23 30:21 43:3

**engaged** 27:13 63:3 64:11 67:22 68:4,6

90:22

**engagement** 28:19

**engaging** 42:22 49:4,20 59:7 62:23 63:6,24 76:12

**entail** 15:22 17:2 18:6

**enters** 13:5

**entities** 20:17 24:5 51:23

**entity** 22:22,24 25:7 29:2 42:3 44:17

**entry** 15:24

**Epicure** 8:25 9:13 12:13 26:6 39:21,22, 23 40:2,7,8,12,20 45:7,8,13,15,21 47:5, 16,18,19,22,24,25 48:17,21,25 49:7,14, 15,24 50:2,3,6,13 51:11,21 53:8,23 54:13 55:17 56:6 57:15,19 58:4,16 60:4,10,11 62:17,19, 23 63:2 66:18 67:22 68:10,25 71:11,13 72:6,11,15 75:6 76:11,12,19 77:8 80:22 81:9 82:23 83:13 87:10 92:8,9, 13,15,17 93:5,10,20, 23 94:9,16,17 96:7 99:18 101:11,22 102:23 103:18 104:6 105:15 108:4,22 110:25 118:20 119:5, 25 120:4 121:20,23 122:15 126:7,12,15, 18 128:2,13,16 129:2,6,7,14,16,19 130:16,20,23 131:3, 15,22 132:9,10,20 134:14,18,24

**Epicure's** 40:13,14 47:14 49:11 58:5,13 59:11 71:17 73:20 124:5,14

**Epicuremed.com.** 77:4

**equally** 107:3,4

119:17,19 121:11

**essence** 21:8

**essentially** 46:13

**establish** 36:12 41:11 56:6 58:22

**established** 18:25 22:3 29:23 30:7 41:15 42:14 45:15

**estimate** 48:10

**et al** 9:2

**eventually** 16:18,20 18:10

**everyone's** 45:23

**exact** 57:24 81:11 111:25 112:5

**EXAMINATION** 10:6 127:18

**examined** 10:5

**Excel** 102:25 104:3, 13

**excellent** 11:4

**excuse** 17:12,25 77:4 88:15 102:20 115:15 124:4

**executing** 92:17

**Execution** 93:4

**exhibit** 33:13 34:2 37:14,15,16 51:4,5 55:5,6 72:18,19 73:5, 12 79:19,20 84:5,6 91:16,17 97:13,14 100:2,3 103:21,22 104:4 107:21,22 109:19,20 114:10,11 116:18,19 120:15,17 121:13,14 122:18 123:14 124:21,22

**exhibits** 32:19 33:9

**existed** 61:24

**existing** 79:17

**expected** 113:11

**expenditures** 54:21

**expenses** 30:18 31:4,11 36:7 45:20,

25 54:24

**experience** 50:17,19 68:3

**explain** 17:5 19:23

**expressed** 98:15

**extensive** 64:12

**extensively** 127:22

**extent** 115:9 122:18

**eyeballed** 61:16

---

**F**

**face-to-face** 59:18

**facility** 99:4

**fact** 69:17 77:10

**fair** 29:11 47:13,15

**fake** 46:24

**falls** 120:22

**Fargo** 15:2

**fast** 49:17,23

**FDA** 68:23 69:3

**February** 76:24 77:11 78:25 79:14

**Federal** 8:16

**fee-for-service** 30:20

**feel** 33:2 38:11

**fell** 120:7

**felt** 70:20

**Fibbens** 9:11 61:19 96:12 111:10,16

**figure** 90:20

**file** 104:6,13

**fill** 20:2

**finance** 89:10 95:21 124:14

**financial** 104:7 124:5,14,15

**financials** 113:6 114:7

**financing** 94:15,17, 21

**find** 66:13 67:6 85:25

**finding** 29:10

**fine** 96:17,20

**finish** 11:3,4 33:5 64:20

**finished** 118:9

**finishes** 64:20 69:20

**firm** 9:10

**fix** 122:25

**focus** 46:24 48:25

**follow** 17:8 116:10

**forgive** 20:6

**forgot** 42:6

**form** 24:25 30:2 75:3 124:7

**forma** 58:19 85:14,20 86:2

**formal** 59:25 74:25 75:13 120:13

**formas** 58:7,8 59:3 61:9,10,20 85:16

**formation** 47:14 49:11

**formed** 24:23,24 25:7,18,22 30:15 39:24,25 40:5,7,8 45:9 49:7,16 73:21 133:8 134:15

**forms** 14:4

**formulas** 27:14

**formulating** 29:17

**formulation** 18:19

**forward** 77:10 79:9, 17

**forwarded** 76:23 77:13 79:16 115:2 116:8

**Foxhole** 9:13 24:19, 21,24,25 25:3,17,19, 22 26:3,6,22,23,25 27:5,10,16,20 28:5,7,

19,21 29:2,4,9,23 30:7,15 31:8,24 33:23 34:20 35:22,25 36:13 38:5,7,24 39:7 47:23 48:14 75:17,20 76:8,11,14 77:9 118:23 125:19,20,24 126:15,17 127:21,24, 25 128:6,9,11,15,19, 23,25 129:5,10 130:14,15 133:18 134:10

**Foxhole's** 27:24 31:14 125:6

**frame** 47:11

**frankly** 85:5

**free** 38:11

**front** 90:8 95:6

**fulfill** 20:4

**full** 80:5

**fully** 24:14 49:7 76:20

**funding** 96:6

**funds** 119:7,20

---

**G**

**gap** 95:21

**gas** 95:13 96:2 108:25

**gather** 61:24

**gauge** 31:18

**gee** 40:3

**gel** 64:20 65:5,22 66:6,12 67:4

**gel-based** 65:5

**general** 71:9

**generally** 15:22 42:2 111:22 113:13

**generate** 26:25 42:7 43:6 90:21

**gentleman** 88:20 89:8 97:2,3

**get all** 67:17

**give** 11:13 48:10 57:24 69:12 95:8 96:13 104:11 111:8 135:3

**good** 8:2 10:8 48:21 62:5 64:23 92:19 101:20 130:12

**goods** 83:4

**Great** 21:21 86:4

**grocery** 95:2,3,12 112:14

**ground** 10:13

**group** 115:7

**groups** 95:11,13

**guess** 29:9 32:4 41:16 65:20 71:8 85:15 101:19 116:4 122:24

**guidance** 69:3,7

**guides** 68:23

**guys** 69:6 130:14,24 131:4,20,21

**H**

**Habian** 8:9

**half** 42:21,23

**hand** 9:17 46:20 48:25 50:5,8,16,20, 24,25 58:17 62:17, 19,24 63:3 64:4 67:21 68:10 70:10 72:11 80:2,23 81:16 82:3,17,21 85:20 90:24 99:9 108:19,23 109:12 115:19 128:9, 12,15,19 129:3

