# Exhibit 8

Case: 4:21-cv-00249-SEP   Doc. #: 77-8   Filed: 04/24/23   Page: 1 of 11 PageID #: 1162

Page 1

1              L. Ori

2     UNITED STATES DISTRICT COURT

3     EASTERN DISTRICT OF MISSOURI

4          EASTERN DIVISION

5  AWARE PRODUCTS LLC D/B/A    )
   VOYANT BEAUTY,              )
6                              )
              Plaintiff,       )
7                              )
              vs.              )    No. 4:21-cv-249-JCH
8                              )
   EPICURE MEDICAL, LLC,       )
9  FOXHOLE MEDICAL, LLC, and   )
   LEE ORI,                    )
10                             )
              Defendants.      )
11

12    REMOTE VIDEOTAPED DEPOSITION OF LEE ORI

13             March 24, 2022

14

15

16

17

18

19

20  Reported by:

21  KATHY S. KLEPFER, RMR, RPR, CRR, CLR

22

23

24

25  JOB NO. 208140

Page 2

```
 1                    L. Ori
 2            March 24, 2022
 3
 4       REMOTE videotaped deposition of
 5  LEE ORI, before Kathy S. Klepfer, a
 6  Registered Professional Reporter,
 7  Registered Merit Reporter, Certified
 8  Realtime Reporter, Certified Livenote
 9  Reporter, and Notary Public of the State
10  of New York.
```

Page 3

```
 1                    L. Ori
 2            A P P E A R A N C E S:
 3            (All Appearing Remotely)
 4
 5  SHER TREMONTE
 6  Attorneys for Plaintiff
 7       90 Broad Street
 8       New York, NY 10004
 9  BY:  JUSTIN GUNNELL, ESQ.
10       ROBERT PENN, JR., ESQ.
11
12  KORANTENG LAW FIRM
13  Attorneys for Defendants
14       5050 Quorum Drive
15       Dallas, TX 75254
16  BY:  FIBBENS KORANTENG, ESQ.
17
18
19  ALSO PRESENT:
20       TRISHA VON LANKEN, Videographer
```

Page 4

```
 1                    L. Ori
 2                    INDEX
 3  TESTIMONY OF LEE ORI                      PAGE
 4  MR. GUNNELL ..................................  9
 5  MR. KORANTENG ................................
 6
 7  ORI EXHIBITS:                              PAGE
 8  Exhibit 1, LinkedIn profile of Lee Ori     26
 9  Exhibit 2, Picture from website RCTherapy.com  33
10  Exhibit 3, Document titled "Missouri Board of  40
    Pharmacy Newsletter," dated August 2016
11
    Exhibit 4, Document of three pages titled,  44
12  "Michigan Board of Pharmacy Disciplinary
    Subcommittee"
13
    Exhibit 5, Collection of Foxhole formation  56
14  documents, Bates-stamped DEF3744 to DEF3793
15  Exhibit 6, Document titled, "Account        62
    Agreement," Bates-stamped DEF0031
16
    Exhibit 7, Document titled, "Epicure Medical,  77
17  LLC, Organization Chart," Bates-stamped DEF3683
18  Exhibit 8, Document titled "Epicure Medical,  87
    LLC, Limited Liability Company Operating
19  Agreement," Bates-stamped DEF3505 to DEF3545
20  Exhibit 9, Document titled, "Account        91
    Agreement," Bates-stamped DEF0030
21
    Exhibit 10, Sales brochure from Epicure's  111
22  website
23  Exhibit 11, E-mail chain, Bates-stamped DEF1139  121
    to DEF1146
24
    Exhibit 12, Letter on Foxhole Medical      134
25  letterhead, Bates-stamped DEF3835
```

