# Exhibit 9

SARAH SIMMERS

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION

AWARE PRODUCTS LLC,
D/B/A VOYANT BEAUTY,
Plaintiff,

vs. No. 4:21-cv-249-JCH

EPICURE MEDICAL, LLC,
FOXHOLE MEDICAL, LLC,
and LEE ORI,
Defendants.
__________________________/

REMOTE VIDEOTAPED DEPOSITION SARAH SIMMERS

ST. LOUIS, MISSOURI

TUESDAY, MARCH 29TH, 2022

REPORTED BY:
DEBORAH HABIAN, RMR, CRR, CLR
JOB NO. 208448

SARAH SIMMERS

March 29, 2022

11:05 A.M. CST

Remote videotaped deposition of SARAH SIMMERS, appearing at St. Louis, Missouri, USA, pursuant to notice, appearing remotely via Zoom conference before Deborah Habian, an Illinois Certified Shorthand Reporter, Missouri Certified Court Reporter, Registered Merit Reporter, Certified Realtime Reporter, Certified Livenote Reporter.

SARAH SIMMERS

APPEARING REMOTELY VIA ZOOM

ON BEHALF OF THE PLAINTIFF

SHER TREMONTE
BY: ROBERT PENN, JR., ESQ.
90 Broad Street
New York, New York 10004

ON BEHALF OF THE DEFENDANTS

KORANTENG LAW FIRM
BY: FIBBENS KORANTENG, ESQ.
5050 Quorum Drive
Dallas, Texas 75254

ALSO PRESENT:

Rudolfo Durand, TSG videographer

SARAH SIMMERS

I N D E X

| WITNESS: | PAGE |
|---|---|
| SARAH SIMMERS | |
| Examination by Mr. Penn .................... | 10 |
| Examination by Mr. Koranteng ............... | 127 |

INSTRUCTIONS AND REQUESTS OF COUNSEL

| | |
|---|---|
| By Mr. Koranteng........................ | 77 |
| By Mr. Penn ............................ | 85 |

INDEX OF EXHIBITS

EXHIBITS TO SARAH SIMMERS DEPOSITION

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Unanimous Written Consent in Lieu of Organizational Meeting of Managers and Members of Foxhole Medical, LLC, 3/22/18 Bates DEF3744 through DEF3793 | 33 |
| Exhibit 2 | Carrollton Account Agreement 12/10/18, Bates DEF0031 | 37 |

SARAH SIMMERS

(CONTINUING)

INDEX OF EXHIBITS

EXHIBITS TO SARAH SIMMERS DEPOSITION

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 3 | 3/26/20 Operating Agreement of Epicure Medical, LLC Bates DEF3505 through DEF3545 | 51 |
| Exhibit 4 | Carrollton Account Agreement 3/27/20, Bates DEF0030 | 55 |
| Exhibit 5 | 2/21/22 Sarah Simmers e-mail to Lee Ori including 3/26/20 letter to Michael Partridge Bates DEF004811 through DEF004812 | 72 |
| Exhibit 6 | 4/13/2020 Purchase Order from Voyant Beauty to Epicure Bates DEF004741 through DEF004748 | 79 |
| Exhibit 7 | 4/22/20 Lee Ori e-mail thread Pro Forma Sanitizer.xlsx Bates DEF004659 through DEF004660 | 84 |

SARAH SIMMERS

(CONTINUING)

INDEX OF EXHIBITS

EXHIBITS TO SARAH SIMMERS DEPOSITION

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | 5/8/20 Promissory Note Bates DEF004737 through DEF4740 | 91 |
| Exhibit 9 | 5/24/20 Lee Ori e-mail to Michelle Jimenez and others Bates DEF004572 | 97 |
| Exhibit 10 | 6/1/20 Epicure Medical e-mail attaching cash report Bates DEF0176 through DEF0178 | 100 |
| Exhibit 11 | Epicure Medical Excel cash report June 2nd, 2020, no Bates | 103 |
| Exhibit 12 | 6/4/20 Lee Ori letter to Michael Partridge, Bates DEF3680 | 107 |
| Exhibit 13 | 8/4/20 e-mail thread between Lee Ori and Michael Partridge Bates DEF0714 through DEF0715 | 109 |

SARAH SIMMERS

(CONTINUING)

