# Exhibit 10

Page 1

1                      MICHAEL PARTRIDGE

2            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF MISSOURI
3                   EASTERN DIVISION

4  AWARE PRODUCTS LLC D/B/A        )
   VOYANT BEAUTY,                  )
5                                  )
            Plaintiff,             )
6                                  )
            vs.                    )  NO. 4:21-CV-249-JCH
7                                  )
   EPICURE MEDICAL, LLC,           )
8  FOXHOLE MEDICAL, LLC, and       )
   LEE ORI,                        )
9                                  )
            Defendants.            )

10

11

12

13     REMOTE DEPOSITION UPON ORAL EXAMINATION OF

14                   MICHAEL PARTRIDGE

15

16              TUESDAY, APRIL 5, 2022
                     9:37 A.M.
17

18     (All participants are appearing remotely)

19

20

21

22

23

24  REPORTED BY:
    MONNA J. NICKESON, CLR, RPR, CRR, CCR NO. 3322
25  JOB:  209371

Page 2

```
                    MICHAEL PARTRIDGE
        APPEARANCES:


FOR THE PLAINTIFF:

        ROBERT PENN, ESQ.
        JUSTIN SHER, ESQ.
        Sher Tremonte
        90 Broad Street
        New York, New York 10004

FOR THE DEFENDANT:
        FIBBENS KORANTENG, ESQ.
        Koranteng Law Firm
        5050 Quorum Drive
        Dallas, Texas 75254

ALSO PRESENT:

        Joel Coriat, videographer
```

Page 3

```
                    MICHAEL PARTRIDGE
                    I N D E X
               AWARE vs. EPICURE
               NO. 4:21-CV-249-JCH
                 APRIL 5, 2022
WITNESS:  MICHAEL PARTRIDGE                    PAGE
EXAMINATION BY MR. KORANTENG:                    7
                    EXHIBITS
NUMBER            DESCRIPTION                  PAGE
Exhibit 1   "Amended Notice of Deposition"      20
Exhibit 2   Plaintiff's first set of            40
            interrogatories to defendants
Exhibit 3   "Plaintiff's responses and          84
            objections to defendants' first
            set of requests for production
            of documents."
Exhibit 4   AWAREVOYANT_000307                  87
Exhibit 5   Email from Witness to Paul          90
            dated March 26
Exhibit 6   Email dated March 26 from Paul      92
            Heslin to Witness
Exhibit 7   Email from Witness to Paul          96
            Heslin
Exhibit 8   Email from Lee Ori to Paul, the    101
            Witness, Dan Reilly, and Sarah
            Simmers
Exhibit 9   Email                              107
Exhibit 10  March 31, 202 email from Witness   110
            to Paul Heslin
Exhibit 11  Email, AWAREVOYANT_000408          112
Exhibit 12  Email, AWAREVOYANT_000436          115
Exhibit 13  AWAREVOYANT_000426                 131
Exhibit 14  Email, AWAREVOYANT_000297          134
Exhibit 15  Email, AWAREVOYANT000440-000445    143
Exhibit 16  Email, AWAREVOYANT_000463          143
Exhibit 17  Email, AWAREVOYANT_000491          148
Exhibit 18  Email, AWAREVOYANT_000626 -        149
            AWAREVOYANT_000631
```

Page 4

```
                    MICHAEL PARTRIDGE
                I N D E X (continued)
               AWARE vs. EPICURE
               NO. 4:21-CV-249-JCH
                 APRIL 5, 2022
WITNESS:  MICHAEL PARTRIDGE
                    EXHIBITS
NUMBER            DESCRIPTION                  PAGE

Exhibit 19  Email, AWAREVOYANT_000898          150
Exhibit 20  Email, AWAREVOYANT_000983          152
Exhibit 21  Email, AWAREVOYANT_001752          154
Exhibit 22  Email, DEF4741 through DEF4748     175
Exhibit 23  Pro forma invoice                  181
Exhibit 24  Email dated June 19                194
```

Page 5

MICHAEL PARTRIDGE

BE IT REMEMBERED that on APRIL 5, 2022, at 9:37 A.M., the remote videotaped deposition of MICHAEL PARTRIDGE was taken before Monna J. Nickeson, Certified Realtime Reporter, Registered Professional Reporter, Certified LiveNote Reporter, Certified Court Reporter (WA 3322), Certified Shorthand Reporter (ID 1045), (OR 16-0441), (CA 14430), the following proceedings took place:

THE VIDEOGRAPHER: Good morning. My name is Joel Coriat. I am a certified legal videographer in association with TSG Reporting, Inc. Due to the severity of COVID-19, and following the practice of social distancing, I will not be in the same room with the witness. Instead, I will record this videotaped deposition remotely. The reporter, Monna Nickeson, also will not be in the same room and will swear the witness remotely.

