1                    MICHAEL PARTRIDGE

2              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MISSOURI
3                    EASTERN DIVISION

4   AWARE PRODUCTS LLC D/B/A          )
    VOYANT BEAUTY,                     )
5                                      )
                 Plaintiff,            )
6                                      )
                 vs.                   )   NO. 4:21-CV-249-JCH
7                                      )
    EPICURE MEDICAL, LLC,              )
8   FOXHOLE MEDICAL, LLC, and          )
    LEE ORI,                           )
9                                      )
                 Defendants.           )
10

11

12


13      REMOTE DEPOSITION UPON ORAL EXAMINATION OF

14                 MICHAEL PARTRIDGE

15


16              TUESDAY, APRIL 5, 2022
                    9:37 A.M.
17


18      (All participants are appearing remotely)

19


20

21

22


23


24   REPORTED BY:
     MONNA J. NICKESON, CLR, RPR, CRR, CCR NO. 3322
25   JOB:  209371

EXHIBIT

tabbies

2

1              MICHAEL PARTRIDGE

2    request to Foxhole?

3         A.    Michelle Jimenez would have sent the

4    credit application to Lee.

5         Q.    Asking -- well, I'm asking if that

6    letter of -- sorry, that application would have

7    been directed to Foxhole?

8         A.    It was directed to Lee Ori.

9         Q.    Why was the letter of intent -- why

10   would the application be directed to Lee Ori?

11        A.    Because Lee informed us that he was

12   in process of setting up a separate LLC for

13   Epicure.

14        Q.    And so when the -- when that

15   application would have been sent, would it have

16   been sent to Foxhole or Epicure, or who did

17   Voyant intend to complete that letter of --

18   that application for credit?

19             MR. PENN:  Objection to form.

20             THE WITNESS:  At that point, Epicure

21        had been established, and the credit

22        application would be through Epicure.

23   BY MR. KORANTENG:

24        Q.    Do you need a break, or do you want

25   to keep going?

```
 1                    MICHAEL PARTRIDGE

 2        Q.    And what -- this is page 2 of the

 3   document -- of the three-page document; is that

 4   correct?

 5        A.    Correct.

 6        Q.    Can you tell us what this is?

 7        A.    This is the letter of intent.

 8        Q.    From whom to who?

 9        A.    From Foxhole Medical to

10   Michael Partridge from Lee Ori.

11        Q.    Can you read what the letter of

12   intent says, please?

13        A.    March 26th, 2020, to myself, Re:

14   Letter of Intent 2-ounce Gel Formula Alcohol

15   Sanitizer.

16              "Michael, we are committed to of

17   purchasing 1 million units of 2-ounce hand

18   sanitizer at turnkey price of 93 cents per unit

19   FOB our dock Chatsworth, California.  This

20   letter of intent intended for you to

21   immediately procure the bottles and caps prior

22   to a formal purchase order.  Sincerely,

23   Lee Ori."

24        Q.    And at the time when this was

25   submitted, who did you understand that Lee Ori
```

```
 1                    MICHAEL PARTRIDGE

 2        A.     Correct.

 3        Q.     On page 2 of this document is a

 4   credit application; do you see that?

 5        A.     I do.

 6        Q.     Who is listed as the business

 7   information, who is listed on there?

 8        A.     Epicure Medical, LLC.

 9        Q.     Was it Voyant's intention for

10   Epicure to fill out this credit application?

11             MR. PENN:  Objection to form.

12             THE WITNESS:  We had known that Lee

13        was creating another company specific for

14        this business.

15   BY MR. KORANTENG:

16        Q.     When you say we had known, you

17   mean -- do you mean Voyant knew?

18        A.     Correct, yes.

19        Q.     And when did you know that Lee was

20   creating another company specific for this

21   business?

22        A.     I can't tell you exactly, but we

23   knew in -- during preliminary conversations

24   with Lee and Paul that they were creating a

25   separate company.
```

```
 1                    MICHAEL PARTRIDGE

 2        Q.      And you knew that that company was

 3   going to be the one that was going to be used

 4   for the hand sanitizer business?

 5        A.      Correct.

 6        Q.      Is it fair, then, to say that you

 7   knew Foxhole wasn't going to be the company

 8   that fulfilled the March 26 LOI that it

 9   submitted?

10             MR. PENN:  Objection to form.

11             THE WITNESS:  At this point, yes.

12   BY MR. KORANTENG:

13        Q.      So I'm sorry, let me go back to this

14   credit application.  You see the business

15   information over here, at the top of the

16   application.

17             Can you tell us again which -- what

18   company is listed there?

19        A.      Epicure Medical, LLC.

20        Q.      And you testified earlier that you

21   did not discuss this application with Lee Ori

22   or Paul Heslin, or anybody else, for that

23   matter; is that correct?

24        A.      Correct.

25        Q.      Was there any point in time when
```

1                   MICHAEL PARTRIDGE

2        A.    We did not offer them a dollar value

3   of credit, no.  As part of their payment terms,

4   yes.

5        Q.    What's the distinction?  You said if

6   you decide you weren't going to offer credit,

7   then you don't check the trade references.

8              Was that your testimony?

9        A.    Correct.

10       Q.    Okay.  And in this case, you didn't

11  check the trade references; is that correct?

12       A.    I said I don't know.

13       Q.    Okay.  So when you say you did not

14  offer them a credit limit, what do you mean by

15  that?

16       A.    A credit limit would allow you to

17  purchase up to that limit without any deposits.

18       Q.    And so are you saying that you

19  offered Epicure Medical unlimited credit?

20             MR. PENN:  Objection to form.

21             THE WITNESS:  We did not authorize

22       them a credit limit, no.

