Page 1

1                       L. Ori

2         UNITED STATES DISTRICT COURT

3        EASTERN DISTRICT OF MISSOURI

4             EASTERN DIVISION

**EXHIBIT 11**

5  AWARE PRODUCTS LLC D/B/A   )
   VOYANT BEAUTY,                 )
6                                  )
             Plaintiff,  )
7                                  )
        vs.              )   No. 4:21-cv-249-JCH
8                                  )
   EPICURE MEDICAL, LLC,       )
9  FOXHOLE MEDICAL, LLC, and  )
   LEE ORI,                       )
10                                 )
             Defendants. )

11

12   REMOTE VIDEOTAPED DEPOSITION OF LEE ORI

13            March 24, 2022

14

15

16

17

18

19

20  Reported by:

21  KATHY S. KLEPFER, RMR, RPR, CRR, CLR

22

23

24

25  JOB NO. 208140

Page 167

1       L. Ori

2       Let me just see.  Yep, okay.  So now I am on

3   to Exhibit 16.

4           (Ori Exhibit 16, Document entitled,

5       "Promissory Note," Bates-stamped

6       Bates-stamped DEF4737 to DEF4740, marked for

7       identification, as of this date.)

8   BY MR. GUNNELL:

9       Q.    And that will be -- okay.  I have put

10  on the screen what will be Exhibit 16, and that

11  was provided by your counsel.  It's

12  Bates-stamped DEF4737 to DEF4740.

13          It's entitled:  "Promissory Note."

14          Do you see that?

15      A.    Yes, sir.

16      Q.    What is this?

17      A.    It was a -- it was a loan that was

18  made to Epicure.  As -- as we were trying to

19  grow the business, the -- the larger companies

20  that we worked with, such as Albertsons,

21  800-pound guerillas that wanted product were

22  unwilling to provide us with the deposits that

23  we needed in order to continue to organically

24  grow the business the way I described initially.

25          And, you know, their payment terms

```
                                                        Page 168
1                    L. Ori
2    varied of what they were willing to do.  Most of
3    them didn't want to pay for the product until it
4    hit their dock, so we had to have capital in the
5    business in order to -- to pay Voyant for the
6    product.  At that point would have been, my
7    recollection, 75 percent in order for us to
8    receive the payment when it hits the dock for us
9    to then pay the other 25 percent plus profit.
10            So, as we grew and took on other
11   customers, we -- we looked for funding from a
12   number of sources.
13       Q.   And so this is -- it says the amount
14   is $335,000, right?
15       A.   Yes.
16       Q.   And it says that it's to pay to the
17   order of Lee Eric Ori as lender.
18            That's you, right?
19       A.   Yes.
20       Q.   And it was, what, a three-month loan
21   made June, July, August, basically a three-month
22   loan?
23       A.   Correct.
24       Q.   And did you make this loan?
25       A.   I did.
```

Page 169

1            L. Ori

2    Q.   Where did the funds come from?

3    A.   From my trust account.

4    Q.   And were you paid back?

5    A.   I was.

6    Q.   Were you paid back on the maturity

7    date?

8    A.   I don't know the date that I was paid

9    back.  It was -- it was on or before the

10   maturity date.

11   Q.   And the -- and the funds were paid

12   back to the trust account?

13   A.   Correct.

14   Q.   And what's the nature of that trust?

15   A.   My -- mine and my wife's living trust

16   account.

17   Q.   And who's the trustee?

18   A.   Myself and my wife.

19   Q.   And so it's an inter vivos trust?

20   A.   As -- as I recall.  I -- I'm not --

21   certainly not a trust expert.

22   Q.   Sure.

23   A.   And nor do I have the documents in

24   front of me.

25   Q.   Understand.

Page 170

```
 1                    L. Ori
 2       A.    So...
 3       Q.    Did you receive a interest payment for
 4   this loan?
 5       A.    I did.
 6       Q.    And that was what's shown here, the
 7   $25,125?
 8       A.    Yes, sir.
 9       Q.    How do you come up with the interest
10   rate, 7.5 percent?
11       A.    We had spoken with numerous --
12   numerous money -- money lenders, and anywhere
13   from banking institutions to private equity
14   to -- to any number of things, you know, and
15   ultimately we -- we were presented with a -- a
16   contract.
17             The only -- the only person that we
18   got to agree to -- or I shouldn't say person.
19   The only company or entity that was willing to
20   loan to us was at that -- that rate.  That was
21   the rate that they charged -- that they wanted
22   to charge us for -- for the money that we would
23   borrow from them.  And they were essentially
24   financing our receivables and -- and they were
25   going to factor our receivables at a 7.5 percent
```

Page 171

1        L. Ori

2   interest rate.

