**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AWARE PRODUCTS LLC D/B/A VOYANT BEAUTY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Case No. 4:21-cv-00249-SEP |
| | ) | |
| EPICURE MEDICAL LLC, et al., | ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER**

Before the Court are Plaintiff and Defendants' Motions for Summary Judgment. Docs. [98], [101]. The motions are fully briefed and ready for disposition. Docs. [99], [105], [108], [111], [113], [114]. For the reasons set forth below, Plaintiff's Motion for Summary Judgment is granted in part and denied in part, and Defendants' Motion for Summary Judgment is granted in part and denied in part.

### THE PARTIES

Plaintiff Voyant Beauty is a limited liability company that supplies personal care and beauty products. Doc. [112] ¶ 11. Defendant Epicure Medical, LLC, is a limited liability company that sells alcohol-based hand sanitizer and personal protective equipment for distribution to its customers. *Id*. ¶ 2. Epicure's members include Defendants Clover Leaf Strategies, LLC, and PFL Investments, LLC. *Id*. ¶ 1. Defendants Lee Ori and Sarah Simmers are members and beneficial owners of PFL, and Defendant Dan Reilly is a member and beneficial owner of Clover Leaf. *Id*. ¶¶ 4, 7. Through their respective memberships, Ori, Simmers, and Reilly are the beneficial owners of Epicure; they are also the managers of Epicure. *Id*. ¶¶ 5, 6, 8, 9. Defendant Foxhole Medical, LLC, is a limited liability company managed by Ori and Simmers. Doc. [109] ¶ 15. Defendant Neo Health, LLC, is Ori's single-member LLC. Doc. [112] ¶ 60. And Defendants Ori and Jaclyn C. Ori are the co-trustees of the Lee E Ori & Jaclyn C Ori Living Trust. *Id*. ¶ 54.

### FACTS AND BACKGROUND[1]

This dispute is about a contract dating from the early days of the COVID-19 pandemic.  On March 26, 2020, Ori submitted a letter of intent ("March LOI") on Foxhole letterhead stating, "We are committed to purchasing 1 million units of 2-ounce hand sanitizer at turnkey price of 93 cents per unit FOB our dock Chatsworth, California.  This letter of intent [sic] intended for you to immediately procure the bottles and caps prior to a formal purchase order."  Docs. [109] ¶ 18; [110-7] at 2.  Voyant employee Michael Partridge had told Paul Heslin, a consultant working with Ori, that the March LOI should be in the "legal entity name of the company that will be the customer name we sell to."  Doc. [110-1] at 2.  Partridge confirmed receipt of the March LOI and told Ori that he "would get the Team on it, the PO's are ready to go first thing in the morning."  Doc. [110-2] at 2.  Because Ori had sent the March LOI, Partridge testified that Foxhole was not required to make any payments before Plaintiff secured materials to produce the hand sanitizers.  Doc. [110-10] at 5.  On March 31, 2020, Partridge provided Heslin with an update on the bottles and caps:  "Bottle company has come back to us.  In order to get the pricing for the million 2 oz bottles, I need to take it in full truckloads which is actually 1.2m bottles.  I've accepted and adjusted the caps so that they are the same to match.  I'm anticipating that you would take the full 1.2 million.  If not I can easily sell to somebody else, but assumed you would take whatever I could get you."  *See* Doc. [110-6] at 2.  Heslin responded, "[Y]ou are correct in your assumption."  *Id*.

During this same time, Ori was in the process of setting up Epicure.  Doc. [100-2] at 2.  While Simmers had a full-time job as a pharmacist, Doc. [104-28] at 19-20, Ori testified that "100 percent of [his and Reilly's] attention was devoted to Epicure."  Doc. [104-27] at 19.  Simmers testified that she handled infrastructure; Ori handled business development and procurement; and Reilly handled sales.  Doc. [104-28] at 35.  On April 1, 2020, Voyant Vice President Michelle Jimenez sent Heslin and Ori an email stating that she looked forward to assisting on the "**Epicure Medical** account" and asked that they complete a new customer questionnaire.  Doc. [109] ¶ 19.  A little over a week later, Partridge sent another email to Heslin updating him on the bottles and caps ordered.  *See* [110-5] at 2 ("We should

---

[1] Unless otherwise noted, the facts in this section are not disputed.

have components to support the first 100,000 units on Thursday and into production on Friday . . . [and p]roduction [would] keep flowing from there as the remainder of the components arrive."). In that same email, Partridge also proposed the following payment terms: "25% with Purchase Order. For the 2oz bottles, we can split into two Orders of 600,000. One to be submitted asap, and one two weeks out. 50% with shipment. 25% due in 10 business days." Docs. [109] ¶ 20; [100-9]. Partridge stated, "Let me know on the terms and we can get an official purchase order in for the first 600,000 finished goods. I would need a PO and payment for the first 25% of the 600,000 processed Monday / Tuesday." Docs. [109] ¶ 21; [100-9]. On April 13, 2020, Epicure followed up with a purchase order for 600,000 bottles. Doc. [109] ¶ 23. At this point, Plaintiff was aware that Epicure, not Foxhole, would be submitting the purchase orders. *Id.* ¶ 25. Foxhole would never submit any purchase orders, and every invoice and sales confirmation sent by Plaintiff stated that the goods were being sold and shipped to Epicure. *Id.* ¶¶ 26-27. Around this same time, Ori also signed a form titled "Credit Agreement and Application." Doc. [100-12]. The Credit Agreement provided that "[t]he undersigned, by this credit application agreement, does continually personally guarantee payment for all goods and merchandise purchased by the applicant." *Id.*

Between April and June 2020, Epicure sent multiple purchase orders to Plaintiff for finished hand sanitizer bottles. Docs. [112] ¶ 21; [104-1] at 2-7. And in response to the purchase orders, Plaintiff produced and shipped the hand sanitizers to a pre-designated warehouse in California. *See* Docs. [104-3]; [103] ¶¶ 8-9. Ori testified that Epicure would pay a trucking company to retrieve the product from the warehouse and deliver it to the customer. Doc. [104-27] at 14-15. He confirmed that Epicure had custody of the hand sanitizers once they were delivered to the California warehouse. *Id.* at 14. Reilly also confirmed the arrangement in his deposition.

Q. Do you know if there was ever any term that required Voyant to ship hand sanitizer products to Epicure in St. Louis?

A. They -- they shipped samples to us. I don't believe that we ever had sanitizer on hand because we can't receive it at our location.

Q. Correct. Okay. That's my understanding also. So the fact that it's at a warehouse in California doesn't particularly matter about whether Epicure possessed it. It had

3

it as available inventory -- had the hand sanitizer as available inventory, isn't that right?

A. Correct, if we would have been able . . . to move the product, it was ready to go.

Q. Because it was Epicure's product, correct?

A. Epicure -- Epicure's product was in California, yes. I guess if that's what you're asking, yes, there was product in California that was -- that was considered Epicure's that was paid for.

Doc. [115-2] at 6.

On May 8, 2020, Ori loaned Epicure $335,000 from his trust, Lee. E. Ori & Jaclyn C. Ori Living ("Ori Trust"). Docs. [109] ¶ 34; [100-11] at 3-4; [100-13]. It was a three-month loan with a 7.5 percent interest rate. Docs. [100-11] at 3; [100-13] ("**Principal and Interest Payments**. Borrower shall promptly pay Lender $25,125, on a date not beyond the maturity date stated above."). Ori testified that Epicure was trying to grow the business, but the larger companies were not willing to pay for any product "until it hit their dock." Doc. [100-11] at 2-3. Ori explained that they looked for funding from a "number of sources," but only one company was willing to make a loan to Epicure. *Id.* at 5. According to Ori, that company required a 7.5 percent interest rate and would only let Epicure borrow what they had purchase orders for. *Id.* at 5-6. He explained that Epicure agreed to those terms, but the entity ended up taking Epicure's money without lending it anything. *Id.* at 6. Ori then decided to make the loan himself. *Id.*

On May 29, 2020, Epicure transferred $10,000 to Ori[2] and $10,000 to Reilly. Doc. [112] ¶¶ 66, 84, 85. On June 3, 2020, Epicure also transferred $10,000 to Simmers. *Id.* ¶ 74. The next day, Epicure sent Plaintiff another letter of intent ("June LOI") where it committed to purchase "5mm units of 2oz hand sanitizer, monthly, for the next 90 days." Docs. [112] ¶ 37; [103-2] at 2. In the June LOI, Plaintiff was instructed to "immediately procure the alcohol and the bottles and caps prior to a formal purchase order." *Id.* Ori testified that Epicure understood that it was committing to purchase 5 million units of hand sanitizer at $1.02 per unit, and that it was directing Plaintiff to "immediately procure materials for which Voyant would incur costs." Doc. [112] ¶¶ 40, 42. Plaintiff

---

[2] While the transfer was technically made to Neo Health, Ori's single-member LLC, the parties agree that Ori was the beneficiary of that transfer. Doc. [112] ¶ 63.

"communicated its acceptance of the June LOI, prepared to manufacture [the] 5 million units, and proceeded to secure bottle parts." Doc. [112] ¶ 39.  On June 5, 2020, Epicure transferred $335,000 to a bank account of Ori's Trust. Docs. [112] ¶ 58; [100-14] at 2.  The transfer was labeled "Repayment of Loan" in Epicure's bank statements.  Doc. [100-14] at 2.  A few days later, Epicure followed up the June LOI with a formal purchase order for 1 million bottles. Docs. [112] ¶ 41; [104-1] at 8.  Soon after, Epicure received another loan from Ori's Trust in the amount of $250,000.  Docs. [112] ¶ 59; [100-14] at 2.

On June 25, 2020, Jimenez sent Epicure an email with an attached spreadsheet showing that eight invoices were past due.  Doc. [104-5] at 2-4 ("The invoices shown in RED on the attached are still due to Voyant.").  She also noted that one of the purchase orders would be pushed to September pending a 50 percent down payment. *Id.* at 2.  On July 8, 2020, Epicure transferred $250,000 to Ori's Trust and $25,125 to Neo Health.  Doc. [112] ¶¶ 59, 60.  The entry in Epicure's bank statements for the $250,000 transfer was labeled "Repayment of loan to," and the entry for the $25,125 transfer was labeled "Loan Charge."  Doc. [100-14] at 3.  On July 13, 2020, Epicure transferred $10,000 to each of its members (Ori,[3] Simmers, and Reilly).  Doc. [112] ¶¶ 63, 67, 75, 84, 86.