**happen** 88:2 126:2, 12

**happening** 56:22 62:20

**happy** 85:25

**hard** 14:17 66:24 85:2,3 95:8

**head** 10:18 83:12 93:25 94:11

**header** 76:16 101:10 103:4

**heads** 58:24

**Health** 16:25 17:17 18:2,6

**hear** 14:17 78:6 113:16

**heard** 25:20

**hearing** 14:8 78:5

**helped** 91:9

**Hexsom** 67:24

**high** 14:21 17:6

**highlighted** 38:15

**hired** 64:14

**history** 15:13,15

**hold** 73:22 97:10

**holder** 101:14

**holds** 40:20

**home** 16:5,6,7,8,10, 15,20 61:17

**honestly** 105:4

**hospital** 15:20,24,25 17:4

**hospitals** 15:16

**hour** 12:10

**hours** 67:18

**How's** 34:11 80:13

**hundred** 59:16

**I**

**I-N-N-O-V-I-S** 18:4

**ID** 33:14 37:17 51:6 55:7 72:20 79:21 84:7 91:18 97:15 100:4 103:23 107:23 109:21 114:12 116:20 120:18 121:15 124:23

**ideas** 48:23

**identified** 34:3 51:19 55:10 73:5 79:24

84:10 91:21 97:18 100:8 125:2

**identifying** 64:3

**imaging** 17:10

**imbedded** 85:22

**immediately** 75:12

**implement** 90:9

**implemented** 102:14

**implying** 134:2

**impressed** 64:18

**inbox** 101:18

**include** 124:17

**includes** 14:3 124:17

**income** 42:7,9 43:6

**incurred** 31:5 36:7

**independent** 28:7, 12 131:9

**individually** 45:17, 22

**industry** 22:13 45:5 68:21,22

**information** 66:8 99:8 115:3

**informed** 124:3,4

**infrastructure** 29:13 89:25 91:3,8 130:5

**infrastructure-wise** 90:17

**infusion** 16:5,6,7,8, 15,21

**initial** 36:25 37:6 38:16 55:23 56:7,12, 20 57:5,15 71:14 113:2

**initially** 40:9 41:25 46:5,6 50:4 60:15,17, 21 120:5

**inject** 21:19

**injectables** 19:21

**Injured** 24:10

**Innovis** 18:2,3,6,11

**input** 64:7 71:13 72:5

**inspected** 70:9

**inspection** 104:19

**instruct** 77:18

**instruction** 77:16,20 78:2 79:4

**instructions** 78:11

**integrated** 90:9

**intended** 75:12

**intent** 75:12,19 108:3,15

**intention** 90:15

**interact** 132:22 133:7

**interaction** 132:8

**interactions** 63:13 132:3

**interest** 35:14 54:3 94:4,13

**interested** 74:18 115:2,8

**interim** 102:8

**interject** 75:22

**intravenous** 16:11

**introduce** 9:5 33:25 51:3 55:4 79:19 97:13 99:25 103:20 107:21 114:9 116:17 120:14 121:12 124:20

**introductions** 127:12

**inventory** 90:7 115:11

**invest** 38:23

**invested** 39:6

**investment** 26:19 30:23 51:25

**investments** 39:11 40:15 41:3,12 52:5, 13 54:2,6,8 60:8

**invoice** 121:5

**invoices** 128:23

**involved** 26:16 29:10 43:11 48:14 53:18 64:3,15 65:9 127:25

**involvement** 63:16 64:10 129:10

**Iowa** 25:15

**ish** 60:19

**issue** 75:17 76:8 128:22

**issued** 75:2 81:10

**items** 60:14

**J**

**James** 19:13

**January** 22:4

**Jason** 86:12

**job** 16:21 17:2,19 18:5 68:20 69:2,15 70:5 132:19

**joining** 9:10

**June** 102:19,20 103:5 104:3 105:3 106:20,25 108:4,12, 21 109:13,16 134:18, 19

**Justin** 9:9

**K**

**keeping** 100:21

**kicked** 25:21

**kind** 24:14 45:2 47:16,19 59:18 90:25 91:6 92:18,24 100:20 104:10 120:7 128:8

**kindly** 117:23

**King** 116:4

**knew** 30:22 56:3 57:3 58:23 95:7 97:7 124:15

**knowledge** 50:21

51:2 54:25 56:9 74:8
87:13 93:11 116:15

**Koranteng** 8:19
9:11,12 11:10 24:12,
16 29:25 30:9 33:8
36:2,4 38:25 42:17
57:7 61:21 69:19,22,
25 72:7 75:3,21,24
77:18 83:5 85:24
86:5 88:6 96:9,13,16,
20 104:10,14 111:8,
11 113:20 122:17,23
123:4 124:7 126:24
127:10,14,19 129:21
131:7,13 132:13
133:5,13,25 134:8,
16,25 135:5

## L

**label** 63:17,19,21
70:23 71:11,14,19,25
**labeled** 8:22
**labeling** 27:15 71:18
**labels** 70:24 71:4,9
**land** 101:18
**lane** 48:20 63:11 64:6
68:11 84:2 87:8,15
97:6
**large** 45:10 46:15
96:24
**largely** 21:13 130:12
**larger** 95:2,11,13
**lawsuit** 78:14 97:4
133:2,9
**Leaf** 52:2,19 53:5
118:6
**lean** 14:13 78:6
**leaning** 78:5 80:11
**leave** 16:20 18:10
**leaving** 15:13
**led** 74:9
**Lee** 9:14 22:22 23:12
24:22 25:23 26:2,4,5,
12,24 30:18 34:21,25
35:24 36:25 37:5