Page 5

```
 1                    L. Ori
 2                 INDEX (Cont'd.)
 3  ORI EXHIBITS:                             PAGE
 4  Exhibit 13, E-mail chain with attachment,  142
    Bates-stamped DEF4592 to DEF4595
 5
    Exhibit 14, Epicure Medical, LLC Purchase  149
 6  Orders, consisting of eight pages,
    Bates-stamped DEF4741 to DEF4748
 7
    Exhibit 15, E-mail chain dated April 22, 2020,  162
 8  Bates-stamped DEF4659 to DEF4660
 9  Exhibit 16, Document entitled, "Promissory  167
    Note," Bates-stamped Bates-stamped DEF4737 to
10  DEF4740
11  Exhibit 17, E-mail chain, Bates-stamped    177
    Bates-stamped DEF0736 to DEF0737
12
    Exhibit 18, E-mails starting with e-mail from  181
13  Mark Murray at Triad Bank, Bates-stamped
    DEF0702 to DEF0703
14
    Exhibit 19, e-mail from                    183
15  LeeOri@EpicureMedical.com, Bates-stamped
    DEF0572
16
    Exhibit 20, Letter from Epicure Medical to  194
17  Michael Partridge at Voyant dated June 4, 2020,
    Bates-stamped DEF3680
18
    Exhibit 21, E-mail chain with attachment,  199
19  Bates-stamped DEF1646
20  Exhibit 22, E-mail chain with top e-mail from  207
    Lee Ori at Epicure Medical to Epicure Medical
21  accounting, Bates-stamped DEF3872 to DEF3875
22  Exhibit 23, E-mail from Lee Ori to Dan Reilly,  215
    Bates-stamped DEF0774 to DEF0775
23
    Exhibit 24, E-mail chain with top e-mail from  217
24  Lee Ori to Michael Partridge and Paul Heslin,
    with CC to Dan Reilly, Bates-stamped DEF0635 to
25  DEF0637
```

Page 6

```
 1                    L. Ori
 2               INDEX (Cont'd.)
 3   ORI EXHIBITS:                              PAGE
 4   Exhibit 25, E-mail chain Bates-stamped DEF0421  221
     to DEF0422
 5
     Exhibit 26, E-mails Bates-stamped DEF0610 to    225
 6   DEF0611
 7   Exhibit 27, E-mails with top e-mail from Lee    237
     Ori to Linda Ragsdale, Bates-stamped DEF0426 to
 8   DEF0427
 9   Exhibit 28, Notice from Voyant to Epicure       239
     Medical, Bates-stamped AWAREVOYANT003784 to
10   AWAREVOYANT003786
11   Exhibit 29, Document titled, "Foxhole           242
     Corporation Balance Sheet as of December 31,
12   2020," Bates-stamped DEF3741 to DEF3743
13   Exhibit 30, Document titled, "Foxhole Medical,  247
     LLC Balance Sheet as of December 31, 2021,"
14   Bates-stamped DEF004807 to DEF004810
15   Exhibit 31, Document titled, "Epicure Medical   252
     Balance Sheet as of December 31, 2020,"
16   Bates-stamped DEF3495 to DEF3497
17   Exhibit 32, Document titled, "Epicure Medical   256
     Balance Sheet As of December 31, 2021,"
18   Bates-stamped DEF004803 to DEF004806
19
20
21
22   REQUESTS FOR PRODUCTION:
23   Page 13:2
24
25
```

Page 7

```
 1                    L. Ori
 2        THE VIDEOGRAPHER:  Good morning,
 3   counselors.  My name is Trisha Von Lanken,
 4   and I'm a certified legal videographer in
 5   association with TSG Reporting.
 6        Due to the severity of COVID-19 and
 7   following the practice of social distancing,
 8   I will not be in the same room with the
 9   witness.  Instead, I will record this
10   videotaped deposition remotely.
11        The court reporter, Kathy Klepfer,
12   also will not be in the same room and will
13   swear the witness remotely.
14        Do all parties stipulate to the
15   validity of this video recording and remote
16   swearing, and that it will be admissible in
17   the courtroom as if it had been taken
18   following Rule 30 of the Federal Rules of
19   Civil Procedures and the state's rules where
20   this case is pending?
21        Do all agree?
22        MR. KORANTENG:  Yes.
23        MR. GUNNELL:  Yes.
24        THE VIDEOGRAPHER:  Thank you.
25        This is the start of media labeled
```