INDEX OF EXHIBITS

EXHIBITS TO SARAH SIMMERS DEPOSITION

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 14 | 8/14/20 e-mail thread between Lee Ori and Bill King Bates DEF0082 through DEF0083 | 114 |
| Exhibit 15 | 9/7/20 e-mail thread between Lee Ori and Dan Reilly Bates DEF0421 through DEF0422 | 116 |
| Exhibit 16 | 10/26/20 e-mail thread between Lee Ori and Linda Ragsdale Bates DEF0426 through DEF0427 | 120 |
| Exhibit 17 | Epicure Medical Balance Sheet As of December 31, 2020 Bates DEF3495 through DEF3497 | 121 |
| Exhibit 18 | Foxhole Medical Balance Sheet As of December 31, 2021 Bates DEF004807 through DEF004810 | 124 |

SARAH SIMMERS

THE VIDEOGRAPHER: Good morning, Counselors. My name is Rudolfo Durand. I am the legal videographer in association with TSG Reporting, Inc. Due to the severity of the COVID-19 and following the practices of social distancing, I will not be in the same room with the witness. Instead, I will record this remotely. The court reporter, Debbie Habian, also will not be in the same room and will swear in the witness remotely.

Do all parties stipulate to the validity of this video recording, the swearing in of the witness, that it will be admissible in the courtroom as if it had been taken following Rule 30 of the Federal Rules of Civil Procedure and the state's rules where this case is pending.

MR. KORANTENG: We do.

MR. PENN: Yes, plaintiffs do.

THE VIDEOGRAPHER: Thank you. This is the start of media labeled number 1 of the remote video recorded deposition of Sarah Simmers in the matter of Aware Products LLC, doing business as Voyant Beauty vs. Epicure

SARAH SIMMERS

Medical LLC, et al. Today is March 29, 2022. The time is 11:05 a.m. Central Daylight Time, and we're on the record.

Will counsel please introduce yourselves.

MR. PENN: Robert Penn for the plaintiff Aware Products LLC, doing business as Voyant Beauty, and my colleague Justin Sher may be joining us from his firm Sher Tremonte.

MR. KORANTENG: This is Fibbens Koranteng, and I'm appearing for the defendants, Foxhole Medical LLC, Epicure Medical LLC, and Lee Ori.

THE VIDEOGRAPHER: Will the court reporter please swear in or affirm the witness.

THE REPORTER: Raise your right hand please.

THE WITNESS: (Complying.)

(Oath administered remotely.)

THE WITNESS: I do.

THE REPORTER: Thank you so much.

SARAH SIMMERS

SARAH SIMMERS,

called as a witness herein by the plaintiff, having been first duly sworn remotely, was examined and testified as follows:

EXAMINATION

BY MR. PENN:

Q. Good morning, Ms. Simmers. My name is Robert Penn. I represent the plaintiff Aware Products LLC, doing business as Voyant Beauty, who I will refer to today as "Voyant."

I'd like to go through some -- a few ground rules. Have you been deposed before?

A. I have not.

Q. Okay. So today I will ask you a series of questions, and of course everything is recorded. The court reporter can only take down the verbal answers, so nods or shaking your head will not be a sufficient answer, so try to make a verbal answer, please.

The reporter can only take down the -- one person at a time, so we'll try not to speak over each other, although I know on Zoom it can be -- sometimes there's a little delay, so we'll try not to speak over each other.

SARAH SIMMERS

I'll do my best to look to let you finish your answers, and if you could let me finish my questions, that would be excellent.

A. Okay.

Q. If you don't understand a question, you can ask me to -- you can tell me, you can ask me to rephrase.

If you -- if I ask a question your counsel, Mr. Koranteng, may object today. Those objections are for the record, and you must still answer the question. So I'm going to ask the question, maybe just give a beat in case there's an objection, and then you can answer the question.

If you need a break at any time, please let me know. We will try to accommodate those requests, of course, but I'll ask that you answer whatever question is pending at the time before we take a break.

A. Okay.

Q. Okay. Did you prepare for your deposition today?

A. Yes.

Q. How did you prepare?

SARAH SIMMERS

A. I reviewed e-mails. That's the only preparation I did.

Q. And were these e-mails e-mails produced by -- by your counsel?

A. Yes.

Q. When did you do your preparation?

A. Yesterday.

Q. And about how long was the preparation?

A. An hour.

Q. And you said you looked at e-mails. Did you look at any other documents?

A. Just my Epicure Operating Agreement.

Q. Today you understand that you're under oath today, correct?

A. I do.

Q. And that if you don't provide truthful answers, that would be considered perjury?

A. I do.

Q. Is there any reason that you cannot testify truthfully today?

A. There's no reason.

Q. So today we're obviously taking this deposition remotely because of -- partly because of the COVID situation, so I have a few

SARAH SIMMERS

questions related to that situation.