Do all parties stipulate to the validity of this video recording and remote swearing, and that it will be admissible in

Page 6

MICHAEL PARTRIDGE
the courtroom as if it had been taken following Rule 30 of the Federal Rules of Civil Procedures and the state rules where this case is pending?
    MR. KORANTENG: Defendants do.
    MR. PENN: Plaintiff agrees.
    THE VIDEOGRAPHER: Thank you. This is the start of Media Number 1 in the video-recorded deposition of Michael Partridge in the matter of Aware Products, LLC, d/b/a Voyant Beauty versus Epicure Medical, LLC, et al.
    This is case number 421-CV-249-JCH filed in the U.S. District Court, Eastern District of Missouri, Eastern Division. This is deposition being held remotely on April 5th, 2022. The time on the video monitor is now 9:38 a.m. Pacific Time.
    Will counsel please state your appearances for record.
    MR. KORANTENG: Fibbens Koranteng for defendants Epicure Medical, LLC; Foxhole Medical, LLC; and Lee Ori.
    MR. PENN: Robert Penn of

Page 7

MICHAEL PARTRIDGE
Sher Tremonte for plaintiff Aware Products, LLC, d/b/a Voyant Beauty.
    MR. SHER: And Justin Sher, also for plaintiff.
    THE VIDEOGRAPHER: Thank you. The court reporter, please swear in the witness.
    MICHAEL PARTRIDGE
Having been first duly sworn, was examined and testified as follows:
         EXAMINATION
BY MR. KORANTENG:
    Q.  Mr. Partridge, my name is Fibbens Koranteng, and I represent Epicure Medical, LLC and -- what do you call it -- Foxhole Medical, LLC, and Lee Ori in this case. I've seen your name in many records and many emails, so it's a pleasure to finally get to talk to you.
    Do you understand that you are here today to testify on behalf of Aware Products, LLC, which does business as Voyant Beauty?
    A.  Yes.
    Q.  And are you okay if I refer to Aware products as Voyant from here on out?

Page 8

MICHAEL PARTRIDGE
    A.  Yes.
    Q.  Have you testified under oath before today?
    A.  Yes.
    Q.  And in what -- under what circumstances did you testify under oath?
    A.  There was a federal case that I was a witness for.
    Q.  What was that case?
    A.  It was -- I wouldn't be able to name it exactly, but for a former company, Kik Custom Products, against a healthcare provider.
    Q.  You said what custom products? I'm sorry, I didn't hear.
    A.  Kik, K-i-k. The former company I worked for.
    Q.  All right. And so having testified under oath before, you probably already know the rules, but let me go over a couple of things with you.
    Well, I asked if you had testified under oath, but I didn't ask if you had your deposition taken before.
    Have you had your deposition taken

Page 9

MICHAEL PARTRIDGE
before?
    A.  Yes.
    Q.  Okay. So you probably already know some of the rules, but I'm going to go over a couple of them with you, if that's okay.
    I will be asking you some questions today directed -- regarding this case, and the court reporter will be recording your answers. If I ask you a question that you do not understand, I want you to let me know. If you go ahead and -- you know, you can ask me to repeat it or rephrase it, but if you go ahead and answer it, I will assume that you understand my question; is that okay?
    A.  Yes.
    Q.  I would ask also that you answer -- I'm sorry? Okay. I thought somebody said something.
    I would ask that you answer all your questions verbally so the court reporter can hear your answer. I would ask you don't nod your head or you say uh-huh; is that understood?
    A.  Understood.

Page 78

MICHAEL PARTRIDGE

1  submitted?
2  (The Court Reporter requested clarification.)
3  MR. KORANTENG: About your damages.
4  (The Court Reporter requested clarification.)
5  BY MR. KORANTENG:
6  Q. When you went back, Mr. Partridge, to refresh your memory about the components of your damages, did you by any chance also determine when the Foxhole LOI was actually sent in March?
7  A. I did not, but I can.
8  Q. Okay. Let me ask you, so when -- when that Foxhole LOI was submitted in March, what did Voyant know about Foxhole as company?
9  MR. PENN: Objection to form.
10  THE WITNESS: So what we knew about Foxhole is just during introductory meetings with Paul and Lee, noting that Foxhole was part of the pharmaceutical side of the business.
11  BY MR. KORANTENG:
12  Q. You said pharmaceutical side of the

Page 79

MICHAEL PARTRIDGE

business. When you say that, what does -- what did that mean? What does that mean?
A. That was Lee's business.
Q. Paul and Lee told you that Foxhole was part of the pharmaceutical side of Lee's business?
A. Correct.
Q. How long after -- let me ask you.
So when were -- when was Voyant first introduced to Foxhole?
A. In March of 2020.
Q. And do you remember the date when that introduction occurred?
A. I don't remember the date. I remember our salesperson handing over the introduction.
Q. When you say a salesperson, who do you mean?
A. Andrew.
Q. Andrew, last name?
A. Davis, D-a-v-i-s.
Q. And how long after that introduction before you had these introductory meetings with Paul and Lee?

Page 80

MICHAEL PARTRIDGE

A. I mean, within days.
Q. How many days? A day? Two days? Ten days?
A. I don't remember.
Q. Did you require Foxhole to make any payment prior to Voyant securing any materials to produce the hand sanitizer ordered in -- or committed to in that March LOI?
MR. PENN: Objection to form.
THE WITNESS: Say the question again.
BY MR. KORANTENG:
Q. Did you require Foxhole to make any payment prior to Voyant securing any materials to produce the hand sanitizer that Foxhole committed to order in that March LOI?
A. No.
Q. And why did you not require any payment?
A. Because we had the letter of intent.
Q. So is the letter of intent the only thing Voyant requires in order to start procuring products to manufacture -- sorry. Strike that.

Page 81

MICHAEL PARTRIDGE

Is the letter of intent the only thing that Voyant requires to procure materials to produce products for its customers?
A. Yes.
Q. Does Voyant require any application for credit prior to procuring any materials to produce products for its customers?
A. It depends on the situation.
Q. Tell me when it would require one and when it wouldn't.
A. So if there was no letter of intent, we would have to have a credit application prior to ordering any materials. With a letter of intent, the credit application can follow.
Q. Did Voyant require Foxhole to submit an application for credit after Foxhole submitted that letter of intent?
A. Yes.
Q. When did Voyant require Foxhole to submit a letter of -- to submit an application for credit?
A. I don't know the exact date. It was following the letter of intent.
Q. How did Voyant communicate that

Page 82

MICHAEL PARTRIDGE

request to Foxhole?