23  BY MR. KORANTENG:

24       Q.    Did you authorize them to order

25  anything without making any deposits -- up to

1                    MICHAEL PARTRIDGE

2    any amount at all without making any deposits?

3        A.    No.

4        Q.    Is it fair to say, then, that you

5    did not authorize any credit for them, then?

6        A.    No.

7        Q.    It's not fair to say that?

8        A.    Correct.

9        Q.    What credit did you offer them?

10       A.    Their payment terms had a 10-day

11   window at the end.

12       Q.    Are you equating payment terms to

13   credit?

14       A.    Yes.

15       Q.    When you offer your customers

16   payment terms, do you -- do you make that

17   determination on the basis of the credit

18   application?

19       A.    Not necessarily, no.

20       Q.    What do you base that off of?

21       A.    It's a group decision from the

22   executive and sales.

23       Q.    In this case, what specifically did

24   the executive and sales decide as far as what

25   to offer -- what to offer Epicure Medical, LLC?

                    MICHAEL PARTRIDGE

1

2       A.      This is an internal lab at Voyant.

3       Q.      So when you say, "We received a new

4   alcohol sample today.  It smelled just fine,

5   which is amazing.  I've overnighted it to a lab

6   to do the testing for aldehydes, methanol,

7   benzene, and other impurities."

8               You're referring to a lab that you

9   own?

10      A.      Correct.

11      Q.      Where is that located?

12      A.      In Chicago.

13      Q.      What was the result of this testing

14  that was done?  Did you catch my question,

15  Mr. Partridge?

16      A.      I did.

17      Q.      Okay.  Sorry.  Sorry, I thought

18  maybe it didn't come through.

19      A.      So we were testing a number of

20  alcohol suppliers.  I can't say from this email

21  which supplier this was, as there were multiple

22  suppliers that we were doing testing for.

23      Q.      On May 21st of 2020, in this email

24  you are -- it sounded like you are talking

25  about a particular sample.

1              MICHAEL PARTRIDGE

2         THE WITNESS:  So I'll go back to the

3    timing.  I don't remember if the initial

4    purchase orders were Epicure or if they

5    were Foxhole.  If we'd been given notice

6    already that Epicure was ready to go, it

7    would be to Epicure.

8  BY MR. KORANTENG:

9         Q.    Okay.

10        A.    If not, it would be Foxhole.  Either

11  way, an email would go to Lee Ori at Foxhole.

12        Q.    Okay.  I appreciate that.

13             So my question is, regardless of

14  where you sent the email, the purchase orders

15  were directed to an entity; is that correct?

16        A.    Correct.

17        Q.    And that would have been either

18  Foxhole or Epicure; is that correct?

19        A.    Correct.

20        Q.    Did you manufacture any products

21  with Foxhole name on it?

22        A.    No.

23        Q.    Did you ship anything in terms of

24  any hand sanitizer that you produced to Foxhole

25  Medical, LLC?

1                MICHAEL PARTRIDGE

2    purchase orders are listed on Exhibit 2 as

3    well?

4                MR. PENN:  Objection to form.

5    BY MR. KORANTENG:

6        Q.    I'm going withdraw that question.

7    Let me ask a better question.  Only if I can

8    navigate this thing.

9                Is it fair to say that these

10   purchase orders that we're looking at in

11   Exhibit 2 all came from Epicure?

12       A.    Yes.

13       Q.    Okay.  And I know you said earlier

14   that there may have been a small purchase order

15   for some sort of administrative fee or

16   something.

17               But as you sit here today, you can't

18   say that that came from Foxhole Medical, LLC,

19   can you?

20       A.    I cannot.

21       Q.    Having looked at Exhibit 22 and come

22   back to refer to Exhibit 2, can you now answer

23   the question as to whether you received any

24   purchase orders from Foxhole Medical, LLC?

25       A.    Yes.

1                    MICHAEL PARTRIDGE

2        Q.      You can?   What's your answer?

3        A.      We did not.

4        Q.      Okay.   Thank you.

5               MR. KORANTENG:  All right.  Can we

6        take a very short break, five minutes?  Let

7        me see -- go through my notes real quick

8        and see what I have left real quick.  And

9        then when we come back, I'm sure that I

10       will get to the end of my questioning.

11              MR. PENN:  That's fine with me.

12              THE VIDEOGRAPHER:  Okay.  Going off

13       the record.  The time is 3:39.

14              (A recess was taken.)

15              THE VIDEOGRAPHER:  We're back on the

16       record.  The time is 3:50.

17   BY MR. KORANTENG:

18       Q.      Mr. Partridge, I just posted in the

19   chat Aware Depo Exhibit 29.  It would be this

20   deposition's Exhibit 23.

21              (Exhibit 23 was identified.)

22   BY MR. KORANTENG:

23       Q.      Share my screen so you can see it as

24   well.

25              Can you see my screen?

Page 190

```
 1                    MICHAEL PARTRIDGE
 2    be not, is that what you're saying?
 3               MR. PENN:  Objection.  Asked and
 4        answered.
 5               THE WITNESS:  I do not know.
 6    BY MR. KORANTENG:
 7        Q.    As we're going through this, did you
 8    see any of these invoices that was directed at
 9    Foxhole Medical, LLC?
10        A.    No.
11        Q.    Did Voyant send any invoices to
12    Foxhole Medical, LLC?
13        A.    Not that I'm aware of.
14        Q.    You testified earlier that one of
15    your -- one element of your damages was bottle
16    materials that -- materials that you guys could
17    not -- could not be returned.
18               Do you recall that testimony?
19        A.    Yes.
20        Q.    What was -- what were those bottled
21    materials?
22        A.    They were bottles to put the product
23    in.
24        Q.    What do they comprise of, bottles,
25    caps, what?
```