3        Q.   In other words, you would pay a 7.5

4   percent on the amount borrowed plus a percentage

5   of receivables?

6        A.   No.  No.  It was 7.5 percent on the

7   money borrowed, but they would only let us

8   borrow what we had purchase orders for.

9        Q.   Uh-huh.

10       A.   So if we had purchase orders for a

11  million dollars, they would let us borrow a

12  million dollars and we would pay 7.5 percent --

13  a rate of 7.5 percent flat rate for borrowing

14  that money.

15       Q.   I see.

16       A.   So we would have to repay 1 million

17  plus 7.5 percent.

18       Q.   And is there a reason why you

19  ultimately chose to make this loan and not go

20  with that company?

21       A.   We ultimately did go with that

22  company, and then they -- they proceeded to

23  not -- not lend to us.  Took our money and

24  didn't lend, and we attempted to sue them for --

25  for that, and the -- the gentleman that was in

Page 222

1                    L. Ori
2    A.   So I only assume I replied all.
3    Q.   Got it. Okay.
4         So you say here, "We also need to
5    distribute funds to the partners this week."
6         What did you mean by that?
7    A.   Do a distribution to -- to the three
8    members.
9    Q.   What was the process for that?
10   A.   If you scroll down at the bottom,
11   it -- you know, Dan -- basically, you know,
12   we -- this was our -- substantially our
13   full-time job. You know, Dan -- Dan had
14   expressed, you know, concern to me that, you
15   know, he needed -- he needed money to live. We,
16   you know, by the nature of our partnership, we
17   couldn't take salaries and we could only take
18   distributions.
19        We took very bare minimum
20   distributions to essentially support our life,
21   to live off of.
22        You can see where I asked Dan, "What
23   do you need...? You indicated $3,000. Is that
24   enough? Please advise Linda so she can
25   schedule." You know, we have-- we have met, we

```
                                                      Page 223
 1                         L. Ori
 2    are in agreement, please let Linda know the very
 3    bare minimum that you need to survive.  Is
 4    $3,000 enough?  And that's -- that's what we
 5    distributed to the partners as a result.
 6        Q.    In other words, as a result of this,
 7    $3,000 went to yourself, $3,000 went to Dan, and
 8    $3,000 went to Ms. Simmers?
 9        A.    Correct.
10        Q.    And did you have any schedule upon
11    which distributions were made?
12        A.    We did not.
13        Q.    No?
14        A.    Go ahead.
15        Q.    I didn't hear your answer.  I'm sorry.
16        A.    We -- we did not have a schedule.
17    The -- the schedule was -- there wasn't one, no.
18        Q.    And how did distributions come about?
19              MR. KORANTENG:  Objection.  The
20        question is vague.  Can you -- can you
21        rephrase that?
22        Q.    What prompted you to make
23    distributions when you made them?
24        A.    We -- we met as a group and, you know,
25    as you probably know, there were only five or
```

Page 224

1          L. Ori
2  six total distributions made.  It was a
3  combination of availability of -- of funds
4  and -- and, you know, the perceived liabilities
5  at that time and, you know, quite honestly,
6  necessity.  You know, in this case, necessity.
7      Q.    And do you recall how many
8  distributions were made in 2020?
9      A.    Five or six.
10     Q.    And do you recall how many --
11     A.    I don't recall the exact number.
12           Sorry.  Go right ahead, sir.
13     Q.    Do you recall roughly the total?
14     A.    $43,000 per member.
15     Q.    And would that -- that amount was --
16 just happened to be the sum of what the
17 distributions were?  It wasn't a predetermined
18 amount that you would get X amount over the
19 year?
20     A.    It was not a predetermined value, no,
21 sir.
22     Q.    And were the five or six
23 distributions, were they equal amount or varying
24 amounts?
25     A.    I believe there were four, four

Page 279

1        L. Ori

2    Q.    Okay.  Were you, Lee Ori, asked to
3  personally guarantee purchases made by Epicure?
4    A.    No.
5    Q.    In fact, earlier when you were
6  discussing with opposing counsel, he asked if
7  you knew this line was in this credit
8  application.
9          Do you recall that testimony?
10   A.    I do.
11   Q.    And your answer was?
12   A.    I was unaware of that line being in
13 that document.
14   Q.    Okay.  All right.
15         When you signed that credit
16 application, who were you signing it on behalf
17 of?
18   A.    As a manager of Epicure.
19   Q.    Okay.
20   A.    And Fibbens, can I add one more thing
21 there without you beating me?
22   Q.    I'll kill you later.
23   A.    Well, specifically, the -- the --
24 the -- there was an e-mail sent from Michael
25 Partridge to -- to me regarding the -- that if