On July 15, 2020, Partridge sent Ori an email summarizing the number of hand sanitizers shipped and how much Epicure owed.  Doc. [104-6].  Partridge explained to Ori that $473,000 was past due and $1,054,000 was due at the end of the month.  *Id.*  Ori forwarded this email to Reilly and added the following message:  "Heres [sic] the bad news.  Lets [sic] discuss in the morning."  Doc. [104-7].  In August 2020, Ori sent Partridge two emails updating Partridge on Epicure's attempts to pay their outstanding balance.  *See* Docs. [104-8] at 2 ("We are expecting payment tonight/tomorrow and will flip those dollars to you (roughly $40,000).  Realize thats [sic] a drop in the bucket and its [sic] not lost on us.  We are working diligently to sell large chunks of inventory and have several opportunities to do it."); [104-9] at 2 ("Wanted to updated [sic] you on payments briefly.  We have FINALLY gotten notice that Albertsons mailed our check and once received will

---

[3] While the transfer was technically made to Foxhole, the parties agree that Ori was the beneficiary of that transfer.  Doc. [112] ¶ 63.

remit it to Voyant.  Additionally, Dan and I are very close to closing a few large PPE deals that will allow us to put a significant dent in the balance.").

On September 6, 2020, Ori sent Dan and Linda Ragsdale, Epicure's controller, an email that stated, "We also need to distribute funds to the partners this week.  Dan - what do you need to be distributed?  You had indicated $3000.  Is that enough?"  Doc. [110-11] at 2.  Two days later, Epicure transferred $3,000 to each member.  Doc. [112] ¶¶ 68, 76, 84, 87.  This was on the same day that Partridge sent an email to Reilly explaining that the executive team was not willing to discount the product produced and sold to Epicure.  Doc. [116-4] at 3.  Partridge added, "I don't think there's an option other than selling through the 2oz at the discounted price to at least pay some of the receivable.  We're a few months into the shelf-life of the product already, and need to move it."  *Id.*  Reilly responded that the price was "still too high to move the product," and that they are working against quotes for ".64 per 2 oz bottle."  *Id.* at 2.  Partridge wrote back, "Dan – the 2oz product belongs to you.  You can sell it for whatever price you want to sell it it [sic].  I suggest you take the deal and move the product."  *Id.* at 2.

In October 2020, Epicure made two more transfers to Ori, Reilly, and Simmers.  The first transfer was for $10,000 each and took place at the beginning of October.  Doc. [112] ¶¶ 69, 77, 84, 88.  The second transfer was also for $10,000 each and took place on October 23, 2020.  *Id.* ¶¶ 71, 78, 84, 89.  When discussing the distributions, Ori also asked that Linda pay Plaintiff:  "I'd like to pay Voyant some more money ($25,000 to 50,000) and also distribute some money to the ownership.  I'd like to distribute $10,000 per person on top of the Voyant."  Doc. [104-11] at 3.

On November 2, 2020, Ori sent another email updating Partridge on Epicure's attempts to pay their outstanding balance:  "Dan and I are very close to completing PPE deal(s) as well as we have bid out the sanitizer to several groups that are interested in purchasing anything up to everything (2, 8, and 12oz) . . . . I'm going to continue to try to close these deals and pay our liability."  Doc. [104-12].  By November 8, 2020, Epicure had an outstanding balance of $1,420,233.26.[4]  Doc. [104-13].  And on November 24, 2020,

---

[4] In the Second Amended Complaint, Doc. [50] ¶¶ 113-14, and Plaintiff's motion for summary judgment, Doc. [105] at 12, Plaintiff argues that Epicure has accrued an outstanding balance of

Voyant's Senior Vice President sent Ori a letter regarding "Improper Cancellation of Purchase Agreement."  Doc. [104-35] at 3.  The letter stated, in relevant part:

> Voyant Beauty ("Voyant") has been told of Epicure Medical's ("Epicure") intention to not fulfill its purchase and payment obligations in connection with the letter of intent date [sic] June 4 2020 (the "LOI").  As a result of Epicure's commitment and direction to "immediately procure the alcohol and the bottles and cap prior to a formal Purchase Order" as set forth in the LOI, Voyant Beauty has incurred significant costs and is now carrying inventory in the amount of $951,973.  Further, you have failed to pay outstanding invoices in the amount of 1,420,223.  The total amount owed by Epicure to Voyant as of this date remains $2,372,196.

*Id.*

On February 16, 2021, Plaintiff filed this Complaint against Epicure, Foxhole, and Ori, bringing claims for breach of contract, account stated, promissory estoppel, and unjust enrichment.  Doc. [1].  After discovery revealed that Epicure made certain transfers of funds, the Court granted Plaintiff leave to amend the Complaint to assert claims of fraudulent transfer and unjust enrichment against Ori in his capacity as co-trustee of the Ori Trust; Jaclyn Ori in her capacity as co-trustee of the Ori Trust; Dan Reilly; Sarah Simmers; Clover Leaf Strategies, LLC; PFL Investments, LLC; and Neo Health, LLC.  *See* Doc. [49].  The Second Amended Complaint now includes eight counts:

**Count I:** Breach of Contract (against Foxhole and Ori)

**Count II:** Breach of Contract (against Epicure and Ori)

**Count III:** Breach of Contract (against Ori)

**Count IV:** Account Stated (against Epicure and Ori)

**Count V:** Promissory Estoppel (against Foxhole and Ori)

**Count VI:** Promissory Estoppel (against Epicure and Ori)

**Count VII:** Unjust Enrichment (against all Defendants)

**Count VIII:** Fraudulent Transfer (against Epicure, Ori, the Ori Trust, Reilly, Summers, Clover Leaf, PFL, and Neo).

Doc. [50].  Defendants move for summary judgment on Counts I, II, IV, V, and VI, with respect to Ori.  Defendants also move for summary judgment on Counts I (against Foxhole),

---

$1,420,233.36.  But the account statement that Plaintiff submits as evidence shows an outstanding balance of $1,420,223.26.  The Court will assume Plaintiff meant to put $1,420,223.26 in its Second Amended Complaint and briefing.

V (against Foxhole), and VII.  Plaintiff moves for summary judgment on Counts II (against Epicure) and IV.  And the parties filed cross motions for summary judgment on Counts III, VI (against Epicure), and VIII.

## LEGAL STANDARD

A court must grant a motion for summary judgment if it finds, based on the factual record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56.  Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quotation marks omitted).  The burden then shifts to the non-movant to "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'" *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078-79 (8th Cir. 2008)).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:  (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The evidence must be viewed "in the light most favorable to, and making all reasonable inferences for, the nonmoving party." *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 404 (8th Cir. 2013).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).  "'If reasonable minds could differ as to the import of the evidence,' summary judgment is inappropriate." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986)).

## RULE 26 DISCLOSURES

Rule 26(a)(1)(A)(iii) requires a party to provide a "computation of each category of damages claimed by the disclosing party . . . [including] the documents or other evidentiary material . . . on which each computation is based." Such disclosures "must be supplemented when new information comes to light." *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 405 (8th Cir. 2013). "Because Rule 26 is intended to eliminate surprise and promote settlement, courts have held that a 'plaintiff should provide more than a lump sum statement of the damages allegedly sustained.'" *Carmody v. Kansas City Bd. of Police Comm'rs*, 2012 WL 12896525, at *3 (W.D. Mo. Aug. 27, 2012) (quoting *City & Cnty. of San Francisco v. Tutor-Saliba Corp.*, 218 F.R.D. 219, 221 (N.D. Cal. 2003)).

Plaintiff's computation of damages consists of a single sentence: "Pursuant to Fed. R. Civ. P. 26(a)(1)(iii), Voyant claims the following damages: (1) damages in an amount to be proven at trial but no less than $6,420,233.36; (2) the costs and disbursements of this action; (3) attorneys' fees; and (4) such further damages as are just, equitable, and proper." Doc. [100-17] at 5. Defendants assert that Plaintiff's computation fails to satisfy the requirements of Rule 26(a)(1)(A)(iii). The Court agrees. As a sanction, Defendants urge the Court to exclude Voyant's evidence of damages. While the Court has discretion to do so under Rule 37(c)(1), the Court will not impose such a harsh sanction in this particular case. *See Carmody*, 713 F.3d at 405 ("The district court has discretion under Rule 37(c)(1) to apply sanctions against a party who has failed to satisfy initial or supplemental disclosure requirements; for example, excluding the evidence or testimony entirely.").

Plaintiff served its initial disclosures on August 10, 2021. *See* Doc. [100-17]. Instead of promptly raising the issue with Plaintiff or the Court, Defendants raise it for the first time in a motion for summary judgment. The Court will not reward such delay by excluding evidence of Voyant's damages. But the Court will require Plaintiff to provide an updated disclosure regarding damages within seven (7) days of the date of this Order. And if Plaintiff's updated disclosure includes information not previously available to Defendants during discovery, Defendants may raise the issue with the Court.

CHOICE OF LAW

The parties disagree as to which law governs this case, California or Missouri.[5]  For Counts I (Breach of Contract), II (Breach of Contract), V (Promissory Estoppel), and VI (Promissory Estoppel), the outcome is the same whether the Court applies California or Missouri law.  Thus, a conflict-of-laws analysis is not required for those counts, and the Court will apply both California and Missouri law.  *See Interstate Cleaning Corp. v. Com. Underwriters Ins. Co.*, 325 F.3d 1024, 1028 (8th Cir. 2003) ("Under Missouri law, a conflict of laws does not exist 'unless the interests of the two states cannot be reconciled.'" (citing *Brown v. Home Ins. Co.*, 176 F.3d 1102, 1105 (8th Cir. 1999))); *see also Phillips v. Marist Soc. of Washington Province*, 80 F.3d 274, 276 (8th Cir. 1996) ("We agree with the statement of Judge Richard A. Posner that 'before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.'" (quoting *Barron v. Ford Motor Co. of Canada, Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992))).  But for Counts III (Breach of Contract), IV (Account Stated), VII (Unjust Enrichment), and VIII (Fraudulent Transfer), the parties claim, or the Court has found, that the outcome is different based on which law applies.  As such, the Court will undertake a conflict-of-laws analysis for those counts.

I.    **California law applies to Counts III (Breach of Contract), IV (Account Stated), and VII (Unjust Enrichment).**

"The district court must apply the choice-of-law rules of the forum state."  *Interstate Cleaning Corp.*, 325 F.3d at 1028.  "In determining which state's laws should be applied in contract claims, Missouri courts apply the most significant relationship test set forth in Restatement (Second) of Conflict of Laws § 188."  *Zafer Chiropractic & Sports Injuries, P.A. v. Hermann*, 501 S.W.3d 545, 551 (Mo. Ct. App. 2016).[6]  "Section 188(2) lists five factors to

---

[5] Defendants also argue that Plaintiff's failure to plead the governing law in its Second Amended Complaint requires dismissal.  Doc. [99] at 3-4.  In support, Defendants cite cases from other circuits but concede that the Eighth Circuit has not weighed in on this issue.  *Id.* at 4.  Without specific direction from the Eighth Circuit that a complaint must plead the governing law, the Court will not dismiss Plaintiff's Second Amended Complaint on that basis.  If Plaintiff wishes to amend its Second Amended Complaint to plead the governing law, the Court will grant Plaintiff leave to do so.

[6] "An action for unjust enrichment is based on [a] . . . quasi-contractual obligation."  *Royal Forest Condo. Owners' Ass'n v. Kilgore*, 416 S.W.3d 370, 373 (Mo. App. 2013).