39:24 40:5 41:8,10,
15 43:11 44:4 49:22
51:25 53:12 54:24
56:5 58:6,20 60:15
61:2 63:24 64:5
68:14 72:15 73:23
74:6,15 76:17 78:19
79:9 83:20,23 86:8,
14,22,25 87:24 89:18
91:9 92:7,9,14 93:9
94:9,15 95:22 96:5
97:6,19 98:11,21
99:8 106:24 108:16
109:11 110:20 111:4,
18 112:7 113:15
114:2 116:9,10,13,
14,15 117:25 118:19
119:4,6 122:3 124:13
129:18 130:19 132:2,
7,14 133:7,14,16,22
134:3,9,17

**Lee's** 28:16 64:6
67:24 130:10

**lee@epicure.med**
77:2

**lee@foxholemed.
com** 76:18

**left** 15:19 16:18 17:23
**legal** 8:4
**legible** 85:23
**lended** 92:14
**lender** 87:25 94:5
**lenders** 87:21 88:5,
11,17
**lending** 88:23 92:22
95:16,20
**letter** 75:11 108:3,15,
17
**letterhead** 76:14
**level** 17:6
**liabilities** 126:6
**license** 25:15
**licensed** 25:10,13,
14,16
**licensure** 44:10
**Linda** 100:11,19

101:17,20,25 102:21
103:13,16 120:19

**Linda's** 101:18
103:13,19 121:4
**lined** 46:13
**liquid** 65:4 66:12,14
**liquidy** 65:4
**Lisa** 52:3,24
**listed** 34:14,16,25
35:17 51:24 52:18,24
53:11 54:18 106:10
**listened** 89:2,3
**lists** 35:5 53:8,25
122:3
**LLC** 8:24 9:2,8,13
10:10 23:7 24:20,21
25:8 41:5 51:25 52:2,
19
**loan** 31:8 91:25
92:19,23 93:21,24
94:12 125:23
**loaned** 92:8,9
**loans** 125:21
**LOI** 73:16,18,23 74:9,
21 75:2,10,15 76:13
108:9,10 127:24
129:11 133:15,17,18,
23 134:3,10,11,17,22
**long** 12:9 16:16
28:25 29:4 39:15
61:23 67:25 69:6
**Long-term** 126:5
**looked** 12:11 65:7,13
70:19,20,21 113:8
**looped** 63:22 87:16
**lot** 30:16,21 44:4
48:19,23 59:6,14,15
60:17,20 61:3,12
64:12,20,22 67:18
68:3 97:2 100:23
127:20
**Louis** 28:17 59:17
110:3,18 111:7,17,21
**love** 31:17

## M

**made** 35:9 39:10
49:12,13 54:7,16
69:14 70:5 89:13
91:4 117:25 131:21
**make** 10:19 17:9
18:17 19:18,25 21:4,
7 39:12 45:4 56:25
67:15 68:5 72:14
84:23 85:4 88:2
112:21 131:19
**makeup** 72:4
**making** 20:13 44:16
47:11 56:20 93:13
**managed** 36:22
**management** 26:7,
8,16 36:18,20 45:3
101:17
**manager** 34:17,25
36:25 51:25 52:3,7,9,
10,24 60:13 134:24
**managers** 26:23
36:22,23 37:6,8 41:9
53:8,11 59:11,25
130:20 131:9,10,15
132:22
**manual** 102:18
**manufacture** 68:10
**manufacturer** 27:13
65:16 66:13 130:11
**manufacturers**
29:21 62:23 64:4,8,
15,21 67:21 68:19
69:6 95:18
**manufacturing** 40:9
50:23 64:13 68:3
74:16
**March** 9:2 40:2,5
51:17 55:20 62:21
63:13 66:17 75:10
127:25 129:12
**mark** 37:15
**marked** 33:9,13
37:16 51:5 55:6
72:19 79:21 84:6
91:17 97:14 100:3

103:22 107:22
109:20 114:11
116:19 120:17
121:14 124:22

**market** 120:7
**marketing** 60:19,20,
23 61:4 89:24
**marketplace** 31:18
49:9 64:24 99:16
**mask** 46:25 57:20,21,
22 58:2
**masks** 40:11 46:22
**match** 66:14 71:23
**materials** 60:24
**matter** 8:24 77:17
78:3,12,13
**maturity** 93:19 94:6
126:3
**means** 17:5 30:3,10
**meant** 111:4 133:22,
23
**measures** 65:16
**media** 8:22
**Medical** 9:2,13
24:20,21 26:7 33:23
39:22,23 55:18
101:11 102:23 104:6
105:15 118:20 119:5
127:21 128:23
**medications** 16:10
**meet** 26:11 28:18
30:24 60:24 95:17
**meeting** 30:18 45:18
59:19 69:7 87:20
88:11 110:3,18
111:21,23 112:11
114:2
**meetings** 30:16,18
36:8 39:8 59:12,25
60:14 94:24 124:12
131:18
**member** 34:14,19
35:17 40:18 52:6,10,
12,16,18
**members** 25:25
26:2,23 36:24 37:12