Page 8

```
 1                    L. Ori
 2   number 1 of the video-recorded deposition of
 3   Lee Ori in the matter of Aware Products LLC,
 4   doing business as Voyant Beauty versus
 5   Epicure Medical, LLC, et al., in the United
 6   States District Court, Eastern District of
 7   Missouri, Eastern Division, Case No.
 8   4:21-cv-249-JCH.
 9        This deposition is being held remotely
10   on Thursday, March 24, 2022 at approximately
11   9:32 a.m.
12        Counsel, will you introduce yourselves
13   and the parties you represent, after which
14   the court reporter will swear in the
15   witness.
16        MR. GUNNELL:  Good morning.  My name
17   is Justin Gunnell from Sher Tremonte, and I
18   represent the plaintiff Aware Products LLC,
19   doing business as Voyant Beauty.
20        I am also here with my colleague
21   Robert Penn.
22        MR. KORANTENG:  Good morning.  This is
23   Fibbens Koranteng, and I represent Lee Ori,
24   Foxhole Medical, LLC and Epicure Medical,
25   LLC, all defendants in this case.
```

Page 9

```
 1                    L. Ori
 2                    * * *
 3   LEE ORI,  called as a
 4       witness, having been duly sworn by a Notary
 5       Public, was examined and testified as
 6       follows:
 7   EXAMINATION BY
 8   MR. GUNNELL:
 9        Q.   Good morning, Mr. Ori.
10        A.   Good morning.
11        Q.   My name is Justin Gunnell.  As I
12   mentioned, this is my colleague Robert Penn.  We
13   represent the plaintiff in this action, Aware
14   Products LLC, doing business as Voyant Beauty,
15   who I will refer to today as "Voyant."
16             I want to just go over a few ground
17   rules.  Today I'm going to ask you a series of
18   questions.  Everything is recorded, both on
19   video and by a stenographer.
20             The court reporter can only take down
21   verbal answers and cannot take down more than
22   one person at a time.  So let's try not speak
23   over one another.  I'll do my best not to speak
24   over you when you're giving an answer, and
25   please do your best not to speak over me when
```

Page 10

L. Ori

1  I'm asking a question.
2        And this is particularly true in a
3  remote environment like we have today: If you
4  don't understand a question that I am phrasing
5  to you, please ask me to rephrase it.
6        If you need a break, I will do my best
7  to accommodate you, but I ask that you answer
8  the question pending at the time before we
9  break.
10       Your counsel may make objections
11 today. They are for the record only, and unless
12 you are specifically instructed not to answer,
13 you must still answer the question.
14       Do you understand?
15    A.   Yes.
16    Q.   Did you do anything to prepare for
17 your deposition today?
18    A.   Read through all of the e-mails, all
19 the documents provided by both parties.
20    Q.   Did you meet with your counsel?
21    A.   Over the phone.
22    Q.   When?
23    A.   Yesterday.
24    Q.   For how long?

Page 11

L. Ori

1     A.   Hour-and-a-half.
2     Q.   And did you review specific documents
3  together?
4     A.   No, it was more him -- there was a few
5  items that we needed to get for you, and the
6  documents that were discussed were the
7  documents -- the e-mails or documents that were
8  discussed were things that we needed to get to
9  you. So I spent some time making sure to
10 facilitate that.
11    Q.   Are there any documents in particular
12 that you're -- that you recall that you
13 reviewed?
14    A.   All of them.
15    Q.   When you say "all of them," you mean
16 all of the documents that were produced in this
17 case or...
18    A.   I reviewed all documents that were
19 presented by Voyant as well as myself.
20    Q.   And those would be documents that your
21 counsel provided to us?
22    A.   Correct.
23    Q.   And you understand that you're under
24 oath today?