Is anyone in the room with you?

A. No.

Q. I would ask that if anyone enters the room at any time that you please let me know.

A. Absolutely.

Q. And are you looking at anything other than the screen upon which the deposition is being taken?

A. Just the screen.

Q. So I'd ask that you please don't look at anything else while we're on the record.

A. Okay.

Q. I'd like to please -- I'd like you to please answer all questions by yourself and that you don't look to anyone or anyone else to help in answering the questions.

A. Okay.

Q. If you cannot answer a question by yourself, let me know.

I'd also ask that you agree not to communicate with anyone else besides me in any way while we're on the record.

Do you agree to do that?

clinic pharmacy for Innovis, Innovis Health.
Q. Would you spell Innovis, please?
A. I-N-N-O-V-I-S.
Q. And what was your -- what did your job entail at Innovis Health?
A. I was the clinic pharmacist retail -- more of a retail model dispensing prescriptions within the clinic for the primary care doctors.
Q. And did you eventually leave that position at Innovis?
A. I did.
Q. What was your next position after that?
A. I moved to Arizona and opened a compounding pharmacy.
Q. Tell me what is a compounding pharmacy.
A. A compounding pharmacy is where we make patients' prescriptions pursuant to a doctor's formulation that we work together on for a patient. It's customized to the patients.
Q. What was the -- what is the name or what was the name of the pharmacy in Arizona?
A. Customceutical Compounding.
Q. And do you recall what year you established this pharmacy?

A. 2010, I believe. I believe my operating agreement is 2010, yes, I believe.
Q. And are you -- well, it is Customceutical; is that correct?
A. Customceutical.
Q. Customceutical. Are you an owner of Customceutical?
A. I am.
Q. And are there any other owners?
A. Yes.
Q. Who are the other owners?
A. James Birch.
Q. And has he been an owner since 2010?
A. Yes.
Q. For Customceutical, do you -- does -- do you operate in a retail space or how does -- how do you dispense the products that you make?
A. Customceutical is a retail pharmacy, yes. We dispense the prescriptions to the patient. We also did do some injectables to providers, but they were all patient-specific.
Q. And can you just briefly explain the process for how you might produce a specific product? For example, does the doctor make a

request and then you fill the request?
A. The doctor writes a prescription, yes, and we fulfill the prescription.
Q. And is -- and you may have said this, and forgive me if I'm asking you again. Is Customceutical still operating?
A. It is not.
Q. Okay. When did it stop operating?
A. November 4th of 2020.
Q. Is there any reason that it stopped operating?
A. Yes. It was -- we weren't making it because of the pandemic.
Q. Besides Custom -- Customceutical, did you have any other work -- did you work at any other pharmacies or entities?
A. Yes.
Q. Can you tell me about those, please?
A. I also am an owner in Scottsdale Professional Pharmacy.
Q. Okay. What is Scottsdale Professional Pharmacy?
A. Scottsdale Professional Pharmacy is a nonsterile compounding pharmacy.

Q. And what does a nonsterile -- what is a nonsterile compounding pharmacy?
A. We make customized prescriptions pursuant to a prescription from a doctor specific for certain patients. This is noncommercial products. We make them, in essence.
Q. How is -- how is the non -- how is the product that you produce at Scottsdale Professional different from what you produce with Customceutical?
A. Customceutical was largely sterile products. Scottsdale Professional Pharmacy -- and we do business as Customedico -- was nonsterile.
Q. For a nonpharmacist, what's the difference between sterile and nonsterile?
A. Sterile you inject; nonsterile, you don't.
Q. Great. Thank you. Now, I know that.
Okay. So you are an owner of Scottsdale Professional Pharmacy, and are there any other owners?
A. There is not.

SARAH SIMMERS

A. What are you asking? If you could rephrase that. I'm just not quite understanding what you're asking me.

Q. You testified that customers were looking for the gel product, so I'm just asking, you know --

A. And that was information from Dan. Yeah, that's what -- that's what the ask was. So when you're trying to procure a product, you want to procure what the customer wants. So if they're asking for gel and not a liquid and we're trying to find a manufacturer, you've got to match that up. If I have a liquid, I'm not going to sell it if that's not what the customer wants.