A. Michelle Jimenez would have sent the credit application to Lee.

Q. Asking -- well, I'm asking if that letter of -- sorry, that application would have been directed to Foxhole?

A. It was directed to Lee Ori.

Q. Why was the letter of intent -- why would the application be directed to Lee Ori?

A. Because Lee informed us that he was in process of setting up a separate LLC for Epicure.

Q. And so when the -- when that application would have been sent, would it have been sent to Foxhole or Epicure, or who did Voyant intend to complete that letter of -- that application for credit?

MR. PENN: Objection to form.

THE WITNESS: At that point, Epicure had been established, and the credit application would be through Epicure.

BY MR. KORANTENG:

Q. Do you need a break, or do you want to keep going?

Page 83

MICHAEL PARTRIDGE

A. Keep going.

MR. KORANTENG: I'm going to introduce another exhibit here. Monna or Joel, does anybody need a break or you want to keep going?

THE COURT REPORTER: If we're going to go all day, I'll need a break for lunch.

MR. KORANTENG: Let us know when you want to take that break, and then we can accommodate that.

THE COURT REPORTER: Thank you.

BY MR. KORANTENG:

Q. I just put in the chat Exhibit 3. Do you see that, Mr. Partridge?

A. Yes.

Q. I'm going to share my screen here. You want to take a look through that and then I'm going to ask you just a few questions about it, please?

A. (Indecipherable).

(The Court Reporter requested clarification.)

THE WITNESS: I just said, I'm pulling it up on my own screen, downloading

Page 84

MICHAEL PARTRIDGE

from the chat.

(Exhibit 3 was identified.)

BY MR. KORANTENG:

Q. When you're done, please let me know.

A. Okay.

Q. Okay. Do you know what this document is? Can you identify what this document is?

A. This is the "Plaintiff's responses and objections to defendants' first set of requests for production of documents."

Q. Do you know what documents were produced in response to defendants' request for production of documents?

Do you know what documents were produced by Voyant in response to defendants' request for production of documents?

A. Say the question again, please.

Q. Do you know what documents were produced by defendant -- by Voyant in response to defendants' request for production of documents?

A. I am aware that we produced a number

Page 85

MICHAEL PARTRIDGE

of documents. I couldn't speak to every document individually.

Q. Thank you.

If I represent to you that Voyant produced 3,985 pages of documents Bates labeled AWAREVOYANT, A-W-A-R-E, VOYANT, V-O-Y-A-N-T, same word, underscore, 000001 to AWAREVOYANT_003985, would you have any reason to dispute that as you sit here today?

A. I don't understand your question.

Q. My question to you is, as the person testifying on behalf of Aware -- of Voyant, if I represent to you that Voyant produced 3,985 pages Bates labeled the numbers that I read into the record, do you have any reason to dispute that that's the case today?

A. No, I do not.

Q. Okay. Thank you.

Is it your understanding that all documents responsive to defendants' request have been produced and are included in that 3,985 pages I just mentioned?

MR. PENN: Objection to form. Calls for a legal conclusion.

Page 90

MICHAEL PARTRIDGE

2  to come will be one less than what the
3  label is.
4       (Exhibit 5 was identified.)
5  BY MR. KORANTENG:
6       Q.   So this has been introduced as
7  plaintiff -- Exhibit 5, rather, sorry.
8  Exhibit 5.
9            Do you see that Mr. Partridge?
10      A.   I do.
11      Q.   Okay.  What's the date of this
12 email?
13      A.   Same date.
14      Q.   Okay.
15      A.   March 26.
16      Q.   And can you tell us what it is?
17      A.   It's an email from myself to Paul.
18      Q.   Okay.  And this is -- is this --
19 what is this follow-up, or what's the purpose
20 of this email?
21      A.   Confirming that Paul and I had a
22 conversation about hand sanitizer.
23      Q.   What did you discuss with Mr. Heslin
24 on that conversation?
25      A.   The opportunity to produce hand

Page 91

MICHAEL PARTRIDGE

2  sanitizer.
3       Q.   And if you'd be a little bit more
4  specific, what about the opportunity to produce
5  hand sanitizer that you discussed with Paul --
6  with Mr. Paul Heslin?
7       A.   That Paul was representing a company
8  looking to get into the hand sanitizer
9  business, as a follow-up to the introduction
10 from Andrew to discuss the opportunity.
11      Q.   And what company did Paul say he was
12 representing that wanted to explore
13 manufacturing hand sanitizer?
14      A.   I don't recall the company.  I just
15 recall that he was representing Lee.
16      Q.   A second ago you said he was
17 representing a company.  But now you're saying
18 he was representing Lee?
19      A.   I don't recall the company that he
20 said, but he was representing Lee Ori, which
21 was part of a company.
22      Q.   So I understand your testimony well,
23 you're saying Mr. Paul Heslin told you he's
24 representing a company that Lee Ori is part of
25 in manufacturing hand sanitizer?