10

determine which state has the most significant relationship to the transaction and the parties:  (1) the place of contracting; (2) the place of negotiating of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.*  "Each factor need not be given equal weight."  *Id.* (citing *Sachs Elec. Co. v. HS Const. Co.*, 86 S.W.3d 445, 455 (Mo. Ct. App. 2002)).  "Rather, the court evaluates and weighs these five factors based on their relative importance to the issue before the court."  *Id.*

The parties fail to properly cite the record for the facts relied on in their conflict-of-laws analyses.  Fortunately, they agree that all Defendants except Simmers are citizens of Missouri, and that Plaintiff is a citizen of Delaware and Illinois for diversity purposes.  Doc. [109] ¶¶ 1, 4.  Defendants concede that Plaintiff contracted from California and negotiated its relationship with the parties from California; that Plaintiff manufactured the products in California; and that payments were to be sent to Plaintiff in California.  Doc. [99] at 20-21.  And Plaintiff nowhere disputes that Epicure's payments were to be sent to Plaintiff from Missouri.  *See* Doc. [99] at 20 (Defendants arguing that "payment for goods came from Missouri, as evidenced by Epicure's Missouri bank account statement").  The parties do disagree as to whether the products were tested in California.[7]  *See, e.g.*, Doc. [109] ¶ 3.

Although the parties' relationship spans multiple states, Plaintiff's breach of contract, account stated, and unjust enrichment claims relate to Epicure's failure to make payments to Plaintiff in California for goods manufactured in California.  Because California has a more significant relationship to those claims than any other state, the Court must apply California law.  *See Zafer Chiropractic*, 501 S.W.3d at 552 (although both Kansas and Missouri had a connection to a contract claim, Kansas law applied because the claim "center[ed] on [defendants'] failure to make payments to the [plaintiffs] in Kansas for services provided in Kansas").

## II.    <u>California law also applies to Count VIII (Fraudulent Transfer).</u>

For conflicts of law related to tort claims, Missouri also uses the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws § 145 (1971).

---

[7] Because this dispute is immaterial to which law applies, the Court does not resolve it.

*Zafer Chiropractic*, 501 S.W.3d at 550.  The contacts to be taken into account include the following:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.

*Id.*

 As already noted, all Defendants except Simmers are citizens of Missouri, while Plaintiff is a citizen of Delaware and Illinois for diversity purposes.  The alleged injury occurred in California, but the conduct causing the injury—i.e., the allegedly fraudulent transfers—took place in Missouri.  Docs. [104-18]; [104-19]; [104-20].  And while the parties' relationship spans both states, it is centered in California, where the hand sanitizers—the subject matter of the parties' relationship—were located.  Because the injury occurred in California and the subject matter of the parties' relationship is centered in California, the Court finds that California's relationship to the action is more significant than any other state.  *See Birnstill v. Home Sav. of Am.*, 907 F.2d 795, 797 (8th Cir. 1990) ("Where the place of conduct and the place of injury occur in two different states, Missouri choice of law rules dictate that the place where the act takes harmful effect or produces the result complained of is the more significant contact." (citing *Galvin v. McGilley Memorial Chapels*, 746 S.W.2d 588, 590–91 (Mo. Ct. App. 1987))); *see also Kansas City Star Co. v. Gunn*, 627 S.W.2d 332, 334 (Mo. Ct. App. 1982) ("While the concept of significant contacts or relationships is a complex subject in the choice of law area, the text writers are generally in agreement that when an act operates across a state line, its legal character is determined by the law of the place where it first takes harmful effect or produces the result complained of.").  As such, the Court will apply California law to Count VIII.

DISCUSSION

## I.   <u>Defendants' Motion for Summary Judgment</u>

As set forth below, Defendants are entitled to judgment as a matter of law as to Counts I, II, IV, V, and VI, with respect to Ori.  They have failed to justify summary judgment as to Count I (Foxhole) and Count VII.

12

**A. Summary judgment is granted as to Counts I (Breach of Contract), II (Breach of Contract), IV (Account Stated), V (Promissory Estoppel), and VI (Promissory Estoppel), with respect to Ori.**

In five of its eight counts, Plaintiff seeks to hold Ori responsible on a theory of piercing the corporate veil. Ori argues that he is entitled to summary judgment because "the undisputed evidence shows that [he] did not have complete domination of Foxhole or Epicure." Doc. [99] at 8. Plaintiff responds that it "does not oppose Defendants' motion for summary judgment on the theory of piercing the corporate veil against Lee Ori for [Counts I, II, IV, and VI]." Doc. [108] at 6 n.1. Thus, the Court grants summary judgment for Defendants on Counts I, II, IV, and VI, with respect to Ori.

Plaintiff neglected to respond to Ori's argument regarding Count V. Because "failure to oppose a basis for summary judgment constitutes waiver of that argument," the Court also grants summary judgment for Defendants on Count V, with respect to Ori. *Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009); *see also Thomas v. United Steelworkers Loc. 1938*, 743 F.3d 1134, 1141 (8th Cir. 2014) (collecting cases).

**B. Summary judgment is denied as to Count I (Breach of Contract) against Foxhole.**

In Count I, Plaintiff alleges that it had a contract with Foxhole, "as confirmed by the Foxhole LOI, the LOI POs, and Plaintiff's signed invoices, pursuant to which Foxhole agreed to pay Plaintiff for hand sanitizer bottles, which Plaintiff manufactured and shipped according to prices set forth in Plaintiff's invoices." Doc. [50] ¶ 85. Plaintiff alleges that Foxhole breached the contract when it failed to pay Plaintiff's invoices. *Id.* ¶ 88. Foxhole argues that it is entitled to summary judgment because "the undisputed facts [ ] show that a commercial relationship only ever existed between Voyant and Epicure." Doc. [99] at 16.

"A breach of contract action includes the following essential elements: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Missouri Mil. Acad.*, 304 S.W.3d 98, 104 (Mo. 2010); *see CDF Firefighters v. Maldonado*, 70 Cal. Rptr. 3d 667, 679 (Ct. App. 2008) ("A cause of action for breach of contract requires proof of the following elements: (1) existence of a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and

13

(4) damages to plaintiff as a result of the breach."). "A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." *Jim Lynch Cadillac, Inc. v. Nissan Motor Acceptance Corp.*, 894 S.W.2d 704, 709 (Mo. Ct. App. 1995) (quoting Mo. Stat. Ann. § 400.2–204(1)); *see* Cal. Com. Code § 2204(1) (same). "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." Mo. Stat. Ann. § 400.2–204(3); *see* Cal. Com. Code § 2204(3) (same).

Foxhole argues that there was never a contract between Plaintiff and Foxhole because Plaintiff rejected Foxhole's offer—the March LOI—when it responded by stating it needed an agreement on credit terms, a purchase order, and a downpayment before it would sell and ship the products. *See* Doc. [100-9] ("Let me know on the terms and we can get an official purchase order in for the first 600,000 finished goods. I would need a PO and payment for the first 25% of the 600,000 processed Monday / Tuesday."). But "unless otherwise unambiguously indicated by the language or circumstances, . . . an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." Mo. Stat. Ann. § 400.2–206(1)(a); *see* Cal. Com. Code § 2206(1)(a) (same). And Plaintiff has submitted uncontroverted evidence that Partridge confirmed receipt of the March LOI and told Ori that he "would get the Team on it, the PO's are ready to go first thing in the morning." Doc. [110-2] at 2. Plaintiff then immediately, and before ever inquiring about a downpayment or purchase order, began purchasing the materials ordered in the March LOI. *See* Docs. [110-10] at 5 (Partridge testifying that Foxhole was not required to make any payments before Voyant secured materials to produce the hand sanitizers); [110-6] at 2 ("Bottle company has come back to us. In order to get the pricing for the million 2 oz bottles, I need to take it in full truckloads which is actually 1.2m bottles. I've accepted and adjusted the caps so that they are the same to match."); [110-5] at 2 ("We should have components to support the first 100,000 units on Thursday and into production on Friday. . . [and p]roduction [would] keep flowing from there as the remainder of the components arrive."). While Foxhole emphasizes that Epicure would ultimately send the purchase orders and make the payments, Plaintiff submits evidence that Plaintiff accepted and executed the March LOI before it knew that a

14

different company would fulfill Foxhole's commitment.  Doc. [110-10] at 9 (Partridge confirming that he did not "recall ever discussing with either Mr. Heslin or Mr. Ori or anybody from Epicure, Foxhole that they were going to use a different company than the one that submitted the LOI on March 26th to fulfill their commitment in the LOI").  Indeed, Partridge directed Heslin to submit the LOI in the "legal entity name of the company that will be the customer name we sell to."  Doc. [110-1] at 2.  Without any evidence that Foxhole's obligations were extinguished by some act of either Plaintiff or Epicure, a reasonable jury could infer that the parties intended for both Foxhole and Epicure to be responsible for the payment of the products identified in the March LOI.  Because Plaintiff has presented sufficient evidence for a reasonable jury to conclude that Foxhole accepted the March LOI, summary judgment is denied.

### C.  Summary judgment is denied as to Count VII (Unjust Enrichment).

In Count VII, Plaintiff alleges that "Foxhole, Epicure, and Ori were each enriched by their receipt of hand sanitizer bottles[, and] [t]he value Foxhole, Epicure, and Ori received exceeded the payments Epicure made to Plaintiff."  Doc. [50] ¶¶ 129-30.  Plaintiff further alleges that, "by causing the Epicure Defendants to sell the hand sanitizer bottles without paying Voyant, Ori, the Ori Trust, Reilly, and Simmers were able to keep for themselves $490,000 in distributions."  *Id.* ¶ 131.  Plaintiff claims that "[t]he enrichment the Defendants received was at the expense of Plaintiff[, and] [i]t would be unjust to allow the Defendants to retain the excess benefit they received."  *Id.* ¶¶ 132-33.  Defendants move for summary judgment arguing that "Voyant never identified what benefit was unjustly retained by each defendant." Doc. [99] at 21.

In its section for summary judgment on Plaintiff's unjust enrichment claim, Defendants argue that "[u]njust enrichment . . . actions in Missouri and California have subtle differences that require the Court to determine the applicable law."  *Id.* at 19.  Concluding that Missouri law applies, Defendants then proceed to cite only Missouri law in their argument for summary judgment on Plaintiff's unjust enrichment claim.  *See id.* at 21-22.  But this Court has concluded that California law applies.  And in California, unlike in

Missouri,[8] "there is not a standalone cause of action for 'unjust enrichment.'" *Astiana v. Hain Celestial Grp. Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). Instead, unjust enrichment "describe[s] the theory underlying a claim that a defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion, or request.'" *Id.* (citing *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 699 (Ct. App. 2010))

Rule 56(C)(1) of the Federal Rules of Civil Procedure requires the moving party to show they are entitled to judgment as a matter of law as to each specific claim asserted. By citing only Missouri law, Defendants have failed to meet their burden. As such, Defendants' motion for summary judgment as to Count VII must be denied.