40:13,14 41:7 51:24
119:21

**membership** 35:13
54:2

**Memorial** 15:21

**mentioned** 61:8
65:19 66:19

**merchant** 91:11
130:9

**merchanting** 91:9

**messages** 14:4

**met** 26:12 39:8 59:18,
19 88:18,19 89:6
90:5 111:17 112:2,12

**Mexico** 17:19

**Michael** 73:20,24
74:3,4 98:25 108:18
110:2,9,21 113:15

**micro** 130:8

**middle** 106:6

**million** 74:23 82:7,23
83:4,14,15 99:4,9,19
108:22 114:17
115:16,18

**millions** 109:12,15

**mind** 107:8 111:13
113:21 117:7

**minimal** 31:11

**Minnesota** 15:21
25:15

**minutes** 86:15
126:25 127:16 135:4

**missing** 122:20

**misstates** 42:17
83:5 134:6

**mistake** 23:14 118:7

**model** 18:8

**moment** 25:9 90:19
105:10 126:20

**money** 30:19,24 31:3
39:7 92:7,9,14
117:20 118:23 120:9,
20 126:14,17

**moneys** 125:21
128:12

**monograph** 71:18

**month** 99:4 120:6

**monthly** 108:20

**morning** 8:2 10:8
101:20,21 102:2,3,6

**move** 84:4 91:15
93:13 102:6 109:18
112:13,18,20,24,25
117:15

**moved** 18:14

**moving** 35:4 53:21
84:21 112:19 126:5

**N**

**native** 85:23 104:13

**necessity** 95:16

**needed** 31:8 48:15
67:8 73:20,21,24
91:5,12 95:14,19

**needing** 118:2

**nice** 65:6

**nodded** 42:6

**Nodding** 42:5 98:19
118:25 123:20 126:8
133:19

**nods** 10:18

**nominal** 54:20

**noncommercial**
21:7

**nonpharmacist**
21:17

**nonsterile** 20:25
21:2,3,16,18,19

**North** 14:25 15:7,14,
19,20 17:14

**notation** 106:11
125:13 126:6

**note** 85:12 92:13,17
93:10,19

**November** 20:10

**nuclear** 16:24

**nucleotides** 17:3,7

**number** 8:22 81:11,
25 82:19 94:3
104:11,13 108:2
109:3

**numbers** 109:3

**O**

**oath** 9:20 12:15

**object** 11:10 75:24
96:10 111:11,12
129:25

**objection** 11:14
29:25 30:9 36:2,4
38:25 42:17 57:7
72:7 75:3,22 83:5
88:6 96:11,22 111:14
113:20 124:7 129:20
130:2 131:5,11
132:11 133:3,12,21
134:6,12,23

**objections** 11:11

**obligation** 124:6,14

**obligations** 124:5,
16

**occurred** 111:24

**October** 121:8
123:18

**office** 36:8 39:8

**Oklahoma** 25:16

**oops** 97:9

**opened** 18:14 22:18,
21 46:15

**opening** 43:22 44:3

**operate** 19:17 43:9

**operated** 43:17

**operating** 12:13
17:11 19:3 20:7,9,12
33:22 44:9 51:11

**operations** 43:16,18
91:7

**opportunity** 68:25
74:17

**option** 32:22

**options** 32:18 91:13

**order** 15:24 75:6,14
81:3,14,15,18,19,25
82:16,19 83:17 89:9
91:14

**ordered** 82:23 83:18
99:20 128:12

**orders** 59:14 74:25
75:18 76:9 80:2,22,
23 81:6,10 83:2,10,
16 87:10 88:22,24
89:11 99:13 100:21
113:8 114:17 128:5,8

**organ** 17:10

**organized** 101:3

**Ori** 9:14 22:22 23:12
24:22 25:24 26:2,4,5,
11,15 34:21,25
35:16,17,24 36:25
37:5,11 41:8,10
43:11 46:3 47:3,7
50:18,22 52:2,12
53:12 56:15,20 57:4,
14 60:4,8 61:8 76:17
79:9 86:9,14,22
87:24 88:15,17 89:18
93:9,12 94:9,15 96:5
97:19 98:12,21 99:8
106:24 108:16
109:11 110:20,24
111:4 112:7,11 114:2
116:13 118:19 119:4,
6 122:4 124:13
130:19 133:7,14
134:3

**Ori's** 29:18 129:18
132:2,7

**originally** 47:20

**ounce** 82:10 109:9

**outstanding** 106:7
114:3,4 124:18

**oversight** 103:12

**owner** 19:7,14 20:20
21:22 22:12 24:18

**owners** 19:10,12
21:24

**ownership** 23:6,15,

23 53:22

**owns** 23:12

**P**

**p.m.** 62:10,11,12,14
107:14,16,17,19
123:7,8,9,11 127:5,6,
7,9 135:7,8,9,11,14,
15

**pages** 73:7 80:4
84:11 104:8,17

**paid** 93:21,23 94:9,12
125:23

**pandemic** 20:14
27:3,18 31:17 40:3,
12 47:20 48:7 59:13
61:13

**part** 31:22,24 65:9
84:16 88:25 89:5,15,
19 100:23 103:13
104:25

**parties** 8:12

**partly** 12:24

**partner** 26:5,6 47:23
48:19 49:20 114:24

**partners** 17:17
110:2,18,25 111:3
112:8 119:7 120:9

**Partridge** 74:4
110:21 113:15

**parts** 67:7

**patient** 18:20 19:21

**patient-specific**
19:22

**patients** 16:9 18:20
21:6

**patients'** 18:18

**Paul** 64:12,15,25
67:22,23,24 68:2,6

**pause** 31:16,21 32:4
97:11 126:21

**pay** 94:5 95:6,17 96:3
118:22 120:19
128:11

**payable** 105:23

**payables** 113:16,19, 22 114:4,8

**payment** 44:13 91:14 106:22,23 117:25

**payments** 44:16 92:24 94:4

**pending** 8:18 11:19

**Penn** 8:20 9:7 10:7,9 24:17 30:4,6,12 33:10,15 36:11 37:14,18 39:3,15,19, 20 42:19 51:3,7 55:4, 8 57:9 61:18 62:2,8, 15 70:3 72:8,10,17, 21 75:8 76:7 77:22 78:8,10 79:18,22 83:8 84:4,8 85:19 86:4,6 88:13 91:15, 19 97:9,12,16 99:25 100:5 103:20,24 104:12,15 107:10,20, 24 109:18,22 111:19 113:25 114:9,13 116:2,17,21 120:14, 25 121:12,16 123:12 124:9,11,20,24 126:20,22 129:20 131:5,11 132:11 133:3,12,21 134:6, 12,23 135:3,12