Page 12

L. Ori

1     A.   Yes, sir.
2     Q.   And you understand if you don't
3  provide truthful answers to the questions that I
4  pose, that would be considered perjury?
5     A.   Sure.
6     Q.   And is there any reason you cannot
7  testify truthfully today?
8     A.   No.
9     Q.   Today we're taking this deposition in
10 a remote setting, so I have a couple of ground
11 rules related to this unique forum and some
12 questions.
13       Is anyone else in the room with you
14 where you are today?
15    A.   No. I am by myself.
16    Q.   I would ask if anyone enters the room
17 at any time that you please let me know.
18       Are you looking at anything other than
19 the screen upon which the deposition is being
20 taken?
21    A.   I have a notepad of which I'm taking
22 notes on. Other than that, I have no documents
23 in front of me. I have no documents on my
24 computer nor in front of me.

Page 13

L. Ori

1     Q.   Okay. I would call for the production
2  of any notes that you take during the
3  deposition.
4        Unless I instruct you otherwise,
5  please do not look at anything else while we're
6  on the record. I ask that you answer all the
7  questions by yourself. Don't look to anyone for
8  help in answering the questions, and if you
9  cannot answer a question by yourself, just let
10 me know.
11       I would ask that we agree not -- that
12 you agree not to communicate with anyone else
13 besides me while we're on the record.
14       Do you agree to that?
15    A.   Yes.
16    Q.   That includes checking e-mails, text
17 messages, and things of that nature.
18       Do you understand?
19    A.   Yes.
20    Q.   Okay. And you -- you are here today
21 as Lee Ori, the individual, correct?
22    A.   Correct.
23    Q.   And as a representative of Foxhole
24 Medical, LLC?

Page 142

L. Ori

AFTERNOON SESSION

THE VIDEOGRAPHER: The time is 1:34 p.m. and we are now on the record.

LEE ORI, resumed and testified further as follows:

EXAMINATION BY (Cont'd.)

MR. GUNNELL:

Q. Hello. Welcome back, Mr. Ori.

A. Thank you.

Q. Give me one second. I'm going to share my screen here. This will be Exhibit 13.

(Ori Exhibit 13, E-mail chain with attachment, Bates-stamped DEF4592 to DEF4595, marked for identification, as of this date.)

BY MR. GUNNELL:

Q. This is a document that was provided by your counsel marked DEF4592 to DEF4595. It's an e-mail chain with an attachment.

Do you see this?

A. Yes, sir.

Q. Looking at this, do you have an understanding of what it is?

A. Uh-huh. Yes, sir.

Page 143

L. Ori

Q. What is it?

A. A credit application for Epicure Medical.

Q. And it says, I guess here, from Michelle Jimenez, "As part of our customer process, we need to have a completed credit application on file."

Right?

A. Yes, sir.

Q. And then you provided this credit application and agreement?

A. Yes, sir.

Q. And you listed a company name as "Epicure Medical," your name under "Owners and Officers." You listed some references; is that right?

A. Yes, sir, you're --

(The court reporter interrupted for clarification.)

THE WITNESS: Yeah, he was flipping back and forth quickly, so it was kind of hard to follow.

BY MR. GUNNELL:

Q. All right. We'll take it one at a

Page 144

L. Ori

time.

Under the "Business Information" section, you listed "Epicure Medical, LLC," correct?

A. Yes, sir.

Q. And you listed the address of 4639 Baumgartner Road. That's the address you mentioned earlier?

A. Yes, sir.

Q. And then you also listed some references here, right? CosmoTech, Salis Medical, and Global Medical Source?

A. Yes, sir.

Q. Under "Officer/Owner," you list "Lee Ori, member," correct?

A. Yes, sir.

Q. Who were these references?

A. CosmoTech was the -- was our -- the people that we work with that were our CBD manufacturer. That's the -- the company that manufactured that we were able to have the just-in-time inventory that I talked to you about earlier.