Q. At the time in March 2020, do you know if Epicure had any commitments for the sale of sanitizer except for the one you mentioned earlier?

A. Define "commitments."

Q. I think I would just see if you can answer the question.

A. It's hard for me to answer that question not truly understanding what you mean

SARAH SIMMERS

by "commitment." There were people looking for the product, yes, and this was the specifications they were looking for a gel. They were discussing sizes. It was so difficult to find bottles, like, getting all of those parts to line up to have a true customer you needed to be able to bring them to what they're asking for.

So you had -- you see it's the chicken and the egg here in the sense that you had to have what they want for that, yes, and if we could get the commitments from procurement, then, yes, you could have a commitment. Does that make sense?

Q. Okay.

A. It's trying to get all that to line up, and they did a lot -- they spent a lot of hours at it.

Q. Okay. Shifting back to choosing manufacturers of hand sanitizer, you said you engaged a consultant, Paul, to assist Epicure with that. And who is Paul?

A. Paul Hexsom is a relationship of Lee's. I know they've known each other a long time. I

SARAH SIMMERS

don't know much more beyond that, just that Paul has a lot of experience in manufacturing. That's his background. So we engaged a consultant to help us make a decision there, and Paul -- so that's why we engaged Paul.

Q. And I'm not sure if you said this. Did you have a role in choosing -- strike that.

Did you have a role in choosing Voyant to manufacture hand sanitizer for Epicure?

A. I didn't. That was not my lane.

Q. And who, if you know, chose Voyant?

A. Ultimately, I don't know if it was Dan or Lee, and I'm sure they did it together. I don't know.

Q. You also talked about some of the quality control that you did. Did you do the quality control on products for a variety of manufacturers?

A. No, but I do it in my day job. So my role as it relates to that is my industry -- there was pharmacists in my industry that were compounding sanitizer under the FDA guides. Okay? We did not choose to do that because I had this opportunity in Epicure. So I have --

SARAH SIMMERS

because of my day job and because there was the guidance document put out by the FDA, I was aware of what their requirements were for quality. So my role, when it came to manufacturers, I just said, "Guys, as long as they're meeting the guidance documents, please let me see the SDS."

I don't -- I won't put -- we won't put our name on somebody or work with somebody that we can't be sure, especially as professionals, like, I just can't do that, that I can give something to somebody that's not safe.

Q. You said that -- you made reference to your day job. Are you referring to --

A. Yeah, I'm -- because I'm a pharmacist. That's what I mean. I'm referencing the fact that I'm a pharmacist.

MR. KORANTENG: You wait until he finishes his question, then you answer.

THE WITNESS: Okay.

MR. KORANTENG: I think we're speaking over each other.

THE WITNESS: Sorry.

MR. KORANTENG: Sorry.

SARAH SIMMERS

THE WITNESS: Sorry.

BY MR. PENN:

Q. We'll start over a little bit. So you made reference to your day job as a pharmacist. Is that with Customedico?

A. Yes.

Q. Okay. So you testified, I believe, that you -- you reviewed or inspected Voyant's hand sanitizer product, a sample; is that correct?

A. Yes.

Q. And you reviewed their safety data sheet; is that correct?

A. Yes, sir.

Q. In terms of reviewing the product sample, can you tell me how you -- what you used to assess the sample?

A. I looked at the quality of the container, I looked at how the product felt, I looked at the safety data sheet in regards to the contents.

Q. You also said you approved a label. Was it -- this is labels for the bottles, you mean?

SARAH SIMMERS

A. Yes, sir.

Q. What was the process for approving the labels?

A. What process did I go through? Can you ask the question differently? Like, what do you mean?

Q. Just, I guess, maybe start with a general step-by-step in terms of how the labels were approved. So did Voyant provide a sample label to Epicure for its approval?

A. Yes, please. Yes, they sure did.

Q. Did Epicure have any input into what was supposed to go onto that initial label sample?

A. The only -- only from the design aspect for the -- for Epicure's brand. The -- I would say the monograph labeling came from Voyant.

Q. And once you received the label sample, what did you need or what did you do to approve it?

A. It -- I reviewed -- I reviewed the -- for correctness, basically. Did it match what we provided them for the branding, yes, and it did. I approved it. You had -- you had a label

SARAH SIMMERS

spec, and I approved it.