Page 92

MICHAEL PARTRIDGE

2       A.   Correct.
3       Q.   Move on to the next one.  Just
4  posted another exhibit.  It's labeled
5  Exhibit 7, but it's actually going to be the
6  Depo Exhibit 6.
7            Do you see that in the chat?
8       (Exhibit 6 was identified.)
9       THE WITNESS:  I do.
10 BY MR. KORANTENG:
11      Q.   Can you tell us what this is,
12 please?
13      A.   This is an email.
14      Q.   An email from whom to whom?
15      A.   From Paul Heslin to myself.
16      Q.   And what date was that?
17      A.   Same date, March 26th.
18      Q.   So this is the same day that
19 Mr. Andrew Davis introduced Paul Heslin to you?
20      A.   Yes.
21      Q.   And on the same date, you had a
22 conversation with Paul Heslin about
23 representing the company that wants to
24 manufacture hand sanitizer?
25      A.   Yes.

Page 93

MICHAEL PARTRIDGE

2       Q.   And on the same day, he says -- can
3  you read what Paul Heslin writes to you for the
4  record, please?
5       A.   "The one thing I will need still
6  today is the formula, label language, and SDS
7  sheet and pallet configurations on the sizes.
8  What do you want in the LOI?  You have verbiage
9  you want me to use or you want me to wing it?"
10      Q.   And let me ask so I'm clear.
11           Do all -- do all your transactions
12 with your customers happen at that fast, all
13 within one day, like this?
14      MR. PENN:  Objection to form.
15      THE WITNESS:  We have product that
16   customers can buy that they can happen
17   absolutely in one day.
18 BY MR. KORANTENG:
19      Q.   When you are engaging a customer for
20 whom you're going to manufacture hand sanitizer
21 or any other product, I mean, does -- do those
22 engagements usually go this fast?
23      MR. PENN:  Objection.  Form.
24      THE WITNESS:  This was the only one
25   at the time, so I have no comparison.

TSG Reporting - Worldwide    877-702-9580

Page 98

MICHAEL PARTRIDGE

Q. But then you provided the verbiage that's down there right next to that sentence; is that correct?
A. These are the things that we would need to have in it, yes.
Q. Okay. And you suggest that they should write something to this effect in the legal entity name -- or in the legal entity name of the company that will be the customer name you sell to; is that correct?
A. Correct.
Q. At this point, had you discussed anything with Lee Ori in person?
A. No.
Q. Over the phone?
A. No.
Q. You had not talked to Lee Ori at all?
A. No.
Q. Did you not need to know who Lee Ori was if you were going to manufacture a million hand sanitizer -- a million units of 2-ounce hand sanitizer for, and that you have procured materials to do so, you did not know -- you did

Page 99

MICHAEL PARTRIDGE

not need to know who Lee Ori was?
    MR. PENN: Objection to form.
    THE WITNESS: So this was already something that had been assigned from Andrew over to us in L.A.
BY MR. KORANTENG:
Q. Okay.
A. So preliminary discussions with Paul had already occurred.
Q. Okay. And you said Paul told you he represented a company that Lee Ori was a part of; is that correct?
A. Correct.
Q. Did you ask who is Lee Ori and why is it relevant to mention his name in that conversation?
    MR. PENN: Objection to form.
    THE WITNESS: Ask the question again.
BY MR. KORANTENG:
Q. Did you ask who Lee Ori was and why it was relevant to mention his name in that conversation?
A. That was (audio distortion)

Page 100

MICHAEL PARTRIDGE

provided, yes.
    (The Court Reporter requested clarification.)
    THE WITNESS: That was information that Paul had provided, yes.
BY MR. KORANTENG:
Q. My question is, Paul provided you that information, that he represents a company that Lee Ori was a part of, was that your testimony, right?
A. Yes.
Q. And did you ask, well, who is Lee Ori and why are you mentioning his name?
    MR. PENN: Objection to form.
    THE WITNESS: I did not ask that, no, because I -- Paul had already provided.
BY MR. KORANTENG:
Q. When you say that's something that Paul had already provided, what do you mean?
A. During our conversation, Paul detailed that he was a consultant to a company looking to provide hand sanitizer. He let me know that Lee was part of that company, was part of a pharmaceutical group, and he'd

Page 101

MICHAEL PARTRIDGE

already had conversations with our upper management, as well, detailing the same.
Q. So that information was sufficient for you to move forward without asking anything else about Lee Ori?
A. Outside of our initial conversation that we had, no, that's correct.
Q. As you sit here today, it's still your testimony that you don't recall at this point whether the name of the company had been revealed to Voyant?
A. Correct, I don't recall that.
Q. Go to the next exhibit. I just put in the chat Aware Depo Exhibit 9, but this is actually going to be Exhibit 8.
    (Exhibit 8 was identified.)
BY MR. KORANTENG:
Q. Do you see that?
A. I do.
Q. Can you identify what this document is?
A. This is an email.
Q. From whom to whom?
A. From Lee Ori to Paul, myself,

Page 106

MICHAEL PARTRIDGE

A. From myself to Lee Ori, Paul Heslin, copying Dan Reilly and Sarah Simmers.

Q. Why was Mr. Reilly and Ms. Simmers copied on here?

A. They were copied on the previous email.

Q. And who did you understand Ms. Simmers and Mr. Reilly to be?

A. It was explained that Dan Reilly was sales and Sarah was more of the business office.

Q. And when was this explained to you?

A. This is part of the initial conversation with Paul Heslin.

Q. Okay. Did you talk to Dan or Sarah Simmers or Lee Ori before you -- well, first of all, before you received the LOI from Lee Ori?

A. No.

Q. Okay. So you had never had a conversation with Lee Ori before you received the LOI from him on March 26th?

A. Correct.

Q. What's the date of this email that

Page 107

MICHAEL PARTRIDGE

we have -- that is on my screen right now?