## II.   **Plaintiff's Motion for Summary Judgment**

Plaintiff is entitled to judgment as a matter of law that Defendants are liable under Count II (Breach of Contract), but it has not furnished sufficient evidence to warrant summary judgment as to all of its claimed damages. Count IV (Account Stated) fails as a matter of law.

### A.   Partial summary judgment is granted as to Count II (Breach of Contract).

In Count II, Plaintiff alleges that Epicure breached its contract by failing to pay Plaintiff's invoices and by failing to purchase any of the hand sanitizer bottles requested in the June LOI. Those two alleged breaches require separate analyses.

#### 1.   *The Invoices*

##### a.   Epicure is liable for failure to pay Plaintiff's invoices.

Plaintiff has presented uncontroverted evidence that, in response to the purchase orders submitted by Epicure, it produced and shipped bottles of hand sanitizer to a designated warehouse in California. *See* Docs. [104-1] at 2-7; [103] ¶ 7; [104-3]. Plaintiff has also presented uncontroverted evidence that Epicure failed to pay the invoices as they came due. *See* Docs. [104-13]; [104-7]; [104-27] at 21; [104-8] at 2; [104-9] at 2; [104-12]; [104-35] at 3.

---

[8] To prove unjust enrichment in Missouri, the plaintiff "must show (1) she conferred a benefit and enriched [defendant]; (2) the enrichment was at [defendant's] expense; and (3) it would be unjust for [defendant] to retain the benefit." *Vitello v. Natrol, LLC*, 50 F.4th 689, 695 (8th Cir. 2022).

Epicure attempts to conjure a genuine issue of material fact by arguing that Plaintiff did not perform its contractual obligations.  Doc. [111] at 5.  According to Epicure, Plaintiff did not ship anything because "it maintained possession and control of the [hand sanitizers] by keeping them in its own warehouse."  *Id.*  That argument fails for two reasons.  First, Epicure fails to point to any evidence that Plaintiff was supposed to ship the hand sanitizers to any location other than the California warehouse.  Second, Epicure's own managers and owners contradicted the claim in their depositions.  Both Reilly and Ori confirmed that, once the hand sanitizers were delivered to the California warehouse, they were Epicure's product.  *See* Docs. [104-27] at 14-15 (Ori confirming that Epicure had custody of the hand sanitizers once they were delivered to the California warehouse); [115-2] at 6 (Reilly testifying that "Epicure's product was in California, yes . . . [and it] was considered Epicure's that was paid for.").  Epicure would then pay a trucking company to retrieve the product from the warehouse and deliver it to the customer.  Doc. [104-27] at 14-15; *see also* Doc. [116-4] at 2 ("Dan – the 2oz product belongs to you.  You can sell it for whatever price you want to sell it it [sic].  I suggest you take the deal [for .64 per 2 oz bottle] and move the product.").

Because Epicure has not identified a genuine issue of material fact as to whether Epicure is liable for failure to pay Plaintiff's invoices, Plaintiff is entitled to summary judgment on that issue.

    b.   <u>Plaintiff is entitled to $1,420,233.26 in damages for Epicure's failure to pay Plaintiff's invoices.</u>

Plaintiff claims that Epicure has accrued an outstanding balance of $1,420,233.26 for the finished hand sanitizers.  Doc. [50] ¶ 113.  Under the UCC, a seller may recover, with any incidental damages, the price of goods accepted.  Cal. Com. Code § 2709(1)(a); Mo. Stat. Ann. § 400.2-709(1)(a) (same).  Acceptance of goods occurs when the buyer:

(a) After a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

(b) Fails to make an effective rejection . . . , but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) Does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

Cal. Com. Code § 2606(1); Mo. Stat. Ann. § 400.2-606(1) (same).

Plaintiff has presented evidence that, in response to the purchase orders submitted by Epicure, Voyant produced and shipped bottles of hand sanitizers to the California warehouse, where Epicure acknowledged receipt and sold at least some of the hand sanitizers to its customers. *See* Docs. [104-1] at 2-7; [103] ¶¶ 8-9; [104-6]; [104-3]; [115-2] at 6; [115-1] at 7; [104-27] at 15. In support of its claim that Epicure never objected to the quality, price, or number of finished bottles manufactured and shipped, Plaintiff points to Partridge's declaration and the multiple emails where Ori acknowledged Epicure's outstanding balance. *See* Docs. [103] ¶ 10 (Partridge Declaration: "Epicure did not object to the quality, price, or number of finished bottles manufactured and shipped."); [104-7] (Ori forwarding Reilly the July 15 statement stating, "Heres [sic] the bad news. Lets [sic] discuss in the morning."); [104-8] at 2 ("We are expecting payment tonight/tomorrow and will flip those dollars to you (roughly $40,000). Realize thats [sic] a drop in the bucket and its [sic] not lost on us. We are working diligently to sell large chunks of inventory and have several opportunities to do it."); [104-9] at 2 ("Wanted to updated [sic] you on payments briefly. We have FINALLY gotten notice that Albertsons mailed our check and once received will remit it to Voyant. Additionally, Dan and I are very close to closing a few large PPE deals that will allow us to put a significant dent in the balance."); [104-12] ("Dan and I are very close to completing PPE deal(s) as well as we have bid out the sanitizer to several groups that are interested in purchasing anything up to everything (2, 8, and 12oz) . . . . I'm going to continue to try to close these deals and pay our liability."). Finally, Plaintiff has submitted ample evidence that Epicure did not pay for all the hand sanitizers it ordered and currently owes $1,420,233.26. Docs. [104-6] (July 15, 2020, email from Partridge explaining that $473,000 was past due and $1,054,000 was due at the end of the month); [104-13] (November 18th statement showing a balance of $1,420,233.26); [104-35] at 3 ("Further, you have failed to pay outstanding invoices in the amount of 1,420,233."); s*ee also* Docs. [104-7]; [104-8]; [104-9] at 2; [104-12]. With this evidence, Plaintiff has met its initial burden of showing an absence of genuine dispute as to its claimed damages of $1,420,233.26 for Epicure's failure to pay the invoices.

Epicure's attempts to challenge Plaintiff's damages claim are unavailing. First, Epicure restates its argument that Voyant never shipped the goods. Doc. [111] at 5-6.

According to Epicure, "because Voyant never shipped the goods, the invoices never actually became due." *Id.* at 6.  For the reasons already stated, that argument fails.  Second, Epicure claims that Voyant cannot recover the price because there is no evidence that Voyant attempted to resell any goods.  Doc. [111] at 8-9.  Because Plaintiff has shown that Epicure accepted the goods, the requirement to resell is not applicable.  *See* Cal. Com. Code § 2709(1) ("When the buyer fails to pay the price as it becomes due the seller may recover, . . . the price (a) of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer; and (b) of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing."); Mo. Stat. Ann. § 400.2-709(1) (same).  Epicure points to nothing in the record that creates a genuine dispute as to whether Epicure owes an outstanding balance of $1,420,233.26.[9]  Thus, Plaintiff is entitled to damages in the amount of $1,420,233.26.

    c.   <u>Plaintiff has not established entitlement to incidental damages as a matter of law.</u>

Plaintiff also claims that it is entitled to incidental damages for costs incurred to store and dispose of the finished bottles.  Incidental damages "include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyers' breach, in connection with return or resale of the goods or otherwise resulting from the breach."  Cal. Com. Code § 2710; Mo. Stat. Ann. § 400.2-710 (same).  In support of its claim for incidental damages, Plaintiff points to Partridge's declaration that Plaintiff incurred "costs of $98,172.27 to store the finished bottles Epicure ordered but failed to retrieve" and "costs of $280,825.75

---

[9] Although not in their opposition, Defendants argue in their response to Plaintiff's Statement of Facts that "Epicure's representative sent multiple emails to plaintiff asking why payments were not being applied in accordance with the parties' agreed upon payment terms."  Doc. [112] ¶ 25. Defendants reference an email from June 3, 2020, in which Linda asked Michelle Jimenez at Voyant how the payments were being applied.  Doc. [112-2].  Ragsdale followed up on June 19, 2020, with the following message:  "I just wanted to follow up with you on this now that we've sent another payment for $250,000.  I am really worried about our open invoices not matching the longer we wait on tying this together.  Thanks!"  *Id.*  That email exchange does not create a genuine issue of material fact as to the amount of damages for the unpaid invoices.  Defendants submit no evidence that they disputed the amount owed after Partridge sent the July 15th email explaining that $473,000 was past due and $1,054,000 was due at the end of the month.

to dispose of the finished bottles Epicure ordered but failed to retrieve."  Doc. [103] ¶¶ 12, 23.  That statement provides no basis for a reasonable factfinder to find that such expenses were "commercially reasonable."  And while Plaintiff points to two other exhibits to support its claim, those exhibits do not help.  An invoice from Sooner Express, Inc., shows that Plaintiff owed Sooner $33,674.25 for storage costs—an amount significantly lower than the $98,172.27 Plaintiff claims to be entitled to.  Doc. [104-32].  And while the second exhibit appears to show the number of hand sanitizers Epicure had at the warehouse, the document does not include a date or any information about how long the hand sanitizers had been there.  Doc. [104-34].  Although not cited by Plaintiff, another exhibit submitted by Plaintiff appears to show the number of Epicure's components still on hand as of March 2022 as well as the number of days since the components were last received.  *See* Doc. [104-36].  But even considering that exhibit, Plaintiff has provided no information as to how it determined that its storage and disposal costs were $98,172.27 and $280,825.75, respectively.  Without such information, the Court cannot find that Plaintiff has met its initial burden with respect to incidental damages.  The question of incidental damages will go to the trier of fact.

2. *The June LOI*

a. Epicure is liable for failing to purchase any of the hand sanitizer bottles requested in the June LOI.

Plaintiff also asserts that Epicure breached the June LOI by failing to purchase any of the hand sanitizers requested therein.  Plaintiff has presented uncontroverted evidence that Ori sent a letter of intent committing to purchase "5mm units of 2oz hand sanitizer, monthly, for the next 90 days."  Doc. [103-2]; [112] ¶ 37.  And Ori testified that Epicure understood that it was committing to purchase 5 million units of hand sanitizer at $1.02 per unit, and that it was directing Voyant to "immediately procure materials for which Voyant would incur costs."  *Id.* ¶¶ 40, 42.  It is also undisputed that Plaintiff communicated its acceptance of the June LOI, prepared to manufacture the 5 million units, and proceeded to secure bottle parts.  Doc. [112] ¶ 39.  Plaintiff claims that it "performed its obligations under the June LOI until it was apparent [that] Epicure materially breached the agreement by failing [to make any payment towards the goods ordered in the June LOI]."  Doc. [113] at 13; *see* Docs. [116] ¶ 15 ("Epicure failed to make any payments for the goods ordered in the

June LOI."); [104-35] ("Voyant Beauty ('Voyant') has been told of Epicure Medical's ('Epicure') intention to not fulfill its purchase and payment obligations in connection with the letter of intent date [sic] June 4 2020 (the 'LOI') . . . Voyant Beauty has incurred significant costs and is now carrying inventory in the amount of $951,973.").