**people** 67:2 74:18 98:21

**percent** 23:5,13 35:14 54:2 59:16

**percentage** 23:3,9 40:19

**Perfect** 14:17 34:12

**performing** 130:22, 24 131:4,8,14

**periphery** 65:10 83:25

**perjury** 12:18

**person** 10:22 134:3

**personal** 45:19

**personally** 39:7 54:21 106:22,23

**PFL** 40:15 41:3,11,15 42:7,14,25 43:4,6,9, 12,20,23 44:13,24 51:25 52:4,5,13 53:25 54:6,8,10,24 60:8

**PFL's** 41:7,9,14

**pharm** 22:23,24 23:9 45:6

**pharmacies** 20:17

**pharmacist** 15:20 16:24 18:7 25:11 69:16,18 70:5

**pharmacists** 45:5 68:22

**pharmacy** 15:6,16, 24 16:5,8 18:2,15,16, 17,22,25 19:19 20:21,23,24,25 21:3, 14,23 22:6,12,15,18 23:4,25 24:7 25:2,4, 7,8,18 26:12 32:11, 12 41:24,25 43:22 44:9 45:2,3,6 125:17

**phone** 56:17 59:4,15, 16,20,21 60:3,9 61:13,15

**physically** 30:24 31:2

**physicians** 15:25 17:10

**PIC** 25:15

**picked** 103:15

**pieces** 60:20 89:24

**pivot** 58:25

**pivoted** 49:8 50:5 89:25

**place** 46:22 48:4,7 49:18,24 73:22,23 74:15 75:7 102:9

**placeholder** 73:20, 21,25 134:14

**places** 32:8,9

**plaintiff** 9:8 10:3,9

**plaintiffs** 8:20

**plan** 110:4,19 112:9, 10

**planning** 33:8 44:6

**PO** 91:12 97:2 101:17

**point** 48:24 65:23 103:18

**points** 124:4

**portion** 32:21

**POS** 89:8 90:21 113:2,4

**position** 15:18 16:3, 16,18,23 17:21 18:11,13 26:16

**positive** 99:22

**possibly** 48:18 114:25

**potential** 65:20,21 87:25 88:5,17

**practices** 8:6

**predominantly** 15:17 44:11

**preparation** 12:3,7,9 43:21 44:2

**prepare** 11:22,25

**prepared** 45:19

**Preparing** 17:3

**prescription** 20:3,4 21:5

**prescriptions** 16:2 18:8,18 19:20 21:4

**present** 60:25 61:6

**pretty** 46:15,24 48:16

**previously** 99:19

**price** 74:24 116:6,13

**pricing** 61:2

**primarily** 29:16,18

**primary** 18:9

**principal** 94:4

**prior** 47:14 49:11 62:20 75:13 123:14

**privileged** 77:24

**pro** 58:7,8,19 59:3 61:9,10,20 85:14,16, 20 86:2

**problem** 23:17

**Procedure** 8:16

**procedures** 44:9

**proceedings** 97:11 126:21

**process** 19:24 64:3 71:3,5 81:2 120:11, 13

**processes** 100:25

**procure** 56:8 66:10, 11 75:13 132:19

**procurement** 61:2 63:25 67:13 130:11

**procurements** 60:15

**procuring** 56:11

**prod** 74:18

**produce** 19:24 21:10,11 63:3 79:8 86:2

**produced** 12:4 34:4 50:6 55:9 61:20,21 65:7,13 73:4 78:3 79:7,23 85:20 97:17 100:7 103:25 104:12 107:25 109:23 114:14 116:22 120:15 121:17 124:25

**producing** 50:8 79:5

**product** 19:25 21:10 63:20 65:2,6,7 66:6, 10 67:3 70:10,16,20 74:19 96:4 112:13, 18,22,25 132:20

**production** 98:17

**products** 8:24 9:8 10:10 19:18 21:7,14 28:23 29:9 40:9,10, 12 50:20,24 68:18

**Professional** 20:21, 22,24 21:11,14,23 22:6 26:9 125:17,22

**professionals** 69:11

**program** 17:18 44:12

**programs** 25:7,8 30:17,22 31:5,12 36:7 39:10

**progressed** 95:10

**project** 130:7

**projections** 58:12, 18

**promissory** 92:13, 17 93:10,19

**promotional** 28:22 49:4

**promptly** 94:5

**proof** 61:5

**prototypes** 112:23

**provide** 12:17 17:19 43:24 71:10 72:5 78:18 86:2 90:18

**provided** 51:18 61:24 71:24 78:18 84:9 91:20

**providers** 19:22

**providing** 44:25

**purchase** 74:12,25 75:5,14,18 76:9 79:25 80:22,23 81:3, 10,14,15,18,19,25 82:16,19 83:10 88:22,23,24 89:9,10 91:14 99:13 100:21 108:22 113:8 128:5

**purchased** 82:7 109:15

**purchasing** 74:22 108:19 109:11

**purpose** 41:14

**pursuant** 18:18 21:5 96:21

**pushing** 49:20 113:3

**put** 31:12 39:9 45:17 55:2 58:24 69:3,9 74:15 95:23 96:2 101:6 110:19 113:9 123:22 133:16

**putting** 30:17,24 31:2,5 32:16 48:22 83:22 90:6 112:8

---

**Q**

**quality** 64:22 65:15 68:17,18 69:5 70:19

**quantities** 83:17

**question** 11:6,9,12, 13,15,19 13:20 24:13,14 30:2,5,13 36:5 39:4 61:18 66:23,25 69:20 71:6 72:3 75:25 76:5 77:15,23 86:24 96:11 98:8 104:19 111:12 117:11 118:14 119:22 124:8,9 128:18 129:24 130:3 133:6

**questions** 10:16 11:4 13:2,16,18 23:18 104:9 126:22 127:2,15,23 135:2,12

**quick** 58:25

**Quickbooks** 90:10

**quickly** 61:7 99:2

**Quip** 104:7

**quote** 133:16

---

**R**

**radio** 17:3,7

**Raise** 9:17

**ramp** 98:16 99:3

**re-** 45:18 124:10

**read** 33:3 85:2,3,7 104:20 108:16 117:22

**reading** 33:5 87:3,6 118:9

**ready** 84:18 117:15

**real** 88:3

**realistic** 99:2

**realtime** 90:11 102:11

**reason** 12:20,22 20:11 79:7 103:9

**recall** 18:24 22:2 27:19,23 28:10 35:21 40:16,24 41:17 42:9, 15 45:8 47:10 54:16 56:3 57:17 58:4 61:11,22 62:4 63:14 77:13,14 79:5,14,15, 16 80:18 81:11 83:11 85:17 87:17 89:6 98:20 99:7,23,24 102:3,4,5 105:2 108:11 109:10 110:13,15 111:20,22, 23 113:12 118:10 119:12 121:6 123:19, 21 124:2 126:2,14 132:4