Q. And when you say "we," you're

Page 145

L. Ori

referring to Foxhole?

A. Well, "we," collectively, being Dan, Sarah and I, and in our working on the -- the white label manufacturing and the warehouse and distribution. So that -- we three, yes.

Q. But the -- but the CBD business was run out of Foxhole?

A. Correct.

Q. Okay.

A. Yes.

Q. And what's Salis Medical?

A. Salis is -- was -- is a vendor as well as a customer. Salis is a medical -- medical and pharmaceutical supply company. They -- they were also a client of Epicure that bought -- that bro- -- had customers looking for sanitizer and PPE.

So Salis Medical is based out of Phoenix. Again, medical supply company.

Q. And what about the last one, Global Medical Source?

A. Same. Same.

Q. Uh-huh.

A. A PPP -- excuse me. Pardon me.

Page 146

L. Ori

Greg See has multiple companies. Global Medical Source was a company that he had that was specifically for PPE and sanitizer.

Q. And did you have an understanding of why you were supplying this agreement?

A. Per Michelle's direction of new credit application for new customers.

Q. Uh-huh. Okay. And is that your signature on the bottom here?

A. Yes, sir.

Q. And did you understand by signing this you were agreeing to its terms?

A. Yes, sir.

Q. And if you look here, it says -- let's see. "The undersigned by this credit application agreement does continually personally guarantee payment for all goods and merchandise purchased by the applicant."

Do you see that?

A. I do.

Q. And you understood when you signed this that you were personally guaranteeing payment for all goods and merchandise purchased by Epicure?

Page 147

L. Ori

A. I did not.

Q. But that is your signature on the bottom?

A. It is.

Q. And what became of this? You sent to it Ms. Jimenez?

A. Yes, sir.

Q. And -- and did you receive a reply from her?

A. Don't recall.

Q. Okay. And this is dated April 12, 2020, this e-mail, correct?

A. Yes.

Q. Who's Courtney Reihs, R-E-I-H-S?

A. I do not know Courtney.

Q. Okay. Never had any dealings with her?

A. Other than a -- I'm going to say no. I don't even recognize the name.

Q. Got it.

And now just a question: You -- by this time, Epicure has been formed, correct, April 12, 2020?

A. That is correct.

Page 148

L. Ori

Q. And did you have an Epicure e-mail address?

A. I don't know if we had it at that point.

Q. Looks like you did just looking at the top. It says Lee@epicuremed.com?

A. You are correct.

Q. But then it looks like your signature block and -- and the icon that goes with it is associated with Foxhole Med?

A. That was obviously not my -- my Epicure medical signature block that -- that was traditional. So I -- you know, without having an idea of -- you know, this was forwarded -- well, I -- I don't even know. So I don't know how that's on there. It's obviously not my Epicure one.

Q. Right.

A. So --

Q. Were you still using your Foxhole Med signature block and -- and contact information in connection with hand sanitizer sales at this point?

A. I was not.

Page 149

L. Ori

Q. Okay. I'm going to introduce now Exhibit --

MR. GUNNELL: What am I up to? 13? Or was that 13? Give me one second.

COURT REPORTER: That was 13.

MR. GUNNELL: Okay, thank you.

I will now introduce Exhibit 14.

(Ori Exhibit 14, Epicure Medical, LLC Purchase Orders, consisting of eight pages, Bates-stamped DEF4741 to DEF4748, marked for identification, as of this date.)

BY MR. GUNNELL:

Q. And that will be a collection of purchase orders. Just let me get those.

That's not what I want. Apologies.

Just bear with me for one moment while I get the exhibit that I want.