Q. Okay. Just one more question on the sample. Did the makeup of the sample, did Voyant provide that or was there any input from Epicure?

MR. KORANTENG: Objection, vague.

MR. PENN: Yeah, let me see if I can ask it differently.

BY MR. PENN:

Q. Did Epicure request a sample of hand sanitizer from Voyant?

A. I believe so, yes. I believe we requested that. I didn't make the request, but Epicure did. I don't know if it was Lee, I don't know if it was Dan.

MR. PENN: Okay. Let me go to what's going to be Exhibit 5.

(Simmers Exhibit 5 was marked for ID.)

BY MR. PENN:

Q. Okay. Do you recognize this document?

A. (Reviewing document.)

It's an e-mail.

Q. Okay, and what is it?

SARAH SIMMERS

A. I can see the top of it is an e-mail.

Q. Sure. Let me start over, back up a little bit. This was produced by your counsel. It's Exhibit 5. It's identified as DEF4811 through 4812. Let me show you first. It's two pages in this document.

A. Okay.

Q. I can show you the first page, and let me know if you can see all of it.

I'll go to the second page.

This exhibit is also in the chat if you want to see it.

Okay. Do you -- do you recognize what this is?

A. That's the LOI. It looks to be the LOI we sent.

Q. Okay. And how did this LOI come about?

A. I understood from our calls that Michael needed a placeholder until Epicure's was formed. He needed a placeholder so we could have our basically place in line, to hold our place in line. So that's the LOI that Lee sent.

Q. And so you said Michael needed a placeholder?

SARAH SIMMERS

Q. All right. So you weren't implying that somehow Lee Ori as a person sent the LOI, were you?

A. No.

MR. PENN: Objection. Misstates testimony.

BY MR. KORANTENG:

Q. Okay. Okay. So when Lee had submitted the LOI on behalf of -- on behalf of Foxhole, in what capacity was he submitting that LOI?

MR. PENN: Objection.

THE WITNESS: From what I understood, it's -- it was a placeholder until Epicure was formed.

BY MR. KORANTENG:

Q. And when Lee submitted the LOI for Epicure, that was dated June -- I think June 4th, that you had -- you and counsel had discussed, do you understand -- what's your understanding of the capacity in which he was submitting that LOI?

MR. PENN: Objection.

THE WITNESS: As a manager of Epicure.

MR. KORANTENG: Okay. I don't think I

SARAH SIMMERS

have any further questions, Robert.

MR. PENN: Okay. Give me -- let's just go off the record for a couple minutes, please.

MR. KORANTENG: Okay.

THE VIDEOGRAPHER: The time is 3:33 p.m., and we're going off the record.

(Recess taken from 3:33 p.m. to 3:36 p.m.)

THE VIDEOGRAPHER: The time is 3:36 p.m., and we're back on the record.

MR. PENN: I have no further questions.

THE VIDEOGRAPHER: The time is 3:36 p.m., and we're going off the record.

(Deposition concluded at 3:36 p.m. CST.)

SARAH SIMMERS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

AWARE PRODUCTS LLC,
D/B/A VOYANT BEAUTY,
Plaintiff,

vs. No. 4:21-cv-249-JCH

EPICURE MEDICAL, LLC,
FOXHOLE MEDICAL, LLC,
and LEE ORI,
Defendants.

________________________/

I hereby certify that I have read the foregoing transcript of my deposition given at the time and place aforesaid, consisting of pages 1 to 135, inclusive, and I do again subscribe and make oath that the same is a true, correct, and complete transcript of my deposition so given as aforesaid and includes changes, if any, so made by me.

______________________________
SARAH SIMMERS

SUBSCRIBED AND SWORN TO
before me this _____ day
of ______________, A.D. _________.

___________________________
Notary Public

SARAH SIMMERS

REPORTER CERTIFICATE

I, Deborah Habian, a Certified Shorthand Reporter within and for the State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was remotely duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition was reported stenographically by me, was thereafter reduced to printed transcript by me, and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken remotely before me at the time and place specified;

That the reading and signing by the witness of the deposition transcript was not discussed within the body of this transcript;

That I am not a relative or employee of attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand this 8th day of April, 2022.

Deborah Habian
________________________________
DEBORAH HABIAN, CSR, RMR, CRR, CLR
IL CSR NO. 084-02432
MO CCR NO. 1409