A. March 26th, 2020.

MR. KORANTENG: Again, this is Exhibit 9 for this deposition.

(Exhibit 9 was identified.)

BY MR. KORANTENG:

Q. Can you tell us what that email -- what the email states, please?

A. Subject "Re: LOI. Thanks so much, Lee. I will get the team on it. The POs are ready to go first thing in the morning. It's been quite a tumultuous supply and demand day, so very much hoping that the bottles and caps are still available. As soon as we have confirmation in the morning, I will reach out."

Q. When you write that, "very much hoping that the bottles and caps are still available," what are you talking about here?

A. So in writing this, we had a lead on bottles and caps to support the LOI. And I'm saying, I'm hoping that they're still available because things were going very quickly.

Q. And at this point -- at the point, had you discussed this particular bottles and

Page 108

MICHAEL PARTRIDGE

caps that you were hoping could support the LOI with Mr. Ori, Sarah Simmers, and Mr. Reilly?

A. No, with Paul Heslin.

Q. Paul Heslin. Okay.

You never discussed it with Lee Ori that you had a lead on certain bottles and caps that you may use to support the LOI?

A. Correct.

Q. Was there a discussion between you and Mr. Heslin or Mr. Ori -- strike that.

Was there discussion between you and Mr. Heslin or Epicure or Foxhole about needing an LOI on March 26th to be able to secure this bottles and caps that you're discussing in your email?

MR. PENN: Objection to form.

THE WITNESS: Yes.

BY MR. KORANTENG:

Q. Okay. And what was the form of that discussion?

A. That we would need the letter of intent in order to procure those bottles and caps.

Q. Okay. And did you have a discussion

Page 109

MICHAEL PARTRIDGE

about -- strike that.

I think earlier you testified that you didn't send a credit application to Foxhole because you knew that they were going to use another entity, and at that time, the entity had been set up.

At this point in -- on March 26th, 2020, had you discussed with either Paul Heslin or anybody from Epicure or Foxhole what entity was going to actually fulfill the LOI that was submitted by Foxhole?

MR. PENN: Objection to form.

THE WITNESS: I don't recall a specific discussion on that topic, no.

BY MR. KORANTENG:

Q. You don't recall ever discussing with either Mr. Heslin or Mr. Ori or anybody from Epicure, Foxhole that they were going to use a different company than the one that submitted the LOI on March 26th to fulfill their commitment in the LOI?

MR. PENN: Objection to form.

THE WITNESS: That's correct.

Page 110

MICHAEL PARTRIDGE

BY MR. KORANTENG:

Q. Okay. We're going to introduce another exhibit here. This is labeled 11. I'm going to put it in the chat here. This will be Aware Depo Exhibit 10, instead of 11.

(Exhibit 10 was identified.)

BY MR. KORANTENG:

Q. I'm going to share my screen so you can see that.

Can you see my screen, Mr. Partridge?

A. I do.

Q. Can you tell us what this is, please?

A. This is an email.

Q. An email from whom to whom?

A. From myself to Paul Heslin.

Q. And when is it dated?

A. March 31st, 2020.

Q. Can you tell me what the subject of the email is?

A. 1.2 million versus 1 million bottle of the 2-ounce.

Q. Can you tell us what the email

Page 111

MICHAEL PARTRIDGE

discusses, please?

A. It says, "Paul, bottle company has come back to us. In order to get the pricing for the million 2-ounce bottles, I need to take it in full truckloads, which is actually 1.2 million bottles. I've accepted and adjusted the caps so that they are the same to match. I'm anticipating that you would take the full 1.2 million. If not, I can easily sell to somebody else, but assumed you would take whatever I could get you. Please let me know."

Q. And would you be kind to tell us what you're discussing in terms of this 1 million versus 2 million -- sorry, 1 million versus 1.2 million in this email?

A. So the letter of intent is for one million units --

Q. By the letter of intent, are you referring to the March 26 letter of intent from Foxhole?

A. I am.

Q. And you couldn't secure the one million, but instead you found a supply for

Page 112

MICHAEL PARTRIDGE

1.2 million?

A. Correct.

Q. I'm going to introduce another exhibit here labeled Aware Depo Exhibit 12, but it's actually Exhibit 11 here. Just put it in the chat.

(Exhibit 11 was identified.)

BY MR. KORANTENG:

Q. Do you see that, Mr. Partridge?

A. Yes.

Q. You can see my screen?

A. I can.

Q. So at the top of this document, which on the bottom is labeled AWAREVOYANT_000408, is a date. Can you tell us what the date is on that?

A. April 8th, 2020.

Q. What is this document?

A. This is an email.

Q. From whom to whom?

A. From Michelle Jimenez to Paul Heslin, Lee Ori -- two emails for Lee Ori, Courtney, who's in our credit department, on copy.

Page 113

MICHAEL PARTRIDGE

Q. And what does this -- what's the purpose of this email?

A. The subject is credit application.

Q. What does the email say?

A. "Hi, Paul and Lee. As part of our new customer process, we need to have a completed credit application on file. See attached. Please review, fill out, and return to me at your earliest convenience. Thanks, Michelle."

Q. What was the reason why this email was sent?

A. We send a credit application to every new customer.

Q. So whether a customer requests credit or not, you still send them a credit application?

A. Correct.

Q. Did Mr. Heslin or Mr. Ori ask Voyant to provide it credit -- sorry, strike that.

Did Mr. Heslin or Mr. Ori ask Voyant to provide credit to either Foxhole or Epicure?