Epicure argues that there was no contract for 5 million units based on the June LOI because there was no purchase order for that amount and no initial deposit. According to Epicure, Plaintiff's obligation to perform was triggered only when Epicure submitted a purchase order with a down payment. The Court disagrees. As indicated by the plain text of the June LOI and consistent with Ori's deposition testimony, Epicure agreed to submit purchase orders for 5 million units of hand sanitizers. Thus, Epicure breached the June LOI when it failed to submit purchase orders for the hand sanitizers requested therein. Because Epicure has pointed to no specific evidence that raises a genuine issue of material fact, Plaintiff is entitled to judgment as a matter of law that Epicure is liable for breach of the June LOI.

> b. Damages for Epicure's breach of the June LOI will be determined by the trier of fact.

Plaintiff claims it suffered $5.1 million in damages—the price due under the June LOI—as a result of Epicure's breach. Doc. [105] at 13. But under the UCC, the price of goods can be recovered only if the "seller is unable after reasonable effort to resell [the goods] at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing." Mo. Stat. Ann. § 400.2-709(1)(b); Cal. Com. Code § 2709(1) (same). Voyant has failed to produce any evidence that it attempted to resell the hand sanitizers or that such effort would have been unavailing. Moreover, it does not appear that Voyant finished producing any hand sanitizers for the June LOI. *See* Docs. [112] ¶ 46 ("Voyant also incurred out-of-pocket costs of $46,256.65 to store the bottle *materials* related to the June LOI.") (emphasis added); [104-35] at 3 ("As a result of Epicure's commitment and direction to 'immediately procure the alcohol and the bottles and cap prior to a formal Purchase Order' as set forth in the LOI, Voyant Beauty has incurred significant costs and is now carrying inventory in the amount of $951,973."); [113] at 13 ("Voyant performed its obligations under the June LOI *until* it was apparent Epicure materially breached the agreement by failing to pay.") (emphasis added); [50] ¶ 125 (Plaintiff reasonably relied on Epicure and

Ori's promises to purchase hand sanitizer bottles, by manufacturing and shipping the bottles in response to the Foxhole LOI, the LOI POs, the Individual POs, and by procuring and storing *raw materials in response to the June LOI*.") (emphasis added).  If that is the case, other provisions of the UCC may be applicable for calculating damages.  *See, e.g.*, Cal. Com. Code § 2704(2) ("Where the goods are unfinished an aggrieved seller may in the exercise of reasonable commercial judgment for the purposes of avoiding loss and of effective realization either complete the manufacture and wholly identify the goods to the contract or cease manufacture and resell for scrap or salvage value or proceed in any other reasonable manner."); Mo. Stat. Ann. § 400.2-704(2) (same).  Because Plaintiff has not produced enough evidence to establish the applicable legal standard, much less to eliminate any genuine dispute of material fact, the question of damages for breach of the June LOI will be left for the trier of fact.

### B.  Summary judgment is denied as to Count IV (Account Stated).

Plaintiff also moves for summary judgment on the basis of account stated, seeking a judgment of $1,420,223.26.  According to Plaintiff, the parties "twice agreed on the amounts Epicure owed and [Epicure] made unconditional promises to pay the amounts due on its account:  first, Epicure accepted the invoices without objection; and second, Epicure did not question or object to the July 15, 2020, statement that accounted for all Epicure payments and stated a new amount owed, $1,527,143.36."  Doc. [105] at 12 n. 3.

"The elements of an account stated are: '(1) previous transactions between the parties establishing the relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by the debtor, express or implied, to pay the amount due.'"  *Martini E Ricci Iamino S.P.A.--Consortile Societa Agricola v. Trinity Fruit Sales Co.*, 30 F. Supp. 3d 954, 976 (E.D. Cal. 2014) (quoting *Zinn v. Fred R. Bright Co.*, 76 Cal. Rptr. 663, 665 (Ct. App. 1969)).  "Both parties must assent to the new amount owed in order to create an account stated."  *Id.*  "If a statement is rendered to the debtor, and the debtor does not reply in a reasonable time, the law implies an agreement that the account is correct."  *Id.*  But "a debt which is predicated upon the breach of the terms of an express contract cannot be the basis of an account stated."  *Id.* (citing *Moore v. Bartholomae Corp.*, 159 P.2d 436, 437 (Cal. Ct. App. 1945)).  "Rather, to establish a claim for account stated, a plaintiff must show the existence of a 'new

contract by and under which the parties have adjusted their differences and reached an agreement.'" *Advanced Cleanup Technologies, Inc. v. BP America Inc.*, 2016 WL 67671, at *7 (C.D. Cal. Jan. 4, 2016) (quoting *Gardner v. Watson*, 150 P. 994, 995 (Cal. 1915)) (dismissing plaintiff's account stated claim for failure to state a claim where the plaintiff only sought to recover the amount it claimed was due and owed under the express contracts with the defendants).

Here, Plaintiff seeks to recover $1,420,223.26, which is the same amount it claims to be owed for the finished hand sanitizers under the parties' contract. This is not a case where the parties "adjusted their differences and reached an agreement." *Gardner*, 150 P. at 995. Rather, the sum sought is based on "the original dealings and transactions of the parties." *Id*; *see National Ins. Co. of Hartford v. Expert Automotive Reconditioning, Inc.*, 2013 WL 6190591, at *4 (C.D. Cal. Nov. 24, 2013) (dismissing plaintiff's account stated claim "[b]ecause the sum sought in the alleged account stated is based upon the terms of the insurance contract—'the original dealings and transactions of the parties'"). Because the debt Plaintiff seeks to collect is predicated upon the breach of the terms of an express contract, Plaintiff is not entitled to judgment as a matter of law for its account stated claim.[10] Summary judgment is denied as to Count IV.

III.     **Cross Motions for Summary Judgment**

Defendants are entitled to summary judgment on Counts III and VI.

### A. Ori is entitled to summary judgment as to Count III (Breach of Contract).

Plaintiff brings a breach of contract claim against Ori for failing to pay for the goods and merchandise ordered by Epicure. Doc. [50] ¶ 102. Plaintiff claims that when Ori signed the "Credit Application and Agreement," he agreed to "personally guarantee payment for all goods and merchandise" ordered by the Defendants. *Id*. ¶ 100. Ori argues that he is not personally liable because he signed the Credit Agreement in a representative

---

[10] Under Missouri law, an account stated claim supersedes and merges antecedent causes of action. *See Urb. Painting & Dry Wall Co. v. Sander*, 446 S.W.2d 500, 503 (Mo. App. 1969) ("[W]hen the original debt or balance was acknowledged by the defendant a new cause of action known as an account stated arose between the parties. The amount or balance so agreed upon constitutes a new and independent cause of action, superseding and merging the antecedent causes of action."). Under neither state's law could Plaintiff pursue both causes of action.

capacity on behalf of Epicure.  Both parties move for summary judgment.  *See* Docs. [99]; [105].

"Under California law, in order to resolve the parties' dispute, [the Court] must determine whether it is objectively reasonable to conclude that the parties mutually intended to create a personal guaranty."  *Oncology Therapeutics Network Connection v. Virginia Hematology Oncology PLLC*, 2006 WL 334532, at *4 (N.D. Cal. Feb. 10, 2006).  "The precise meaning of any contract . . . depends upon the parties' expressed intent, using an objective standard."  *Id.* (quoting *ASP Properties Group, v. Fard, Inc.*, 133 Cal. Rptr. 3d 343, 349 (Ct. App. 2005)).

"Where the parties disagree about the meaning of the contract, the Court construes the contract using a two step process."  *Id.*  First, the court determines whether the contract is ambiguous, meaning "it is 'reasonably susceptible' to either of the meanings urged by the parties."  *Id.*  (quoting *Curry v. Moody*, 40 Cal. Rptr. 2d 627, 630 (Ct. App. 1995)).  "In making this determination, the court is not limited to the contract language itself but provisionally receives, without actually admitting, any extrinsic evidence offered by a party which is relevant to show the contract could or could not have a particular meaning."  *Curry*, 40 Cal. Rptr. 2d at 630.

If the Court finds that the contract is "reasonably susceptible to either of the meanings urged by the parties" then the Court "moves on to the second step which is to determine just what the parties intended the contract term to mean."  *Oncology Therapeutics*, 2006 WL 334532, at *5 (quoting *Curry*, 40 Cal. Rptr. 2d at 630).  During the second step, "the Court admits the extrinsic evidence, if any, proffered by each party to aid in interpreting the contract."  *Id.*  (citing *ASP Properties*, 133 Cal. Rptr. 3d at 349).  "If the parties submit no extrinsic evidence, or if the material extrinsic evidence is not in conflict, the Court's construction of the contract is purely a question of law."[11]  *Id.* (citing *ASP Properties*, 133 Cal. Rptr. 3d at 349).  "If, however, the evidence presents a genuine issue of

---

[11] In Missouri, "summary judgment is inappropriate in an action arising out of a contract . . . where the disputed contract language is ambiguous and parol evidence is required to interpret the contract and the parties' intent."  *Zeiser v. Tajkarimi*, 184 S.W.3d 128, 132 (Mo. Ct. App. 2006) (quoting *Northwest Plaza, L.L.C. v. Michael-Glen, Inc.*, 102 S.W.3d 552, 557 (Mo. Ct. App. 2003)).

material fact, that fact issue must be resolved by a jury before the Court can interpret the contract." *Id.*

> 1.  *The Credit Application is ambiguous.*

Plaintiff urges the Court to find that Ori agreed to personally guarantee Epicure's payment obligations.  According to Voyant, Ori's signature on the first signature line bound Epicure as the buyer and Ori as the personal guarantor.  Ori contends, to the contrary, that he signed his name only once in his representative capacity for Epicure, the buyer, and that the second signature line, which he did not sign, was for the personal guarantor.  The Court finds that the Credit Agreement is reasonably susceptible to either of the meanings proffered by the parties.