**recalled** 54:4

**recalling** 40:25

**recap** 129:17

**receipts** 45:18,23,25

**receivables** 92:21

**receive** 44:13 79:3 106:19 119:24 120:3 122:14 128:15,19,25 129:5

**received** 61:22 63:18 71:19 77:16,25 78:11 103:6 106:24 123:25 124:2

**receiving** 105:3 110:13,15 118:10 119:12 121:6

**recess** 62:11 107:16 123:8 127:6 135:8

**recognize** 33:19 37:24 51:8,10 52:15 55:13 72:22 73:14 80:15 91:22 98:5 100:16 104:22,25 108:6 114:20 121:19 125:3

**recollection** 28:2 29:7 46:9 64:8 126:17

**record** 8:8 9:4 11:11 13:13,24 62:8,10,14 107:11,15,19 123:3, 7,11 126:25 127:5,9 135:4,7,11,14

**recorded** 8:23 10:17

**recording** 8:13

**refer** 10:11

**reference** 15:25 69:14 70:5 87:7 89:14

**referencing** 69:17 85:18

**referring** 22:21 69:15 78:22 88:4 89:21 109:8 110:25 113:19,23,24 121:4

**refers** 106:16

**reflect** 53:22

**reflected** 83:17

**reflects** 125:19

**reforming** 47:21

**regular** 59:12,24 60:13

**regularly** 59:19

**Reilly** 28:12,14,15, 18,21 29:2,5,10 46:3 47:7 48:12 50:19,23 52:3,24 53:12,17,18, 19 56:15,20 57:4,14 60:5 61:8 86:9 109:11 111:5 112:11 114:3 119:5 122:4 124:12 130:19 132:9

**Reilly's** 129:18

**reimbursement** 118:7

**reimbursements** 118:3

**rejoin** 122:25

**related** 13:2 41:25

**relates** 68:21 126:13

**relating** 129:2 131:22 132:2

**relation** 132:10 133:17

**relationship** 23:21 28:16 44:23 64:11 67:24

**relationships** 28:24 46:18 48:20 49:21 59:8 64:13 130:11

**remember** 44:17,22 56:6 61:14,16 89:12 98:6,8 102:15,16 104:24 105:5,7 108:8,9,13,14 109:3, 4,6,14,16 112:12 113:5 114:5,6,8 117:12,13 118:2,4 119:14,17 120:10 121:9,10

**remind** 38:8

**remote** 8:23

**remotely** 8:9,11 9:20 10:4 12:24

**reorders** 112:19,20 113:10

**repeat** 16:19 25:20 58:14

**repeats** 33:11

**rephrase** 11:8 58:15 66:3 133:6

**report** 100:11 104:3, 7 106:5

**reporter** 8:9 9:16,17, 22 10:17,21 115:22, 25 122:19,21

**Reporting** 8:5

**reports** 101:21 102:2,22 105:5,9

**represent** 10:9 79:25 108:3

**representing** 74:6

**reps** 100:24

**reputable** 64:17

**Repzio** 90:5,23 100:23 130:6

**request** 20:2 72:11, 14

**requested** 72:14

**requests** 11:18

**required** 17:20

**requirements** 69:4

**requires** 88:7

**respect** 29:16 49:22

**response** 87:2,5 116:3,12

**responsibility** 44:10

**restart** 32:5

**restate** 124:10

**restock** 90:14

**result** 129:6

**retail** 18:7,8 19:17,19 24:6

**revenue** 26:25 27:20 125:20

**review** 32:24 84:12, 14 97:22 98:4 105:8, 10 109:25

**reviewed** 12:2 70:9, 13 71:22

**reviewing** 34:10 70:16 72:23 84:19 92:4 97:24 98:3 100:12 106:2 110:8 114:18 117:3,6,19 118:8 120:23 121:3

**Robbinsdale** 15:21

**Robert** 9:7 10:9 78:4 122:17,23 127:21 129:25 131:12,17 135:2

**role** 29:15,18 43:14 56:10,11 63:5 68:8,9, 21 69:5 81:5 129:16, 18 130:4,10 133:23

**roles** 13:18 130:22, 24,25 131:4,8,14

**room** 8:7,10 13:3,6

**round** 32:16

**Rudolfo** 8:3

**rule** 8:16 129:24

**rules** 8:16,17 10:13

**run** 40:3

**running** 45:6 83:24

**S**

**safe** 69:13

**safety** 65:12,13 70:13,21

**Saint** 28:16

**sale** 45:11 57:21,22 66:18 87:11

**sales** 29:14,16 31:20 46:12 47:11 48:15, 19,20 49:11,12,13,21 50:16 56:6,12 58:18 60:15 83:24 86:2 87:8 88:25 90:3,7,24 91:2,5 99:10 100:24 113:7 115:9 130:7,13

**salespeople** 59:7

**sample** 63:20 65:10 70:10,17,18 71:10, 15,19 72:4,11

**samples** 65:8

**sanitizer** 40:10 45:11 46:20,23 49:2,6 50:5, 9,16,20,24,25 56:4,8, 9,12,25 58:17 62:18, 19,24 63:3,25 64:4 66:19 67:21 68:10,23 70:10 72:12 74:12 80:3,24 82:3,17,21 85:14,20 86:17 87:11 99:9 108:19,23 109:12 115:2,3,12,19 116:7,13 128:9,12, 16,19 129:3

**sanitizers** 74:23 81:16

**Sarah** 8:1,23 9:1 10:1,2 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1,12 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1,8,9 36:1 37:1,2,5 38:1

39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1, 13,15 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1,21 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1,9 97:1 98:1 99:1 100:1 101:1 102:1 103:1,6, 15 104:1 105:1 106:1,11 107:1 108:1 109:1 110:1 111:1,8 112:1 113:1 114:1 115:1 116:1 117:1 118:1,22 119:1 120:1 121:1 122:1,4,8 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1