There we go. Okay. I have introduced as Exhibit 14 a collection of documents provided by your counsel. It's eight pages. It starts at DEF4741 and goes to -- I can't read the Bates on the last one. DEF --

MR. GUNNELL: Am I still here? I just got an error that Zoom quit unexpectedly.

Page 166

L. Ori

that -- that -- that, you know, it was -- the projection -- you know, the ability to project the business based on supply was -- was not possible at that moment in time.

So I was encouraging Paul to continue to do his job as a consultant and identify other sources of supply to -- to help us grow the company.

Q. And -- and then you say "Giddy up, baby," with several exclamation points.

Do you see that?

A. I do.

Q. What did you mean by that?

A. Hurry up. Get on your horse. Make it happen.

Q. And Paul would have -- he was in a position to receive commissions?

A. He -- he got a commission based on the units that were sold from vendors that he identified and qualified and that we would have worked with, yes.

Q. Uh-huh. Okay.

MR. GUNNELL: Is the chat -- is the chat up to date with the exhibit number?

Page 167

L. Ori

Let me just see. Yep, okay. So now I am on to Exhibit 16.

(Ori Exhibit 16, Document entitled, "Promissory Note," Bates-stamped Bates-stamped DEF4737 to DEF4740, marked for identification, as of this date.)

BY MR. GUNNELL:

Q. And that will be -- okay. I have put on the screen what will be Exhibit 16, and that was provided by your counsel. It's Bates-stamped DEF4737 to DEF4740.

It's entitled: "Promissory Note."

Do you see that?

A. Yes, sir.

Q. What is this?

A. It was a -- it was a loan that was made to Epicure. As -- as we were trying to grow the business, the -- the larger companies that we worked with, such as Albertsons, 800-pound guerillas that wanted product were unwilling to provide us with the deposits that we needed in order to continue to organically grow the business the way I described initially.

And, you know, their payment terms

Page 168

L. Ori

varied of what they were willing to do. Most of them didn't want to pay for the product until it hit their dock, so we had to have capital in the business in order to -- to pay Voyant for the product. At that point would have been, my recollection, 75 percent in order for us to receive the payment when it hits the dock for us to then pay the other 25 percent plus profit.

So, as we grew and took on other customers, we -- we looked for funding from a number of sources.

Q. And so this is -- it says the amount is $335,000, right?

A. Yes.

Q. And it says that it's to pay to the order of Lee Eric Ori as lender.

That's you, right?

A. Yes.

Q. And it was, what, a three-month loan made June, July, August, basically a three-month loan?

A. Correct.

Q. And did you make this loan?

A. I did.

Page 169

L. Ori

Q. Where did the funds come from?

A. From my trust account.

Q. And were you paid back?

A. I was.

Q. Were you paid back on the maturity date?

A. I don't know the date that I was paid back. It was -- it was on or before the maturity date.

Q. And the -- and the funds were paid back to the trust account?

A. Correct.

Q. And what's the nature of that trust?

A. My -- mine and my wife's living trust account.

Q. And who's the trustee?

A. Myself and my wife.

Q. And so it's an inter vivos trust?

A. As -- as I recall. I -- I'm not -- certainly not a trust expert.

Q. Sure.

A. And nor do I have the documents in front of me.

Q. Understand.

Page 222
L. Ori

A. So I only assume I replied all.
Q. Got it. Okay.
So you say here, "We also need to distribute funds to the partners this week."
What did you mean by that?
A. Do a distribution to -- to the three members.
Q. What was the process for that?
A. If you scroll down at the bottom, it -- you know, Dan -- basically, you know, we -- this was our -- substantially our full-time job. You know, Dan -- Dan had expressed, you know, concern to me that, you know, he needed -- he needed money to live. We, you know, by the nature of our partnership, we couldn't take salaries and we could only take distributions.
We took very bare minimum distributions to essentially support our life, to live off of.
You can see where I asked Dan, "What do you need...? You indicated $3,000. Is that enough? Please advise Linda so she can schedule." You know, we have-- we have met, we