A. Yes.

Q. When did that request -- when was

```
                                              Page 114
 1                    MICHAEL PARTRIDGE
 2   that request made?
 3        A.    When they returned the credit
 4   application.
 5        Q.    When they returned the credit
 6   application, they asked for credit from Voyant?
 7        A.    Yes.
 8        Q.    Who asked for the credit?
 9        A.    Lee did.
10        Q.    Lee asked for credit from Voyant?
11        A.    Yes.
12        Q.    Did he ask on a phone call, by
13   email, or in some other document?
14        A.    In some other document.
15        Q.    Which other document?
16        A.    In the credit application.
17        Q.    So it's your testimony that by
18   completing the credit application, which you
19   sent to every customer, Lee was asking for
20   credit from Voyant?
21        A.    Yes.
22        Q.    Other than filling out the credit
23   application that you sent to every customer,
24   did Mr. Ori specifically -- or Mr. Heslin
25   specifically ask Voyant to provide either
```

```
                                              Page 115
 1                    MICHAEL PARTRIDGE
 2   Epicure or Foxhole credit?
 3        A.    Not that I'm aware of, no.
 4        Q.    I'm going to move on to this --
 5   attached to this email on page 2 is -- can you
 6   tell us what that is?
 7        A.    Yes.  It's a credit application.
 8        Q.    Did you or anyone at Voyant talk to
 9   Mr. Ori or Mr. Heslin about this application,
10   other than the email sending it?
11        A.    Not that I'm aware of, no.
12        Q.    Move on to another exhibit.
13              (Exhibit 12 was identified.)
14   BY MR. KORANTENG:
15        Q.    I just put in the chat Exhibit 12,
16   but it's actually Exhibit -- sorry.
17              MR. KORANTENG:  Monna, can you tell
18        me what exhibit I'm on?  I think I reposted
19        Exhibit 12, so...
20              (Discussion held off-the-steno
21        record.)
22   BY MR. KORANTENG:
23        Q.    So what I just put in the chat says
24   Exhibit 12 as well.  And it's a -- but it's a
25   different Exhibit 12.  So let's see.
```

```
                                              Page 116
 1                    MICHAEL PARTRIDGE
 2              So last document that I put in there
 3   is actually going to be Exhibit 12 for this
 4   deposition.
 5              Do you see that, Mr. Partridge?
 6        A.    I do.
 7        Q.    Can you identify what this is for
 8   me, please?
 9        A.    It's an email.
10        Q.    Can you identify what's on the
11   bottom -- the notation that's on the bottom of
12   the email, the Bates number?
13        A.    AWAREVOYANT_000436.
14        Q.    This is a three-page document; is
15   that correct?
16        A.    Correct.
17        Q.    It's an email from whom to whom?
18        A.    An email from Lee Ori to
19   Michelle Jimenez.
20        Q.    Copied on here is -- who is copied
21   on here?
22        A.    Paul Heslin and Courtney.
23        Q.    And there's no subject -- well, not
24   subject, but there's no content in this email;
25   is that correct?
```

```
                                              Page 117
 1                    MICHAEL PARTRIDGE
 2        A.    Correct.
 3        Q.    On page 2 of this document is a
 4   credit application; do you see that?
 5        A.    I do.
 6        Q.    Who is listed as the business
 7   information, who is listed on there?
 8        A.    Epicure Medical, LLC.
 9        Q.    Was it Voyant's intention for
10   Epicure to fill out this credit application?
11              MR. PENN:  Objection to form.
12              THE WITNESS:  We had known that Lee
13        was creating another company specific for
14        this business.
15   BY MR. KORANTENG:
16        Q.    When you say we had known, you
17   mean -- do you mean Voyant knew?
18        A.    Correct, yes.
19        Q.    And when did you know that Lee was
20   creating another company specific for this
21   business?
22        A.    I can't tell you exactly, but we
23   knew in -- during preliminary conversations
24   with Lee and Paul that they were creating a
25   separate company.
```

Page 118
MICHAEL PARTRIDGE
1
2    Q.    And you knew that that company was
3  going to be the one that was going to be used
4  for the hand sanitizer business?
5    A.    Correct.
6    Q.    Is it fair, then, to say that you
7  knew Foxhole wasn't going to be the company
8  that fulfilled the March 26 LOI that it
9  submitted?
10         MR. PENN:  Objection to form.
11         THE WITNESS:  At this point, yes.
12 BY MR. KORANTENG:
13   Q.    So I'm sorry, let me go back to this
14 credit application.  You see the business
15 information over here, at the top of the
16 application.
17         Can you tell us again which -- what
18 company is listed there?
19   A.    Epicure Medical, LLC.
20   Q.    And you testified earlier that you
21 did not discuss this application with Lee Ori
22 or Paul Heslin, or anybody else, for that
23 matter; is that correct?
24   A.    Correct.
25   Q.    Was there any point in time when

Page 119
MICHAEL PARTRIDGE
1
2  anybody from Voyant, other than you, discussed
3  this credit application with Lee Ori, do you
4  know?
5    A.    That I'm aware of, no.
6    Q.    Okay.
7    A.    Other than just needing -- that it
8  needs to be filled out.
9    Q.    Okay.  Do you -- when you sent this
10 to your customers, all your new customers, do
11 you discuss with them that you're required
12 somebody to personally guarantee the purchases
13 to be made by the company that has submitted
14 the application?
15         MR. PENN:  Objection to form.
16         THE WITNESS:  We do not go through
17    the details of the credit application with
18    them, no.
19 BY MR. KORANTENG:
20   Q.    I'm sorry, what was the last thing
21 you said?
22   A.    We do not go through the details of
23 the credit application with them, no.
24   Q.    All right.  Does Voyant require its
25 customers to provide a personal guarantee as a