The Credit Application includes five sections:  Business Information, Officers/Owners Information, Trade References, Bank Information, and Terms and Conditions.  Doc. [100-12].  The first four sections include information related to Epicure.  *Id.*  The last section, Terms and Conditions, states:

> **Buyer hereby agrees** to pay finance charges to Seller at the rate of 1½% per month (18% per annum) on any balance of any sums not paid when due.
>
> It is mutually agreed that if at any time in the opinion of Seller, the financial responsibility of the Buyer becomes impaired, jeopardized, threatened or unsatisfactory, Seller may immediately  temporarily stop work and deliveries and require payment of all sums then due at that time, and also require payment in advance for all remaining sums due and either or both of these actions  shall not constitute a breach of this agreement by  the Seller, and seller may wait to perform the balance of this agreement until the aforementioned payment in full has been received. Payable at Voyant Beauty, 9250 Mason Ave., Chatsworth, CA 91311.
>
> **Buyer hereby agrees** that time shall be of the essence in regard to all payments provided for herein, and if any payment is not made when due. **Buyer agrees** to pay all collection expenses, costs  and attorney fees which may be incurred in the collection or any sums due under this contract. **Buyer hereby also waives** the benefit of any statute of limitation which would outlaw this obligation  and the benefit of any exemption statute, including Section 690 of the Code of Civil Procedure, and such waiver shall apply to any judgment secured thereon.
>
> **The undersigned**, by this credit application agreement, **does continually personally guarantee payment** for all goods and merchandise purchased by the **applicant**.
>
> THE ABOVE INFORMATION IS TRUE AND ACCURATE TO THE BEST OF **OUR** KNOWLEDGE. IT IS **OUR** DESIRE TO OPEN AN ACCOUNT WITH AWARE PRODUCTS AND AGREE TO THE TERMS ABOVE.
>
> **I (THE UNDERSIGNED)** HEREBY GRANT PERMISSION FOR AWARE PRODUCTS TO VERIFY **OUR** BANK AND TRADE REFERENCES.

*Id.* (emphases added).  At the bottom of the Credit Application, there are two signature lines—the first line is labeled "Signature of Applicant," and the second line is labeled "Signature of Co-Applicant."  *Id.*  Ori signed on the first line.  *Id.*  To the left of his signature, Ori printed his name and wrote the word "Member" next to it.  *Id.*  The second signature line was left blank.  *Id.*

The Credit Agreement is ambiguous on its face.  On one hand, the plain language of the personal guaranty clause distinguishes the applicant and the guarantor as separate entities and expressly states that the "undersigned" intends to incur *personal* liability for the goods purchased by the "applicant."  Doc. [100-12].  Ori was also the only "undersigned," and so it would not be "transparently unreasonable" to find that Ori's single signature on the first line operated to (1) bind Epicure as the "Buyer"/ "Applicant," and (2) bind Ori as the personal guarantor.  *Oncology Therapeutics*, 2006 WL 334532, at *6.

On the other hand, the Credit Agreement plainly contemplates that multiple entities are agreeing to be bound.  It lays out obligations for a "Buyer," and then requires "the undersigned" to personally guarantee goods "purchased by the applicant."  And the text immediately following the personal guaranty uses the term "our" several times.  *See Kafka v. Bellevue Corp.*, 999 F.2d 1117, 1123 (7th Cir. 1993) (finding that under California law the letter was ambiguous as to whether the defendant was personally bound, in part because the letter used "the term 'we', rather than 'me' or 'I'").  That multiple entities would be bound by the agreement is also consistent with the use of two signature lines.  Thus, although the signature lines are identified as "Applicant" and "Co-Applicant," it would be reasonable to conclude that the first signature line was for the "Buyer" / "Applicant," and the second for the personal guarantor.  On that interpretation, Ori did sign the Credit Agreement only on behalf of Epicure, the "Buyer"/ "Applicant."

The extrinsic evidence available does not eliminate the ambiguity.  The only extrinsic evidence that Plaintiff submits in support of its position is Ori's deposition testimony, where Ori confirmed that he understood by signing the Credit Agreement, he was agreeing to its terms.  Doc. [104-27] at 13.  In support of his interpretation, Ori submits his deposition testimony where he testified that he did not understand that he was personally guaranteeing payment by signing the Credit Agreement.  Doc. [110-8] at 7.  And Partridge confirmed that no one discussed with Ori that by signing the Credit Application,

Ori was personally guaranteeing payment for all goods and merchandise purchased by Epicure. Doc. [110-10] at 14. Ori also points out that he wrote "Member" next to his name on the Credit Application, *see* Doc. [100-12], suggesting that he meant to sign only in his representative capacity as a "member" of Epicure. Doc. [99] at 11.

Because the contract is reasonably susceptible to either of the meanings proffered by the parties, the Court moves to the second step where it "admit[s] all the extrinsic evidence and proceed[s] to determine whether plaintiff presents a genuine issue of material fact with respect to the parties' intentions as expressed in the terms of the contract or whether [the Court] interpret[s] the contract as a matter of law." *Oncology Therapeutics*, 2006 WL 334532, at *7.

> *2. There was no mutual intention to create a personal guaranty.*

In the second step, the Court begins by recognizing that "California law creates two presumptions in favor of a finding that the [Credit Agreement] did not create a personal guaranty . . . ." *Id.* First, there is a presumption "that an agent of a disclosed principal does not bind himself individually absent clear evidence that the parties intended to do so." *Id.* (quoting *Heringer v. A.G. Schumacher*, 263 P. 550, 552 (Cal. Ct. App. 1928)). Second, "agreements to guaranty the debt of another are 'strictly construed so as not to impose a burden not contained in or clearly inferable from the language of the contract.'" *Id.* at *8 (quoting *Airlines Reporting Corp. v. U.S. Fidelity and Guaranty Co.*, 37 Cal. Rptr. 2d 563, 567 (Ct. App. 1995)). Thus, to survive summary judgment, Plaintiff must point to evidence from which a trier of fact could conclude by "'clear and explicit evidence' that both [Plaintiff] and [Ori] mutually intended to impose personal liability." *Id.* Plaintiff has produced no such evidence.

As noted above, the Credit Agreement is ambiguous on its face. It would be reasonable to conclude that the person who signs on the "Applicant" line is agreeing to the credit terms and to act as the personal guarantor. But it would also be reasonable to conclude that the first line is for the applicant, and that the personal guarantor is supposed to sign on the "Co-Applicant" line. Given the ambiguity, no reasonable jury could find that the Credit Agreement, by itself, provides "clear and explicit evidence" that Voyant and Ori mutually intended to impose personal liability.

And the only relevant extrinsic evidence suggests that the parties did not intend to impose personal liability. *See* Docs. [110-8] at 7 (Q: "And you understood when you signed this that you were personally guaranteeing payment for all goods and merchandise purchased by Epicure?" A: (By Ori) "I did not."); [110-10] at 14 (Partridge confirming that no one discussed with Ori that by signing the Credit Application, he was personally guaranteeing payment for all goods and merchandise purchased by Epicure); [100-12] (Ori's signature with the word "Member" next to his name); *see also Oncology Therapeutics*, 2006 WL 334532, at *9 ("While it is true that the placement by an agent of his title after his name does not necessarily prevent a finding that the agent is personally liable on the contract, the addition of 'words descriptio personae' 'is significant in connection with other facts.'" (quoting *Heringer* 263 P. at 552)); *Kafka*, 999 F.2d at 1123 (7th Cir. 1993) (concluding that California case law "leave[s] open the possibility that if the contract is ambiguous, the corporate title may sway the balance in determining who was bound"). Plaintiff "submits no extrinsic evidence even that it was [Plaintiff's] intent to create a personal guaranty—much less that [Ori] reasonably should have understood that [Plaintiff] intended to do so." *Oncology Therapeutics*, 2006 WL 334532, at *11. "Finally, [the Court] note[s] that if, at this juncture, the ambiguity were not otherwise resolved, California rules of contract construction would require [the Court] to construe unresolved ambiguity against the drafter—in this case, [Plaintiff]." *Id.* at 12.

Because a trier of fact could not reasonably conclude that Plaintiff has proven by "clear and explicit evidence that both [Plaintiff] and [Ori] mutually intended to impose personal liability," *id.* at *8, the Court finds that, as a matter of law, the Credit Agreement does not create a personal guaranty by Ori. Defendants are entitled to summary judgment on Count III.

### B. Epicure is entitled to summary judgment as to Count VI (Promissory Estoppel against Epicure), but Foxhole is not entitled to summary judgment as to Count V (Promissory Estoppel against Foxhole).

Plaintiff and Defendants both move for summary judgment on Plaintiff's promissory estoppel claim against Epicure. Defendants also move for summary judgment on Plaintiff's promissory estoppel claim against Foxhole. In Count V, Plaintiff alleges that it "reasonably relied on Ori and Foxhole's promise to purchase hand sanitizer bottles, by manufacturing

and shipping the bottles in response to the Foxhole LOI and the LOI POs."  Doc. [50] ¶ 119. And in Count VI, Plaintiff alleges that it "reasonably relied on Epicure and Ori's promises to purchase hand sanitizer bottles, by manufacturing and shipping the bottles in response to the Foxhole LOI, the LOI POs, the Individual POs, and by procuring and storing raw materials in response to the June LOI."  *Id.* ¶ 125.

 "A claim of promissory estoppel has four elements: (1) a promise; (2) on which a party relies to his or her detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure."  *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. 2007); *see also Fleet v. Bank of America N.A.*, 178 Cal. Rptr. 3d 18, 26 (Ct. App. 2014) ("The elements of a cause of action for promissory estoppel are (1) a promise, (2) the reasonable expectation by the promisor that the promise will induce reliance or forbearance, (3) actual reliance or forbearance, and (4) the avoidance of injustice by enforcing the promise.").  "However, the remedy of promissory estoppel is not available when an unambiguous contract exists that covers the issue for which damages are sought."  *Hamra v. Magna Grp., Inc.*, 956 S.W.2d 934, 939 (Mo. Ct. App. 1997); *see also Fleet*, 178 Cal. Rptr. 3d at 26-27 ("A cause of action for promissory estoppel is a claim in equity that substitutes reliance on a promise for consideration 'in the usual sense of something bargained for and given in exchange.'  If actual consideration was given by the promisee, promissory estoppel does not apply." (internal citations omitted)).

Because there are enforceable contracts between Epicure and Plaintiff as to the purchase orders and the June LOI, the remedy of promissory estoppel is not available.  Thus, the Court grants Epicure's motion for summary judgment as to Count VI.  But there remains a genuine dispute of material fact as to whether Plaintiff had an enforceable contract with Foxhole.[12]  *See supra* Section I.B.  The Court denies Defendants' motion for summary judgment on Count V.

---

[12] Foxhole relies heavily on *Clevenger* and *Zipper v. Health Midwest*, 978 S.W.2d 398 (Mo. Ct. App. 1998), to support its argument that Plaintiff has failed to show that injustice can be avoided only by enforcement of the promise.  *See Zipper*, 978 S.W.2d at 412 ("Generally, equity will not intercede if an adequate remedy at law exists.").  But in *Clevenger* and *Zipper*, the parties were seeking money damages, not specific enforcement of a promise.  By contrast, Plaintiff is seeking specific enforcement of Foxhole's promise to pay for the finished hand sanitizers.

**C.  Neither party is entitled to summary judgment on Count VIII.**

In Count VIII, Plaintiff asserts that the following transfers were fraudulent and should be avoided to satisfy Defendants' obligations to Voyant.