**sarah@ custommedico. com** 103:7

**sarah@foxhole. med** 77:6

**sat** 89:7

**Schedule** 35:5 54:18

**school** 14:21,22

**schools** 15:10

**Scottsdale** 20:20,22, 24 21:10,14,23 22:3, 5 26:8 125:17,22

**scrambling** 49:17

**screen** 13:9,11 32:15,21 33:17 37:20 51:20 80:8

**screwed** 118:3

**scroll** 80:3,5 81:21 91:25 92:8 93:8 97:25 100:10 104:8 110:5 114:16 116:25

117:22 118:4 120:24

**scrolled** 119:3

**scrolling** 38:19 92:5

**SDS** 69:8

**SDSS** 65:11

**search** 77:17 78:2, 12,15

**searching** 79:4

**section** 38:15 52:16 122:3 126:6

**secure** 56:23,25 95:24

**seeking** 95:20 96:6 99:8

**sell** 28:24 66:15 86:17,18 91:6 115:4

**selling** 46:10,17,20 47:8 50:8,19 62:17, 19 120:7

**semblance** 99:13

**send** 61:25 79:13 103:17

**sending** 101:21 102:21

**sense** 24:9 45:4 67:11,15

**sentence** 36:19 86:23 88:5 98:14 108:17

**sentences** 36:20 98:24

**separate** 24:4

**September** 116:24 118:16,19 119:4,15, 16 123:15

**series** 10:15

**Serverx** 41:16

**service** 45:3

**services** 43:24 44:14,25 91:11 129:2

**set** 33:12 76:20 77:9

**setting** 16:14 36:7 44:12 47:18 54:25

58:3

**setup** 55:14,15

**severity** 8:5

**shaking** 10:18 83:12

**share** 32:14 33:17 80:8

**sharing** 32:21

**sheet** 70:14,21 121:21,22 125:6,7

**sheets** 65:12,14

**shelf** 113:2

**Sher** 9:9,10

**shifted** 48:25

**Shifting** 67:20

**short** 33:2

**show** 32:13 33:24 36:15 73:6,9

**showed** 112:15,24

**shows** 38:15

**shrink** 120:21

**side** 43:17,18 45:24 65:18 83:24

**signature** 34:13,16, 22 38:20 51:21,24 52:15 53:4,6,13 93:3, 5

**signatures** 34:6

**signed** 41:18,23 44:21 90:8 108:15

**significantly** 129:16

**signing** 93:5

**simmers** 8:1,24 9:1 10:1,2,8 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1,13 34:1 35:1,9 36:1 37:1,2,5,16,20 38:1 39:1,17 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1,13,15 51:1,

5 52:1 53:1 54:1 55:1,6 56:1 57:1 58:1 59:1 60:1 61:1 62:1, 16 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,19 73:1 74:1 75:1 76:1 77:1,25 78:1 79:1 80:1 81:1 82:1 83:1,9 84:1,6 85:1 86:1 87:1 88:1 89:1 90:1 91:1, 17 92:1 93:1 94:1 95:1 96:1 97:1,14 98:1 99:1 100:1,3 101:1 102:1 103:1,6, 22 104:1 105:1 106:1,11 107:1,21,22 108:1,6 109:1,20 110:1 111:1 112:1 113:1 114:1,11 115:1 116:1,19 117:1 118:1 119:1 120:1,17 121:1,14 122:1,4,9 123:1,13 124:1,22 125:1 126:1 127:1,10 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1

**single** 86:16

**sir** 22:10 23:14 24:8 26:3 28:20 34:15,18 35:3 37:23 41:6 42:5 43:10 44:15 50:17 53:24 55:19 63:4 70:15 71:2

**situation** 12:25 13:2

**size** 109:2,4,7,9

**sizes** 67:5 82:4,13,14

**slide** 34:7

**small** 38:6,9 80:12

**smoother** 101:3

**social** 8:6

**sold** 31:22,24 99:18, 21,22

**solve** 102:17

**SOP** 44:8

**SOPS** 44:8

**sort** 32:17

**sounds** 47:3,5

**source** 42:9

**space** 19:17 29:6 32:11,12 44:4 49:5,8

**speak** 10:22,25 60:4 132:16

**speaking** 15:23 58:9 69:22 100:20,25

**spec** 72:2

**specialize** 24:9

**specific** 19:24 21:6 55:2 104:17

**specifically** 30:3 50:25 58:11 61:23 79:15 98:7 109:15,17 112:15 114:5 119:14 127:23

**specifications** 67:4

**speculate** 88:7

**spell** 18:3

**spend** 86:15

**spent** 64:24 67:18 97:2

**spoke** 53:16

**SPP** 125:14,16

**spreadsheet** 102:25

**St** 28:17 59:17 110:3, 18 111:7,17,21

**stake** 23:23,24

**stamp** 104:2

**stamped** 37:19

**standard** 44:9

**start** 8:22 14:19 31:11,17 50:14 70:4 71:8 73:3 101:21 117:8,14

**started** 25:2 27:9 28:13 47:19 48:11,13 60:21

**starting** 47:17 117:7

**state** 14:25 15:8,14, 19 17:15 111:13 113:21

**state's** 8:17

**stated** 94:6

**states** 25:13 74:22

**stations** 95:13 96:2 108:25

**status** 31:15

**stay-at-home** 59:14

**step-by-step** 71:9

**stepping** 25:9

**sterile** 21:13,18,19

**stipulate** 8:12

**stock** 90:14

**stop** 20:9 27:20

**stopped** 20:11 120:8

**store** 90:14 95:3

**stores** 90:12 95:12 96:2 112:14,15

**straight** 127:14

**strategies** 52:2,19 53:5 112:21

**strategizing** 113:9

**strike** 17:13 23:2,19, 20 24:18 35:16 38:22 42:13 43:2 47:4,5 48:5 50:2 56:10 59:10,22 68:8 74:20 80:18,20 89:15 115:15 118:11,13,17 123:16 128:18