Page 223
L. Ori

are in agreement, please let Linda know the very bare minimum that you need to survive. Is $3,000 enough? And that's -- that's what we distributed to the partners as a result.
Q. In other words, as a result of this, $3,000 went to yourself, $3,000 went to Dan, and $3,000 went to Ms. Simmers?
A. Correct.
Q. And did you have any schedule upon which distributions were made?
A. We did not.
Q. No?
A. Go ahead.
Q. I didn't hear your answer. I'm sorry.
A. We -- we did not have a schedule. The -- the schedule was -- there wasn't one, no.
Q. And how did distributions come about?
MR. KORANTENG: Objection. The question is vague. Can you -- can you rephrase that?
Q. What prompted you to make distributions when you made them?
A. We -- we met as a group and, you know, as you probably know, there were only five or

Page 224
L. Ori

six total distributions made. It was a combination of availability of -- of funds and -- and, you know, the perceived liabilities at that time and, you know, quite honestly, necessity. You know, in this case, necessity.
Q. And do you recall how many distributions were made in 2020?
A. Five or six.
Q. And do you recall how many --
A. I don't recall the exact number. Sorry. Go right ahead, sir.
Q. Do you recall roughly the total?
A. $43,000 per member.
Q. And would that -- that amount was -- just happened to be the sum of what the distributions were? It wasn't a predetermined amount that you would get X amount over the year?
A. It was not a predetermined value, no, sir.
Q. And were the five or six distributions, were they equal amount or varying amounts?
A. I believe there were four, four

Page 225
L. Ori

$10,000 distributions and one $3,000.
Q. And you didn't receive a salary from Epicure?
A. We did not.
Q. Do you know if -- if Dan or Sarah had -- were employed elsewhere in addition to their work with Epicure?
A. Dan -- Dan was not. Dan -- Dan and I have solely -- 100 percent of our attention was devoted to Epicure.
Sar- -- Sarah was also not on salary anywhere else.
Q. Do you know if Sarah had other sources of income other than Epicure during this time?
A. I can't speak for Sarah.
Q. Okay. Let me introduce Exhibit 26.
(Ori Exhibit 26, E-mails Bates-stamped DEF0610 to DEF0611, marked for identification, as of this date.)
BY MR. GUNNELL:
Q. This is an e-mail Bates-stamped DEF0610 to DEF0611. Starts with an e-mail from Michael Partridge to Dan Reilly, and I want to draw your attention to the e-mail by Dan finally

Page 274

L. Ori

2  A.  No.
3      MR. GUNNELL: Objection to form.
4  Q.  So I guess do you recall if at that
5  point there was a need for some significant
6  capital contribution from either you or Sarah to
7  fund the operations of that entity?
8      MR. GUNNELL: Objection to form.
9  A.  No.
10 Q.  You testified earlier when opposing
11 counsel asked you about whether Epicure held --
12 held any meetings, and I think at some point, if
13 I recall -- do you recall that testimony, that
14 exchange about what meetings were held and
15 whether they were documented or not documented?
16 A.  I do recall.
17     MR. GUNNELL: Fibbens, I can't -- I
18     can't make out the word you're saying.
19     MR. KORANTENG: I'm sorry, which word?
20     Do you want Kathy -- Kathy to repeat what I
21     said?
22     MR. GUNNELL: Yes. Yes. Please,
23     sorry.
24     MR. KORANTENG: That's okay. No
25     worries.