Page 120
MICHAEL PARTRIDGE
1
2  course of dealing -- as a course of business?
3    A.    Yes.
4    Q.    But it doesn't discuss that personal
5  guarantee with its customers?
6    A.    Correct.
7    Q.    So if you would -- if I can direct
8  your attention to this document that we are
9  discussing.  At the bottom, terms and
10 conditions, one, two, three -- first of all,
11 let's go to the third paragraph.
12         Would you be kind to read -- I know
13 it's long, but if you indulge me, if you can
14 read that into the record for me, please?
15   A.    Sure.  Can you move your cursor,
16 please?
17   Q.    Sorry.
18   A.    "Buyer herby agrees that time shall
19 be of the essence in regard to all payments
20 provided for herein, and if any payment is not
21 made when due, buyer agrees to pay all
22 collection expenses, costs, and attorney fees
23 which may be incurred in the collection or any
24 sums due under this contract.  Buyer hereby
25 also waives the benefit of any statute of

Page 121
MICHAEL PARTRIDGE
1
2  limitation which would outlaw this obligation
3  and the benefit of any exemption statute,
4  including Section 690 of the Code of Civil
5  Procedure, and such waiver shall apply to any
6  judgment secured thereon."
7    Q.    Thank you.
8          Would be kind to tell me what the
9  reference Section 690 of the Code of Civil
10 Procedure is to?
11   A.    I'm -- I'm not able to, no.
12   Q.    Okay.  Does it refer to any
13 particular state's code of civil procedure?
14   A.    I still can't answer the question.
15   Q.    What do you mean you can't answer
16 the question?  You don't know?
17   A.    Correct.
18   Q.    And then on the next line, can you
19 read what that states for me, please?
20   A.    "The undersigned, by this credit
21 application agreement, does continually
22 personally guarantee payment for all goods and
23 merchandise purchased by the applicant."
24   Q.    Okay.  When you have your customers
25 sign this, do you draw their attention to this

Page 122

```
 1                 MICHAEL PARTRIDGE
 2   particular clause that, hey, by signing this,
 3   you're personally guaranteeing the purchases by
 4   the company that's applying for credit?  Or
 5   that -- sorry, go ahead.
 6       A.     I do not.
 7       Q.     No, you do not.
 8              I see that at the top of this
 9   document, in the business information section
10   is an amount requested; do you see that?
11       A.     I do.
12       Q.     And in this case, what is stated?
13       A.     Amount requested $500,000.
14       Q.     Do you also see on the left side of
15   that -- this document where it states, "How
16   long in business?"
17       A.     Yes.
18       Q.     And what is the answer to that?
19       A.     One month, new entity for this
20   business.
21       Q.     On the bottom -- or in the middle,
22   rather, there are some trade references; do you
23   see that?
24       A.     I do.
25       Q.     Who are the trade references listed
```

Page 123

```
 1                 MICHAEL PARTRIDGE
 2   on this application?
 3       A.     It looks like C-o-a-m-e [sic], Tech,
 4   LLC; Salus Medical; Global Medical Source.
 5       Q.     Let me ask you, when Voyant obtains
 6   these completed credit applications from its
 7   customers, what does it do with it?
 8       A.     We would check their trade
 9   references to determine what the most
10   appropriate credit or payment terms would be
11   applicable for each customer.
12       Q.     So you -- Voyant would check with,
13   in this case, CosmeTech, LLC, Salus Medical,
14   and Global Medical Source; is that correct?
15       A.     Correct.
16       Q.     How about the bank information
17   section, do you -- can you tell me what is
18   listed in this bank information section just --
19   just the name of the bank?
20       A.     Unfortunately, a little fuzzy.  But
21   it looks like --
22       Q.     Let me see if I can -- is that
23   better?
24       A.     Carrollton Bank.
25       Q.     And what does Voyant do with that
```

Page 124

```
 1                 MICHAEL PARTRIDGE
 2   information once it gets this credit
 3   application?
 4       A.     At this point, nothing.
 5       Q.     Okay.  Do you check the bank to make
 6   sure that whatever they put here is -- is this
 7   one -- is this another point of reference that
 8   you check before deciding to offer credit --
 9       A.     No.
10       Q.     -- or payment terms?  No.  Okay.
11              So other than the trade references,
12   what else does Voyant do with this credit
13   application before it decides to offer credit
14   or payment terms?
15       A.     If applicable, we'll run a Dun &
16   Bradstreet on the customer as a new customer
17   that wouldn't provide any information.
18       Q.     Did Voyant in this case contact
19   CosmeTech, LLC?
20       A.     I can't presume.  I do not know.
21       Q.     How about Salus Medical?
22       A.     Same answer.
23       Q.     And Global Medical Source?
24       A.     Same answer.
25       Q.     As you sit here today, you can't
```

Page 125

```
 1                 MICHAEL PARTRIDGE
 2   tell whether Voyant contacted any one of these
 3   companies are not?
 4       A.     Correct.
 5       Q.     Does Voyant always check the
 6   references, the trade references, before
 7   deciding to offer credit?
 8       A.     No.
 9       Q.     It doesn't?
10       A.     No.
11       Q.     Under what circumstances would
12   Voyant not check the trade references before
13   deciding whether to offer credit or not?
14       A.     If we had predetermined that we
15   would not be offering credit, we would not
16   check trade references.
17       Q.     Did you make that determination in
18   this case?
19       A.     Yes.
20       Q.     So Voyant decided it wasn't going to
21   offer Epicure credit; is that correct?
22       A.     We did not offer them a credit
23   limit, no.
24       Q.     I'm sorry.  So I understand, you
25   didn't offer them any credit; is that correct?
```

Page 126

MICHAEL PARTRIDGE

A. We did not offer them a dollar value of credit, no. As part of their payment terms, yes.

Q. What's the distinction? You said if you decide you weren't going to offer credit, then you don't check the trade references.