Distribution Transfers

- Epicure to Ori
    - May 29, 2020: $10,000 (Doc. [112] ¶ 66)
    - July 13, 2020: $10,000 (*Id.* ¶ 67)
    - September 8, 2020: $3,000 (*Id.* ¶ 68)
    - October 1, 2020: $10,000 (*Id.* ¶ 69)
    - October 23, 2020: $10,000 (*Id.* ¶ 71)
- Epicure to Simmers
    - June 3, 2020: $10,000 (*Id.* ¶ 74)
    - July 13, 2020: $10,000 (*Id.* ¶ 75)
    - September 8, 2020: $3,000 (*Id.* ¶ 76)
    - October 2, 2020: $10,000 (*Id.* ¶ 77)
    - October 23, 2020: $10,000 (*Id.* ¶ 78)
- Epicure to Reilly
    - May 29, 2020: $10,000 (*Id.* ¶¶ 84, 85)
    - July 13, 2020: $10,000 (*Id.* ¶¶ 84, 86)
    - September 8, 2020: $3,000 (*Id.* ¶¶ 84, 87)
    - October 2, 2020: $10,000 (*Id.* ¶¶ 84, 88)
    - October 23, 2020: $10,000 (*Id.* ¶¶ 84, 89)

Ori Trust Transfers

- Epicure to Ori's Trust[13]
    - June 5, 2020: $335,000 (*Id.* ¶ 58)

July 8th Transfer

- Epicure to Ori

---

[13] In its briefing, Plaintiff asserts that a $250,000 transfer to Ori's Trust was also fraudulent and should be avoided to satisfy Defendants' obligations to Plaintiff.  Doc. [105] at 10.  Because it did not raise that transfer in the Second Amended Complaint, Plaintiff cannot rely on it now.  *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) (plaintiff cannot "expand his claims in his brief").  The Court will not consider that transfer for purposes of Count VIII.

▪ July 8, 2020: $25,125 (*Id.* ¶ 60)

Under California's Uniform Voidable Transactions Act, "[a] claim in the nature of a claim under this chapter is governed by the local law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred." Cal. Civ. Code § 3439.10(b). "A debtor that is an organization and has only one place of business is located at its place of business." § 3439.10(a)(2). Because Epicure's one place of business is in Missouri, *see* Doc. [109] ¶ 4, the Court applies Missouri law. *See F & W Lawn Care and Landscaping, Inc. v. Cozart*, 2024 WL 5202743, at *5-7 (M.D. Fl. Dec. 23, 2024) (first applying Florida's choice-of-law rules to conclude that California law applies, then applying California UVTA's governing law provision to find that California law applies because the debtor was located in California at the time of the transfer); *Airborne Am., Inc. v. Kenway Composites*, 554 F. Supp. 3d 1066, 1071 n.8 (S.D. Cal. 2021) (plaintiff had properly alleged its claims under Maine's Uniform Fraudulent Transfer Act because the debtor had its principal place of business in Maine).

Under Missouri's Uniform Fraudulent Transfer Act, a transfer may be deemed fraudulent through a showing of actual fraud or constructive fraud. Mo. Stat. Ann. § 428.024. To establish actual fraud, Plaintiff must show that a transfer was made "with actual intent to hinder, delay, or defraud any creditor of the debtor." § 428.024.1(1). "There rarely is direct evidence of actual intent, but '[i]t has always been held that fraud may be proven by circumstantial evidence, if that evidence affords a clear inference of fraud, and amounts to more than a mere suspicion or conjecture.'" *Konopasek v. Konopasek*, 683 S.W.3d 250, 258 (Mo. 2023) (quoting *Herrold v. Hart*, 290 S.W.2d 49, 55 (Mo. 1956)). "[A] concurrence of circumstances, or of 'badges of fraud,' may warrant an inference of fraud, although each such circumstance may, in itself, be trivial." *Id.* (alteration in original) (citing *Herrold*, 290 S.W.2d at 55). "The badges of fraud . . . are recognized evidentiary facts a plaintiff may use to establish the ultimate fact—the debtor's actual intent to hinder, delay, or defraud creditors." *Id.* at 259. The Supreme Court of Missouri has recognized "several facts or circumstances . . . as indicia or 'badges' of fraud, including:

A conveyance in anticipation of suit; a conveyance to near relatives; inadequacy of consideration; unusual clauses in instruments or unusual methods of transacting business; transfer of all or nearly all of a debtor's property; insolvency; retention of

31

possession by the debtor; the failure to produce available explanatory or rebutting evidence when the circumstances attending the transfer are suspicious.

*Id*. at 258.  The UFTA also codifies a "non-exhaustive list of such 'factors' that 'may' be considered in determining a debtor's actual intent."  *Id*. at 259 (Mo. Stat. Ann. § 428.024.2).  Those factors include:

(1) Whether the transfer or obligation was to an insider.

(2) Whether the debtor retained possession or control of the property transferred after the transfer.

(3) Whether the transfer or obligation was disclosed or concealed.

(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5) Whether the transfer was of substantially all the debtor's assets.

(6) Whether the debtor absconded.

(7) Whether the debtor removed or concealed assets.

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

*Id*. at 258-59.  Under the UFTA, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."  § 428.014.1.  "A debtor who is generally not paying his debts as they become due is presumed to be insolvent."  § 428.014.2.

As for constructive fraud, Plaintiff must show the debtor made a transfer without receiving a "reasonably equivalent value in exchange for the transfer or obligation." § 428.024.1(2).  In addition, Plaintiff must show that the debtor either (1) "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," or (2) "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."  *Id*.

Plaintiff asserts that the Distribution Transfers, the Ori Trust Transfer, and the July 8th Transfer were made with actual intent to hinder, delay, or defraud Plaintiff.  Plaintiff also claims that, at a minimum, the transfers were constructively fraudulent.[14]  Plaintiff moves for summary judgment on both theories.  Defendants move for summary judgment only on the basis that the transfers were not made with actual intent to hinder, delay, or defraud Plaintiff.  *See* Doc. [114] at 10 (Defendants not disputing that they did not move for summary judgment on the basis of constructive fraud).

> 1.  *Neither party is entitled to summary judgment on Plaintiff's fraudulent transfer claim, to the extent such a claim is based on actual fraud.*

In support of its claim that the Distribution Transfers were fraudulent, Plaintiff asserts that the Distribution Transfers were made with actual intent to hinder, delay, or defraud Plaintiff based on the presence of five badges of fraud:  (1) the transfers were made to insiders; (2) the transfers were of substantially all the debtor's assets; (3) the value received by Epicure was not reasonably equivalent to the value of the transfers; (4) the transfers occurred shortly before or shortly after a substantial debt was incurred; and (5) Epicure was insolvent or became insolvent shortly after the transfers were made or the obligation was incurred.  Doc. [105] at 15-18.  Defendants concede that the Distribution Transfers were made to insiders but contend that the other badges of fraud lack evidentiary support.

The record discloses several badges of fraud.  It is uncontested that the Distribution Transfers were made to insiders.  And although Defendants argue that the Distribution Transfers were made to compensate Ori, Simmers, and Reilly for work, Plaintiff points to evidence that the transfers were in fact ownership distributions consistent with the members' ownership shares.  For example, Simmers received the same amount as Ori and Reilly even though she had another full-time job.  Doc. [115-3] at 6-8.  Plus, Ori referred to

---

[14] Defendants argue that Plaintiff's Second Amended Complaint did not allege constructive fraud, but they cite no authority requiring Plaintiff to use the words "constructive fraud" in its Complaint. Plaintiff's Second Amended Complaint includes sufficient factual allegations to plausibly allege constructive fraud:  Epicure did not receive reasonably equivalent value for the transfer, Doc. [50] ¶ 143; Epicure's assets at the time of the transfers were "unreasonably small in relation to the business in which it was engaged," *id.* ¶ 139; and "at the time of these transfers, the Defendants knew that Epicure would incur debts beyond its ability to pay them when they came due," *id.* ¶ 140.

the transfers as "distributions to ownership," and they were reported as "distributions" on Epicure's Statement of Cash Flow and Schedule K-1s.  Docs. [110-11] at 2 ("We also need to distribute funds to the partners this week."); [104-11] ("I'd like to pay Voyant some more money ($25,000 to 50,000) and also distribute some money to the ownership.  I'd like to distribute $10,000 per person on top of the Voyant."); [104-15] at 4 (Epicure's Statement of Cash Flows characterizing the Distribution Transfers as "distributions"); [104-16] (Epicure's Schedule K-1 showing that the Distribution Transfers were reported to the Internal Revenue Service as "distributions"); [104-17] (same).

Plaintiff also presents evidence that the Distribution Transfers occurred shortly before or after a substantial debt was incurred.  Epicure made the first $10,000 transfer to each member shortly after Epicure submitted purchase orders for millions of hand sanitizers and right before it submitted the June LOI.  Docs. [112] ¶¶ 21, 66, 74, 84, 85; [104-1] at 2-7; [112] ¶ 37; [103-2] at 2.  A month later, just two days before Partridge told Ori that $473,000 was past due and $1,054,000 was due at the end of the month, Epicure transferred another $10,000 to each member.  Docs. [104-6]; [112] ¶¶ 67, 75, 84, 86.  And as Epicure's debt continued to grow, it made two more $10,000 transfers as well as one $3,000 transfer to each member.  Doc. [112] ¶¶ 68, 69, 71, 76-78, 84, 87-89.  Within weeks of the last Distribution Transfer, Epicure's outstanding balance had reached $1,420,223, and it had failed to fulfill its purchase and payment obligations in connection with the June LOI.  Docs. [104-13]; [104-35] at 3.

Finally, Plaintiff points to evidence that Epicure was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.  "A debtor who is generally not paying his debts as they become due is presumed to be insolvent." § 428.014.2.  Epicure fell behind on its payment starting around June 25, 2020.  Docs. [104-5]; [104-6] at 2.  Thus, a reasonable jury could find that it became insolvent shortly after the first Distribution Transfer on May 29, 2020, and June 3, 2020, and that it already was insolvent when it made the other four between July 2020 and October 2020.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find the following badges of fraud:  (1) the Distribution Transfers were made to insiders; (2) the value received by Epicure was not reasonably equivalent to the value of the Distribution Transfers; (3) the Distribution Transfers occurred shortly before or shortly

after a substantial debt was incurred; and (4) Epicure was insolvent or became insolvent shortly after the Distribution Transfers were made or the obligation was incurred.[15]  This is sufficient evidence for a reasonable jury to find that the Distribution Transfers were made with actual intent to hinder, delay, or defraud.