**structure** 53:22 101:6

**study** 17:14 104:18

**stuff** 29:13 44:12 59:15 61:4 65:12 91:7 97:5 102:8 118:3

**subject** 111:14 129:25

**submit** 78:16 85:19

**submitted** 76:13 79:11 80:2 127:24 128:6 133:14 134:9, 17

**submitting** 134:11, 22

**Subsection** 36:19

**successful** 96:6,23 97:7

**sufficient** 10:19

**supplies** 36:8 39:9

**supply** 60:16 90:22

**support** 90:3

**supposed** 71:14

**swear** 8:10 9:16

**swearing** 8:13

**sworn** 10:4

**system** 16:2

**systems** 17:11 130:9

---

**T**

**tacky** 64:21

**taking** 12:23 27:20

**talk** 39:21 56:16 60:11 83:21 87:17 89:5,19 129:14

**talked** 46:9 48:17 56:16 59:4 61:11,15 68:16 79:6 113:7

**talking** 14:20 42:23 47:21 48:21 60:10 85:16 89:3 114:24

**tasked** 90:20

**tasks** 91:4

**team** 90:4,7,24 91:2, 5 98:12 99:10 130:7

**technical** 122:24

**telephone** 131:20

**term** 92:19

**terms** 70:16 71:9 91:14 95:4,14,15,17

**test-** 132:18

**testified** 10:5 37:11 50:2 52:4 66:5 70:8 74:10 89:17 94:14

129:15 130:4,19 131:17 133:10,15

**testify** 12:21 77:21

**testimony** 42:18 83:6 127:20 131:25 132:4,19 134:7

**text** 14:4

**things** 39:9 44:6 46:23 48:16 54:25 83:25 84:2 87:15 90:2 91:3 101:2 112:24

**thinking** 23:16 58:16 88:8

**thought** 108:25

**time** 9:3 10:22 11:16, 19 13:6 14:18 22:2 27:24 30:25 32:15 33:2,4 38:8 39:16 47:10 57:21,24 58:3 60:12 62:5,9,13 63:2 64:4,25 66:17 67:25 77:8 81:7 87:11 88:8 95:10 97:3 102:14 104:20 105:11 107:18 108:12 123:6, 10 127:8 135:6,10,13

**time's** 127:4

**timely** 90:19

**times** 76:2

**title** 105:13

**today** 9:2 10:11,15 11:10,23 12:14,15, 21,23 43:9

**told** 56:15 83:23

**top** 73:2 76:21,22 92:11 93:9,25 94:11 110:17

**top-to-down** 59:19

**tops** 127:2

**total** 82:6

**touch** 110:3 117:17

**track** 100:21

**tracking** 100:20

**training** 17:18,19

**transaction** 129:7

**transactions** 128:2 132:3,10,25 133:8

**transfer** 93:9

**Tremonte** 9:10

**Trish** 61:6

**trouble** 14:8 78:5 96:25

**true** 67:7

**truthful** 12:17

**truthfully** 12:21

**TSG** 8:4

**turn** 14:10

**Turning** 45:7

**turnkey** 74:23

**two-thirds/one-third** 54:5

**tying** 102:6

**type** 42:2,3 43:19 44:2 88:22

**typically** 131:21

---

**U**

**Ultimately** 68:13

**Um-hum** 22:25 41:4 77:3,7 101:24 115:21 116:5 118:21 122:6

**understand** 11:6 12:14 14:5 44:23 88:21 94:23 130:3 134:20

**understanding** 46:14 66:3,25 74:7 83:3 86:21 95:25 99:7 106:15 111:4 113:18 134:21

**understood** 46:16 73:19 74:18 134:13

**unified** 90:25

**unit** 74:24

**units** 57:2 74:23 81:15 82:2,7,16,20,

23 99:2,4,9,19 108:19,23 109:12,15 115:4,18

**University** 14:25 15:8 17:15,18

**V**

**vague** 30:2,11 36:5 72:7 75:4 96:11 124:8

**validity** 8:13

**variety** 68:18

**vendors** 124:18

**venture** 32:3,4,6 50:4

**ventures** 53:19

**verbal** 10:18,20

**versa** 23:25

**version** 85:23

**vetted** 90:2

**vetting** 64:21,25

**vice** 23:25

**video** 8:13,23

**view** 32:18,20

**VII** 36:17

**visible** 112:22

**visit** 62:17

**Voyant** 8:25 9:9 10:10,11 63:3,6,13, 16,24 64:17 65:5 68:9,12 71:10,18 72:5,12 74:4,6,13,17 75:2 76:11,12 80:2 83:18 95:18 97:19 98:12,21 105:19,23 108:4 109:12 114:4 120:20 128:3,6,9,11, 20,22 129:7,11 132:3,8,23 133:8

**Voyant's** 70:9

**W**

**wait** 24:12 69:19 96:9

123:5,15

**waiting** 31:19

**walk** 81:2

**wanted** 49:5 61:4 64:25 65:4 74:12 82:14 84:17 95:4,15 117:17

**wanting** 56:8 65:22 84:14

**ways** 95:20

**website** 60:18,22 89:24 130:5

**Wednesday** 86:15

**week** 98:15 110:3,19 113:16 119:7

**whatsoever** 129:10

**white** 27:14

**William** 116:4

**withdraw** 30:4 77:15 118:13 124:9

**withdrawals** 106:7

**Withdrawn** 88:15

**word** 64:23 130:12

**work** 14:20 15:13,15 17:15,25 18:19 20:16 24:10,22 29:4 41:16, 24 42:3 43:12 44:5,8, 12 47:17 64:25 69:10 74:14 76:10 98:16 103:13

**worked** 15:15 16:13 17:24 29:20 58:6 60:17,19 130:5,6

**workers** 24:10

**working** 17:11 28:25 40:11 48:13 49:23 56:5 58:8,20 61:2,6,9 63:17 65:3 74:6 87:15 90:25 95:22 97:3,6 100:22 113:3

**Workman's** 24:11

**wrap** 58:24

**write** 39:11 86:15

**writes** 20:3 86:14 87:24 112:7 119:6

**writing** 38:6 101:20

**written** 119:10

**wrote** 54:22 88:9

**Y**

**year** 18:24 40:4 42:21 79:6,10,14 105:6 119:13 122:15

**years** 15:7 16:17 40:3 105:6

**yesterday** 12:8 101:2

**Z**

**Zoom** 10:23 59:20 120:22