Page 275

L. Ori

2      (Record read.)
3      MR. GUNNELL: Thank you.
4      MR. KORANTENG: Okay. All right.
5  BY MR. KORANTENG:
6  Q.  So let me ask you, Lee, did you, as
7  managers, you -- when I said "you," you, Dan
8  Reilly and Sarah Simmers hold meetings to make
9  decisions about what you guys were doing as far
10 as Epicure was concerned?
11 A.  Yes.
12 Q.  Okay. So you held meetings, but did
13 you document those meetings?
14 A.  No.
15 Q.  Okay. All right.
16     So the meetings were held. It's just
17 that you guys didn't have documents that said
18 that this -- you know, these are minutes of the
19 meeting, is that -- is that your testimony?
20 A.  Yes.
21 Q.  Okay. All right.
22     There was some testimony earlier, I
23 believe, when opposing counsel was asking you
24 about the operating agreement for Epicure.
25     Do you recall that discussion?

Page 276

L. Ori

2  A.  I do.
3  Q.  And I -- I believe at some point you
4  said that Epicure was member-managed, and I --
5  do you recall that -- giving that answer when --
6  when you were asked about certain questions?
7      MR. GUNNELL: Objection to form.
8  A.  I -- I recall the -- the
9  questioning -- the line of questioning, and --
10 and I don't recall the -- the exact context, but
11 Epicure is -- is a manager-managed entity.
12 Q.  Okay.
13 A.  So if I -- if I said it was
14 member-managed, it was -- it was a miss --
15 misspoken.
16 Q.  I just wanted to clarify, because --
17 could you tell us who the managers of Epicure
18 are?
19 A.  Myself, Dan Reilly and Sarah Simmers.
20 Q.  But you, Dan and Sarah are not members
21 of Epicure directly, are you?
22 A.  No, the PFL and Clover Leaf are -- are
23 the actual members.
24 Q.  Okay. All right. Thank you.
25     Earlier we -- you had some discussions

Page 277

L. Ori

2  with opposing counsel about a credit application
3  that Epicure submitted to Voyant.
4      Do you recall that?
5  A.  I do.
6  Q.  Okay. And what do you recall as the
7  circumstances under which you were asked to
8  submit that credit application by Voyant? When
9  I say "you," Epicure was asked.
10 A.  To paraphrase the e-mail, it was this
11 is a formality for all new customers.
12 Q.  And at this point, if I recall, this
13 was -- at this point, you had already submitted
14 not a purchase order but a letter of intent to
15 Voyant; is that correct?
16     MR. GUNNELL: Objection to form.
17     Who do you mean by "you"?
18     MR. KORANTENG: Sorry. Thank you
19     for -- thank you for that.
20 BY MR. KORANTENG:
21 Q.  When I say "you" -- at this point,
22 Epicure had already submitted either just an LOI
23 or purchase orders to Voyant, do you recall?
24     MR. GUNNELL: Objection.
25 Q.  Lee, go ahead and answer.

```
                                                       Page 290
 1                          L. Ori
 2                       CERTIFICATE
 3   STATE OF NEW YORK )
                       : ss
 4   COUNTY OF NEW YORK)
 5        I, Kathy S. Klepfer, a Registered
 6   Merit Reporter and Notary Public within and
 7   for the State of New York, do hereby
 8   certify:
 9        That LEE ORI, the witness whose
10   deposition is herein before set forth, was
11   duly sworn by me and that such deposition is
12   a true record of the testimony given by such
13   witness.
14        I further certify that I am not
15   related to any of the parties to this action
16   by blood or marriage and that I am in no way
17   interested in the outcome of this matter.
18        In witness whereof, I have hereunto
19   set my hand this 5th day of April, 2022.
20
21        _____
          KATHY S. KLEPFER, RPR, RMR, CRR, CLR
22
23
24
25
```

```
                                                       Page 291
 1   NAME OF CASE:
 2   DATE OF DEPOSITION:
 3   NAME OF WITNESS:
 4   Reason Codes:
 5        1.  To clarify the record.
 6        2.  To conform to the facts.
 7        3.  To correct transcription errors.
 8   Page _____ Line _____ Reason _____
 9   From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25                        _____
```