Was that your testimony?

A. Correct.

Q. Okay. And in this case, you didn't check the trade references; is that correct?

A. I said I don't know.

Q. Okay. So when you say you did not offer them a credit limit, what do you mean by that?

A. A credit limit would allow you to purchase up to that limit without any deposits.

Q. And so are you saying that you offered Epicure Medical unlimited credit?

MR. PENN: Objection to form.

THE WITNESS: We did not authorize them a credit limit, no.

BY MR. KORANTENG:

Q. Did you authorize them to order anything without making any deposits -- up to

Page 127

MICHAEL PARTRIDGE

any amount at all without making any deposits?

A. No.

Q. Is it fair to say, then, that you did not authorize any credit for them, then?

A. No.

Q. It's not fair to say that?

A. Correct.

Q. What credit did you offer them?

A. Their payment terms had a 10-day window at the end.

Q. Are you equating payment terms to credit?

A. Yes.

Q. When you offer your customers payment terms, do you -- do you make that determination on the basis of the credit application?

A. Not necessarily, no.

Q. What do you base that off of?

A. It's a group decision from the executive and sales.

Q. In this case, what specifically did the executive and sales decide as far as what to offer -- what to offer Epicure Medical, LLC?

Page 128

MICHAEL PARTRIDGE

A. Their terms, 25 percent down, 50 percent prior to shipping, 25 percent, net 10.

Q. And you are saying that was based on this credit application?

MR. PENN: Objection. Misstates testimony.

THE WITNESS: No.

BY MR. KORANTENG:

Q. It wasn't based on this credit application?

A. No.

Q. Okay. I asked you this as a general question to -- relating to all customers, but I'm going to ask you specifically.

Did you or anybody discuss with Mr. Ori that by signing this application on behalf of Epicure, that he was personally guaranteeing payment for all goods and merchandise purchased by the applicant?

A. No.

Q. Did you or anybody at Voyant discuss with Mr. Ori that you are basing any credit decisions that you make, if any, on the fact

Page 129

MICHAEL PARTRIDGE

that he is signing this credit application?

MR. PENN: Objection to form.

THE WITNESS: You'll have to repeat the question, please.

BY MR. KORANTENG:

Q. Did you or anybody at Voyant discuss with Mr. Ori that you are basing any credit decisions that you make, if any, on the fact that he is signing this credit application?

MR. PENN: Objection to form.

THE WITNESS: Not that I'm aware of, no.

BY MR. KORANTENG:

Q. Let me ask you -- sorry, let me put this back up again.

Has Voyant ever filed a lawsuit against any of its customers enforcing this credit application and agreement?

A. Not that I'm aware of, no.

Q. Has any Voyant customer defaulted on its obligations under circumstances where Voyant offered credit based on this credit application?

MR. PENN: Objection to form.

```
                                                                    Page 226
 1                    C E R T I F I C A T E
 2              I, MONNA J. NICKESON, CCR, CSR, CLR, RPR,
 3     CRR, the undersigned Certified Court Reporter,
 4     authorized to administer oaths and affirmations in and
 5     for the states of Washington (3322), Oregon (16-0441),
 6     Idaho (1045), and California (14430), do hereby
 7     certify:
 8              That the sworn testimony and/or proceedings,
 9     a transcript of which is attached, was given before me
10     at the time and place stated therein; that the witness
11     was duly sworn or affirmed to testify to the truth;
12     that the testimony and/or proceedings were
13     stenographically recorded by me and transcribed under
14     my supervision.  That the foregoing transcript contains
15     a full, true, and accurate record of all the testimony
16     and/or proceedings occurring at the time and place
17     stated in the transcript; that a review of which was
18     not requested; that I am in no way related to any party
19     to the matter, nor to any counsel, nor do I have any
20     financial interest in the event of the cause.
21     IN WITNESS WHEREOF I have set my hand on
22     April 18, 2022.
23     _____
       Monna J. Nickeson
24     MONNA J. NICKESON, CCR, CSR, CLR, RPR, CRR
25
```

```
                                                                    Page 227
 1     NAME OF CASE:
 2     DATE OF DEPOSITION:
 3     NAME OF WITNESS:
 4     Reason Codes:
 5          1.   To clarify the record.
 6          2.   To conform to the facts.
 7          3.   To correct transcription errors.
 8     Page _____ Line _____ Reason _____
 9     From _____ to _____
10     Page _____ Line _____ Reason _____
11     From _____ to _____
12     Page _____ Line _____ Reason _____
13     From _____ to _____
14     Page _____ Line _____ Reason _____
15     From _____ to _____
16     Page _____ Line _____ Reason _____
17     From _____ to _____
18     Page _____ Line _____ Reason _____
19     From _____ to _____
20     Page _____ Line _____ Reason _____
21     From _____ to _____
22     Page _____ Line _____ Reason _____
23     From _____ to _____
24
25                              _____
```