However, viewing the evidence in the light most favorable to Defendants, a reasonable jury could also find that the Distribution Transfers were not made with such an intent.  It is undisputed that Epicure generated $3,468,906.47 in sales in 2020, while the Distribution Transfers amounted to only $129,000 and took place over a period of five months.  Doc. [109] ¶ 47.  Ori testified that "100 percent of [his and Dan's] attention was devoted to Epicure," and that the members "took very bare minimum distributions to essentially support [their] life, to live off of."  Doc. [104-27] at 19; *see also* [110-11] at 2 (email from Ori stating, "We also need to distribute funds to the partners this week.  Dan - what do you need to be distributed?  You had indicated $3000.  Is that enough?").  It is also undisputed that the Distribution Transfers stopped in October 2020, before Epicure received the "Improper Cancellation of Purchase Agreement" letter demanding payment for the outstanding balance and informing Epicure that Plaintiff would "pursue all available rights and remedies in order to collect the past due balance."  Doc. [104-35] at 3.  Ori testified that Epicure's commitment to pay "was not taken lightly."  Doc. [104-27] at 21.  He explained that the members committed to paying Plaintiff "substantially all money that was collected in order to remove . . . [Epicure's] debt," and even committed to paying Plaintiff "from other revenue sources such as PPE or any other thing that Epicure would do to generate revenue."  Doc. [104-27] at 21; *see* Doc. [104-12] (November 2, 2020, email from Ori to Partridge:  "Dan and I are very close to completing PPE deal(s) as well as we have bid out the sanitizer to several groups that are interested in purchasing anything up to everything (2, 8, and 12oz) . . . . I'm going to continue to try to close these deals and pay our

---

[15] Plaintiff also claims that the Distribution Transfers amounted to substantially all of Epicure's assets because "Epicure's average monthly balances of its checking account was $136,409.41 between March 2020 and January 2021, and Epicure has no other assets."  Doc. [105] at 15-16.  But Plaintiff may not just group all the transfers together and compare the total to an average monthly balance.  Instead, Plaintiff would have to demonstrate that each transfer, at the time it was made, amounted to substantially all of Epicure's assets.  Because Plaintiff has not done that, it has not submitted sufficient evidence for a reasonable factfinder to find that additional badge of fraud.

liability."). Finally, there is undisputed evidence that, on October 22, 2020, the day before the last Distribution Transfer, Epicure had $152,040.86 in its operating account. Doc. [100-14] at 6. The next day, Epicure paid $30,000 in ownership distributions and paid $50,000 to Voyant. *See* Doc. [104-11] ("I'd like to pay Voyant some more money ($25,000 to 50,000) and also distribute some money to the ownership. I'd like to distribute $10,000 per person on top of the Voyant."); [100-14] at 6. As Defendants point out, had "[D]efendants really wanted to harm Voyant, one would expect them to distribute [to ownership] all [the] funds." Doc. [99] at 24.

"At the summary judgment stage, the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Quick*, 90 F.3d at 1377-78 (citing *Anderson*, 477 U.S. at 249). "Rather, the court's function is to determine whether a dispute about a material fact is genuine, that is, whether a reasonable jury could return a verdict for the nonmoving party based on the evidence." *Id.* at 1378 (citing *Anderson*, 477 U.S. at 248). Because "reasonable minds could differ" as to whether the Distribution Transfers were made with actual intent to hinder, delay, or defraud, both motions for summary judgment as to that question are denied. *Id.* at 1378 (citing *Anderson*, 477 U.S. at 250).

Reasonable minds could also differ as to whether the Ori Trust Transfer and the July 8th Transfer were made with actual intent to hinder, delay, or defraud. There is no dispute that Ori loaned $335,000 to Epicure on May 8, 2020. Docs. [109] ¶ 34; [100-11] at 4; [100-13]. The loan had a maturity date of August 7, 2020, and an interest rate of 7.5 percent. Docs. [109] ¶ 35; [100-13]. Plaintiff argues that this "short-term, usurious loan[ ][16][ ] did not provide value to Epicure; instead, [it] served as a mechanism for Ori to extract

---

[16] A loan is usurious under Missouri law if it charges more than the maximum interest rate. *MM Fin., LLC v. Rose*, 649 S.W.3d 29, 32 (Mo. Ct. App. 2022). "Under section 408.030.1, the maximum annual interest rate that a lender may charge in Missouri is ten percent or the 'market rate,' which is calculated according to long-term U.S. government bond yields." *Id.* While a 7.5 percent interest rate for a 3-month loan is more than an annual rate of 10 percent, Plaintiff has not provided the market rate at the time of the loan. Because it would not affect the disposition of any issue presently before the Court, the Court need not determine the market rate.

additional funds from Epicure."[17]  Doc. [105] at 17.  Viewing the evidence in the light most favorable to Plaintiff, the Court finds that a reasonable jury could reach that conclusion. There is evidence that Epicure repaid Ori, an insider, on June 5, 2020—two months before the loan's maturity date and just one day after Epicure committed to purchasing 5 million more hand sanitizers.  Docs. [109] ¶ 38; [100-14] at 2; [100-13]; [103-2] at 2.  Then, on July 8, 2020—just two months after Ori made the loan and when Epicure had already begun to fall behind on its payments to Plaintiff—Epicure decided to pay Ori $25,125 in interest. Docs. [109] ¶ 39; [100-14] at 3; [104-5]; [104-6] at 2.  Given the high interest rate, the timing of the payments, and the fact that the payments were made to an insider, a reasonable jury could find that the Ori Trust Transfer and the July 8th Transfer were made with actual intent to hinder, delay, or defraud.

Viewing the evidence in the light most favorable to Defendants, however, a reasonable jury could find the opposite—i.e., that the Ori Trust Transfer and the July 8th Transfer were not made with fraudulent intent.  Ori testified that Epicure needed capital to grow its business and that the only entity willing to loan money to Epicure required a 7.5 percent interest rate and would let Epicure borrow only what it had purchase orders for. Doc. [100-11] at 5-6.  Epicure agreed to the terms, but the entity failed to lend the money, so Ori decided to make the loan himself.  *Id*. at 6.  Epicure then repaid Ori the exact amount he loaned and the exact amount of interest the parties agreed to.

Again, at this stage, the Court must not weigh evidence or make credibility determinations.  *Quick*, 90 F.3d at 1377-78 (citing *Anderson*, 477 U.S. at 249).  Because both parties have come forward with evidence from a which a reasonable jury could find in their favor, summary judgment is inappropriate, and the parties' motions are denied.

---

[17] To the extent Plaintiff asks the Court to render the interest paid void on the basis that the loan is usurious, the Court notes that the statute setting the maximum rate provides that, "[i]f a rate of interest greater than permitted by law is paid, the person paying the same or his legal representative may recover twice the amount of the interest thus paid."  § 408.030.2.  Thus, the borrower can bring an action to recover the interest.  Plaintiff has not provided—nor has the Court found—any case law suggesting that a creditor in Plaintiff's position has standing to request that the Court void the interest paid by a borrower on the basis that the loan is usurious.

2. *Plaintiff is not entitled to summary judgment on its fraudulent transfer claim under a constructive fraud theory.*

To succeed on a constructive fraud theory, Plaintiff must first show that Epicure made a transfer without receiving "reasonably equivalent value in exchange for the transfer or obligation." § 428.024.1(2). Plaintiff presents evidence that Epicure did not receive reasonably equivalent value from the Distribution Transfers because the transfers "were made to insiders for the sole purpose of benefiting the beneficial owners." Doc. [105] at 16; *see Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp.*, LLC, 2020 WL 4819416, at *51 (W.D. Mo. May 26, 2020) (finding that transfers made for the sole purpose of benefitting insiders did not qualify as providing reasonably equivalent value); Docs. [110-11] at 2 ("We also need to distribute funds to the partners this week."); [104-11] ("I'd like to pay Voyant some more money ($25,000 to 50,000) and also distribute some money to the ownership. I'd like to distribute $10,000 per person on top of the Voyant."); [104-16] (Epicure's Schedule K-1 showing that the Distribution Transfers were reported to the Internal Revenue Service as "distributions"); [104-17] (same).

Defendants respond with evidence that the Distribution Transfers were made to compensate Epicure's members for services provided. Simmers testified that she handled infrastructure; Ori handled business development and procurement; and Reilly handled sales. [104-28] at 35. And Ori testified that "100 percent of [his and Dan's] attention was devoted to Epicure." Docs. [104-27] at 19. Plaintiff counters that Simmers received the same amount as Ori and Reilly even though she had a full-time job as a pharmacist. Doc. [104-28] at 19-20. According to Plaintiff, "[t]he only reasonable inference is that the Distribution Transfers were made, not to compensate Ori, Simmers, and Reil[l]y for work they did, but to pay them ownership distributions." Doc. [113] at 19. The Court disagrees. At the stage, the Court must draw all reasonable inferences in favor of the non-moving party. A trier of fact could reasonably infer that Epicure's transfer of $43,000 to Ori, Reilly, and Simmers over a five month period represented the reasonably equivalent value of the services each one of them provided. Thus, Plaintiff is not entitled to summary judgment on the Distribution Transfers under a theory of constructive fraud.

Plaintiff is also not entitled to summary judgment on the Ori Trust Transfer and the July 8th Transfer. Ori was repaid the same amount he loaned. And the July 8th transfer

was based on the interest rate agreed to in the promissory note.  *See* § 428.019 ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied.").  Even assuming the loan was usurious, Plaintiff has cited no case law holding that a debtor does not receive reasonably equivalent value when it is charged an interest rate higher than the maximum rate.  Moreover, Defendants have presented testimony that the amount was based on the interest rate offered by the only other company willing to lend to Epicure.  Doc. [100-11] at 5-6.  Because Defendants have raised a genuine issue of material fact as to whether Epicure received reasonably equivalent value in exchange for the Ori Trust Transfer and July 8th Transfer, summary judgment is denied.

## IV.    Attorneys' Fees

The Court defers ruling on any attorneys' fees or collection efforts Plaintiff believes it is entitled to.  *See* Doc. [105] at 19 ("If the Court issues a judgment, Plaintiff respectfully seeks an opportunity to supplement this submission with further details of fees and costs incurred by Voyant in connection with its collection efforts.").

### CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment is granted in part and denied in part, and Defendants' Motion for Summary Judgment is granted in part and denied in part.  Plaintiff is entitled to partial summary judgment as to Plaintiff's breach of contract claim against Epicure.  Defendants are entitled to summary judgment as to Plaintiff's breach of contract claims against Ori (Counts I, II, and III); Plaintiff's account stated claim against Ori (Count IV); and Plaintiff's promissory estoppel claims against Ori and Epicure (Counts V and VI).  The following claims remain:  breach of contract against Foxhole; breach of contract against Epicure (incidental and June LOI damages only); account stated against Epicure; promissory estoppel against Foxhole; unjust enrichment against all Defendants; and fraudulent transfer against Epicure, Ori, the Ori Trust, Reilly, Summers, Clover Leaf, PFL, and Neo.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, Doc. [101], is **GRANTED IN PART AND DENIED IN PART**, as set forth herein.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment, Doc.

[98], is **GRANTED IN PART AND DENIED IN PART**, as set forth herein.

    **IT IS FINALLY ORDERED** that Plaintiff shall provide Defendants with an updated computation of damages within seven (7) days of the date of this Order.  *See* Rule 26(a)(1)(A)(iii).

    A separate Judgment shall accompany this Memorandum and Order.

    Dated this 31st day of March, 2025.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE